UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION


IMPERIUM IP HOLDINGS (CAYMAN) :        DOCKET NO. 4:14CV371
                               :
VS.                            :        SHERMAN, TEXAS
                               :        JANUARY 29, 2016
SAMSUNG ELECTRONICS CO.        :        9:00 A.M.

                    PRETRIAL HEARING
          BEFORE THE HONORABLE AMOS L. MAZZANT,
              UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:              MR. ALAN MICHAEL FISCH
                                MR. ROY WILLIAM SIGLER
                                MR. JOHN T. BATTAGLIA
                                MR. JEFFREY SALTMAN
                                FISCH SIGLER
                                5301 WISCONSIN AVENUE NW
                                FOURTH FLOOR
                                WASHINGTON, DC  20015

                                MR. DAVID MICHAEL SAUNDERS
                                MR. S. DESMOND JUI
                                MR. SRULI YELLIN
                                FISCH SIGLER
                                96 N. THIRD STREET, SUITE 260
                                SAN JOSE, CA  95112

                                MS. SILVIA JORDAN
                                FISCH SIGLER
                                505 EIGHTH AVE, 12TH FLOOR
                                NEW YORK, NY  10018


FOR THE DEFENDANT:              MR. JESSE J. JENNER
                                MR. CHRISTOPHER JOHN HARNETT
                                MR. STEVEN PEPE
                                MR. KEVIN JOHN POST
                                MR. ALEXANDER ERNEST MIDDLETON
                                ROPES & GRAY
                                1211 AVENUE OF THE AMERICAS
                                NEW YORK, NY  10036

```
 1                              MR. SAMUEL LAWRENCE BRENNER
                                MR. SCOTT STEPHEN TAYLOR
 2                              ROPES & GRAY
                                PRUDENTIAL TOWER
 3                              800 BOYLSTON STREET
                                BOSTON, MA  02199
 4
                                MS. REBECCA R. CARRIZOSA
 5                              ROPES & GRAY
                                1900 UNIVERSITY AVE 6TH FLOOR
 6                              EAST PALO ALTO, CA  94303
 7                              MR. CLYDE MOODY SIEBMAN
                                MR. LARRY PHILLIPS
 8                              SIEBMAN BURG PHILLIPS & SMITH
                                300 N. TRAVIS
 9                              SHERMAN, TX  75090
10
11  COURT REPORTER:             MS. JAN MASON
                                OFFICIAL REPORTER
12                              101 E. PECAN #110
                                SHERMAN, TEXAS  75090
13
14
15
16
17
18
19
20
21
22
23
24  PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
25  PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
```

1          THE COURT:  Good morning.  Please be seated.

2      We're here for Final Pretrial Conference in case

3  4:14CV371, Imperium Holdings versus Samsung Electronics, and

4  I guess we're ready to proceed.

5      From the Plaintiff?  And just always make sure you turn

6  your mic on if you're speaking.

7          MR. FISCH:  It's on, Your Honor.  Good morning.  Alan

8  Fisch on behalf of Imperium.  We're ready to proceed, sir.

9          THE COURT:  Very good.  On behalf of Samsung?

10         MR. SIEBMAN:  Yes, Your Honor.  Samsung is ready to

11  proceed.

12         THE COURT:  Very good.  Then I don't know if we're

13  going to have multiple speakers today handling different

14  issues.  If that's the case, just please identify who you are.

15      Then, of course, we're set for trial to start Monday.

16  And I guess first let me take care of some various pretrial

17  motions that have been pending that I want to go ahead and

18  resolve.

19      I do apologize that I haven't gotten written orders out

20  on everything that's been pending.  Part of that is just

21  I've been extremely busy.  I just finished a seven day

22  patent trial.  The jury came back yesterday on that, and I

23  have trials every week in February.  So that's our

24  situation.  Being down several judges, we're really busy.

25      So the first motion is Docket 107, Defendant's motion

1    to amend invalidity contentions.  And I will tell you,

2    I will enter written orders on these.  It just may not be --

3    it may not be until after the trial is over, but I will do

4    written orders.  That motion is going to be denied.

5         Docket 109, Plaintiff's partially opposed motion for

6    leave to amend invalidity contentions.  The only question I

7    had was did y'all agree -- it was a little unclear to me

8    whether you were agreeing that the S6 and the S6 edge, I

9    wasn't sure there was opposition to that.

10             MR. BRENNER:  Your Honor, Samuel Brenner.

11             THE COURT:  And you need to either have a mic or go

12   to the podium.

13             MR. BRENNER:  Samuel Brenner, Your Honor.

14        We do not oppose with respect to the Galaxy S6 and the

15   Galaxy S6 edge and we did oppose with respect to the Galaxy

16   Note1.

17             THE COURT:  So the motion will be granted as to the

18   S6 and S6 edge and be denied as to the rest of the motion.

19        Docket 143, Defendant's motion to strike portions of

20   Dr. Wright's rebuttal report.  That motion is denied as

21   well.

22        Docket 180, Plaintiff's motion for leave to file

23   further claim construction.  That motion is denied as well.

24        Then Docket 186, Defendant's motion to submit

25   supplemental expert reports, I'm also denying that motion.

1    Then the only other one I think I have, which I spent

2    time last night until midnight reading, was Samsung's motion

3    to strike products Imperium failed to accuse in its '029

4    contentions from Imperium's expert report, which is Document

5    135.  I'm denying that motion.

6    I will enter written orders on all these matters

7    explaining the decisions but it won't be until after the

8    case.

9    Okay.  So let's talk about -- let me first ask, did I

10   forget any of the pending pretrial motions?

11             MR. FISCH:  Alan Fisch, Your Honor.  No, sir.

12             MR. HARNETT:  I don't think so, Your Honor, no.

13             THE COURT:  Okay.  Good.  So let's talk about trial

14   time.  We will -- the jury Monday will be here -- I think they

15   usually report at 9:00.  We'll start voir dire around 10:00.

16   You'll have a chance to -- the questionnaire y'all submitted,

17   based on the jurors who show up, you will get a seating chart

18   when we have that done, plus all the questionnaires that

19   morning.

20   Then how long -- you all think it will take five, six

21   days?

22             MR. FISCH:  Your Honor, Alan Fisch.  I think it will

23   take five days, probably four and a half days of evidence.

24   We can probably go to close on Friday morning is my view, Your

25   Honor.

1    MR. HARNETT:  We suspect, Your Honor, it's going to

2 be a little longer than that, perhaps six days, six and a half

3 days, Your Honor.

4    THE COURT:  Okay.  Well, we can discuss that because

5 we may run a little bit longer in the day if we need to.  I

6 typically run a 9:00 to 5:00 day with the jury.  I only have --

7 I have six days, so I can go -- because by the time we seat the

8 jury and get started, we'll start Monday afternoon, but

9 depending on how long you take for voir dire, and then I start

10 another trial the following Tuesday.  So I have all of next

11 week allotted for it, plus one extra day.  So I don't impose

12 time limits, but the only self-imposed time limit is we have to

13 be done by that time period, so --

14    And we can judge -- we can start off 9:00 to 5:00 if we

15 need to.  I had to do this in the last patent trial.  We

16 started working at the end bringing the jury in at 8:30 and

17 keeping them to 6:00.  I don't like to do that because our

18 jurors travel a great distance, but if we have to -- I will

19 keep monitoring that with y'all.

20    So then for voir dire I don't think anybody -- well,

21 local counsel has tried cases in front of me before, but I

22 let y'all do the voir dire.  So I'll ask some general

23 questions in the beginning.  Of course, you have your

24 questionnaires.  You'll have a seating chart that will show

25 the name, city where they're from, their occupation, their

1    spouse, if they have one, and the spouse's occupation if

2    there is one.

3        Then we use juror numbers so we don't use their names.

4    You'll have that information but for voir dire purposes we

5    use that.

6        After I do my preliminary questions I turn it over to

7    the attorneys to do the voir dire and you can ask what you

8    want to ask.  So I'm pretty liberal about that.

9        Any questions about voir dire?  And you are welcome --

10   the jury will be over here to my left seated in the rows

11   there and you're not -- as long as you have a lapel mic,

12   you're not bound to the podium, so you can walk around

13   during voir dire, as well as opening and closing too.  I

14   don't hold you to the podium.  If you so desire to roam

15   around the courtroom, you don't have to ask permission for

16   any of those three events.

17       Mr. Siebman.

18           MR. SIEBMAN:  Yes, Your Honor.  The patent video that

19   is presented by the Federal Judiciary Center, does Your Honor

20   ever show that to the jury panel before -- I mean the big group

21   before they're actually submitted to voir dire?

22       That would actually streamline the voir dire process if

23   that was presented to them so they would have that

24   background before voir dire started.

25           THE COURT:  Yes, we -- typically we have, and I'll

1   tell you in my last patent trial we totally forgot about it so

2   we did not.  But, yes, we can see that's played to the jury

3   before voir dire starts.

4          MR. SIEBMAN:  Great.  Thank you, Your Honor.

5          THE COURT:  Any other questions about voir dire?

6     And then how much time do you want for opening

7   statements?

8          MR. FISCH:  Your Honor, 60 minutes, please.

9          MR. HARNETT:  60 minutes will be fine, Your Honor.

10         THE COURT:  Okay.  That's fine.  I'll give that to

11  y'all.

12     And then just some other procedural things is the issue

13  of exhibits.  The way I do exhibits is that if they're

14  unobjected to or I've overruled objections -- if we take up

15  any exhibits today and they're overruled, they're

16  conditionally admitted at the beginning of the evidence, but

17  then they have to be utilized.  If they're not utilized by a

18  witness or you bring the evidence before the jury in some

19  way during the trial, then it won't be admitted.  So if it's

20  not used, that exhibit won't be finally admitted at the end

21  of the trial.

22     So if there's an exhibit that you're not going to use

23  with a witness but you want it in for some purpose, you need

24  to offer it in front of the jury.  So exhibits have to be

25  used with the jury in front of the jury for it to be fully

1    admitted.  Any questions about that?

2              MR. FISCH:  None, Your Honor.

3              MR. HARNETT:  No, Your Honor.

4              THE COURT:  So the way that works is you don't have

5    to offer -- if it's unopposed, unobjected to exhibit, all you

6    have to do is utilize it.  It's automatically in.  We keep

7    records of that, so you don't have to offer the exhibit.

8         If there's an objection to an exhibit, you do have to

9    go through the normal procedure and offer it.  So we keep

10   track of that on the exhibit list.

11        Also, I allow the jury to ask questions of live

12   witnesses, and since y'all all do work in the Eastern

13   District, some of the judges allow it, some don't.  Have you

14   had that experience before in other courts in the Eastern

15   District?

16             MR. HARNETT:  Mr. Siebman has explained it to us,

17   Your Honor.

18             THE COURT:  Okay.  Mr. Fisch, have you had that --

19             MR. FISCH:  We understand the process, Your Honor.

20             THE COURT:  Okay.  So it's pretty easy, and I will

21   tell you that in the last trial we had some jurors who had much

22   more knowledge than probably anyone thought and asked very

23   detailed questions.  Some we asked, some we didn't.  But it was

24   certainly interesting.  They get very engaged.  The jury loves

25   that process, and there will be something in my preliminary

1  instructions explaining that.

2      Then the one thing -- it's the first time it ever

3  happened in doing this because I never had people put on

4  rebuttal cases.  If the rebuttal case is not a new witness,

5  I don't ask the jury again for questions.  So only -- if

6  there's a rebuttal case, only if they're new and haven't

7  testified before, just so everyone knows.  Because it came

8  up in my last trial and that situation had not come up

9  before.

10     Okay.  Before we get into the meat, is there anything

11 else?  I don't think there's anything else I need to take

12 up.

13     There's conference rooms downstairs.  I assume each of

14 you picked out conference rooms so you have space if you

15 need that.

16     So let's deal with this issue -- I want to hear from

17 both sides on the issue of -- on the licensing issue in

18 terms of the impact of the trial.  I've read your briefs and

19 everything, but I would like to hear from each side on how

20 this impacts and what you think I should do on this issue.

21         MR. BATTAGLIA:  I think I'm live.

22     Good morning, Your Honor.  John Battaglia on behalf of

23 Imperium, and I assume Your Honor is referring to the Sony

24 license issue.

25         THE COURT:  That's really the only -- there may be

1   one other licensing issue but this is the one --

2           MR. BATTAGLIA:  Correct.

3           THE COURT:  -- that's permeating everything recently.

4           MR. BATTAGLIA:  That's right.  And it's our view,

5   Your Honor, consistent with all the case law, all the precedent

6   and Rule 16, this Court's Scheduling Order, that it should not

7   be part of the trial at all.

8       The one thing I think the parties have agreed on

9   through all the different papers that have been filed with

10  Your Honor is that Rule 16 does apply here, and so

11  therefore, we agree remarkably that they have to show

12  diligence and each of the four good cause factors, and they

13  haven't done that.

14      And Your Honor's order last week spoke to that in

15  finding that they knew of this theory long ago, and by

16  our --

17          THE COURT:  I understand that.  Of course, that went

18  to the issue of whether to allow late summary judgment.  The

19  issue I'm concerned about is is that issue still before the

20  Court and how it impacts the trial.  I didn't allow them to

21  file the summary judgment and consider it, and I think that was

22  the right decision on that but that doesn't end the issue.  So

23  it seems I have to figure out is that issue still before the

24  Court and how I deal with it in the trial.

25          MR. BATTAGLIA:  Fair enough, Your Honor.  And the

1   answer is, no, it shouldn't be before the Court because

2   presumptively it is barred by the order.  It's not a scheduling

3   suggestion.  Scheduling Orders are a serious thing to be

4   enforced, and the diligence required for it is very strict.

5   And that's why the case law is so adamant on emphasizing the

6   requirement for diligence.  It says that the inquiry usually

7   begins and ends with diligence, and if you get past that, then

8   you still have to show the four good cause factors.  The

9   parties agree on that.

10       So with respect to it being allowed at trial, our view

11  is that they still haven't met diligence.  They haven't

12  shown diligence.  And when they can't get past that

13  threshold requirement, then per Rule 16, Fifth Circuit case

14  law, Federal Circuit case law, precedent or case law from

15  this Court, then the defense is barred.

16       It's an all new theory.  It's not like it's a witness

17  or a document that's being offered.  It's an all new theory

18  being offered, for which there has been no discovery.

19       So offering it now for the first time at trial when

20  there has been, like I said, no discovery on it, no expert

21  reports, no expert testimony.  They tried to put in, as Your

22  Honor I think already ruled, supplemental expert reports

23  around Christmas time.  But nothing was done in time to

24  raise this defense.

25       So it would be -- on top of a lack of diligence, it

1   would be severely prejudicial now for them to be able to

2   unveil this defense that they've been touting as wiping out

3   variously -- first it was more than 85 percent of damages

4   and then it was around 40 percent and now it's 70 percent.

5        Whatever it is, that's the type of defense that had to

6   be timely disclosed and had to have a showing of diligence

7   and all the other good cause factors.  They haven't met any

8   of those, and their brief yesterday only speaks to the one

9   factor about the importance of the defense.

10       We obviously have a disagreement on that, but that

11  still doesn't get them past the other factors with respect

12  to diligence, explanation for delay, so on and so forth.

13       And Your Honor's opinion spoke to that last week too,

14  and I recognize of course it was speaking towards the

15  summary judgment motion, but it has a lot of broad

16  applicability to the same issue with respect to trial, only

17  more so now because it would be even more unfairly

18  prejudicial if, okay, they couldn't raise it on summary

19  judgment but then they can suddenly just come in at trial

20  and start presenting a defense that we never had an

21  opportunity to conduct discovery on so, and no obligation to

22  either.

23            THE COURT:  Well, what discovery would you need?

24            MR. BATTAGLIA:  Well, per our brief yesterday, we

25  would need expert -- we need an expert report from them

1    spelling out how it is that the accused products meet the

2    claims under their theory.  We don't have that with respect to

3    this license agreement.  We don't have that and we would have

4    to have an opportunity for our expert to rebut that.  We need a

5    supplemental expert damages report.  We need a deposition of

6    their expert.  We would want a Samsung witness, a 30(b)(6)

7    witness on the documents, which we haven't received, that

8    corroborate or show what -- what suddenly now they say are

9    products that use a Sony sensor, when before -- all we had

10   before was sort of their -- it was unclear about whether it

11   used Samsung or Sony.  And now, as we understand it, there's

12   assertion that, oh, those use all Sony.  We don't have any

13   corroboration on that -- that impact on damages, which is

14   substantial.

15        So we don't have documents.  We haven't had witnesses.

16   We haven't had fact witnesses.  We haven't had an

17   opportunity to investigate or develop this defense.

18        This Court has held that whether it's an individual

19   litigant or a large company, we're all bound by Rule 16 and

20   you can't excuse it by saying, well, it's an all new defense

21   but they should be able to handle it at trial.

22        That's trial by ambush, and that's of course what the

23   Fifth Circuit says is a no-go under the Federal Rules of

24   Civil Procedure.

25             THE COURT:  But their assertion is that you concealed

1    this.

2            MR. BATTAGLIA:  Right.  And, Your Honor, I think your

3    ruling last week does speak to this.  We didn't conceal.  And

4    in any event, their --

5            THE COURT:  I didn't decide that issue in my decision

6    last week.  Basically all I said was essentially that they

7    didn't -- they didn't bring up the issue to this Court in time

8    to get a summary judgment.  So they have asserted that as a

9    general defense license, not particularly this one, but -- and

10   so I haven't done that analysis of whether it was concealed or

11   not, but that's their assertion.

12           MR. BATTAGLIA:  And if I may speak to that, Your

13   Honor.

14           THE COURT:  Yes, go ahead.

15           MR. BATTAGLIA:  And so the concealment, their theory

16   is on the Sony license that any product that has a Sony image

17   sensor in it is automatically licensed, and I think their brief

18   yesterday made that abundantly clear.

19        On that theory, it didn't matter what Imperium did or

20   did not do.  It wouldn't make a difference, because under

21   that theory they knew by January, last January, what the

22   accused products were.  In other words, they knew which

23   products would have a Sony sensor or not, and they knew at

24   the latest by early April of 2015 the Sony license agreement

25   itself when that was produced.

1      So in terms of evaluating diligence or concealment,

2  their own theory doesn't require anything that we would have

3  concealed or not concealed or anything like that.  We didn't

4  conceal.  But the point is it doesn't matter what we did or

5  did not do.

6      Under their theory it was right there in front of them

7  all along since at least last April.  Their theory -- if the

8  theory is anything that has Sony sensor is licensed under

9  the Sony agreement, then they had those two pieces last

10 April.  Didn't matter what we said or did.

11          THE COURT:  Anything else you want to add?

12          MR. BATTAGLIA:  And with respect to -- or we will

13 say, we didn't conceal anything.  And what they're pointing to,

14 and I think we pointed this out time and time again -- Your

15 Honor is probably sick of reading it -- that they point to

16 silence in our contentions and silence in seeking subpoenas

17 from third parties and so on.

18     The reason we're silent is because we're not relying on

19 Sony sensors, and the reason why we didn't seek subpoenas or

20 third party discovery from Sony is because we're not relying

21 on Sony.

22     So there's no reliance on Sony sensors here and there's

23 no concealment of that theory.  And on top of that, this is

24 a theory that --

25          THE COURT:  Go ahead and finish your thought.

1          MR. BATTAGLIA:  I'm sorry.

2          THE COURT:  No, go ahead.  Finish your thought.  I'll

3    ask a question in a second.

4          MR. BATTAGLIA:  Okay.  On top of that, this is a

5    theory that their own experts and that their lawyers talked

6    about in early September, so on and so forth, and again, still

7    just waited until whenever to bring up at least the summary

8    judgment in November.  And now here on the doorstep of trial,

9    having no discovery on it, we would be severely prejudiced if

10   we have to deal with this for the first time at trial.

11         THE COURT:  Okay.  Response.

12         MR. PEPE:  Good morning, Your Honor.  Steve Pepe of

13   Ropes & Gray.

14      Your Honor, the Sony license is the single biggest

15   dispute between the parties, and it has a significant impact

16   on the number of accused products and the damages in this

17   case, and it is properly before this Court.

18      Samsung pled a general license defense in its answer

19   back in September, 2014.  Imperium knew that it had a

20   license with Sony.  Imperium knew by March, 2015, that some

21   Samsung products used Sony sensors.  They knew there was a

22   license issue.  That is why they carefully avoided referring

23   to Sony sensors in the over 100,000 pages of contentions

24   that were provided at the beginning of discovery, proposed

25   contentions in the middle of discovery and in their expert

1    reports.

2        This archive box holds 3,000 pages.  Picture 40 of

3    these stacked up.  Not one reference to a Sony image sensor,

4    not one reference.  They named every other component by

5    name:  Omnivision, Qualcomm, Fujitsu, every other one, but

6    not Sony.

7        In their expert reports -- let's see if I can turn this

8    on -- let me give some context for this.  The Galaxy Note2

9    is an accused product.  There are two versions of it.  One

10   uses a Sony sensor; one uses a Samsung sensor.  This is from

11   the September 9th expert reports.  You can see the language:

12   The Galaxy Note2 incorporates a CMOS image sensor and a

13   S5C73M3 image signal processor.

14       The reference there to a Sony image sensor, that's

15   actually a Sony sensor that they knew about, because we

16   provided them that information.

17       Next page, same exact product, Galaxy Note, the Samsung

18   version.  The Galaxy Note2 incorporates a Samsung S5K6A3Y

19   camera chip and a Sony image signal processor.

20       They knew about the one that used a Sony sensor.  They

21   identified the Samsung sensor, but in the Sony chart they

22   referred to it generically.  They were aware that there was

23   a Sony issue and the impact it has on the case.

24       This is not a situation where we have trial by ambush.

25   We weren't laying behind the log hiding this defense.  We

1  had no reasonable belief that they were going to be accusing

2  Samsung products with Sony sensors.  130,000 pages of claim

3  charts.  Not one reference to a Sony sensor.

4      They knew there was a Sony license.  They knew our

5  products included Sony sensors.  They never mentioned it

6  once, even in their expert report.

7      Counsel made a statement that the reason why it doesn't

8  refer to a Sony sensor is because they're not relying upon a

9  Sony sensor.  Well, we submit they are, Your Honor, and we

10  provided a chart with our submission that walks you through

11  exactly how they're relying upon a Sony sensor.  And if it

12  would be helpful for the Court, because it is such a

13  significant issue, I would be happy to show you -- it would

14  take two minutes to show you how they're doing this.

15          THE COURT:  Go ahead.

16          MR. PEPE:  Your Honor, this is the '029 patent, Claim

17  1.  You can see in highlight it's a method claim that requires

18  capturing a preparatory image.  That's basically what the claim

19  says.  You have to capture an image.  You have to get the image

20  data in.  You have to capture it.  That's the claim term.

21      During deposition in October:  Dr. Wright, in your

22  opinion, is it necessary for a product to have a digital

23  imaging sensor in order for that product to practice Claim 1

24  of the '029 patent?  Yes or no.

25      Answer:  As I interpret this claim, you would need some

1  sort of digital imaging sensor.

2      So on this page, this is Attachment A that you've heard

3  so much about, this is the components for all of our

4  products.  You're relying on Attachment A to show which

5  image sensor and image processor used in the Galaxy Note2,

6  is that correct?  Yes or no.

7      Answer:  Yes.  I'm relying on the information supplied

8  by Samsung to tell me what components are inside that

9  product.

10      Question:  Going back to Exhibit 15, Dr. Wright, what

11  is the image sensor in the Galaxy Note2?  According to this

12  it's the IMX175 Sony.

13      So we have capturing a preparatory image.  We have

14  their expert saying that you need an image sensor and we

15  have him acknowledging that in fact it has a Sony sensor.

16      Next question:  In your opinion, is the Galaxy Note2,

17  when using the Sony image sensor you previously testified

18  about, covered by any claim of the '029 patent?  Yes or no.

19      Answer:  I'm looking here at the Galaxy Note2.  It's in

20  the claim charts; it's accused; so the answer to that would

21  have to be yes.

22      Question:  Which claim?  Again, if you go to the claim

23  charts you can see Claim 1.  I'll go through all of them and

24  we'll go 1B and all that.

25      Looking at line 25:  Dr. Wright, if that Sony image

1    sensor in the Galaxy Note2 were not in the Galaxy Note2,

2    would the Galaxy Note2 infringe any of the asserted claims

3    of the '029 patent?

4         Answer:  If the Galaxy Note2 had no image sensor at

5    all, is that your question?

6         Question:  Yes.

7         Answer:  A product that had no image sensor at all

8    would not have a digital camera involved.  If it has no

9    digital camera involved, it can't be infringing the '029

10   patent.

11        But perhaps the most compelling part of this, again,

12   capturing preparatory image, is from Dr. Wright's expert

13   report:  An image may be captured by acquiring the image

14   data that represents the particular image.  In other words,

15   whenever an image sensor acquires data, it has acquired or

16   captured an image.

17        Your Honor, right there, black and white, Dr. Wright is

18   saying in his expert report that to capture a preparatory

19   image, you need to use the image sensor.

20        So I submit that they are in fact relying upon Sony

21   image sensors.  They rely upon image sensors to meet all

22   of -- for all the products, and that is why in all their

23   claim charts they identified all the image sensors except

24   here for Sony.

25   XXXXXXXXXXXX(Redacted pursuant to Court order)XXXXXXXXXXXXX

1  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2  XXXXXXXXXXXXX and we pointed out one of them yesterday in

3  our brief.  And if I can, I'm going to put that provision up

4  because it is significant.

5          Sangmin, could you step out for a moment?

6                              (Samsung corporate representative leaves

7                              (the courtroom.

8  XXXXXXXXXXXXX(Redacted pursuant to Court order)XXXXXXXXXXXXXX

9  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21      So what we're asking, Your Honor -- there's a clear

22 path forward here.  Ask the jury, as we said in our paper,

23 whether Imperium is relying on or exploiting the

24 functionality of a Sony sensor in their infringement case.

25      This issue is teed up.  Their expert is going to be

1    testifying about it anyway.  He has to present his

2    infringement proof.  This is just another question to ask.

3         Now, they talked about additional discovery.  We submit

4    there is no additional discovery that's needed, especially

5    on the technical front.  They know our position.  We

6    disclosed it to them in November in our motion for leave.

7    We set forth in the brief here's how you're relying upon the

8    Sony sensor.  I just walked you through it.

9         We don't need discovery from them.  We took their

10   expert's deposition.  We know what his position is.  This

11   issue is teed up on the technical front.

12        On the damages front, I want to clarify something.

13   That 85 percent number that was in our initial motion, that

14   was the best number that we had based upon the best

15   information at that time.  We have now pulled that back to

16   70 percent because we've done a further investigation.

17        Now, counsel spoke about the 40 percent number that was

18   in Dr. Perryman's report.  Well, that 85 and 70 percent

19   number that we're talking about is based upon their damages

20   expert's model.  Our damage expert uses a different model,

21   and that's why it's at 40 percent.  And I can try to get

22   into some details about those different methodologies, but

23   it's like comparing apples to oranges.  The 85 percent and

24   70 percent is based upon their expert's model and his

25   analysis.  The 40 percent from Dr. Perryman is based upon

1    his methodology and his model.

2        But all of that, Your Honor, can be taken care of on

3    the back end.  There's going to be an accounting procedure

4    at some point here.  New products just got added to the case

5    today by your ruling.  We have to account for those new

6    products, and we can easily account on the back end for any

7    products that you determine through post-trial briefing are

8    licensed based upon the jury verdict.

9    XXXXXXXXXXX(Redacted pursuant to Court order)XXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21       That's exactly what they're doing.  They're trying to

22   double-dip here.  XXXXXXXX(Redacted pursuant to Court order)

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25       It would be highly inequitable and unfair to allow us

1    not to present the Sony license, given the fact, as I showed

2    you, even today they're denying that they're relying upon

3    Sony sensors, even today, three days before trial.  And I

4    stepped you through it.  It's clear as day to us.  It would

5    be inequitable and unfair to let us not present it.

6        This -- one other thing that I wanted to point out,

7    Delaware.

8            THE COURT:  I mean, you went to Delaware.  You didn't

9    come to this Court.  You went to Delaware before ever raising

10   the issue here.

11           MR. PEPE:  So the XXXXXXX(Redacted pursuant to Court

12   order)XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13           THE COURT:  Why can't Delaware handle this issue, if

14   it is an issue?  Why should I insert this in my trial?

15           MR. PEPE:  Because the issue is teed up here.  We

16   have the discovery done.  We have the experts here.  It's a --

17   and we're going to be presenting this evidence anyway.  It's a

18   simple question for the jury to consider.

19       In Delaware, that's where we are bringing the breach

20   claim.  There's a XXXX(Redacted pursuant to Court order)XXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   The intention was always breach in Delaware, XXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXX; license defense here.

24       But let me tell you what happened in Delaware.  There

25   was a hearing with the Judge and Imperium said, Your Honor,

1   this case -- this case doesn't belong here.  This case

2   belongs in Texas because the same issue, same products, send

3   it all down to Texas.

4         We got up and we explained to the Judge, well, Your

5   Honor, what they're not telling you is they're going to go

6   tell the Judge in Texas that we've waived the defense.  So

7   they're telling you, Judge, it doesn't belong here, it

8   belongs in Texas, but they're going to tell the Texas Judge

9   it doesn't belong here either because it's been waived.

10        And Judge Robinson, what did she say?  And so the

11  question is are you telling me now that there is -- and I'm

12  talking to defense counsel -- to resolve the issue because

13  it properly belongs in Texas but you're telling me that it's

14  actually not going to be resolved in Texas because you're

15  going to argue waiver?  That strikes me as not a very

16  compelling argument.

17        Judge Robinson had foresight.  That's exactly what

18  they're doing here.  They're telling you -- they're telling

19  everybody we can't have our day in court on the Sony

20  license.

21        Your Honor, we pled the defense.  No discovery is

22  needed.  It would be inequitable and unfair, given the

23  importance of the Sony license and given what happened in

24  discovery, 130,000 pages.

25        They subpoenaed every supplier but Sony.  The claim

1 charts mention everybody but Sony.

2      It would be unfair to not let us present that defense.

3        THE COURT:  Well, let me ask you, I mean, if I follow

4 your suggestion and submit that question to the jury, do they

5 not also get to submit the question of did you waive it and

6 doesn't that cause a whole bunch of other issues, procedural

7 issues?

8        MR. PEPE:  Well, I think that issue of waiver is not

9 properly teed up with the evidence or with the experts.  That

10 would get into a whole bunch of evidence that we don't think

11 would be appropriate for the jury about when we knew what,

12 whether or not they concealed the reliance.  I think that

13 unnecessarily complicates the presentation of evidence.

14      If that's something that Your Honor is interested in, I

15 think I would want to talk to my co-counsel.  It's something

16 certainly we could consider.

17      But now you're getting into what happened during

18 discovery, when did they -- the timing of all those sorts of

19 issues, so I'm not entirely sure it would be appropriate.

20        THE COURT:  Well, let me -- Mr. Battaglia, do you

21 want to respond to several things?

22        MR. BATTAGLIA:  Yes, Your Honor, and it strikes me

23 that a lot of those arguments highlight all the more why the

24 Court, per its case law, Fifth Circuit case law, should -- the

25 clearest path here is just to follow the rules, per Rule 16.

1    It's not --

2        Of course you can raise defenses or theories, but it's

3    not an open check, right?  Rule 16 and Scheduling Orders are

4    there for a reason and you have to raise it by the

5    deadlines, and that is crystal clear.  It's how litigation

6    works.

7        So the fact that they were -- lacked diligence in

8    raising that theory and can't meet any of the other good

9    cause factors should be the end of the question.

10        He highlighted here and said that no discovery is

11    needed, XXXXXXXX(Redacted by Court Order)XXXXXXXXXXXXXXXX

12    Obviously, Your Honor, we have a different view, XXXX

13    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX   They're not and

15    Imperium is not relying on Sony sensors to meet any element

16    of the claim.

17        The claims that are pointed to for the two patents

18    here, not a single one of them recites a image sensor

19    requirement, and otherwise, what's pointed to in terms of

20    providing the benefit or the functionality for the patented

21    method or product is the image processor, not the image

22    sensor.  So there's no reliance on an image sensor.

23        That's why when he pulled up that one chart and was

24    reading through, he pointed to the image sensor but it's

25    also referring to the image processor, and it's the

1  processor that provides the benefit, the functionality, the

2  one that makes the pictures better or that eliminates stuff,

3  that improves the quality of the picture.

4      So our view is that there's no license, but that all

5  goes back to the big point that there has been no discovery

6  on this.  We're arguing these things on the fly on points

7  where they assert, XXXX(Redacted pursuant to Court order)

8  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9  XXXXXXXXXXXXXXXXXXXXXXXXXX  We, a party to the contract.  We

10 believe Sony has the same view.

11     And it would be severely prejudicial for them to just

12 come into trial now for the first time and make all these

13 arguments, when they haven't had -- when we haven't had any

14 discovery on any of those points.

15     And that just makes Rule 16 all the more important here

16 and why the motion -- why the Sony defense should be denied

17 pursuant to the rules.  There's a process.  I mean,

18 everybody has to play by the rules.  So the fact that

19 they're trying to make an end-run around this Court and race

20 off to Delaware and raise the Sony defense doesn't mean that

21 therefore they didn't have to comply with this Court's

22 Scheduling Order.  Of course they did.  All parties do, big

23 or small.  Big or small, as this Court has held.

24     And we explained to Your Honor in our briefing how the

25 Delaware process works.  Judge -- Judge Robinson stayed the

1  case, as you saw.  And they pulled out that snippet, but

2  we're confident per the case law in Delaware and per

3  controlling Federal Circuit precedent that the Delaware

4  case, per the first-filed rule which has been around for 200

5  plus years, that case is going to be dismissed per the

6  first-filed rule or otherwise be transferred to this Court

7  and rolled into the judgment that's ultimately entered here.

8       Either way, Delaware should not be a reason or an

9  effort to justify raising, for the first time now, a defense

10  that they sat on or that they knew of or should have known

11  of at least last spring and never did anything to raise it.

12       So under straight application of binding precedent and

13  Rule 16, they shouldn't be allowed now to come in, two days

14  before trial, without us having any discovery, any discovery

15  to defend against this and try to launch an all new defense.

16       And per this Court's case law, as said repeatedly, and

17  this is in some of the briefing too, if it's so important,

18  where were they?  Where were they?  I'm paraphrasing a bit,

19  but that's the gist of what this Court has held repeatedly

20  in not raising that defense.

21       THE COURT:  Well, they assert that -- he held up the

22  box as an example.  There were many pages, boxes of discovery

23  or I guess contentions that were submitted, but none of them

24  mentioned Sony.

25       MR. BATTAGLIA:  Right, because we're not relying on

1    Sony.  We're not relying on Sony sensors.  We're not pointing

2    to any Sony sensor to meet any element of any claim.  We're not

3    relying on the benefits or the functionality that it provides.

4                THE COURT:  What about the excerpts of the

5    deposition?

6                MR. BATTAGLIA:  The excerpts of the deposition, as we

7    put in our briefing, are taken out of context.  You'll see

8    further on in those pages -- and I don't have the pages with

9    me -- but Dr. Wright makes it clear it doesn't matter what type

10   of image sensor we're talking to.  And otherwise when they're

11   asking him or insisting on getting these yes/no answers about

12   whether a camera requires an image sensor, it's rather beside

13   the point.  The claim language doesn't require an image sensor.

14        It's like saying, well, if you have a patent that's

15   directed -- or claims directed to the wing of an airplane

16   and then you're insisting that, well, you have to agree that

17   an airplane includes a propellor, doesn't it?  Well, yes,

18   but the claim language is focused on a different aspect.

19        And that's with respect to the claims here.  They never

20   asked for any claim construction and Your Honor has issued

21   no claim construction requiring an image sensor for any of

22   these claims, and the claim language itself does not require

23   an image sensor.

24        And the focus of -- of the infringement analysis is

25   with respect to the processor, not the image sensor.

1          THE COURT:  Any response?

2          MR. PEPE:  Sure, Your Honor.  The fact that the

3    claims don't require explicitly an image sensor doesn't matter,

4    if an image sensor is used to perform one of the steps.

5          I showed it to you:  Capturing a preparatory image.

6    Their expert said in his expert report, he admitted at

7    deposition, an image sensor is used to perform that step.

8    It doesn't matter that the claim doesn't say image sensor.

9          There was a claim that said image sensor.  It was a

10   claim that they were asserting that had image sensor and

11   they conveniently dropped it because of this issue.

12         So, Your Honor, the fact that it doesn't have image

13   sensor in the claim doesn't matter.

14         As far as discovery goes, Your Honor, as I said, we're

15   asking you to permit us to ask the jury one simple question:

16   Are they relying on or exploiting Sony sensors in their

17   infringement case?

18         You don't need discovery on that.  They know our

19   position.  We know their position.  We deposed their expert

20   on it.  We gave them analysis that shows our position on

21   that.  They're free to ask our experts about it.

22         We even offered them a deposition on it.  We don't

23   think one is necessary, but we offered them a deposition on

24   it.

25              THE COURT:  Why should I allow that at this point

1  when I haven't decided the issue of whether this defense has

2  been waived or not?  I mean, that issue hasn't been -- the only

3  issue I was addressing was whether to allow a late summary

4  judgment.  That other issue hasn't been teed up for me to say

5  whether or not that's been waived or not, which is the reason

6  why it's so late at trial.

7       So why should I allow that question to be submitted

8  when I haven't even determined whether or not you should be

9  able to utilize that defense?

10          MR. PEPE:  Well, Your Honor, I submit that we have

11  raised a license defense.  We raised it in our answer.  And

12  because of the concealment, we weren't able to raise it until

13  we did.

14          THE COURT:  No, I understand that's your position

15  that it's been concealed, but how -- we're on Friday before the

16  Monday trial.  How am I supposed to determine that issue with

17  trial starting Monday?

18          MR. PEPE:  Your Honor, there's no prejudice --

19          THE COURT:  Because if there's no concealment, it's

20  probably been waived.  So how am I supposed to decide that?

21          MR. PEPE:  Your Honor, based upon the evidence that I

22  have presented during this and in our briefing, it's clear that

23  the importance of this under Rule 16, the fact that we have an

24  explanation for why we didn't raise it when we did, because of

25  the concealment, those factors show good cause for why this was

1   not waived.

2       And this issue has been teed up since September.  They

3   know about our position.  They've known it since September.

4   They've known it for months.

5       So our view is that it hasn't been waived.  There's

6   been sufficient time for the parties to develop this.  We

7   have been very forthright with them.  We've told them

8   exactly what our defense relates to and we've shown them the

9   analysis for why we think that there has been concealment of

10  their reliance and why it's appropriate for this defense to

11  go forward.

12          THE COURT:  Okay.  Mr. Battaglia, final word,

13  anything you want to add?

14          MR. BATTAGLIA:  I'll just add, Your Honor, with

15  respect to their argument that it's raised in the answer, it

16  wasn't.  There's no -- it's just a general pleading.  You can

17  see in their own filing from their exhibits yesterday, we

18  raised an affirmative defense of a license.  That's not

19  disclosing the defense.

20      And we asked in an interrogatory last January,

21  January 2015, for the basis for their affirmative license

22  defense, and they never disclosed before the September 9

23  deadline anything about the Sony license theory.  So the

24  argument that they raised it is, we submit, wrong and

25  incorrect.

1     And otherwise, when they talk about how they provided

2  an analysis, they provided -- and I think Your Honor has

3  already ruled on it -- the expert reports or supplemental

4  expert reports that just talk about our expert allegedly

5  relying on Sony sensors.  There's no technical analysis

6  about how they meet the requirements of the license defense

7  itself -- the license requirement itself, XXXXXXXXXXXXXXXXX

8  XXXXXXX(Redacted pursuant to Court Order)XXXXXXXXXXXXXXXXXXX

9  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11     So for those reasons and more, that just highlights all

12 the more the prejudice now in raising this for the first

13 time at trial.

14          MR. PEPE:  Your Honor, one last word, if I may?

15          THE COURT:  Okay.  I guess I'll give you the final

16 word.

17          MR. PEPE:  If Imperium is sincere that they're not

18 accusing Sony sensors, then they shouldn't object and shouldn't

19 have a problem with us presenting that question to the jury and

20 then backing out Sony sensors from the damages model

21 post-trial.  If they truly aren't, then there's no issue.

22          THE COURT:  Well, here's what I'm going to do is I'm

23 not going to allow this issue to be inserted into this trial at

24 this time, and I'll tell you that I -- I haven't decided the

25 issue of whether or not it's been waived or not because that

1  issue is -- basically I'm being asked to make that decision

2  now.  I don't believe I can make that decision based on what's

3  before me.

4      You assert that it was concealed.  Absent concealment,

5  I think it is definitely waived.  And so I don't have enough

6  before me to make that decision, and so I'm not going to

7  allow this to be inserted into this trial.

8      What we will do is post-trial we'll have a full set

9  of -- I can allow the issue to be briefed, and if it

10  turns -- if I determine that it has not been waived, then

11  we'll have another trial dealing with this issue.

12     But I'm not going to insert this in the trial today, so

13  that's where we're at.

14         MR. PEPE:  So for clarification, are we permitted to

15  present evidence during the trial that relates to the

16  concealment or is this something we're just going to brief?

17         THE COURT:  No.  It will be something that will be

18  briefed and you can submit evidence on that issue and we'll

19  have a full briefing post-trial on that issue.

20     If I make that determination, then -- I'll have to make

21  the legal determination whether you waived the defense or

22  not.  And if I determine it was waived, the issue is done.

23  If it's not, then we'll have to have another trial just on

24  that issue.

25         MR. PEPE:  Okay.  Thank you, Your Honor.

1    THE COURT:  Okay.  I guess we'll go ahead and do the

2  motions in limine.  I guess we'll take up Imperium's motions

3  first.

4    MR. BATTAGLIA:  Good morning again, Your Honor.

5    THE COURT:  Good morning.

6    MR. BATTAGLIA:  Motion in Limine 1 I think is rather

7  straight-forward.  We're just asking that they not use

8  Imperium's -- any motivation or to imply or infer, to suggest

9  that there's anything bad about Imperium's tax status or its

10  incorporation in the Cayman Islands.

11    This Court and Judge Ward has ruled in 02 Micro that's

12  a no-go.  I know other Judges have ruled and acted

13  accordingly.  I know one lawyer was sentenced to jail for

14  two days for doing something like that.

15    So I don't think there's any real disagreement on it.

16  Their opposition, as I read it, just said that they wanted

17  to oppose it because they thought it was a preview of

18  Imperium wanting to suggest that we were going to use their

19  Korean citizenship in an adverse way, and the answer to that

20  is no, that's not a preview.  We're not going to be arguing

21  that because they're a Korean company, they should be -- you

22  know, they should be punished accordingly or anything like

23  that.

24    So I think this one is straight-forward, but unless

25  Your Honor has any questions, it goes right to the 02 Micro

1  ruling by Judge Ward and the motivation for incorporation or

2  tax status is irrelevant.

3          THE COURT:  Response.

4          MR. HARNETT:  Counsel is correct in one thing and

5  it's -- this motion is part of a larger piece of the puzzle on

6  how the presentation at trial is going to be.

7      We cited some testimony from a deposition in our

8  opposition.  The chairman of Imperium was asked a straight-

9  forward question:  Is it true that Imperium doesn't make any

10 products?  And he launched into this anti-Asian invective

11 about Asian companies steal technology, Asian companies have

12 caused us to lose jobs.  No American company steals

13 technology, only Asian companies.

14     We have seen, Your Honor, Imperium's technology

15 tutorial.  Your Honor asked the parties in advance of the

16 Markman hearing to submit non-argumentative technology

17 tutorials, and what we got instead from Imperium was this

18 glossy produced video of Ronald Reagan, Star Wars, this

19 technology somehow protecting us against the Soviet Union's

20 anti-ballistic missiles.

21     We asked Imperium during the meet and confer of these

22 motions whether or not they would agree that they were not

23 going to make any not necessarily overt suggestion that --

24 that Asian companies are not trustworthy.  They wouldn't

25 agree to that.

1    And when you see what's going on in Mr. Michaelson's

2 testimony that we quoted to Your Honor, it's pretty clear

3 that Imperium is going to be trying to drape itself in the

4 flag: We are an American company. We do things right.

5 This company, Samsung, is not trustworthy.

6    We can't unilaterally disarm.

7    THE COURT: Well, the issue of them being

8 incorporated in the Cayman Islands, I mean, it's in the title

9 of their name. That's -- I don't know that that's -- the

10 motion in limine is motivation for them being in the Cayman

11 Islands and their tax status. That's a discrete issue. I

12 don't see a problem with that.

13    MR. HARNETT: Right. Initially before, while we

14 didn't agree on it in the meet and confer, what the ask was

15 don't even mention Cayman Islands, and of course we couldn't do

16 that because Cayman Islands is on the cover of the complaint.

17    But I would ask, Your Honor -- we would be perfectly

18 happy to say we're not going to ask any questions about tax

19 status, but we can't unilaterally say we're going to play

20 fair if Imperium is going to be making suggestions about

21 Asian companies not being trustworthy.

22    THE COURT: Well, why can't we just make this mutual?

23    MR. HARNETT: We would love that, Your Honor.

24    MR. BATTAGLIA: That's what I tried to suggest at the

25 outset.

1           THE COURT:  I mean, yes, so they're incorporated in

2     the Cayman Islands.  You can't hide the fact that Samsung is a

3     Korean company.

4           MR. HARNETT:  Right, and we're not going to run from

5     that.

6           THE COURT:  Right.  I understand.  So I'll grant one

7     and just make it mutual.

8         Two.

9           MR. JUI:  Good morning, Your Honor.  Desmond Jui for

10    the Plaintiff.  Thank you for the Court's indulgence, and may

11    it please the Court.

12          THE COURT:  Yes.  Go ahead.

13          MR. JUI:  With respect to Plaintiff's Motion in

14    Limine No. 2 I would just like to make a couple of brief points

15    and then we would submit.

16        With respect to products that Imperium has now dropped

17    from the case, allowing Samsung to refer to these products

18    would improperly imply to the jury that the products do not

19    infringe simply because they have been dropped.

20        With respect to claims that Imperium has now dropped,

21    allowing -- Samsung has made clear that they wanted to refer

22    to these claims as part of the Sony license issue.

23        Given that issue is not before the Court any longer, we

24    would submit that that issue is moot.  Thus, we believe that

25    this motion should be granted under Rule 403.

1    With that, we would submit, Your Honor.

2          MR. MIDDLETON:  Good morning, Your Honor.  Alex

3    Middleton for the Defendants.

4          THE COURT:  Wait.  What was your name?

5          MR. MIDDLETON:  Alex Middleton.

6          THE COURT:  I didn't see you on my --

7          MR. MIDDLETON:  It's Alexander on the docket.

8          THE COURT:  Very good.  Thank you.

9          MR. MIDDLETON:  So I think with respect to the Sony

10   license issue and the dropped claims, I think that we're in

11   agreement, at least at this point, since you ruled that it's

12   not going to come into the trial.

13         With respect to the non-infringing alternatives,

14   Samsung has identified certain non-infringing alternatives

15   based on functionality that would not infringe claims, and

16   Samsung has identified certain devices that actually

17   practice that -- practice that functionality that wouldn't

18   infringe the claims.

19         What Samsung intends is to point to that functionality

20   and say these alternatives are feasible because Samsung was

21   able to implement these alternative functionalities in other

22   devices, and we're never going to say these alternatives are

23   alternatives merely because Imperium has decided not to

24   assert the claims against those devices.

25         So we think we should be able to present arguments that

1    these devices are non-infringing alternatives for -- on the

2    merits as opposed to arguing that they're dropped.  We're

3    not going to say that because they're dropped, they don't

4    infringe.

5              THE COURT:  Would you like to respond?

6              MR. JUI:  Yes, Your Honor.  If Samsung were to refer

7    solely to these products, I don't think Imperium would have any

8    objection.

9         I think the problem lies in referring to these products

10   as products that were once asserted but now have been

11   dropped.  I think that would improperly suggest to the jury

12   that the motivation for dropping the products was because

13   they infringe.

14             THE COURT:  I understand that.  Let me --

15             MR. MIDDLETON:  And we don't intend to do that.

16             THE COURT:  Okay.  So I'm going to grant two since

17   really you're not really in disagreement about that.

18        So three.

19             MR. SALTMAN:  Thank you, Your Honor.  Jeff Saltman on

20   behalf of Imperium.  May it please the Court.

21        In his report Dr. Perryman refers to Sony sensors as

22   being a non-infringing alternative.  This is somewhat

23   wrapped up in the Sony issue that we dealt with this

24   morning.

25        A few points on that, Your Honor.  One is that in terms

1    of timing, Dr. Perryman at his deposition stated that for

2    his analysis any non-infringing alternative must be

3    available at or near the time of the hypothetical

4    negotiation, which in this case is 2007.

5        The Sony -- it's undisputed that the Sony license

6    XXXXXXXXXX(Redacted pursuant to Court order)XXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9        Another point, Your Honor, is the timeliness.  An

10   interrogatory was asked about what your non-infringing

11   alternatives are, and Samsung responded generally anything

12   that's licensed we would have, but they didn't point to

13   anything as the Sony sensor.

14       So in our expert's report we don't have anything

15   regarding the Sony license being a non-infringing

16   alternative.  And so there is prejudice to us because we

17   don't have any expert testimony on it, whereas Dr. Perryman

18   does on that issue.

19       And last, Dr. Perryman in his deposition stated that he

20   didn't know whether Sony sensors would apply to all the

21   products or whether Sony made a processor that would work in

22   any of the products.  And as Mr. Battaglia stated, for some

23   of the patents, the processor is the only infringing

24   component, and therefore, the Sony license couldn't even be

25   a non-infringing alternative because we don't have the

1    necessary information as a result.

2            THE COURT:  Response.

3            MR. PEPE:  Your Honor, Steve Pepe again.

4        We cited a case in our MIL opposition, Laser Dynamics,

5    which makes it clear that non-infringing alternatives need

6    to be available during the entire damages period.  So you

7    look at the entire period, not just the hypothetical

8    negotiation.  That's Laser Dynamics.

9        XXXXXXXX(Redacted pursuant to Court order)XXXXXXXXXXXXX

10   that's still during the accounting period, the damages

11   period, so it's appropriate for Dr. Perryman to rely upon

12   that.

13       In our interrogatory response we did in fact say that

14   any licensed products or products that are subject to a

15   covenant not to assert, not to sue, those would be

16   non-infringing alternatives.

17       Obviously they never followed up on that to be more

18   specific, and as we've explained, there was some concealment

19   there with respect to those Sony sensors.

20       But nevertheless, it was identified in our

21   interrogatory response that anything that would be licensed

22   would be something that would be a non-infringing

23   alternative.

24       And finally, Your Honor, the other points about whether

25   it could be used or not used, that's something that they

1  could cross-examine our witnesses on.  That goes to the

2  weight of the evidence, not whether it's something that

3  should be excluded.

4          THE COURT:  Well, I'm going to grant.  And all this

5  means is approach the bench before you go into anything like

6  this.  It's not a final ruling, but right now I'm granting the

7  motion in limine to make you approach the bench.

8      Four.

9          MR. BATTAGLIA:  Four, Your Honor, relates again to

10  the Sony license defense.  I think Your Honor's ruling deals

11  with that since it's been ruled out.

12          MR. PEPE:  We agree.

13          THE COURT:  So I'll grant four.

14      Five.

15          MR. SIGLER:  Good morning, Your Honor.  Bill Sigler

16  on behalf of Imperium.  Thank you for the opportunity to be

17  heard today.

18      Your Honor, from the briefing, it appears that the

19  parties agree that evidence of the IPR proceedings will not

20  be presented to the jury.  Therefore, Imperium respectfully

21  requests that the Court grant this motion.

22      Samsung has indicated that they would like to raise

23  evidence from the IPRs before Your Honor with regard to the

24  issue of willfulness at a later time.  I'm happy to address

25  that now or to take it up later at that appropriate

1  juncture, Your Honor.

2          MR. BRENNER:  Your Honor, Samuel Brenner again for

3  Samsung.

4          The MIL is very broad and speaks to discussion of IPRs

5  as a whole.

6          Counsel is correct that the parties are in agreement

7  that the IPRs should not be presented or discussed in front

8  of the jury, but Samsung feels that the IPRs are a relevant

9  consideration for you, Your Honor, especially as you address

10  the objective prong of willfulness.

11          As you know, Imperium is arguing willful infringement

12  for the three patents here.  The willfulness determination

13  has two prongs.  The first is an objective prong.  It's a

14  threshold issue that's for you, Your Honor, to decide, not

15  for the jury.

16          And the second prong is the subjective prong, which is

17  an issue for the jury to decide.  And if it would be

18  helpful, we have a short bench memo on the willfulness

19  procedure.

20          Imperium in its MIL has cited a lot of cases talking

21  about Rule 403, talking about jury confusion.  With respect,

22  those are inapposite because we're not talking about

23  presenting the IPR question in front of the jury.  We're

24  simply talking about presenting it to you.

25          In deciding the objective prong, your determination,

1   Your Honor, is supposed to be whether any arguments,

2   non-infringement arguments or invalidity arguments that

3   Samsung could have had at any time are reasonable, and it

4   doesn't turn on what Samsung knew when.  It's just any

5   arguments that they could have had.

6       Here the United States Patent and Trademark Appeals

7   Board has instituted IPRs on the '290 patent and the '029

8   patent, and what they've said is that Samsung has a

9   reasonable likelihood of showing that all of the contested

10  claims here for those patents are in fact unpatentable, and

11  that conclusion we think is surely a relevant factor for you

12  to consider as you consider whether Samsung's invalidity

13  defenses are reasonable.

14      So we suggest, Your Honor, or we would respectfully ask

15  that you do as other courts have done, for example, in the

16  Ultratec v Sorenson decision which is cited in our MIL

17  opposition, and say there the Defendants are free to refer

18  to the Board's findings and argue their weight when making

19  any arguments outside the jury's presence on the objective

20  prong of the willfulness test, but say that we won't do it

21  in front of the jury.

22          THE COURT:  Well, of course, I'll grant the motion in

23  limine because I think you're both in agreement that that

24  shouldn't be in front of the jury.

25      Mr. Sigler, do you disagree that the information can be

1  presented to me at the appropriate time?

2      MR. SIGLER:  Pardon, Your Honor?

3      THE COURT:  I said you don't disagree that this is

4  something that could be presented to me at the appropriate time

5  for consideration of the objective part of the test?

6      MR. SIGLER:  Your Honor, I agree that we could

7  present our objection to this information at that time.  We

8  don't agree that this information is appropriate evidence going

9  to that prong, Your Honor.

10      THE COURT:  I understand.  We can address -- if you

11  have a bench memo you want to present, that's fine.  You can

12  give it to the Court.  But as far as the motion in limine, I

13  think we're in agreement that that's not going to come in front

14  of the jury.  And if they're going to offer it at some point

15  for me to consider, we'll take it up at that time.

16      MR. SIGLER:  Thank you, Your Honor.

17      MR. BRENNER:  Thank you, Your Honor.

18      THE COURT:  Six.

19      MR. SALTMAN:  Thank you, Your Honor.  Jeff Saltman

20  again on behalf of Imperium.  May it please the Court.

21    From Dr. Perryman's report and deposition it appears

22  that Samsung is intending to rely on products accused of

23  infringement for a specific patent as a non-infringing

24  alternative to that patent.  For example, a product that's

25  accused of the '029 patent would be a non-infringing

alternative to that patent.

It's a very confusing argument that I have trouble following as well, and I think it would just be extraordinarily confusing to the jury to hear that a product accused of infringement can also be a non-infringing alternative to that patent.

We're not saying, for example, a product accused of infringing the '029 patent can't be a non-infringing alternative to one of the other patents. It's that it can't be a non-infringing alternative to the patent for which it is accused of infringing.

THE COURT: Response.

MR. BRENNER: Yes, Your Honor. Samuel Brenner again.

I think counsel is jumping past a finding of infringement. So the parties are in agreement that products that are found to be infringing are not non-infringing alternatives for those patents. That's not in dispute.

But I think Imperium wants to go further and say anything that's even accused of infringing a particular patent isn't going to be a non-infringing alternative. But as we explained in our opposition, this sweeps in products that Imperium is accusing of infringement but that the jury finds don't in fact infringe.

If the jury finds that they don't infringe, the jury should be allowed to consider whether those are

50

non-infringing alternatives, and you, Your Honor, on JMOL

should be allowed to consider whether those are

non-infringing alternatives.

     Moreover, if the jury finds that a class of products,

of accused products such as mobile phones, for example, for

the '029 patent don't infringe, the jury should be permitted

to consider the accused features of the mobile phones and

whether they would apply -- that functionality would apply

to a different class of accused products.  For example, the

digital cameras that are going to be accused for the '029

patent.

     Your Honor, both parties in their MIL -- Imperium in

its MIL and Samsung in our opposition -- cited the SRI v

Internet Securities Systems case from the District Court in

Delaware for the same exact proposition, and I think it's a

good one.

     The case says that generally, non-infringing

alternatives include any products found to be non-infringing

or products that are not accused of infringement.

     That's exactly what we think the rule should be in this

case.

          THE COURT:  Response.  So they want it to be

considered if the jury does find that a product isn't

infringing, that it could also -- then at that point they could

consider whether that's a non-infringing alternative.

1    MR. SALTMAN:  Your Honor, if a product is found not

2  to be infringing, then it doesn't need to be a non-infringing

3  alternative because it's non-infringing so it's found not to

4  infringe.

5    I think as far as -- the argument is just extremely

6  confusing that the jury has to presuppose a

7  non-infringing -- it presupposes a non-infringement finding.

8  And as the cases we cite, Your Honor, the Stryker case, the

9  TV Interactive and the SRI International, say that

10  non-infringing alternatives cannot include -- include any

11  products found to be non-infringing or not accused.

12    So I think that presupposes a finding of

13  non-infringement by -- prior to trial, because if it's

14  during trial, it just confuses the issues I think for the

15  jury, Your Honor.

16    THE COURT:  I agree.  I think it does cause great

17  confusion to the jury.  I'm going to grant six.

18    Seven.

19    MR. SALTMAN:  Thank you, Your Honor.  Jeff Saltman

20  again on behalf of Imperium.  May it please the Court.

21    Imperium has a number of settlement agreements dating

22  to the Imperium 1 case that are all lump sum settlements for

23  all of Imperium's patents.

24    Dr. Perryman has relied upon those settlements as one

25  of his reasonableness checks, stating that, for example,

1   Apple sells more phones than Samsung does.  Therefore,

2   Samsung would pay less under a license.  But there is no

3   information XXXXXXXX(Redacted by Court order)XXXXXXXXXXXX

4   XXXXXXXXXXXXXX Dr. Perryman admitted at his deposition that

5   he had no information about XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8        I know the language of the patent -- of the license

9   states XXXXXXXXXXXXXXXXXXXXXXXXX.  I mean, XXXXXXXXXXXXXXXX

10  XXXXXXXXXXXXXX, well, that includes the XXXXXXXX, which

11  clearly doesn't have a camera.

12       So it's unclear as to XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXXX because we don't -- there's no information

14  that was produced during discovery from any party, including

15  Apple, that would indicate that information.

16       And I'm using Apple as an example, Your Honor.

17            THE COURT:  Right.

18            MR. SALTMAN:  So I don't have a problem -- I know

19  they referenced in their opposition the value of various

20  patents in the portfolio, trying to weigh those.  That's not

21  the issue.  The issue is a unit number, trying to come up with

22  a unit comparison to the accused units in this case, and you

23  just can't do that because XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25            THE COURT:  Response.

MS. CARRIZOSA:  Your Honor, Rebecca Carrizosa on behalf of Samsung.

Imperium seeks to preclude Dr. Perryman from making any comparisons of the units licensed under the settlements to the accused units in this case, but Imperium's motion fails both on the law and the facts of this case as applied to the law.

Importantly, Imperium has not sought to exclude these settlement agreements, as was done in the Data Treasury case it cites, nor did Imperium file a Daubert motion suggesting that Dr. Perryman's analysis of the settlements was unreliable, as the plaintiffs did in the Alexsam versus Pier 1 Imports case, another case cited by Imperium.

And the Wordtech Systems, Federal Circuit case cited by Imperium, is also about pretrial motions -- is not about pretrial motions.  It's a 59(a) new trial motion where the Federal Circuit found both the lump sum and running royalty agreements were insufficient to support the jury's lump sum amount.

Imperium is simply seeking to have it both ways:  Let the settlement agreements in to bolster their contentions about the patents-in-suit not being obvious, and put large XXXXXXXXXXXXX settlement amounts in front of the jury, but without allowing Samsung to give the jury context that would allow them to understand what those agreements represent in

1    an economic sense.

2        Samsung and Dr. Perryman have done exactly what the

3    Federal Circuit requires, as explained in Wordtech Systems

4    and ResQNet.  Comparisons of past patent licenses to the

5    infringement must account for the technological and economic

6    differences.

7        Now, counsel just mentioned that they don't seem to

8    dispute that he can talk about the patent grading and the

9    different weights of the patents within the portfolio.  As

10   to the units, Dr. Perryman talks about the length of the

11   agreement, the number of years covered, geography world-wide

12   and market share, particularly in the U.S. and world-wide.

13   That's all information that can be useful to the jury to

14   determine what that settlement agreement amount meant.

15       If Imperium disagrees with what he's done, they're free

16   to cross-examine him.

17           THE COURT:  Thank you.  I agree with Samsung.  I'm

18   going to deny seven.

19       Eight.

20           MR. BATTAGLIA:  Good morning again, Your Honor.  May

21   it please the Court, John Battaglia on behalf of Imperium.

22       Eight is our motion in limine to exclude use or

23   reference or argument based on documents that are basically

24   trying to make a comparison between apples and oranges.

25   These are FAS documents or financial accounting documents

1   prepared for and pursuant to securities and accounting

2   standards and do not speak to the proper valuation of

3   patents, as is done under patent law per the Georgia Pacific

4   Factors.

5       And so they are irrelevant, but at the minimum, we

6   submit, Your Honor, they're barred under Rule 403 as being

7   misleading, because to use these documents would then

8   require explanations about why these documents are valuing

9   this under the securities laws or under a different

10  accounting standard and so on, so forth.  It would create a

11  real sideshow about the valuation of the patent portfolio,

12  when those documents are not speaking to the analysis that

13  is actually required by the patent laws and that Your Honor,

14  I think we all agree, will be instructing the jury on when

15  they make their final assessment in the final jury

16  instructions, using Georgia Pacific and all the other proper

17  damage analyses.

18      So these documents, we submit, Your Honor, should be

19  precluded under -- either under 401 as irrelevant, or in the

20  alternative, as misleading and unduly prejudicial and all

21  the rest under Rule 403.

22          THE COURT:  Thank you.  Response.

23          MR. HARNETT:  Good morning again, Your Honor.  Chris

24  Harnett for Samsung.

25      The documents in question are required to be submitted

1   by a company like Imperium under Financial Accounting

2   Standard No. 157.  The definition -- and that's exactly what

3   Imperium did.  They submitted these documents.  The

4   documents themselves say that the valuation is per National

5   Accounting Standard No. 157, and they say that they talk

6   about the valuation pursuant to that standard.

7       The definition of fair value in FAS 157 is this:  Fair

8   value is the price that would be received to sell an asset

9   or paid to transfer a liability in an orderly transaction

10  between market participants at the measurement date.

11      Okay.  We asked Mr. Michaelson about these documents.

12  He said he made them as true and accurate as possible.  It's

13  an admission against interest.

14      The fact that it may take some testimony to explain it,

15  that doesn't make it irrelevant.  That doesn't make it

16  prejudicial.  It's an admission.  They've admitted pursuant

17  to an established Financial Accounting Standard what they --

18  at a particular snapshot in time, what they thought the

19  value of the entire patent portfolio was.

20      All evidence in some ways is prejudicial.  The question

21  is, is it unfairly prejudicial.  This is an established

22  Financial Accounting Standard.  It's an admission against

23  interest.  It's relevant to the value of the portfolio

24  because there will be testimony about the sale value, the

25  license value.

1       It's just a matter, I believe, that Imperium doesn't

2   like what its own chief executive officer said about the

3   value of the patent portfolio.  That's not the basis to

4   exclude evidence.

5       If they need to explain it, they had the opportunity to

6   ask redirect questions in his deposition.  They can bring

7   Mr. Michaelson to come and testify.  There's no reason

8   Samsung should not be permitted to rely on these, Your

9   Honor.

10              THE COURT:  Response.

11              MR. BATTAGLIA:  It's just the same point though.

12  It's Rule 403 though because it's a document that's created for

13  a different purpose pursuant to different standards under the

14  securities and accounting standards.  He read one of the

15  standards, but there are multiple standards under the FAS that

16  they have to satisfy.  And they testified about it and they

17  testified that that does not represent what we sell the patent

18  portfolio for.

19      But be that as it may, having to get into a sideshow

20  explaining the securities laws or the Financial Accounting

21  Standards and what these documents speak to, that's really

22  far astray from what the jury has to focus on with respect

23  to determining damages under the patent laws.  And using

24  these documents is unfairly prejudicial and gets us into

25  this morass of securities laws and all the rest where I

1   don't think -- there's not even necessarily disagreement

2   that we would have to have jury instructions explaining

3   securities laws in a patent case.  It doesn't make sense.

4           So we submit, Your Honor, it should be excluded under

5   403.

6                   THE COURT:  I'm going to grant eight.

7           Nine I think is the last one.

8                   MR. YELLIN:  Good morning, Your Honor.  Sruli Yellin

9   on behalf of Imperium.

10                  THE COURT:  What was your name, sir?

11                  MR. YELLIN:  Sruli Yellin.  It's a tough one.

12                  THE COURT:  All right.  Go ahead.

13                  MR. YELLIN:  Your Honor, Imperium's position is that

14  your ruling denying leave to amend the invalidity contentions

15  resolves this motion in limine, and so that's -- that's our

16  position.

17                  THE COURT:  Any disagreement on that?

18                  MR. MIDDLETON:  Alex Middleton for Samsung.  No

19  disagreement.

20                  THE COURT:  Okay.  So I'll grant nine.

21          Okay.  So now we have the other side.

22                  MR. HARNETT:  Number 1, Your Honor --

23                  THE COURT:  Wait one second.  Let me get that motion

24  in front of me.  I think No. 1, isn't that our Reagan --

25                  MR. HARNETT:  Yes, Your Honor, it is.  I'll make the

1   argument simple.  Your Honor saw the video.

2          THE COURT:  Well, let me tell you, I -- I know you

3   raised the issue.  I enjoyed it.  I thought that was the best

4   tutorial I've ever seen in all the Markmans I've done in terms

5   of being engaging and entertaining, so -- I've actually

6   mentioned that at different seminars about putting tutorials

7   together for judges who are not technical experts themselves.

8          So anyways --

9          MR. HARNETT:  The difference is -- oh, go ahead.

10          THE COURT:  No, I understand that -- I didn't really

11   take it as argumentative, but in terms of -- what I always say,

12   for Judges who don't do this all the time, I thought it was a

13   good tutorial.

14          MR. HARNETT:  Yes, Your Honor.  That's precisely the

15   difference.  Your Honor is the Judge.

16          THE COURT:  I watched both, but I just -- it didn't

17   impact the decision.  I'm just saying in terms of introducing

18   the materials.  But go ahead.

19          MR. HARNETT:  We just think the glossy historical

20   imagery of Ronald Reagan, anti-ballistic missiles has nothing

21   whatsoever to do with the issues that the jury is going to be

22   asked to decide, infringement and validity, and it's unfairly

23   prejudicial under Rule 403.  Talking about sideshows, I think

24   that would become a sideshow.

25          THE COURT:  Mr. Battaglia.

1          MR. BATTAGLIA:  Your Honor, with respect, we submit

2    that's part of every patent trial is to explain as background

3    where the patented technology came from, and that's -- per the

4    tutorial you saw, that's explaining where the technology came

5    from.  It is part of the narrative integrity, as the Supreme

6    Court put it, in terms of deciding relevance, so that's just

7    part of the story here.

8          THE COURT:  Well, I mean, is that the story?  The

9    question is -- I know they mention it's not the expert's -- or

10   the inventors don't talk about that I think but --

11         MR. BATTAGLIA:  That's right.

12         THE COURT:  And it was many years before.  So is it

13   truly part of the story?  I mean, you'll have evidence to

14   establish that?

15         MR. BATTAGLIA:  We have other witnesses who can speak

16   to it, Your Honor, yes.

17         THE COURT:  So, Mr. Harnett, let me ask you, I mean,

18   if it's part of the story, it's part of their story, if they

19   can link it up.  I mean, if they can't link it up, it won't

20   look good in front of the jury.  I mean, if -- but the issue is

21   if they believe it's part of their story and if they have

22   evidence to establish that, why shouldn't they be able to tell

23   their story?

24         MR. HARNETT:  Well, we're in a political season here,

25   Your Honor, in the United States and I think that this

1  reference to Star Wars, this reference to President Reagan

2  underlies some sort of nationalist sentiment, Your Honor, and I

3  think that under -- that there is a great risk that this sort

4  of presentation may bias a jury against a foreign corporation.

5  And as I said, under Rule 403 --

6           THE COURT:  We have two foreign corporations.

7           MR. HARNETT:  Under Rule 403 it has nothing to do

8  with the question of is it more likely or not that Samsung

9  infringes or is it more likely or not that the patents are

10  invalid.  Has nothing to do with the ultimate issues that are

11  going to be decided.  It's a sideshow.  It's distracting.  It's

12  prejudicial.

13           THE COURT:  Well, I'm going to deny it.  And this

14  happens in all of -- even my regular civil cases, that one side

15  wants to tell their story and part of that story is things the

16  other side doesn't necessarily want to be discussed, but I

17  think if it comes in the story that one side has to tell or

18  they want to tell, I'm not going to prevent that.

19      Okay.  Two.

20           MR. BRENNER:  Samuel Brenner again for Samsung, Your

21  Honor.  One second, Your Honor.

22      Your Honor, the parties agree -- this is a copy of 35

23  USC 298 and it says that the failure to obtain the advice of

24  counsel may not be used to show willfulness or induced

25  infringement.

1      And, by the way, this is Exhibit 9 to Samsung's MILs

2 which I'm showing you right now.

3      Your Honor, the parties agree that this is what 35 USC

4 298 says.  I think the only disagreement is whether the

5 provision applies in this case.

6      As we explained in our motion in limine, it does,

7 because in 2013 Congress passed a new law that changed the

8 effective date, and that's what you see here as highlighted.

9 What that says under the effective date is that the section

10 we're discussing, Section 298, shall apply to any civil

11 action commenced on or after January 14th, 2013.  This case

12 was filed in June of 2014, a year and a half after that,

13 Your Honor.

14      Imperium's opposition relies on an unpublished case in

15 which the Court did not discuss or cite this language.  This

16 is, again, the result of a law that was passed in 2013

17 called Leahy-Smith America Invents:  Technical Corrections.

18 This is the law, and with respect, we submit that Congress's

19 statute governs here.

20           THE COURT:  Mr. Sigler, you're responding?

21           MR. SIGLER:  Yes, Your Honor.  Bill Sigler on behalf

22 of Imperium.

23      Your Honor, the Federal Circuit's holding in the

24 Suprema case back in September is directly on point here.

25 The Court in that case held that this provision, Section

1   298, does not apply to patents issued -- or it only applies

2   to patents issued after September 16th, 2012, Your Honor.

3   The patents here --

4           THE COURT:  And did they address this issue of the

5   statute?

6           MR. SIGLER:  Yes, they did, Your Honor.

7           THE COURT:  I have not read this but I'm going to.

8   But go ahead.

9           MR. SIGLER:  Yes, Your Honor.  In our brief on page

10  three we have the quote there from the Suprema case, and in

11  that case the accused infringer was trying to preclude the

12  evidence of its failure to get an opinion of counsel from

13  coming in under this provision, and the Federal Circuit said

14  this provision does not apply to patents issued before

15  September 16, 2012.

16      All three patents here in this case, Your Honor, issued

17  before that date.  Therefore, this provision does not apply

18  under this controlling Federal Circuit case.

19          THE COURT:  But in Suprema did they actually

20  address -- the quote you say doesn't address the issue of the

21  change of the effective date.

22          MR. BRENNER:  Your Honor, may I respond?  I

23  apologize.

24          THE COURT:  Well, let me -- Mr. Sigler, if you want

25  to answer that first and then I'll give you a chance.

1      MR. SIGLER:  Sure.  And I apologize, Your Honor.

2  What was the question?

3      THE COURT:  No.  I said is the effective -- Congress

4  changed the effective date of the statute, so did Suprema deal

5  with that issue?  The quote you gave me doesn't indicate one

6  way or the other whether they addressed the issue of, one,

7  whether the AIA applied to certain -- only patents filed after

8  a certain date versus this idea that -- I just want to make

9  sure, do you believe they addressed this issue?  I mean, they

10  actually addressed the issue that the statute got changed in

11  terms of the effective date?

12      MR. SIGLER:  Your Honor, I don't know if they -- I

13  don't think they addressed that particular issue, but they

14  certainly addressed the application of this particular statute,

15  and you can see that in the quote on page three of our brief.

16  And this case came out in 2015, several years after this law

17  that counsel for Samsung is pointing to, Your Honor.

18      THE COURT:  Okay.  Go ahead.

19      MR. BRENNER:  May I respond, Your Honor?

20      THE COURT:  Yes.

21      MR. BRENNER:  Your Honor, this is the language from

22  the unpublished on remand decision in Suprema that opposing

23  counsel is referring to.

24      First of all, I would like to say, the Suprema case has

25  been around for a very long time.  I believe the initial

1  case was filed well before I believe the AIA was passed

2  itself and certainly well before this law, the effective

3  date was changed.

4      So this is an unpublished case.  It's dicta.  It

5  doesn't talk about the law, the actual law that changed.

6      Your Honor, we submit that Congress was explicit that

7  this statute applies in this case.

8          THE COURT:  Well, I'm going to grant two.  I believe

9  that Suprema is not really binding and it was issued -- that

10  case was issued before the decision by Congress to change the

11  date, so --

12     Okay.  No. 3.

13         MR. SIEBMAN:  Yes, Your Honor.  Clyde Siebman.

14     With respect to No. 3 what we're asking for is a motion

15  in limine to prevent Imperium from making any comment about

16  the assertions of privilege or inclusion of documents on

17  privilege logs.

18     We think that would be totally for the purpose of

19  prejudicing the jury.  It would undermine the privilege in

20  that it's a comment on the privilege and it would be highly

21  inappropriate.

22         THE COURT:  Response.

23         MR. BATTAGLIA:  The response, Your Honor, is pursuant

24  to this Court's decision in SynQor, as Judge Ward explained,

25  the privilege is inappropriate or otherwise the privilege

1  objections can be played and shown to the jury when you have a

2  sword/shield issue, and that's exactly what we have here where

3  Samsung is precluding investigation, discovery, deposition

4  questions into issues that go to willfulness, what they did

5  when they learned about the patents, did they conduct an

6  infringement analysis, what patents did they actually look at,

7  did they actually look at prior art.

8        They shut down questioning on all those topics and now

9  want to turn around and use their witnesses to argue that

10  they can't meet their burden on willfulness because they

11  don't have discovery, don't have information on what

12  investigation Samsung did, what prior art did they look at,

13  did they conduct an investigation with respect to

14  non-infringement.

15        And that is just like Judge Ward's decision in SynQor

16  where he said where you have that sword/shield dynamic, and

17  that's exactly what we have here, then yes, you can play the

18  objections to the jury.  Otherwise, it would paint a

19  misleading picture to the jury about the state or extent of

20  whatever prior investigation they claim to have done in

21  saying that we looked at this, we found prior art.

22        Well, it gets a little deeper than that when the

23  witnesses are getting shut down on questions about they

24  didn't -- they can't answer or won't answer per a privilege

25  instruction what prior art they looked at, so on, so forth.

1   That makes it just like the SynQor decision and consistent

2   with all the principles in other Courts saying you can't use

3   the privilege as both a sword and a shield.

4           MR. SIEBMAN:  Your Honor, it's not like that

5   decision.  They've not contested the assertion of privilege in

6   any way.  They didn't move to compel.  They didn't take any

7   action with respect to the privilege issue.

8       It's not a situation of sword and shield.  We're not

9   communicating part of the information and withholding other

10  information.

11      It would simply be read to this jury to prejudice the

12  jury in terms of the assertion of privilege and the use of

13  privilege logs.  Its purpose is simply to prejudice the

14  jury.

15          THE COURT:  Well, I'm going to grant three.

16      Now, again, all these are just motions in limine.  You

17  just have to approach the bench, and I'm not saying that I

18  wouldn't let it in but I'll wait until -- you just have to

19  approach the bench about the issue.

20      Okay.  Four.

21          MR. JENNER:  Jesse Jenner, Your Honor.  Good morning.

22          THE COURT:  Good morning.

23          MR. JENNER:  This is what I would characterize, Your

24  Honor, as a relatively boilerplate motion in the sense of

25  seeking to preclude testimony or evidence about other lawsuits

1    not involving the patents-in-suit here, and we have given you

2    examples of why this would be a problem.  We referred to the

3    witness, Mrs. Riley, who referred to the Apple/Samsung

4    litigation for the proposition that Samsung has been found to

5    infringe other patents in that case, patents that have

6    absolutely nothing to do with this case.

7         We also referred to the Witness Parulski where there

8    was some reference to the fact that he previously worked for

9    Kodak, and by the way, Samsung paid $550 million to Kodak

10    in order to settle another matter, again having absolutely

11    nothing to do with this.

12         I don't see how reference to that kind of information

13    could be anything other than pure prejudice, which other

14    Courts have routinely precluded.

15         We did submit to Your Honor reference to three

16    exemplary situations:  ContentGuard, Mobile

17    Telecommunications and Wi-LAN as examples of where Courts

18    have granted such a motion.

19         I don't see that the opposition to this motion really

20    contests this.  The opposition refers to some very specific

21    kinds of procedural or evidentiary matters that could come

22    up.

23         One example that's given is the potential need to

24    impeach a witness with testimony from another case.  Well,

25    number one, if you're going to impeach the witness with

1    testimony, you can read him the questions and the answers

2    without even getting at the caption of the case, and

3    certainly not getting into any of the accusations or

4    remedies that were in the case.

5        And if there was some reason to refer to the title of

6    the case, then I submit the appropriate thing to do would be

7    to approach Your Honor before doing that and explaining why

8    it's necessary to invoke the caption of the other case.

9        Another example that's given is the possibility that in

10   one of the other cases there could be an admission against

11   interest or a party admission.  Once again, if there is such

12   a party admission, that can be presented without going into

13   the caption of the case.  If the caption is necessary,

14   approach Your Honor and explain why, and there shouldn't

15   have to be reference to any of the accusations, allegations

16   or remedies in the case.

17       So all the procedural reasons why Imperium says this

18   motion should not be granted are really very particular.

19   They probably don't require identifying the cases, and if

20   they did, they're classic situations why the parties should

21   approach Your Honor first and seek permission to do anything

22   having to do with the title of the case.

23       The goal here is to keep out prejudicial information,

24   such as accusations that were made, other patents that were

25   alleged to be infringed, settlements that were made,

1  remedies that were made, which are clearly prejudicial, have

2  no value whatsoever as far as the patents in this suit are

3  concerned.

4      So I would submit to Your Honor that it would be

5  appropriate to grant this motion, just as this type of

6  motion is really routinely granted in virtually all cases.

7          THE COURT:  Response.

8          MR. SIGLER:  Thank you, Your Honor.  Bill Sigler on

9  behalf of Imperium again.

10     Your Honor, there's really two cases that are impacted

11  by this motion.  The first one is the Apple versus Samsung

12  case, Your Honor.  And Samsung itself made that case

13  relevant here, Your Honor.

14     You've heard throughout the case that Samsung

15  approached Imperium in 2011 about buying Imperium's patent

16  portfolio, and the gentleman from Samsung who made the first

17  contact with Imperium was the inside counsel for Samsung

18  managing the Apple versus Samsung litigation.

19     Now, Your Honor, we have deposition testimony on that

20  and it's certainly relevant here because we have asked a

21  number of Samsung witnesses throughout this case why they

22  were interested in buying Imperium's patents.  None of them

23  have given us an answer.

24     Your Honor, this evidence of the counsel responsible

25  for the Apple case reaching out to Imperium should be

1    available to the jury as at least one potential reason why

2    they were interested in buying our patents, Your Honor.

3         And I will note in the Apple case Samsung asserted a

4    patent against Apple that it purchased from Hitachi at

5    around the same time, Your Honor.

6         Related to that, Your Honor, one of their technical

7    experts, Mr. Parulski, was indeed the expert witness in the

8    Apple versus Samsung case who testified about that patent

9    that Samsung had bought from Hitachi.

10        Mr. Parulski relies on, like many other experts, his

11   professional experience, his personal and professional

12   experience.  That certainly includes his experience in the

13   Apple versus Samsung case.  Samsung chose to rely on him as

14   their expert in this case, and if he's relying on his

15   experience working on that case, Imperium should be

16   permitted, under Rule 705 and other rules, to explore that

17   as a basis for his opinions.

18        The other cases, Your Honor, that are relevant under

19   this motion are a series of cases that Kodak, Mr. Parulski's

20   former employer, brought against Samsung.  And indeed, those

21   cases involve patents on which Mr. Parulski is an inventor.

22        I asked Mr. Parulski in his deposition, are you relying

23   on your experience working in licensing at Kodak and dealing

24   with companies like LG and like Samsung in particular, and

25   he said yes, he is.  He's their licensing expert in this

case with respect to willfulness and he's relying on his

experiences he had at Kodak.  And they include his

experiences testifying in the case that Kodak brought

against Samsung, for example, before the ITC in Washington,

Your Honor.

So, Your Honor, again, under 705 and other rules, if

he's relying on that, Imperium should be permitted to

explore the bases of his opinions.

THE COURT:  Response.

MR. JENNER:  Well, Your Honor, with respect, I think

counsel really makes my points.

Number one, as far as the business about buying

patents, there's no evidence whatsoever that anybody was

interested in buying patents for the Apple litigation.

But here again, if they want to ask a witness whether

or not you wanted to buy patents for use in another case,

they can ask that question without getting into Apple versus

Samsung specifically, about which there's no evidence.  And

if they had some reason to even mention the Apple case, they

could approach the bench and say this is what we want to do

and here's why we want to do it.

But if they simply want to say:  Did you consider

buying patents for use in another case?  Answer yes or no.

That's no reason to open the door as to what patents were in

the Apple litigation and whether or not Samsung had to pay

1    any damages.  That really demonstrates how far afield the

2    justification is from the potential harm.

3         The same thing with Mr. Parulski.  He was an expert on

4    another patent in the Apple case, to which I would say, so

5    what?  They want to ask him about his experience and his

6    expertise.  They can ask him who he has testified for in the

7    past and the answers would be companies one, two, three,

8    four, five, Kodak, Apple, eight, nine and ten.

9         That doesn't get into the Apple versus Samsung

10   litigation or what the claims and remedies were.  It

11   certainly doesn't get into the Kodak litigation and what the

12   settlement was.

13        Those are classically sideshows if there's anything

14   more than the limited questioning that might be invoked by

15   what counsel refers to.

16        To the extent they want to ask about experience, ask

17   about experience.  That has nothing to do with the other

18   case or what the other case remedies were and claims were.

19        So I think the limited purposes that counsel has

20   brought up, number one, could be put to Your Honor at the

21   time, and they demonstrate the irrelevance of going into

22   those cases and bringing out the -- the claims that were

23   made in those cases, the -- the remedies in those cases, the

24   amounts of damages, all of which could do nothing other than

25   to prejudice the jury.

1          THE COURT:  Mr. Sigler, would you respond to that,

2     this issue of can't you ask all those questions?  Why is the

3     Apple/Samsung litigation relevant to -- even though it's maybe

4     the backdrop of where some of that information came from, but

5     why is that an issue we have to get into and can't you get all

6     that information without the jury hearing about that

7     litigation?

8          MR. SIGLER:  Well, Your Honor, I can't get all that

9     information without the jury hearing about it, and the reason

10    for that is that the individuals that were involved in reaching

11    out to Imperium and inquiring about buying their patents and

12    analyzing Imperium's patents back in 2011 are not coming to

13    trial.  We have to rely on their deposition testimony, Your

14    Honor, and that deposition testimony shows that at least

15    Mr. Shim was working on the Apple versus Samsung case at the

16    time.

17       So I can't preview that for a witness on the stand and

18    then get into it.  I mean, this is all in deposition

19    testimony because Samsung has chosen to not bring these

20    witnesses to trial.

21          THE COURT:  But I guess they can testify via

22    deposition, but why do you have to get into that litigation?

23    That's what I'm trying to understand.  These questions that

24    were asked about whether or not they were interested in buying

25    the Imperium patents, I'm trying to understand why -- why the

1  jury would ever have to hear, even by video deposition or the

2  deposition itself, why would they have to hear that?

3          MR. SIGLER:  Well, Your Honor, it goes to willfulness

4  certainly.  The fact that Samsung knew about Imperium's

5  patents --

6          THE COURT:  No, that's fine.  What I'm saying is the

7  issue of the person testifying about who they're asking on

8  behalf of, those things are all fair game, but the idea of

9  getting into the other litigation, that's what I'm trying to

10 understand is why does it matter and why can you not present

11 the testimony that you want to present without that being

12 mentioned by the witness?

13         MR. SIGLER:  Sure, Your Honor.  It does matter for a

14 specific reason.  Mr. Parulski, their expert on willfulness for

15 the three patents --

16         THE COURT:  Well, let's talk about the fact witness

17 first.  You were talking about the one deposition you were

18 talking about using, Sim or --

19         MR. SIGLER:  Mr. Shim, Your Honor.

20         THE COURT:  Shim.  I'm sorry.  So explain to me

21 related to that deposition why it's necessary to go into the

22 other litigation.

23         MR. SIGLER:  Sure, Your Honor, and this is related to

24 Mr. Parulski's opinion, which I was going to.

25      Mr. Parulski has offered a number of opinions as to

1  hypothetically why Samsung may have been interested in

2  buying Imperium's patents.  He has not offered an opinion on

3  why in fact they were.  He hasn't talked to anyone at

4  Samsung.  Samsung hasn't produced any testimony showing why

5  they were attempting to buy our patents.

6      So, Your Honor, all that evidence is relevant to show

7  potential reasons why Samsung was interested in buying our

8  patents, because their expert has based part of his

9  willfulness opinion on these hypothetical allegations as to

10  why Samsung may have been interested and he goes into why he

11  thinks these other potential reasons for buying our patents

12  show that their infringement wasn't willful.

13      So for that reason, Your Honor, we do think this is

14  relevant information.  It undermines Mr. Parulski's opinions

15  on this.

16          THE COURT:  Okay.  Well, I'm going to grant four with

17  the exception that I'll give you some leeway on this situation

18  of -- well, I'm going to grant it.  I guess if you can submit

19  to me the deposition, I want to -- I need to see it.  So I'm

20  not saying I won't let you do it, but -- I mean, I have no

21  problem with you getting into all the testimony regarding their

22  desire to buy it.  I just can't -- I can't mentally figure out

23  why the Samsung/Apple litigation needs to be getting -- why the

24  witness would have to talk about that.  But if you want to show

25  me in the deposition excerpts that you're wanting to submit,

1　then I may change my view on that.

2　　　　　MR. SIGLER:  Sure, Your Honor.  We're happy to take

3　it up when we submit that deposition for entry into evidence.

4　　　　　THE COURT:  Okay.

5　　　　　MR. SIEBMAN:  And, Your Honor, we can work with him

6　when we do the page and line designations.

7　　　　　THE COURT:  That's fine.  I just need to see it.  And

8　again, I'm not saying I won't allow it.  I just want to -- but

9　until I can see it, I --

10　　　Okay.  Why don't we do this, why don't we go ahead and

11　take -- my court reporter would probably love a break.

12　Let's take about 15 minutes and we'll come back and

13　continue.

14　　　　　　　　　(Recess.

15　　　　　THE COURT:  Please be seated.

16　　　No. 5.

17　　　　　MR. MIDDLETON:  Alex Middleton for Samsung again.

18　　　Samsung's MIL No. 5 relates to argument, testimony,

19　evidence or reference to denials of motions for summary

20　judgment.

21　　　In particular, in the previous case between Imperium

22　and Apple, the Defendants in that case filed a motion for

23　summary judgment of invalidity of five patents, including

24　the '884 patent which is at issue here.  That motion was

25　denied, and Imperium seeks to use that denial of summary

1 judgment in this case.

2     Now, the denial of summary judgment doesn't show that

3 the patents were valid.  All the denial shows is that there

4 was an issue of fact that has to be considered by the jury.

5 And -- but a jury here isn't going to understand the

6 distinction.  They'll see an order saying I'm denying a

7 motion that these patents are invalid and they'll think the

8 patents must be valid and they will put undue weight on this

9 and be confusing to the jury and prejudicial to Samsung.

10     Imperium argues that they should be able to rely on the

11 denial of the motion in order to rebut certain opinions that

12 they say that they wouldn't be able to otherwise rebut from

13 Samsung's expert, Dr. Neikirk.  This is wrong for two

14 reasons:  The denial of summary judgment doesn't rebut his

15 opinions, and also Imperium is free to rebut with other

16 evidence.

17     So there are two statements that Dr. Neikirk made that

18 they're pointing to.  So one is that Dr. Neikirk includes in

19 his report that he has seen no evidence that any clause of

20 any of the license agreements between the Defendants and

21 Imperium from the first Imperium case recognized the

22 validity of the '884 patent.

23     Now, the denial of summary judgment won't change what's

24 in the contract and doesn't have any relevance to what's in

25 the contract.

1        If they want to present evidence that there's something

2  in the contract that shows that the parties did consider and

3  did determine or thought that the '884 patent is valid, then

4  they're free to present that.  So we're not stopping them

5  from presenting that information.

6        Dr. Neikirk also said that he did not see any evidence

7  that during the negotiation specifically relating to those

8  licenses that the parties actually discussed the validity of

9  the '884 patent.

10        And, again, the denial of the summary judgment motion

11  isn't going to show whether or not the parties actually

12  discussed during those negotiations the validity of any of

13  the patents.  At best, it shows that the parties disputed

14  the validity of the patent, particularly, the Defendants

15  disputed that validity, but there are other ways that

16  Imperium could, if they want to show that to the Court, for

17  example, or to the jury they could show, for example, there

18  was an answer in that case.  You don't need to get into --

19  I'm sorry.  And the answer will have the defenses and they

20  dispute the validity of the patents.

21        There's no need to try to use this prejudicial

22  information or evidence to show this to the jury.

23             THE COURT:  Response.

24             MS. JORDAN:  Good morning, Your Honor.  Silvia Jordan

25  on behalf of Plaintiff Imperium.  Thank you for the opportunity

1    to be heard on this issue.

2         As a preliminary matter, Imperium does not intend to

3    use the summary judgment denial of invalidity in the

4    Imperium 1 case as evidence that the '884 patent is valid.

5    Rather, we intend to use the summary judgment denial to

6    rebut Dr. Neikirk's opinion that the validity of the '884

7    patent was not discussed or considered during the licensing

8    and settlement negotiations between Imperium and the

9    Imperium 1 Defendants.

10        The fact that summary judgment on invalidity was denied

11   means that a reasonable jury could find that the '884 patent

12   was not invalid, and that certainly would have been

13   something that the parties considered.  The issue is still

14   alive, it's still kicking, it's on the table.  It would have

15   been something that the parties considered going into

16   settlement negotiations and determining how much they were

17   willing to pay for license to the Imperium patents.

18        So Imperium should, as a matter of fairness, be

19   permitted to present evidence rebutting Dr. Neikirk's

20   opinion that the '884 patent's validity was not given any

21   attention during the discussions between the Imperium 1

22   Defendants and Imperium for licensing and settlement

23   purposes.

24             THE COURT:  Thank you.  Well, I will grant five with

25   the exception of I will allow it to be used for impeachment if

1    Dr. Neikirk makes that opinion, so --

2              MS. JORDAN:  Thank you, Your Honor.

3              THE COURT:  If he doesn't, then you won't be able to

4    use it.

5         Okay.  Six.

6              MS. CARRIZOSA:  Your Honor, Rebecca Carrizosa again

7    on behalf of Samsung in regards to Samsung's Motion in Limine

8    No. 6.

9         In Imperium's opposition, Imperium has stated that it

10   agrees not to argue Samsung's total profits and revenues,

11   and so based on that, Samsung is still moving for an order

12   precluding Imperium from offering any argument, testimony or

13   evidence concerning Samsung's size and wealth and the price

14   of the accused products.

15        Both of these kinds of information similarly risk

16   misleading and confusing jurors, and we seek to exclude them

17   under Federal Rules of Evidence 402 and 403.

18        I'll start with size.  We do not dispute that Samsung

19   is a world-leading technology company with over 15,000

20   employees in the U.S., 7,000 just here in Texas, and that

21   it's considerably bigger than Imperium, which I understand

22   has two employees.

23        That is certainly relevant to the Georgia Pacific

24   Factors and the bargaining position of the parties at the

25   hypothetical negotiation.  Samsung intends to present that

1    evidence at trial as set forth in Dr. Perryman's expert

2    report.

3         That is the only evidence Imperium identifies about

4    size, and if that's all Imperium intends to argue, there's

5    no dispute.  But just as revenue is a measure of size, so is

6    wealth, and that should not open the door to Imperium

7    improperly making arguments about those sorts of measures of

8    size, for example, large billion dollar figures from

9    Samsung's balance sheet.

10        On January 19th Your Honor granted a motion in limine

11   by the Defendant in the Motio, Inc. versus BSP Software

12   case.  That was Docket Item 248 stating that Plaintiff

13   should not introduce, argue or mention in trial evidence

14   Avnet's size, total profits or total revenues.

15        I'll address the issue of the price of the accused

16   products next.  Contrary to Imperium --

17             THE COURT:  That's not fair pointing at a case I just

18   tried.  I'm joking.

19             MS. CARRIZOSA:  Thank you, Your Honor.

20             THE COURT:  Because now you're using that against me.

21   But go ahead.

22             MS. CARRIZOSA:  As to the price of the accused

23   products, contrary to Imperium's position, what Imperium seeks

24   to do is a violation of the Federal Circuit guidance on the

25   entire market value rule.  There's a critical difference

1  between what Imperium seeks to do through Ms. Riley's

2  reasonableness check and what a few courts have allowed in the

3  cases cited by Imperium.

4      Let's take a look at those cases.  In none of those

5  three cases, that's the Fractus case, the Pact XXP case or

6  the TVIIM case from the Northern District of California,

7  were the experts in those cases able to identify a smallest

8  saleable unit.

9      In this case both experts agree that the smallest

10  saleable units are the image sensor and the image processor

11  or some combination thereof.  Those range from, in

12  XXXXXXXXX(Redacted pursuant to Court order)XXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14      Going back to the cases cited by Imperium, the experts

15  were forced to take the price of the total product and

16  provide some apportionment, as required by the Federal

17  Circuit under the entire market value rule and under

18  VirnetX, to isolate the value of the technology.

19      Now, in the Fractus case it was a ten percent

20  apportionment from $140 to $14 for the antenna and that was

21  allowed to be presented to the jury.

22      In the Pact XXP case, that was a Daubert motion, and so

23  it wasn't clear from the briefing whether it was going to be

24  allowed to present the entire price of the accused product

25  to the jury or not, just that the methodology of starting

with the total product and apportioning as was necessary in that case was an okay way to satisfy VirnetX.

I think if we look at the VirnetX case, it's instructive and we can compare it to what Ms. Riley did in this case. In the VirnetX case, Weinstein had multiple theories, and in one of his theories he based his calculations, undisputedly according to the Federal Circuit, on the price of the entire cost of the device, from $199 for an iPod Touch to $649 for an iPhone 4S.

The Federal Circuit goes on to say, indeed, the record supports Apple's contention that Weinstein could have apportioned a smaller per unit figure for Facetime, namely, for the use of the Facetime on Mac computers.

And in this case, in fact both experts agree it's the XXXXXXXX(Redacted pursuant to Court order)XXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

In VirnetX the Federal Circuit goes on to say in the end, VirnetX should have identified a practicing feature with a sufficiently close relation to the claimed functionality. The law requires patentees to apportion the royalty down to a reasonable estimate of the value of its claimed technology or else establish that its patented technology drove demand for the entire product. VirnetX did neither.

And there's no dispute in this case that the

1  patents-in-suit do not drive sales of the accused products.

2      What Imperium seeks to do through Ms. Riley is

3  introduce that the average price of a smartphone is $472.

4  By my very rough calculations -- please don't hold me to

5  XXXXXXX(Redacted pursuant to Court order)XXXXXXXXXXXXXXXXXXXX

6      Clearly Imperium's intention -- and this is through a

7  reasonable royalty check, the basis of which, I'll note, is

8  a discussion that LG had with Imperium, not a signed

9  agreement, nothing that is a consummated agreement between

10  parties.  They seem to introduce that, apply it to a $472

11  price of the entire accused product as a check on damages.

12  That is improper under Uniloc and Laser Dynamics.

13          THE COURT:  Thank you.  Response.

14          MR. SALTMAN:  Thank you, Your Honor.  Jeff Saltman

15  again on behalf of Imperium.  May it please the Court.

16      I'll address the price issue first and then I'll

17  discuss size.

18      Regarding the price issue, Ms. Riley, as Dr. Perryman

19  did, did a reasonableness check too on her reasonable

20  royalty calculation.  And one of those checks was based on

21  negotiations that Imperium had with LG close in time to the

22  hypothetical negotiation.  And those reasonableness

23  checks -- strike that.

24      The negotiations were based on LG proposing a point

25  one percent royalty on the entire price of the phone.

1       So Ms. Riley says, all right, well, the price of the

2   phone here is $472.  Based on that, it would be 47.02, which

3   is much higher than my rate, and she apportions based on the

4   asserted value of the patents, the asserted patents versus

5   the non-asserted patents.

6       So the concern here is not the same as it was in Uniloc

7   or in Laser Dynamics.  In those cases the Plaintiffs put

8   before the jury vast sums of money that said the Defendant

9   made $18 billion, I believe, in the Uniloc case on the

10  accused product.  Ms. Riley is not putting that information

11  before the jury.  She's just using this information as a

12  reasonableness check based on discussions that Imperium had

13  with a third party back around the time of the hypothetical

14  negotiation to check what her number ends up being.

15      As far as the size of Samsung, I don't think there's a

16  dispute on that issue.  I think the point we were making was

17  that Samsung is a very large company.  I don't think there's

18  any dispute about that.  And that their position at the

19  hypothetical negotiation, they would have a stronger

20  position vis-a-vis Imperium at that time.

21      So we're not intending to put forth the entire profits

22  that Samsung makes or the entire revenue that Samsung makes.

23  Instead, the point is that at that time, Samsung was a very

24  large company and Imperium is a small company, and so that

25  would affect how the two parties bargain.

1    The other issue I want to bring up to Your Honor is

2  that I understand that Samsung's motion is not precluding

3  Imperium from relying on the profit percentages for these

4  products.  So, for example, if Samsung's profits are

5  ten percent, we're not going to say that they make a billion

6  dollars a year on these but say they make ten percent of the

7  revenue, because Ms. Riley uses that.  And that obviously

8  would not skew the jury because there's no large numbers

9  that would be before the jury on that issue.

10    THE COURT:  Thank you.  Okay.  I'm going to grant

11  six.  Of course, I granted it in Motio and I allowed them to

12  also talk about percentages.  I don't think that's impacted by

13  the way the request is written.

14    I'll take out the issue of size.  I think you both

15  agree you're going to talk about the size of each company as

16  a general sense, so I'm taking that out of that.

17    Then the issue of price per phone I don't think is

18  covered by the requested instruction anyways.  The motion in

19  limine doesn't talk about the price of the phone.  So to the

20  extent that's the intent, I'm allowing you to talk about the

21  price of the phone.  I don't think that's covered by this

22  anyways.

23    But otherwise, you're not going to be talking about

24  their profits and wealth and everything like that.

25    Okay.  Seven.

1    MR. POST:  Good morning, Your Honor.  Kevin Post on

2  behalf of Samsung.

3    Samsung's Motion No. 7 is directed to testimony that if

4  there -- if there were invalidating prior art to any patent,

5  the PTO would have found it and not issued the patents.

6    This one should be a fairly straight-forward one.  This

7  comes up in the context of testimony that Dr. Wright

8  provided essentially that he has made an assumption that the

9  experts at the Patent Office, they know what's out there,

10  and so during the initial prosecution of the patents, they

11  would have had the opportunity and in fact would have found

12  any art that wasn't cited.

13    And in fact, we have identified uncited prior art that

14  we believe does in fact invalidate the patents.

15    Now, Dr. Wright, he's not an expert in Patent Office

16  procedure.  He's not a patent lawyer.  He doesn't have any

17  particularized expertise that would lead him to be able to

18  offer an expert opinion like this.

19    Moreover, we would submit that there's no basis in fact

20  or law for an assumption like this.

21    On the fact point, there are publications, there are

22  statistics.  If you take Dr. Wright's assumption to its

23  conclusion, no PTAB panel, no District Court Judge, no

24  Federal Circuit panel could invalidate a patent based on

25  uncited prior art, because, well, obviously it would have

1    been found if it existed.  And that's not what the

2    presumption of validity is intended to protect.

3        Imperium cites some case law in support of Dr. Wright's

4    opinion.  That case law doesn't support his assumption.

5    What that case law says is there is a presumption of

6    validity.  We don't dispute that.  That's statutory.  We

7    agree with it.

8        The cases that they cite say if -- with respect to

9    uncited prior art, you might be able to assume that within a

10   field of search that an Examiner would have found the prior

11   art within that field.

12       Now, notably, the prior art that we are going to

13   present at trial, this uncited prior art, is not within that

14   field of search.  Patents have a classification, U.S.

15   patents, foreign patents, right there on the face of the

16   patent.  Those classifications are not in the field of

17   search for the asserted patents, so those cases don't apply

18   whatsoever.

19       And one other point I want to make, Your Honor,

20   Imperium doesn't cite Eye-for-Eye Partnership versus

21   Microsoft.  You may be aware of that case.  It's a Supreme

22   Court case from 2011, June.  It post-dates all but one of

23   Imperium's cited cases.  That one case came out about six

24   weeks after.  It's an Eastern District of Michigan case,

25   doesn't address Eye-for-Eye.  Simply stands for the basic

1 idea that there is a presumption. Again, we don't dispute

2 that.

3 But there's a few points from Eye-for-Eye that I think

4 are relevant to this issue. Eye-for-Eye, the Supreme Court

5 goes through and looks at the basis of the presumption,

6 looks at where it came from, what the basis is, how it's

7 applied, and they talk about uncited prior art and the fact

8 where you have uncited prior art, new prior art, the burden

9 of proof doesn't change, but it may be more easily satisfied

10 when you have that kind of art.

11 And they say we observe in the circumstances here where

12 prior art was not before the fact finder, before the

13 Examiner, quote, the rationale underlying the presumption,

14 the presumption of validity, that the PTO in its expertise

15 has approved the claim, seems much diminished. That's the

16 Supreme Court. It's citing KSR V Teleflex, a leading case

17 on obviousness.

18 They go further: The alleged infringer's burden may be

19 more easily carried because of the additional evidence.

20 That's new, uncited evidence. Simply put, if the PTO did

21 not have all the material facts before it, its considered

22 judgment may lose significant force.

23 This is the Supreme Court telling us.

24 So Dr. Wright's assumption has no basis. It's

25 contradicted by Supreme Court case law and would be clearly

1    prejudicial to Samsung if he were allowed to offer that

2    opinion.

3              THE COURT:  Response.

4              MR. BATTAGLIA:  Good morning still, Your Honor.  John

5    Battaglia again on behalf of Imperium.

6         It's not an assumption.  It's the presumption of law

7    that the patents are presumed valid, and the presumption is

8    based, of course, in part on the recognized legal

9    presumption that the PTO Examiners do their job and consider

10   all relevant prior art.

11        And as Your Honor saw in our brief, there are lots of

12   cases that hold exactly just that, that you can consider the

13   fact that the PTO considered all relevant prior art as part

14   and parcel of determining validity.  That's why we've cited

15   in our brief cases like Medtronic v Catalyst that speaks

16   right to the issue, or Hobbs and the DuPont v Berkley case.

17   They all speak right to that.

18        They didn't cite any cases in their motion, and they

19   mention Eye-for-Eye for the first time.  Eye-for-Eye

20   presumably wasn't cited in their motion because it's not

21   really applicable to the argument that they're making here.

22   Eye-for-Eye upholds the presumption, the burden of proof

23   being clear and convincing evidence, but it doesn't preclude

24   an argument or evidence that the PTO Examiner is presumed to

25   have done their job and considered all pertinent or all

relevant prior art. It doesn't speak to that at all.

To be sure, it says if there are other references that were not before the Examiner, that can be considered, but that doesn't mean therefore. In fact, that doesn't speak to it at all. It does not mean, therefore, you can't argue that the Examiner considered all relevant prior art. And that's consistent with what the case law has been recent and new from -- I think we cited cases from 2015 going back to the 1970's on this point.

So arguments that say we can't make this point that cut against the presumption of validity and cut against the legal presumption that the PTO does its job are barred or are impermissible -- or are allowed. So their argument is wrong, we submit, as a matter of law pursuant to the case law. And Eye-for-Eye doesn't affect it either way.

MR. POST: Your Honor, very brief response.

THE COURT: Yes.

MR. POST: Again, we don't dispute that the presumption of validity exists. Our argument is that Dr. Wright's assumption that if prior art existed anywhere, it would have been found, is baseless. That's not what the cases that they cite say.

In fact, one of them, Medtronic that they rely on in their brief says, quote, the presumption of validity extends to all references classified in areas searched by the

1   Examiner.

2       So it's not all prior art anywhere in existence.  It's

3   a very specific class of prior art, and this prior art that

4   Dr. Wright is testifying about is outside of that class.

5       So their case law doesn't support the assumption he's

6   making.  We submit it is inconsistent with what Eye-for-Eye

7   tells us about that presumption being more easily rebutted

8   in the case of uncited prior art, and so Dr. Wright should

9   not be allowed to present that unfettered opinion to the

10   jury, Your Honor.

11         THE COURT:  Okay.  I'm going to grant seven.

12   Eight.

13         MR. POST:  All right.  No. 8, Your Honor, prior art

14   considered by Defendants in the previous Imperium litigations.

15   Again, this goes back to the Imperium v Apple case or cases, I

16   guess, and the opinion that is set forth is essentially this:

17   That the Defendants in that case, so Apple, Sony, LG, these

18   were sophisticated companies and XXXX(Redacted by Court order)

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX if the prior

20   art they relied on invalidated the '884 patent.

21       Your Honor, there's lots of things that may go into XXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX  We've got no evidence

23   in this case of what Apple and Sony and LG thought about any

24   particular prior art reference.

25       Allowing Imperium to make that suggestion would

1  essentially require this Court to have a trial within a

2  trial, find out what those parties actually considered at

3  the negotiation table, what were they thinking about

4  invalidity.  It's pure speculation.

5      We have no evidence of that.  It's not a reliable

6  statement.  It's prejudicial to suggest that these other

7  companies that the jury would have presumably heard of must

8  have XXXXXXXXXXXXXX only because they thought this patent

9  was valid, and that's not the case.

10      In fact, XXXXXX(Redacted by Court order)XXXXXXXXXX

11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX  I'm trying to be

12  sensitive of confidentiality, but they are not -- they can't

13  be relied on for that point.

14      So, Your Honor, that opinion -- that specific opinion

15  that they must have been -- they must have acknowledged the

16  validity XXXXXXXXXXXXXXXXXXXXXXXX is not supported.

17  It's prejudicial and should be excluded.

18          THE COURT:  Response.

19          MR. SIGLER:  Thank you, Your Honor.  Bill Sigler on

20  behalf of Imperium again.

21      Your Honor, the contentions from the Imperium 1 case

22  are relevant for a far more basic reason.  Dr. Neikirk is

23  Samsung's expert on that particular patent, and he has

24  offered invalidity opinions on that patent and he has based

25  those opinions largely on prior art that was disclosed by

1  the Defendants in the Imperium 1 case.  And Dr. Neikirk

2  indeed reviewed those contentions from the Imperium 1 case

3  and that prior art from the Imperium 1 case, and that's

4  where he found that prior art that he's relying on, Your

5  Honor.

6      So it's just more basic than that.  It's relevant to

7  Dr. Neikirk's opinions, where he found the prior art, what

8  he looked at in the Imperium 1 case.  If he's basing his

9  opinions on that, then we should be able to go into it, Your

10 Honor.

11     And previously when Mr. Middleton was arguing for

12 Samsung I believe on Motion in Limine 5, I believe he said

13 that we shouldn't be able to show Your Honor's decision from

14 the Imperium 1 case and that we can show the contentions of

15 the Defendants on invalidity in that case in other ways, by

16 showing the answer from that case.

17     Well, showing the contentions from that case or using

18 the contentions from that case certainly fall into that

19 category, Your Honor, that I believe Samsung's counsel would

20 be permissible to explore this issue.

21         MR. POST:  Your Honor, the prejudicial statement is

22 that you can extend a validity position to the belief that

23 these companies XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX because they

24 had some view of validity of one patent.  And we don't have

25 evidence of that.  There's no evidence of that in this case.

1    Counsel mentioned Dr. Neikirk's invalidity positions in

2  this case.  There is some overlap in the references.  His

3  opinions, however, are his own.  They are distinct.  He has

4  anticipation theories.  He has obviousness theories.  Those

5  obviousness theories were never raised.  Those weren't, from

6  my understanding, even contentions of the parties in that

7  case.

8    But that exemplifies the issue.  We're asking the jury

9  to consider evidence from another matter that has no

10  evidence here.  There's no record for them to base their

11  decision on anything in a reliable way.

12    To say simply, well, those are the big companies so

13  they must have had some conclusion is just speculation and

14  should be excluded under 403.

15    THE COURT:  Okay.  I'm going to grant number eight.

16    MR. POST:  Thank you, Your Honor.

17    THE COURT:  Nine.

18    MR. TAYLOR:  Good morning, Your Honor.  Scott Taylor

19  on behalf of Samsung.

20    Your Honor, Samsung's Motion in Limine No. 9 refers to

21  excluding disputed issues that are resolved before trial as

22  well as any discovery disputes, any alleged litigation

23  misconduct, motions or dropped defenses.

24    Your Honor, this is a relatively routine MIL granted by

25  Courts, and on this MIL both parties are largely in

1   agreement.  Imperium doesn't take issue with the general

2   scope of the MIL but they do try to carve out a specific

3   exemption related to their damages expert, Ms. Riley.

4        In particular, their exemption they wanted to apply to

5   what they anticipate Samsung's cross examination to be of

6   Ms. Riley on her methodology for calculating damages, and

7   they want Ms. Riley to be able to say when cross-examined on

8   her methodology that Samsung did not produce the data that

9   she needed to generate a more accurate damages calculation.

10       Your Honor, we believe that this sort of statement is

11  improper and prejudicial, one, because it is largely

12  attorney argument offered through an expert, and second,

13  because the financial information at issue -- Samsung had

14  given all the data that existed, that was reasonably

15  available to it and which was relevant to the accused

16  products.

17       Imperium, if it believed that additional data existed,

18  could have moved to compel Samsung to produce that data, and

19  they did not, which speaks volumes to their belief that

20  Samsung had given over relevant financial information.  You

21  know, that Ms. Riley thought the data wasn't sufficient does

22  not pertain to whether that data did or did not exist.  And

23  if Imperium believed it did exist, they should have and

24  could have moved to compel at an earlier time.

25            THE COURT:  Response.

1    MR. SALTMAN:  Thank you, Your Honor.  Jeff Saltman on

2  behalf of Imperium.

3    The data he's referring to was produced or additional

4  data, profitability data, was produced on the last day of

5  discovery on September 9th, so it would have been difficult

6  to move to compel additional data when it was produced on

7  the final day.

8    But the point here is that -- the concern is that

9  Samsung will open the door and cross-examine Ms. Riley about

10  her use of company-wide profits as opposed to profits

11  attributable to just the accused products, and her response

12  has to be, well, I wasn't provided the information I needed

13  to be able to calculate the profitability of the accused

14  products.

15    And that's the major concern here is that they're

16  seeking to be able to attack her on her use of company-wide

17  profits as opposed to just the accused products without her

18  being able to explain, well, the reason I didn't do it was

19  because I didn't have access to the information I needed.

20    She's not planning on saying Samsung has this

21  information and I know they've been withholding it.  She

22  just needs to be able to say that information was not

23  produced to me and so I decided to rely on the more reliable

24  information company-wide.

25    THE COURT:  Thank you.  I'm going to grant nine and

1    I'll make it mutual to both sides, with the exception that if

2    you ask that question of Ms. Riley, she can make that response.

3    I'm not going to exempt out -- if you want to ask that question

4    to impeach her testimony, then I'm not going to restrict her

5    ability to respond in kind.

6         So we're on ten.

7         MR. SIEBMAN:  Clyde Siebman for Samsung, Your Honor.

8         With respect to Motion in Limine No. 10, what we're

9    asking for is an in limine to prevent Imperium during the

10   trial from discussing the presence or absence of particular

11   Samsung witnesses at trial.

12        The parties took depositions.  They have --

13        THE COURT:  Well, Mr. Siebman, I mean, that happens

14   all the time in trials.

15        MR. SIEBMAN:  Well, but in this case, Your Honor,

16   we've made our witnesses available.  They've taken the

17   depositions of the witnesses that they want to take, and we

18   think discussions about the absence of witnesses is just a --

19   an issue injected into the trial that really doesn't assist the

20   jury.

21        To the extent that Imperium wanted any evidence from a

22   Samsung witness, they could have obtained that before trial

23   and presented the depositions.  So we think under those

24   circumstances where there has not been an issue of anybody

25   being unavailable that they -- that it's just an issue to be

1   injected into the trial, particularly in a trial where we

2   only have a limited amount of time.  I mean, there's a

3   limited amount of time, and to be discussing why a

4   particular witness was or was not called really doesn't help

5   the jury reach any decision in the case.  And given the time

6   constraints, both sides are obviously making decisions about

7   who to call and who not to call based on presenting just the

8   most relevant information.

9        And so we think that we would like a motion in limine

10  preventing any discussions about particular witnesses that

11  were not called.

12           THE COURT:  Well, as we know, juries typically are

13  going to evaluate that anyways, whether attorneys argue it or

14  not, based on the trial decisions the attorneys make in the

15  case.

16       But response.

17           MR. BATTAGLIA:  Your Honor, it does happen all the

18  time, so much so that it's been part and parcel of a missing

19  witness rule and principle that's been on the books or part of

20  the case law for generations, I submit.  So it is a routine

21  part of a trial to argue and point out that somebody who -- a

22  witness who may have had important information or relevant

23  information within the control of the other party and didn't

24  show up for trial, that's obviously relevant and goes to things

25  that the jury can consider.

1         THE COURT: I am going to deny No. 10. I just think

2 it's just part of the trial and trial strategy that each side

3 makes and both sides -- I mean, y'all can deal with it in

4 argument and say both sides could have called somebody if they

5 wanted to, but it just happens all the time.

6         MR. SIEBMAN: Thank you, Your Honor.

7         THE COURT: You're welcome. Okay. No. 11.

8         MR. PEPE: No. 11, Your Honor -- Steve Pepe again for

9 Samsung -- relates to the Sony issue. I believe it's moot in

10 view of your earlier ruling.

11         THE COURT: Right. I don't think there's

12 disagreement about that at this point. Eleven will be granted.

13     Twelve.

14         MR. HARNETT: Chris Harnett, Your Honor, from

15 Samsung.

16         THE COURT: I haven't heard from you in awhile.

17         MR. HARNETT: I'm back.

18     Your Honor, we believe that No. 12 is a fairly

19 straight-forward application of Rule 403. The Court is

20 going to be instructing the jury on the burdens of proof.

21 It is Imperium's burden to prove infringement. It is not

22 Samsung's burden to prove that it doesn't infringe. Samsung

23 doesn't have to come into court and say I affirmatively can

24 show you, jury, that I don't infringe.

25     Substantial parts of our evidence on the infringing

1    question, Your Honor, is going to be that Imperium failed to

2    meet its burden of proof that all of the elements of the

3    asserted claims are met.

4         What we're concerned about is certain deposition

5    questions that came up during discovery of our experts.  For

6    example, there were many questions of Dr. Neikirk saying in

7    effect you were asked, Dr. Neikirk, simply to give an

8    opinion on whether Imperium met its burden of proof.  You

9    didn't do your own analysis on non-infringement.

10        That, I would submit to Your Honor, would be unfairly

11   prejudicial to the jury because it suggests to the jury that

12   the burdens of proof don't really apply as Your Honor will

13   instruct them.

14             THE COURT:  But isn't that just fair -- you know,

15   fair examination?  I mean, the Court is going to instruct them

16   on the respective burdens, and it cuts both ways because it's

17   your burden to show by clear and convincing evidence

18   invalidity.  I mean, that cuts both ways in terms of the way --

19   it's not their burden to show the opposite, so --

20             MR. HARNETT:  It would be the examination, we would

21   submit, Your Honor, that we would not be permitted to go to

22   their expert and say, well, you haven't come forward with

23   evidence that it is valid.  It is our burden on validity to

24   show that it is invalid.

25        By virtue of that questioning, they're in effect

1    reversing the burdens of proof, and we think that a jury

2    doesn't deal with patent law every day might get confused

3    with it, that it was now Samsung's duty not to simply come

4    to court and show that Dr. Wright didn't do what was

5    required to show that all the elements of the claim were

6    met, but rather, that Dr. Neikirk should have gone and done

7    his own analysis and shown that Samsung's products

8    affirmatively do not meet them.  So it's a reversal of the

9    burden of proof.

10              THE COURT:  Response.

11              MR. BATTAGLIA:  Good afternoon.

12        Your Honor, I think as you indicated, this doesn't

13    speak to the burden of proof.  We agree -- in fact, we

14    offered a stipulation that no one is going to be arguing

15    that the burdens of proof change here during trial.

16        What we're talking about are cross-examination of

17    expert witnesses, for example, and about whether or not

18    their opinions or their testimony is reliable, and so we

19    submit it is a classic form of cross examination to ask what

20    did the expert do or what did the expert not do.

21        So in that way the jurors can evaluate whether that

22    opinion that the expert is offering, like Dr. Neikirk, is

23    reliable or not reliable.

24        The federal rules speak right to this, Rule 705, about

25    exploring the bases, what the expert did and did not do.  So

1 that doesn't speak to the burden of proof. That's talking

2 about sort of classic cross-examination questions about

3 whether the witness's testimony is reliable, credible and

4 all the rest.

5 It doesn't go -- we're not going to be arguing at the

6 end of the trial that somehow the burdens of proof shifted.

7 Of course not.

8 So we submit, Your Honor, it doesn't apply to this

9 situation. This is sort of classic cross-examination

10 questioning.

11 THE COURT: Well, I'm going to deny 12. I don't

12 think it goes to the issue that you're concerned about. And I

13 think, if anything, it just means you have to approach the

14 bench to go into those issues. And if someone uses the burden

15 of proof in the wrong way, you can object and say -- and I can

16 tell the jury this is the burden of proof.

17 Thirteen.

18 MR. SIEBMAN: Yes, Your Honor. Clyde Siebman for

19 Samsung.

20 With respect to No. 13, the motion in limine requests

21 an in limine preventing argument, testimony or reference

22 during trial to the decision of a Korean witness to testify

23 through an interpreter rather than in English.

24 Imperium's response indicates that they really don't

25 have a fundamental problem with the motion in limine except

1  they want to be able to, I guess, leave the door cracked

2  open to make a comment with respect to a witness who may

3  testify or I guess communicate in some English and some

4  Korean.

5        The problem with that, Your Honor, as Your Honor has

6  certainly seen with respect to people who are giving

7  testimony in their secondary language, not their primary

8  language, sometimes for clarity it's necessary to -- to fall

9  back to the primary language.

10       I mean, there's certainly nothing relevant to this

11  jury -- that this jury should know about with respect to

12  whether or not a particular witness feels comfortable giving

13  testimony in English or Korean based on the technicalities

14  and so forth of the subject matter.

15       It would certainly be prejudicial.  It would inject

16  cultural and racial bias into the case and we think that

17  would be highly objectionable.

18            THE COURT:  I don't think -- I don't think that's

19  where they're going.  There must be -- tell me there's

20  something else.

21            MS. JORDAN:  Yes, Your Honor.  Hello again.  Silvia

22  Jordan for Plaintiff Imperium.

23       I don't believe that the parties are that far apart on

24  this issue, Your Honor.  Imperium agrees not to argue or

25  infer that the witness's choice to use an interpreter and

1  not testify in English should be viewed negatively.  So

2  we're in agreement there.

3       And I don't believe that Mr. Siebman correctly

4  summarized what our concern here is.  The concern is more

5  about how broad Samsung's request to preclude may end up

6  being.  Imperium should be permitted to provide context for

7  the witness's testimony and that includes their Korean

8  citizenship, their knowledge of English, their use of

9  English.  That all goes towards the witness's credibility.

10      So, as I said, we're not going to infer or make any

11  argument that the use of an interpreter, the choice to use

12  an interpreter should be viewed negatively, but for purposes

13  of allowing the jury to determine the witness's credibility,

14  we should be able to give some context to this testimony and

15  their knowledge or use of English and those sorts of pieces

16  of information.

17          THE COURT:  I don't see really any dispute among the

18  parties.  I'll certainly grant 13.  I'm not sure the issues you

19  want to go to fall within that means.  Is there something I'm

20  missing from Samsung?

21          MR. SIEBMAN:  Your Honor, the -- in their response

22  they made reference to a Samsung witness that they reference as

23  a third year law student at the University of Maryland and they

24  say that he testified in deposition in English and Korean,

25  sometimes switching between the languages and answering the

1  same question.

2      That certainly doesn't go to credibility.  I mean, in

3  common experience when a witness is speaking in a secondary

4  language, often times they're comfortable with certain words

5  and not other words, and I would think that's -- in my

6  experience, that's even more so true in a technology field

7  where the words can be very precise and technical.

8      And for them to suggest that it's lacking in

9  credibility for someone who's not a primary English speaker

10 to switch between the two languages in an attempt to

11 communicate certainly doesn't go to credibility, and it

12 would inject -- it would be beneficial to allow that.

13         THE COURT:  I don't think they're arguing that.  I

14 don't think they're arguing -- I don't think Imperium is

15 planning on getting up and saying anything about the fact they

16 don't speak English or it's a second language or anything like

17 that.

18         MS. JORDAN:  No.

19         MR. SIEBMAN:  Then what --

20         THE COURT:  So I'm not sure of the concern.  I mean,

21 if they're going to be doing a video deposition and that

22 happens, it happens.  It's no different than in my criminal

23 cases where witnesses testify all the time in Spanish but then

24 they answer in English, even though -- because they do

25 understand some English language but they have the interpreter

1   interpreting the questions.  Of course, the jury sees that

2   where they go in and out between English and Spanish.

3           MS. JORDAN:  That's correct.

4           THE COURT:  If that evidence comes in, that comes in.

5   But they're not commenting on that issue.  So I'm going to

6   grant it to that extent.  I just don't see the disconnect.  I'm

7   at a loss of where the difference is.  The fact that they're a

8   Korean citizen, I mean, that's not the issue.  We're talking

9   about the issue of using an interpreter.  They're not going to

10  mention anything about that.

11          MR. SIEBMAN:  Right.

12          THE COURT:  And they're not seeking to do that, I

13  don't think.

14          MS. JORDAN:  That's correct, Your Honor.  You have it

15  exactly right.

16       For the example that Mr. Siebman used, that's -- I

17  believe that's Mr. Lee.  We would not make a comment about

18  the fact that he was going back and forth between English

19  and Korean, but that would appear, for example, on the

20  deposition video.  And the fact that he is a law student

21  here in the United States is part of his background that he

22  would also be testifying about.

23       But we would not be making any sort of inference about

24  that testimony.  That's simply his background and who he is

25  and his knowledge level.

1        MR. SIEBMAN:  I mean, as long as all they're talking

2   about is playing deposition testimony, that's not what -- what

3   this motion in limine was intended to reach.

4        What we didn't want happening is for them to attempt to

5   draw an inference from that or suggest to the jury that

6   they're somehow lacking in credibility because -- because

7   there's been some discussion in the case that some of the

8   witnesses who speak Korean also speak English, and I --

9   we're just concerned that they're going to try to use that.

10       If they're not, they're not, and that's fine.  We would

11  ask the Court to grant the motion in limine.

12       THE COURT:  Well, I've already granted it.  I'm just

13  trying to see where the difference is.

14       MR. SIEBMAN:  And maybe there is none, Your Honor.

15  Thank you.

16       THE COURT:  I don't think that's -- what they're

17  talking about I don't have an issue with.  If they play the

18  deposition and that situation happens, that's -- but they won't

19  be talking about it and saying -- she's telling us that she

20  won't be making any kind of inference.

21       MR. SIEBMAN:  Thank you, Your Honor.

22       THE COURT:  Or saying something like, well, look, he

23  went from English to Korean.  So I think we're good.

24       MS. JORDAN:  Thank you, Your Honor.

25       THE COURT:  You're welcome.

1    I think that concludes the motion in limine.

2         MR. HARNETT:  Your Honor.

3         THE COURT:  Yes.

4         MR. HARNETT:  May we ask the Court's indulgence for

5    clarification on one of your rulings on the motion in limine?

6         THE COURT:  Yes, on yours or which motion in limine?

7         MR. HARNETT:  It would be the motion relating to the

8    FAS documents, and in order to address this, I request

9    permission to hand up a document to you.

10         THE COURT:  Yes, just give it to Ms. McCord.

11         MR. HARNETT:  And I will hand one to Imperium's

12   counsel as well.

13    I just want to be sure that I understand the scope of

14   the ruling, because Imperium asked for the exclusion of any

15   document that relates to FAS, and I want to make sure that a

16   document like this would not be excluded.

17    As I understood Imperium's objection is that FAS or

18   securities-type documents would require an explanation to

19   the jury of some technical arcane securities law doctrine,

20   and that, Your Honor, is not the case at all.

21    What I have highlighted in one of these documents --

22   and this document references FAS in the top left corner --

23   is a paragraph called valuation.  And undoubtedly, Your

24   Honor, valuation of the patent portfolio is an issue that

25   Imperium has put front and center in this case.  They're

1    going to be telling the jury about the money they got from

2    licenses.  They're going to be telling the jury about the

3    total lump sum value of the portfolio.

4        The valuation information in this document is based on

5    real world data.  It's based on offers.  It's based on

6    projections of market for the sale of intellectual property.

7    It's real world data that's being reported in here by

8    Imperium.

9        Now, we just want to be able to make sure, Your Honor,

10   that we can use this sort of information that is related to

11   real world transactions, real world offers, real world

12   consideration of what the patents are worth.  This is

13   particularly -- expressly what the Georgia Pacific Factors

14   address in valuing what a patent license would be.  So just

15   by virtue of the fact that a document like this says FAS, I

16   want to make sure that we can still use a document of this

17   nature, Your Honor.

18           MR. BATTAGLIA:  It sounds like a motion for

19   reconsideration.  But, no, I think it's the same issue, Your

20   Honor.  I mean, these are the documents that were identified in

21   the parties' respective motions.  This document was attached as

22   being part and parcel of Your Honor's ruling, and for the

23   correct reason that Your Honor ruled under 403.

24       And I believe there's testimony indicating as well that

25   this goes to the accounting or the other standards that are

1  inapplicable to the patent valuation that goes with respect

2  to Georgia Pacific and the like for evaluating the patents.

3  So I believe --

4          THE COURT:  It looks like this document was used to

5  prepare the form that we took up in the motion in limine, the

6  157 form.  I mean, you mentioned -- it just mentions it.  It's

7  not like it mentions it in a vague context where that term is

8  used in the document.  It looks like this was used to prepare

9  that document.

10         MR. HARNETT:  Yes, Your Honor, it was used to prepare

11  that document and that's why it says it up in the corner there.

12  But what it's based upon is real world data.  This is not some

13  fictitious numbers.  These are real world events that are being

14  reported, and these real world events are being reported in

15  this document.  And we submit, Your Honor, that those real

16  world events are relevant and these are calculations based on

17  strictly real world events.

18      It's straight-forward math.  We got an offer of X.  The

19  market has gone down since the date of that offer.

20  Accordingly, the value of -- the market value of these

21  offers is Y.  That information is relevant, Your Honor.

22         THE COURT:  Why isn't this different?

23         MR. BATTAGLIA:  It is prepared -- as Your Honor

24  pointed out, it looks like it's prepared as part and parcel of

25  that same FAS document pursuant to those standards.  And saying

1  it's real world information, that doesn't quite answer the

2  question, but it's the patent valuation that still matters, the

3  patent analysis, whether you're evaluating the patents under

4  patent law and not getting into different standards that apply.

5  And the document itself is referencing the FAS standards.  So

6  the fact that it's referenced as part and parcel of this and

7  was included within the MIL, it's all tied up in the same

8  analysis.

9          THE COURT:  Mr. Harnett, I think it is included in my

10  motion in limine ruling.  Just approach the bench and we'll --

11  that's all that means.

12          MR. HARNETT:  Okay.  Thank you, Your Honor.

13          THE COURT:  Okay.  What else?  That's all the motions

14  in limine.

15          MR. BRENNER:  Your Honor, Samuel Brenner again.

16      Just a quick thing about an agreement between the

17  parties.  One of the witnesses that Samsung will call or is

18  on Samsung's "will call" list is a Mr. Daejin Jeon.  He's

19  going to testify through a translator, through an

20  interpreter.

21      We have met and conferred with Imperium's counsel and

22  identified the interpreter, Ann Park, and my understanding

23  is that they are in agreement that she can be the

24  interpreter and we wanted to present that information to

25  you.

1          THE COURT:  Agreed?

2          MR. SIGLER:  Your Honor, Bill Sigler on behalf of

3     Imperium.

4          We did agree to that, and the exchange was that Samsung

5     had objections based on hearsay and authenticity to a number

6     of documents that we had translated and subsequently

7     provided declarations from the translators for.  And as part

8     of this agreement, Samsung was going to drop those

9     objections to those documents.

10         MR. BRENNER:  Your Honor, yes, Samsung will drop the

11    authentication objections it had to the new translator

12    certificates that Imperium has provided.

13         THE COURT:  Very good.  What else?

14         MR. HARNETT:  Your Honor, we have a couple of

15    procedural questions that we put in the Joint Pretrial Order on

16    how we're going to proceed with certain disclosures during

17    trial.

18         One is the timing of the identification of witnesses

19    and the order of those witnesses.  Samsung suggested 48

20    hours before it happens.  Imperium says 24.  We just wanted

21    Your Honor to resolve that.

22         THE COURT:  Normally the parties make some -- work

23    out their own agreement but -- on these matters and then file

24    it with the Court.  Clearly this case, I'm not sure that's

25    possible.

1    So, I mean, I don't have a problem with 24 hours,

2  because 24 hours would be -- with Monday starting the trial,

3  evidence in the afternoon.  Then the only issue -- well, go

4  ahead.  What other issues do you have?  So that's 24 hours

5  for notice then.

6           MR. HARNETT:  The question of whether Your Honor

7  would welcome transition statements.  We believe that they're

8  not necessary.  The witness will come in through the -- the

9  witnesses, there will be opening argument, closing argument.

10 We don't think there's a need for argument in the middle of

11 trial.

12           THE COURT:  Are you talking about as you call each

13 witness?

14           MR. HARNETT:  I think that Imperium's -- I'm not

15 going to speak for Imperium.  I think Imperium suggestion is

16 that there be transition statements before a witness takes the

17 stand, before depositions are played, that sort of thing.  We

18 don't think that's necessary.

19           MR. FISCH:  Your Honor, Alan Fisch.  The transition

20 statements, as Your Honor may know, a number of judges in the

21 Eastern District permit a brief introduction, one sentence, to

22 explain to the jury why a witness is actually being called.

23 This is a person with this knowledge, this is a person who

24 worked at this company, this is an individual who spent time

25 here, this is an expert witness that will testify about

1    damages, this is an expert witness that will testify about

2    liability.

3        Those are the transition statements.  I know Your Honor

4    is familiar with that style and approach.

5        The question is whether the jury would benefit from

6    that.  My own -- my own experience teaches they do, just so

7    they know why the person is sitting there.  It's intended to

8    be an objective statement as to why the person is there.

9        MR. HARNETT:  We have no objection to that, Your

10   Honor.  We just didn't want anything beyond that in terms of

11   the testimony will show X, he's going to testify -- summarizing

12   the testimony, in other words.

13       THE COURT:  Right.  I have no objections to the

14   transitional statements.  It was actually utilized in the last

15   trial on the defense side for all the video depositions they

16   entered.  So I don't volunteer it.  I don't bring it up.  But I

17   have no problem with it.  And it was done with the video

18   depositions so I think it was helpful to the jury because they

19   didn't see all the background information, in terms of

20   shortening the depositions.

21       But I'll allow that on all the witnesses if you choose

22   to do so.  I don't require it.  You don't have to do it, but

23   if you want to, you're welcome to.

24       MR. HARNETT:  Our concern was that they be -- that we

25   understood the limitations that they were not going to be

1   argumentative statements.

2           THE COURT:  I understand.  I think we understand the

3   limitations there.

4           MR. FISCH:  They're not intended to be argumentative,

5   Your Honor.

6           THE COURT:  Right.  I understand.

7           MR. HARNETT:  Yes.  Your Honor, I think right from

8   the beginning of the case in the parties' opening statements

9   there's going to be confidential information.  How do you want

10  to deal with sealing the courtroom?

11          THE COURT:  Well, for those purposes -- of course, I

12  hate to seal -- that's a hard thing.  Is there a way for

13  opening statements -- I mean, in trial it happens all the time

14  and I'll seal the courtroom for portions of the evidence, but

15  it's a little hard to do that in a disjointed fashion in

16  opening statements.  So I don't know that I'm -- if you choose

17  and desire to go into something like that, I'm not going to

18  seal the courtroom for opening statements.  It makes it too

19  disjointed to have people leave and come back in and out.  So

20  for opening and closing I'm not going to do that.

21      But during evidence being presented -- because, again,

22  if you want to talk about in opening statements evidence you

23  think is coming in that's confidential, that's on you then.

24  But during the case-in-chief if there's something I need to

25  seal the courtroom, we can do that.

1        MR. HARNETT:  Thank you, Your Honor.

2        THE COURT:  Any other procedural issues from Samsung?

3        MR. HARNETT:  No, Your Honor.

4        THE COURT:  Anything from -- we have multiple people

5   standing up.  Okay.

6        MR. BATTAGLIA:  Sorry, Your Honor.

7        THE COURT:  No, that's fine.

8        MR. BATTAGLIA:  Two items.  I think they fall under

9   the rubric of housekeeping.

10       First, with respect to the Sony license, Your Honor has

11  made his rulings, including with respect to the in limines.

12       May I reurge or otherwise gather that per Your Honor's

13  ruling yesterday with respect to Dr. Perryman on the Sony

14  license, that won't be coming in either since that's

15  obviously an issue that's been tabled for after trial?

16       THE COURT:  Correct.

17       MR. BATTAGLIA:  Okay.  Then second is with respect to

18  the witness list.  Samsung has lead trial counsel, Mr. Fisch,

19  identified as a witness and Your Honor ruled on the request to

20  subpoena or take his deposition.  Mr. Fisch is lead trial

21  counsel and he shouldn't be a witness in this case.  He's not

22  going to be interjecting himself as a witness in this case, and

23  so we ask that he be taken off the witness list.

24       MR. HARNETT:  We have no problem with that.  The

25  witness list was submitted before Your Honor's ruling.

1          THE COURT:  Right.  Very good.  Not a problem.

2          MR. BATTAGLIA:  Thank you, Your Honor.

3          MR. HARNETT:  Unless of course he interjects himself

4   into the case, which he hopes he doesn't.

5          MR. BATTAGLIA:  It really was housekeeping.

6          THE COURT:  I doubt he will.  So anything else?  Did

7   Mr. Sigler have something?  I thought he was standing up a

8   minute ago too.

9          MR. SIGLER:  I apologize, Your Honor.

10         THE COURT:  You don't have to apologize.  I don't

11  know how many attorneys we have here but we have a lot

12  participating so that's fine.

13         MR. SIGLER:  I just wanted to go back for a moment

14  and seek a little clarification on Your Honor's order about

15  disclosing witnesses 24 hours in advance.

16      The parties had submitted a stipulation with a number

17  of these trial procedures that we had agreed to.  In that

18  stipulation Imperium's position was that we would disclose

19  witnesses I believe at 6:00 p.m. the night before they're

20  going to go on the next day.  If it's Your Honor's

21  preference that --

22         THE COURT:  Well, no, I -- I mean, I thought there

23  wasn't an agreement.  I'm not sure where that stipulation is.

24  There's a lot of paper in this case so I didn't see that.

25      I have no problem if you want to come up with your own

1    agreement on that and then you'll be bound for that

2    throughout the trial.

3        I don't -- I'm always encouraging the parties to try to

4    make agreements on certain procedures through the case, and

5    if you can do so, I'm -- I'm amenable to doing each thing

6    differently.

7        I think in the last trial we had a 48 hour window is

8    what they agreed to, I think.  But again, that was -- I

9    never had to get involved in that part of the process.

10        So is there a stipulation?  Mr. Harnett gave me the

11    impression there wasn't, so --

12        MR. HARNETT:  The dispute was 24 versus 48, as I

13    understand it.  We'll be happy to talk to Mr. Sigler.

14        Is this a different issue?  Go ahead.  I'm going to ask

15    Mr. Brenner to deal with this then.

16        THE COURT:  Oh, is this a different issue?

17        MR. BRENNER:  Sorry.  This is on the same issue, Your

18    Honor, but the disagreement about the timing for disclosing --

19        I apologize, Your Honor.  The disagreement was about

20    informing the Court or informing the other party about

21    witnesses moving from the "will call" to the "may call" list

22    and the "may call" to the "will call" list.

23        The parties have agreed on a procedural stipulation

24    regarding providing information the night before the

25    witnesses are to testify about which witnesses will go and

1   what order they will go in.

2        But we do have a live disagreement, or we did as we

3   laid out in the procedural stipulation, about how much time

4   in advance we should provide that information about "will

5   call" to "may call".  We would be fine with 24 hours at this

6   point.

7            MR. SIGLER:  Your Honor, our position is that the

8   evening before by 6:00 p.m. is plenty of time for such

9   disclosure.  A trial's fluid, as Your Honor knows, and

10  predicting whether one witness is going to testify 24 hours

11  later can sometimes be difficult, Your Honor.

12           MR. BRENNER:  Your Honor, we think that it's going to

13  be pretty clear which witnesses are present.  If -- you know,

14  if Samsung's witness list says who we intend to have on our

15  "may call" and our "will call" list, and we certainly don't

16  want to be surprised at the last minute by witnesses changing.

17  So we would ask for a little bit of extra time so that we know

18  if opposing counsel is planning on changing its witnesses.

19           THE COURT:  Okay.  So let's make sure.  Let's go

20  back to -- y'all already had an agreement about when to

21  disclose witnesses, so that's not the issue, which is what I

22  thought we were talking about initially.  So y'all have agreed

23  to 6:00 the day before.

24       So the issue now is a dispute about moving people from

25  "may call" to "will call" basically or vice versa.

1    MR. SIGLER:  Correct, Your Honor.

2    MR. BRENNER:  Correct, Your Honor.

3    THE COURT:  So what is each side proposing?  You want

4  24 hours?

5    MR. BRENNER:  Your Honor, in the procedural

6  stipulation we had identified that Samsung propose that the

7  parties provide at least 48 hours of time, and I believe

8  Imperium's -- well, I won't speak for Imperium about what their

9  time was.

10   MR. SIGLER:  Your Honor, we believe 6:00 p.m. the

11  night before in conjunction with the disclosure that the

12  parties already agreed to is sufficient.

13   THE COURT:  Why is that not sufficient?

14   MR. BRENNER:  Your Honor, we're not -- if there's a

15  witness who's on Imperium's "may call" list but they're

16  actually going to call them, we would like some time to prepare

17  appropriately for cross examination.  If we find out at 6:00 or

18  7:00 the night before the witness is going to go, when we did

19  not know that they were on Imperium's "will call" list, we

20  think that doesn't provide sufficient time.

21   And if Imperium is actually going to be moving a

22  witness from its "may call" to its "will call" list, they

23  should tell us as soon as possible, and we think 48 hours in

24  advance would be reasonable.

25   THE COURT:  Well, what happens if during the trial

1    something comes up unexpectedly that day?  And it may not be a

2    problem if they still have -- but, I mean, we're dealing with a

3    limited one week trial time.

4         MR. BRENNER:  Your Honor, Imperium has told us

5    previously that some of the witnesses on its "may call" list

6    are third parties.  They're not exactly sure whether they're

7    going to be able to come or not.  They haven't provided an

8    update on that list.

9       We are concerned that there's going to be a witness

10   who is told to us the night before and we would like some

11   additional information.

12        MR. SIGLER:  Going back to Your Honor's point, things

13   change during trial.  So something might happen on Tuesday that

14   changes how we're going to approach Wednesday and which

15   witnesses we're going to use, Your Honor.

16      There's -- there's certainly no intent by Imperium to

17   call a witness that has not been included on the list of

18   "may call" or "will call", Your Honor.  There's nothing

19   going on here where we're trying to pull a surprise witness.

20        THE COURT:  Okay.  I think the way I'll resolve this

21   is I think if you're going to change someone from "may call" to

22   "will call", 24 hours notice is what I'll require, with the one

23   exception, that if something happens that day in trial, then at

24   the end of the trial day notify the other side right away that

25   something has happened that requires us to change a witness and

1   bring another witness in, so -- which can be by 6:00 o'clock,

2   because we may go to 5:00 or 5:30 or whatever, especially if

3   we're in court until 6:00.  It will be an automatic extension

4   probably at that time.  Fair enough?

5          MR. SIGLER:  Yes, Your Honor.

6          MR. BRENNER:  Thank you, Your Honor.

7          MR. SIGLER:  And I had one more issue.

8          THE COURT:  Because that avoids a situation that

9   either side would unload someone at 6:00 o'clock the night

10  before, a whole bunch of witnesses they change over.  So we'll

11  try to avoid that being a trial strategy versus something

12  changing in the trial.  Certainly if something comes up, I'll

13  be amenable to that.

14         MR. SIGLER:  Absolutely, Your Honor.

15      Just one more quick issue with respect to exhibit

16  lists, Your Honor.  We provided Samsung notice several weeks

17  ago that to the extent they are going to bring certain

18  witnesses to trial, including Mr. Jun Bang, Jongsoo Lee,

19  Daniel Shim and Mr. Stuart Kaler, that we intended to call

20  some or all of those witnesses in our case-in-chief.

21      I understand that Samsung had raised an objection to

22  that at one point, and I just wanted to seek clarification

23  on whether Samsung is standing by that objection.  And to

24  the extent they're not bringing those witnesses to trial,

25  obviously this issue is moot.

1           THE COURT:  Mr. Harnett or --

2           MR. HARNETT:  Yes.  Of those witnesses, I believe the

3 only one that we're really thinking of bringing is --

4           THE COURT:  Is your mic on?

5           MR. HARNETT:  I'm sorry about that, Your Honor.

6           THE COURT:  That will be the thing I will remind

7 everyone more than anything.  Because of the acoustics in this

8 courtroom and also the court reporter, it needs to go through

9 the sound system.

10          MR. HARNETT:  Yes.  Mr. Kaler, we understand he's --

11 we'll call him in our case-in-chief.  We've informed Imperium

12 of that from the get-go, told -- we identified him as a

13 percipient witness, an important witness.  It has been briefed

14 in a lot of papers.

15      They never bothered to take his deposition.  We just

16 think it would be more orderly for him to go in our case.

17 He's not a Samsung employee.  He's a busy man.  I believe

18 he's going to be flying in as soon as he's able to.

19      We would like -- it's not -- he's a third party.  We

20 think he's agreed to come testify for us and we don't -- it

21 would be more orderly for him to testify in our case.

22          THE COURT:  Yes.

23          MR. SIGLER:  Your Honor, it sounds like -- I don't

24 know if this is clear from counsel's comments.  It sounds like

25 this is not an issue with Mr. Bang, Mr. Lee or Mr. Shim, that

1  they are not going to be coming to trial to testify.  I just

2  want to make sure I have that correct.

3            MR. HARNETT:  We have no current intention of

4  bringing them.  You know, if something dramatic comes up, that

5  might change.  I doubt it because they're 14 hours away.  We

6  don't think we'll be calling them.

7            MR. SIGLER:  Then with respect to Mr. Kaler, Your

8  Honor, you know, we can talk about this strategically within

9  our team, but it's within our rights to call him in our

10  case-in-chief if he's going to be here at trial.

11            MR. SIEBMAN:  Your Honor, this clearly violates the

12  goose and gander rule.  They don't even want to tell us within

13  24 hours of who is going from "may call" to "will call" and now

14  they want to be able to find out who we're going to call and

15  who we may call and who we are going to call.

16       And these are third party witnesses.  If they wanted to

17  arrange for them to be here in their case-in-chief, they

18  should have made those arrangements.

19       We arranged for them to be here when we thought we

20  would be putting on our case and there is no rule of

21  procedure that allows them to force us to make people that

22  we have arranged to have in our case here early so they can

23  put them in their case.  That's -- there's just not a

24  procedural rule for that.

25            THE COURT:  Mr. Sigler.

1       MR. SIGLER: Your Honor, as I understand it, the

2  traditional rule here is it's one and done for a witness, and

3  if they're going to call Mr. Kaler, we should be able to call

4  him in our case-in-chief because we think he has relevant

5  evidence that supports our case-in-chief.

6       MR. SIEBMAN: We have no objection to their cross

7  examining beyond the scope of the direct when we put him on in

8  our case. But, you know, if you want to put somebody on in

9  your case, you have to make an arrangement for them to be here.

10  He's a third party witness. He's not --

11       THE COURT: Mr. Sigler, this is a different situation

12  than someone under their control. If he's under their control

13  I agree, but it's not someone -- it's a third party witness so

14  I'm not going to require them to make arrangements for him to

15  come for your case-in-chief.

16       MR. SIGLER: Okay. And, Your Honor, if their

17  position is we can go beyond the scope on cross, I think that

18  alleviates our concern.

19       THE COURT: I'm pretty liberal on that so --

20       MR. SIGLER: Okay, Your Honor.

21       THE COURT: Because I usually want the witness to

22  testify one time.

23       MR. SIGLER: Thank you, Your Honor.

24       THE COURT: Otherwise, you would have to bring him

25  back in rebuttal or whatever. No, I -- I went to Baylor so I

1  view that a little liberally.

2         MR. SIGLER:  Thank you, Your Honor.

3         THE COURT:  Okay.  Anything else?

4         MR. POST:  I think we may have one more --

5         THE COURT:  That's fine.  This makes it easier than

6  you coming to me Monday morning.

7         MR. POST:  Thank you, Your Honor.  Kevin Post for

8  Samsung.

9      I think the last housekeeping matter, the parties have

10  put in their own proposed preliminary jury instructions.

11  Our position was that there were certain instructions that

12  were in the base instructions for Imperium's submission that

13  were omitted that should be provided.  For example, going

14  back to the presumption of validity points, the fact that

15  the jury can consider uncited prior art.  So --

16         THE COURT:  I didn't realize until late last night

17  that they weren't joint instructions, because I went home

18  thinking they were joint instructions.  So when I looked at

19  them, I was like oh, no.  I only had the one side.  I didn't

20  have Samsung's to look at last night.

21      So I will tell you on the preliminary instructions,

22  I'll have a copy for y'all to look at just to see what I put

23  together on Monday when you arrive so you can see that.

24         MR. POST:  So our version was from a different set of

25  base instructions, so it's hard to do the side by side.

1      THE COURT:  I'll come up with what I think is

2  appropriate, which may include what y'all submitted or not.  I

3  don't know yet.  But I'll give you a chance to look at those.

4      The courtroom will be open at 8:00.  The jury will

5  start arriving around 9:00, if you want to come in and get

6  set up and I'll have a copy for each side to look at.  And I

7  may just e-mail it to everybody if we get it finished today,

8  but it may not be until Monday morning.

9      MR. POST:  Great.  Thank you, Your Honor.

10      THE COURT:  Does that answer that question?

11      MR. POST:  That does.  Thank you.

12      THE COURT:  Okay.  Anything else?  I guess --

13      MR. SIEBMAN:  That's all from Samsung.

14      THE COURT:  Okay.  Mr. Fisch.

15      MR. FISCH:  Nothing from Imperium, Your Honor.  Thank

16  you very much for your time this morning.

17      THE COURT:  Looking forward to it.  Of course, I'm a

18  judge who loves to be in trial so I'm looking forward to it,

19  especially everyone being -- we have such great attorneys on

20  both sides so that will be fun for me and for the jury.

21      I didn't bring up the issue of exhibits.  Did y'all --

22  I didn't look through to see whether y'all have a lot of

23  exhibits that were agreed upon or are there a lot of

24  exhibits that there are objections to?  We'll deal with

25  those at trial, but are there a lot of unobjected to

1  exhibits or are we going to be dealing with all those at

2  trial?

3         MR. HARNETT:  There's a considerable number of

4  unobjected exhibits and we expect before they are used in terms

5  of disclosure what's going to be used with witnesses the day

6  before, we'll be able to resolve most, if not all, before we

7  get to court.

8         MR. SIEBMAN:  And it's our understanding that they're

9  conditionally admitted like in the last trial, but they're not

10  really admitted into evidence until they're mentioned in front

11  of --

12        THE COURT:  Yes, and we've had -- there's a little

13  confusion about that sometimes, the way I do it in my trials.

14     But, yes, I will say at the beginning of the trial that

15  they are conditionally admitted, but that does require you

16  to use it.  You don't have to -- literally, all you have to

17  do, if there is no objection, you can just use the exhibit

18  with the witness.  You don't have to show the other side.

19  You can just say Plaintiff's exhibit whatever, and if it's

20  not objected to, it will automatically come in once you use

21  it with a witness.  You don't have to say it's provisionally

22  admitted.  Just use the exhibit.

23     If it's an objected to exhibit, go through the normal

24  steps you would go through in any trial to offer the

25  exhibit.  But you don't have to offer it.  Just start using

1    the exhibits that are unobjected to.

2          MR. SIGLER:  And just one clarification -- point of

3    clarification, Your Honor.  If an expert witness uses the

4    exhibit, is that sufficient, if it's not objected, to get it

5    admitted?

6          THE COURT:  Yes, that's fine too.  Now, as long as

7    you make sure the numbers match up in terms of the exhibit

8    they're referring to, yes, versus if they did it during

9    their -- yes, as long as you announce what the exhibit is, if a

10   witness uses it, that's fine.  It doesn't have to be offered by

11   the attorney, but it has to be utilized in front of the jury in

12   some manner.

13       Any other questions?

14       Okay.  Again, I'll remind everyone, I allow a full voir

15   dire.  I say that because in a recent trial I think someone

16   asked four questions and sat down, and I think that's their

17   practice where they came from.  But -- so I just want to

18   remind everyone I do allow that.

19       We're looking forward to seeing everybody on Monday,

20   and if anything else comes up -- I shutter to even say

21   that -- but you can call my chambers if something comes up

22   that we need to resolve in the next five hours.

23          MR. JENNER:  Your Honor, I'm sorry.  One more

24   question.  Just for administrative purposes, I was asked to

25   inquire what your plans might be, as much as you can predict in

1    advance, for breaks, and in particular, the lunch breaks so

2    that we can plan for that.

3            THE COURT:  Fair enough.  Yes, typically I try to go

4    about an hour and a half.  We'll go longer depending on if I'm

5    trying to push to maybe get a witness finished or something.

6    But usually every hour and a half, and then we'll take a lunch

7    break typically from noon to 1:15 and the jury is free to

8    leave.  Sherman is not a huge town so the jurors usually don't

9    have any trouble getting back in that time period.

10       I don't know if I have any other criminal matters.

11   Sometimes we've been doing a criminal docket at the lunch

12   hours.  I have to ask my -- she's shaking her head so so far

13   she has not planned of that, any of that next week, but

14   that's the desire.

15       We usually start at 9:00 and then we'll go to 5:00 at

16   least the first day, on voir dire day.  But after that if we

17   think we need to, we may go to 5:30, 6:00 just to keep -- I

18   hate doing that because -- especially to the court reporter,

19   and she's smiling, but because y'all are doing daily copy.

20   But we'll address that.  I may the first couple of days keep

21   us to 5:00 but we'll push it but only for the sake of making

22   sure we get done.

23       Does that answer your question?

24            MR. JENNER:  Yes, sir.  Thank you.

25            THE COURT:  Anything else then?  Okay.  See y'all

1  Monday.  Thank you.  Have a nice weekend.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18  I certify that the foregoing is a correct transcript from

19  the record of proceedings in the above-entitled matter.

20

21  _____        _____

22  Jan Mason                        Date

23

24

25