```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF TEXAS
 2                        SHERMAN DIVISION

 3
      IMPERIUM IP HOLDINGS (CAYMAN) :     DOCKET NO. 4:14CV371
 4                                  :
      VS.                           :     SHERMAN, TEXAS
 5                                  :     FEBRUARY 5, 2016
      SAMSUNG ELECTRONICS CO.       :     AFTERNOON SESSION
 6
                         TRANSCRIPT OF TRIAL
 7              BEFORE THE HONORABLE AMOS L. MAZZANT,
            UNITED STATES DISTRICT JUDGE, AND A JURY
 8
      APPEARANCES:
 9
      FOR THE PLAINTIFF:           MR. ALAN MICHAEL FISCH
10                                 MR. ROY WILLIAM SIGLER
                                   MR. JEFFREY SALTMAN
11                                 MR. JOHN T. BATTAGLIA
                                   FISCH SIGLER
12                                 5301 WISCONSIN AVENUE NW
                                   FOURTH FLOOR
13                                 WASHINGTON, DC  20015

14                                 MR. DAVID MICHAEL SAUNDERS
                                   MR. S. DESMOND JUI
15                                 MR. SRULI YELLIN
                                   FISCH SIGLER
16                                 96 N. THIRD STREET, SUITE 260
                                   SAN JOSE, CA  95112
17
                                   MS. SILVIA JORDAN
18                                 FISCH SIGLER
                                   505 EIGHTH AVE, 12TH FLOOR
19                                 NEW YORK, NY  10018

20

21    FOR THE DEFENDANT:           MR. JESSE J. JENNER
                                   MR. CHRISTOPHER JOHN HARNETT
22                                 MR. STEVEN PEPE
                                   MR. KEVIN JOHN POST
23                                 MR. ALEXANDER ERNEST MIDDLETON
                                   ROPES & GRAY
24                                 1211 AVENUE OF THE AMERICAS
                                   NEW YORK, NY  10036
25
```

2

```
 1                              MR. SAMUEL LAWRENCE BRENNER
                                MR. SCOTT STEPHEN TAYLOR
 2                              ROPES & GRAY
                                PRUDENTIAL TOWER
 3                              800 BOYLSTON STREET
                                BOSTON, MA  02199
 4
                                MS. REBECCA R. CARRIZOSA
 5                              ROPES & GRAY
                                1900 UNIVERSITY AVE 6TH FLOOR
 6                              EAST PALO ALTO, CA  94303

 7                              MR. CLYDE MOODY SIEBMAN
                                MR. LARRY PHILLIPS
 8                              SIEBMAN BURG PHILLIPS & SMITH
                                300 N. TRAVIS
 9                              SHERMAN, TX  75090

10

11  COURT REPORTER:             MS. JUDITH WERLINGER
                                DEPUTY OFFICIAL REPORTER
12                              101 E. PECAN #110
                                SHERMAN, TEXAS  75090
13

14

15

16

17

18

19

20

21

22

23

24  PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY, TRANSCRIPT

25  PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
```

```
 1                          (Jury out.)

 2              THE COURT:  Go ahead and bring the jury in now.

 3              COURT SECURITY OFFICER:  All rise for the jury.

 4                          (Jury in.)

 5              THE COURT:  Please be seated.

 6         Sir, go ahead and be seated.  Go ahead and continue.

 7              MR. JENNER:  Thank you, Your Honor.

 8      DR. RAY PERRYMAN, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

 9                    DIRECT EXAMINATION (CONTINUED)

10   BY MR. JENNER:

11   Q.  Dr. Perryman, are you all set there?

12   A.  Yes, sir, I am.

13              MR. JENNER:  Could we have back up Demonstrative

14   Exhibit 402?

15   Q.  (By Mr. Jenner)  Okay.  Dr. Perryman, here is the chart

16   of the Georgia-Pacific Factors, and I believe you've now

17   discussed your evaluation of Factors 1, 2, and 3.

18   A.  Yes, sir.

19   Q.  Correct?

20   A.  Yes, sir.

21   Q.  What's that next factor that you considered relevant

22   here?

23   A.  Well, actually I want to take a few of them together.

24   It's 9, 10, and 13.

25   Q.  What are Factors 9, 10, and 13, and why do you want to
```

1   take them together?

2   A.  Well, 9 and 10 are very similar.  It's become pretty

3   customary to take them together.  One talks about the

4   utility and advantages of the -- of the -- of the patent,

5   and the other one talks about the nature and character of

6   the -- of the patented invention and so they're pretty

7   similar.

8       And then 13 talks about the portion any property that

9   gets allocated to that technology because of its -- its

10  nature and character, so they -- they fit together really

11  nicely, and the same documents and evidence tend to apply to

12  all three of them.

13  Q.  And generally, what kinds of evidence did you consider

14  about how those three factors apply here?

15  A.  Well, here we're trying to figure out what the -- the

16  value of the technology, what the technology does and that

17  sort of thing, so I -- I visited with the experts -- the

18  technical experts, read their depositions.  I looked at the

19  depositions of the inventors of the technology to see what

20  they had to say about it.  I looked at -- at things that --

21  that Samsung and ESS and others had said about the

22  technology.  And so basically just a lot of information,

23  trying to gather what do these products -- these patents

24  contribute to the overall image sensor and end products.

25  Q.  Okay.  First, what kind of information did you get from

1    Samsung's experts?

2    A.  Well, I talked to each one of them, and they described

3    to me the nature of the technology that was allegedly in the

4    patents and what it did, how it fit in, how important it was

5    relative to other things going on in the products.  And --

6    and basically just gave me a -- the level of technical

7    understanding I needed.

8         I -- I didn't -- since I'm assuming they're invalid and

9    infringed to do my analysis, I don't need a highly detailed

10   level, but I need to understand them and the technology, and

11   particularly how -- how it relates to other things.

12   Q.  And just to be clear, I think I heard you say you were

13   assuming they're invalid and infringed.  You meant valid and

14   infringed?

15   A.  I'm sorry, I did, yes.  I misspoke.  I'm sorry.

16   Q.  All right.  What -- what did you consider, first of all,

17   in regard to the -- the flicker patent, the '884 patent?

18   A.  Well, when I talked to Dr. Neikirk about that patent, he

19   explained to me that it had a very limited application.  It

20   was -- basically it applied if you were taking a video in a

21   room that had old-fashioned fluorescent light and there was

22   some fluctuation in that light.  So it didn't apply very

23   often and -- and that when it -- when you compared to it

24   other things going on in the -- in the technology, in these

25   sensors and processors, that a lot of other things were a

1 lot more important.

2 Q.  What did you learn about the '029 preflash patent?

3 A.  Well, for that patent, when I talked to -- to Mr.

4 Parulski about the preflash patent, he explained to me

5 that -- that it's only -- you typically only need it when

6 you're indoors under certain lighting conditions and that

7 there are other ways to get a -- a -- the lighting

8 appropriate for -- for pictures and that sort of thing.

9     It was a fairly minimal piece of the overall camera

10 quality that included a lot of different technologies.  He

11 mentioned an individual sensor might have thousands of

12 technologies in it that -- dealing with resolution and pixel

13 size and a lot of other stuff.

14 Q.  All right.  And what did you learn about the '290

15 interface patent?

16 A.  Well, on that one, Dr. Baker explained to me that --

17 that No. 1, the -- these were old technologies.  The

18 single-ended interface was developed in the 1960s.  The --

19 the differential interface was developed in the 1980s.  And

20 this was just a -- a way to connect if you happened to need

21 backward compatibility in some way.  This was one way to

22 achieve that.  That there were also other technologies like

23 -- called parallel interface and that sort of thing where

24 you wouldn't need this technology.

25     He also explained to me that -- that in terms of any

1    impact on weight or battery life or anything of that nature,

2    it would be minimal, not even measurable.

3    Q.  Now, you mentioned that you also considered some of the

4    testimony given at depositions by the patentees?

5    A.  Yes, sir, I did.

6    Q.  What did you consider in that regard?

7    A.  Well, I read the depositions.  There were -- there were

8    several patentees.  I'm probably not going to remember all

9    the names, but Mr. Chung, Mr. Stark, Mr. Pine, Mr. Medwick,

10   and Mr. Devers, I believe, were the patentees, the

11   individuals who were deposed whose names are on the patents,

12   the people who originally created the patents.

13        And in their depositions they -- they talked about that

14   these were small contributions and that there were a lot of

15   things that go into a sensor -- a sensor processor.

16   Basically it's the same type of information, that this was

17   not the driving force in any of these things.  It didn't

18   determine a demand for any of these things.  These were

19   relatively small contributions.

20   Q.  Did you consider any Samsung or other party market data

21   kind of information here?

22   A.  I did.  I looked at a lot of market data, and I also saw

23   the deposition of Mr. Hernandez, Jose Hernandez, who's a

24   marketing person at Samsung that I think you heard from, as

25   well.

1       And basically this is not the sort of thing that was

2    mentioned.  When you talk about the -- say the camera, for

3    example, since that's most of the units -- I'm sorry, the

4    phone -- camera phone is most of the units, they talk about

5    a variety of things about those phones that have nothing to

6    do with the camera.  And when they get to the camera, they

7    tend to talk more about pixels, the number of pixels, the

8    size of the pixels, those kinds of things that reflect the

9    camera resolution, as opposed to -- to what's involved in

10   these patents.

11       And I didn't find any references to any of these

12   particular technologies or the things they implicate.

13   Q.  All right, sir.  So in conclusion, how did the

14   information that you considered affect your evaluation of

15   these three factors?

16   XXXXXXXXXXXX(Redacted pursuant to Court order)XXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   down.  It seemed to be a more important technology.  These

19   seem to be a small part of the overall picture, so that

20   would tend to have downward pressure on the royalty.

21   Q.  All right, sir.  Looking, again, at Exhibit 402 that's

22   up on the screen, what's the next Georgia-Pacific Factor

23   that you considered important here?

24   A.  The next factor was Factor 12.

25   Q.  What's Factor 12?

1  A.  Factor 12 is -- is the portion of the -- of the selling

2  price that's customarily in this business, a pay for this

3  type of technology in terms of royalties.

4  Q.  And what kind of evidence did you consider for Factor

5  12?

6  A.  Well, a lot of the same things you consider for -- for

7  9, 10, and 13.  Frankly, part of that gets to how much does

8  -- do -- how much does this technology really contribute to

9  the demand for these products from a market perspective, but

10  also I looked at the -- some of the rankings and grading and

11  that sort of thing that ESS has done when it evaluated the

12  patents itself.

13  Q.  Rankings that ESS had applied itself?

14  A.  Yes, sir, that's correct.

15  Q.  Would you turn over to Defendants' Exhibit 160 -- 160?

16  A.  Yes, sir.

17  Q.  You have that?

18  A.  I do, yes, sir.

19  Q.  Sir, what is Exhibit 160?

20  A.  Exhibit 160 is -- is an e-mail between some -- some

21  folks at ESS and some folks at Duff & Phelps, which is a

22  consulting company, basically where they lay out their

23  grading system that they've come up with for the patents.

24  Q.  Using the A plusses, the As, the Bs, and the Cs?

25  A.  That's correct, yes, sir.

1   Q.  And if we turn to the next page, for example, I take it

2   we can see here a chart that basically lists the patents one

3   after another, and in the third column, is that the rating?

4   A.  Yes, sir, it is.

5   Q.  Did you find in this chart the ratings that ESS itself

6   had applied to its patents?

7   A.  I did, yes, sir.

8   Q.  Would you turn over to Page -- it's got two Bates

9   numbers, but the lower Bates number ends in 281 at the

10  bottom?

11  A.  Yes, sir.

12  Q.  And I'd ask you to look at the first, second, third,

13  fourth, fifth, sixth entry from the bottom.

14          MR. JENNER:  Can we expand that?

15  Q.  (By Mr. Jenner)  Do you see the sixth entry up in the

16  second column from the right?

17  A.  Yes, sir.

18  Q.  That's one of the patents-in-suit?

19  A.  It is, yes, sir.

20  Q.  That's the '884 patent?

21  A.  It is, yes.

22  Q.  And what rating did ESS give to its A patent?

23  A.  It gave -- it gave the '884 patent, the flicker patent,

24  an A.

25  Q.  I think I answered -- answered my question.  I'm sorry.

1    The question is what rating did it give it?

2    A.  An A, yes, sir.

3    Q.  If you turn over to the page with the Bates No. 1 --

4    sorry, the bottom Bates number is 283 at the bottom.

5    A.  Yes, sir.

6    Q.  And if you look at the bottom entry --

7                MR. JENNER:  And can we expand that one?

8    Q.  (By Mr. Jenner)  Is that the '029 patent-in-suit?

9    A.  Yes, sir, it is.

10   Q.  What ranking did ESS itself give to the '029 patent?

11   A.  It gave a C.

12   Q.  And can you look one more time to the page that's got

13   the Bates number ending in 289 at the bottom, several pages

14   in?

15   A.  Yes, sir.

16   Q.  And if we could look at the fifth entry from the top on

17   this page?

18   A.  Yes, sir.

19   Q.  You see there, it's in the middle of the screen, it's

20   the '290 patent-in-suit?

21   A.  Yes, sir.

22   Q.  What rating did ESS give to that patent?

23   A.  That one was also given a C.

24   Q.  So just generally, what did you conclude from ESS's

25   rankings of its patents about the relative value of the

1    patents-in-suit?

2    A.  Well, with regard to this particular ranking that was

3    done, Mr. Blair, in one of his depositions that I had read,

4    had indicated that they gave very little, if any, value to

5    Bs and Cs.  In fact, even questioned whether they even kept

6    those patents up and kept them alive.  So obviously, the two

7    Cs, that's the lowest grade in the scale.  And so two of the

8    three patents received a C.

9        The third patent, they -- they regarded it as an A, so

10   it's the second of four -- there was A plus, A, B, C, and it

11   received an A.

12   Q.  And just going back to the first page of the Exhibit

13   160 --

14   A.  Yes, sir.

15   Q.  -- what's the date of this document shown at the top?

16   A.  This is April 27th, 2007.

17   Q.  How does that compare with the date of the hypothetical

18   negotiation?

19   A.  It's very, very close.  The hypothetical negotiation

20   would have been around March or so of 2007.

21   Q.  Now, would you turn to another exhibit in your binder,

22   it's Exhibit DX-894?  Do you have that?

23   A.  Yes, sir, I do.  It took me a second.

24   Q.  What's Exhibit 894?

25   A.  Well, this is another e-mail from -- from Mr. Blair to

1    an individual at OmniVision in which he lists 10 of the

2    patents in the portfolio that he regarded as being essential

3    patents.  I think his exact words were --

4    Q.  I think if you look just above the list of the

5    patents --

6    A.  Yes, sir.

7    Q.  -- the first sentence of the second paragraph?

8    A.  Yes, sir.  He says:  We believe it would be very

9    difficult to build a high quality sensor product without

10   utilizing some of the technologies on this list, especially

11   the first three patents listed.

12   Q.  And he refers in the prior sentence to these patents as

13   what?

14   A.  As fundamental patents.  He called them fundamental

15   patents.

16   Q.  Fundamental patents?  And do you see in that grouping of

17   the ten patents any of the patents-in-suit?

18            THE COURT:  One second.  Don't speak directly into

19   the mic.

20            THE WITNESS:  Okay.  Okay.

21            THE COURT:  That's a fine distance.  When you get too

22   close --

23

24            THE WITNESS:  Okay.  I'm sorry.  Thank you, Your

25   Honor.

1          THE COURT:  Go ahead.

2     Q.  (By Mr. Jenner)  Now --

3          MR. JENNER:  I'm sorry, Your Honor.  Now I think from

4     where I'm standing, I've kind of lost the witness.

5     Q.  (By Mr. Jenner)  Could you say something again?

6     A.  I said that -- that he called these patents the

7     fundamental patents.

8     Q.  Okay.

9     A.  In his opinion.

10    Q.  Now, the author of this is Mr. Blair?

11    A.  That's correct, yes.

12    Q.  That's the same Mr. Blair we've heard about?

13    A.  It is, yes, sir.

14    Q.  Okay.  And the date of this document, how does that

15    compare with the date of the hypothetical negotiation?

16    A.  This document is dated October the 12th, 2008, so it's

17    about 18 months later, something like that.

18    Q.  What did you consider, if anything, to be relevant about

19    these two exhibits, 160 and 894, in relation to Factor 12?

20    A.  Well, this second one, 894, I guess the thing that

21    struck me the most is none of the three patents were on the

22    list.  So Mr. Blair himself didn't regard any of these

23    patents as the ones that were fundamental or potentially

24    necessary to build a high-quality server.

25         And then in the other one, on the whole, the patents

1   got this very low rank.  So I take those two together and it

2   basically tells me that there was not a great deal of value,

3   and hence, not a great deal of profit associated with these

4   patents.

5   Q.  Is there any evidence you considered about what other

6   third parties thought about buying the portfolio of patents?

7   A.  Yes, sir.  I considered some of that evidence.

8   Q.  What did you consider?

9   A.  Well, there were discussions with -- with LG and Tessera

10  that I think you've heard some about before discussing

11  potentially buying the patents.

12  Q.  And did they buy any of the patents?

13  A.  They did not, no, sir.

14  Q.  And what do you conclude from that in relation to Factor

15  12?

16  A.  Well, there again, in one case, the patents were

17  evaluated, and it was found that they didn't think there was

18  much potential there.  So, again, it just reinforced what I

19  had seen with the ranking system.

20  Q.  All right.

21          MR. JENNER:  Could we go back to Demonstrative 402,

22  please?

23  Q.  (By Mr. Jenner) Sir, does this bring us to Factor 15 at

24  the bottom of the page?

25  A.  Yes, sir, it does.

1    Q.   What is Georgia-Pacific Factor 15?

2    A.   Well, rather than read it, Georgia-Pacific Factor15 is:

3    What would the royalty be, basically?  It's where you put

4    all of the information together that you gain from the other

5    14 factors, along with the bargaining power of the two

6    parties, as that might come into play and say:  Given all of

7    that information, what would be the likely outcome after

8    you've done all of this analysis.

9    Q.   And part of the language says:  An amount that a

10   licensor and a licensee would have agreed upon if the

11   parties had been reasonably and voluntarily trying to reach

12   an agreement, right?

13   A.   That's correct, yes.

14   Q.   Does that have anything to do with this concept we've

15   heard about of a hypothetical negotiation?

16   A.   Yes, sir.  An important concept within the hypothetical

17   negotiation, I think I mentioned briefly earlier, is

18   reasonableness.

19        In other words, the two parties are coming together to

20   reach an agreement.  You may have been in a situation where

21   you tried to negotiate with somebody, and one side or the

22   other just would not be reasonable.  That's not what this

23   is.  This is both parties come together with the intent of

24   finding an agreement that's -- that's mutually beneficial.

25   Q.   So how did you go -- how did you go about evaluating

1    Factor 15 in this case?

2    A.   Well, as you know, I've looked at all the other factors,

3    and what I had determined was that the best evidence I could

4    find of what might happen was a negotiation at arm's length

5    XXXXXXXXXXX(Redacted pursuant to Court order)XXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   Q.   Okay.  So let's take this a piece at a time.

15        MR. JENNER:  And, Your Honor, with apologies, I think

16   this is another point where I have to ask the Court to seal the

17   courtroom for more confidential information.

18        THE COURT:  Related to both sides or --

19        MR. JENNER:  I think, with apologies to my

20   colleagues, we only have to kick out the people from Samsung

21   right now, but we will need, at some point, to ask our

22   colleagues across the aisle to leave.  So right now, it's just

23   Samsung.

24        THE COURT:  Very good.

25        Samsung, are there any other people that are not here

1    from the case?

2                        (Courtroom sealed.)

3                        (Page 18, line 3 through page 35,

4                        (line 18 redacted by Court order.

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

```
 1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
```

20

```
 1  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 2  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 3  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 4  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 5  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 6  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 7  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 8  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 9  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
10  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
12  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
13  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
14  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
15  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
16  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
17  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
18  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
19  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
21  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
22  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
23  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
25  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
```

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

```
 1  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 2  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 3  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 4  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 5  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 6  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 7  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 8  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 9  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
10  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
12  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
13  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
14  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
15  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
16  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
17  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
18  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
19  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
21  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
22  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
23  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
25  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
```

34

```
 1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
```

1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17          MR. JENNER:  Now we can unseal, Your Honor.  We can

18  take these numbers off.

19                  (Courtroom unsealed.)

20  Q.  (By Mr. Jenner) Now, you said early on in your testimony

21  that you also considered Ms. Riley's opinions on behalf of

22  Imperium, correct?

23  A.  I did, yes, sir.

24  Q.  All right.  And did you form some views about those

25  opinions?

1    A.  Yes, sir, I did.

2    Q.  In general, what did you conclude?

3    A.  Well, we agreed on the basic structure; that it would be

4    a reasonable royalty; it would be a Georgia-Pacific

5    analysis; it would be a running royalty with some -- with a

6    certain amount per unit.

7        So in terms of the framework, we basically agreed on

8    the units so that there wasn't any -- any squabble there.

9    But I felt like the approach that she used was really

10   inappropriate and unrealistic for several reasons that

11   really exaggerated what the royalty should be.

12   Q.  All right.  Let me walk you through that.

13           MR. JENNER:  Could we have up what has now been

14   marked as Demonstrative Exhibit 2018A?

15   Q.  (By Mr. Jenner) You understand that this is a chart that

16   was used during my questions to Ms. Riley and that the

17   handwritten numbers are numbers that I placed on the chart;

18   they're not her numbers.  You understand that?

19   A.  Yes, sir, I do.

20   Q.  Looking at this chart, are there some number of issues

21   that you have with Ms. Riley's approach?

22   A.  Yeah.  There are -- there are really four, maybe a 4A

23   and B on the last one, but really four issues that are

24   significant.  There are some minor other things we disagree

25   on but four significant ones.

1    Q.  All right.  Would you start with the first issue and

2    tell us what it is?

3    A.  Yes, sir.

4         The first issue is, if you notice at the very top of

5    this diagram here, the -- the profit numbers that came from

6    her analysis were arranged, depending on how many devices

7    and average price and that sort of thing or how many

8    components, anywhere from 27 cents to 74 cents was the

9    profit on -- on one of these units, okay?  The total profit.

10        Now, the way she calculated that was to take the cost

11   information that we were provided and then -- and then go to

12   the -- and use the operating margin of the entire Sony

13   company world -- I'm sorry -- the entire Samsung company

14   worldwide of 11.8 percent to determine what that appropriate

15   level of profit should be.

16   Q.  Do you have an opinion as to whether or not that's an

17   appropriate way to go about it?

18   A.  Yes, sir, I do.

19   Q.  What's your opinion?

20   A.  I don't believe that's the appropriate way.

21   Q.  And why is that?

22   A.  Well, if you stop to think about it here, Sony

23   doesn't -- or Samsung doesn't sell sensors in the United

24   States, so we don't know how much profits Samsung makes on

25   the sensors, so how would we go about trying to figure out

1    what that would be?

2         And what she said was:  Well, let's look at everything

3    Samsung does all over the world.  Well, Samsung makes, as we

4    know, washing machines, televisions, phones, tablets, all

5    sorts of stuff that really bear little relationship to this

6    little sensor that goes inside the phones.

7         And so when we don't have the actual data, what we look

8    for, much like she did in some of her analysis, is something

9    we sometimes call a yardstick, sometimes call a benchmark;

10   that is, we try to figure out, if they were selling them,

11   how much margin would they make?

12        And the best way to do that is to see -- these are a

13   commodity.  Basically, people buy them by the -- companies

14   buy them by the millions.  How much are -- the companies

15   that make a lot of them and sell a lot of them, how much

16   money are they making off of them?  Because that's the best

17   yardstick we could have for that.

18        An example I thought of last night when I was thinking

19   about this is, say you had a -- I'm going to make this up --

20   a 2013 Chevrolet sedan, and you were thinking about selling

21   it.

22        And you went to a used car lot to kind of see what

23   those are selling for right now, and they didn't have any

24   2013 Chevrolet sedans, but they had a 2013 Toyota sedan with

25   about the same features and size and a 2013 Ford sedan with

1   about the same features and size, and they had an old

2   beat-up 1996 Chevrolet pickup.

3        Her analysis would say, since Chevrolet made the

4   pickup, and Chevrolet made the sedan, let's look at the

5   pickup price to see what the sedan sells for.  What I'm

6   saying is it makes more sense to -- let's look at other

7   sedans that compete with that sedan to see what the price

8   would be.

9        And what we're talking about here, the difference in a

10  beat-up pickup and a newer sedan is a lot less than the

11  difference in a little bitty chip in a refrigerator.  I

12  mean, there's a lot of difference there.  It's really an

13  apples and oranges thing.  I'm not even sure one of them is

14  in the fruit bowl.

15  Q.  Now, I believe Ms. Riley said a few times that it would

16  be improper to use OmniVision and Sony sensor sales because

17  neither OmniVision nor Sony is a party to the hypothetical

18  negotiation.  Did you see that?

19  A.  Yes, she did say that, yes, sir.

20  Q.  Do you agree with that?

21  A.  No, sir, I don't.

22  Q.  Why?

23  A.  Because what we're trying to get is how much money would

24  Sony -- would Samsung make on these things, and the best way

25  to determine that is the people who make the same product

40

1   who sell them by the millions, how much money are they

2   making?  That's a much better indicator than how much money

3   Samsung makes on some completely different product.

4   Q.  Now, did you -- did you actually do an analysis of this

5   kind in your own report?

6   A.  I did, yes, sir.

7   Q.  All right.  Did you use the same Sony figures that I

8   used in making this chart?

9   A.  I did not, no, sir.  I used some different ones.

10  Q.  So let's just show what that difference is.

11          MR. JENNER:  Would you turn first to Exhibit --

12  Defendants' Demonstrative Exhibit 301.

13  Q.  (By Mr. Jenner) Now, this is a chart that I showed Ms.

14  Riley, and there were two sets of calculations because

15  there's two sets of products that use image sensors.  Do you

16  understand that?

17  A.  Yes, sir, I do.

18  Q.  And the right-hand one has to do with CMOS and

19  semiconductor devices?

20  A.  Yes, sir.

21  Q.  And the left one is -- is what?  It's imaging products

22  and solutions?

23  A.  Yes, sir.

24  Q.  Do you understand that when I asked Ms. Riley questions

25  regarding the Sony sensor operating profit that I used the

1   right-hand side of this page?

2   A.   Yes, sir, I do.

3   Q.   Did you use the right-hand side of the page when you

4   tested this?

5   A.   No, sir, I did not.

6   Q.   What did you use?

7   A.   I used the left-hand side.

8   Q.   Is there any consequence to the fact that you used the

9   left-hand side?

10  A.   Well, the profit in that division was a little bit

11  lower, and consequently, if I would have done the same thing

12  on the board you did, my numbers would have been lower than

13  the ones you wrote down.

14  Q.   So what is the consequence of any of my having used a

15  higher profitability number on the right?

16  A.   Well, the consequence is you came up with actually

17  higher profit numbers than you would have using the ones

18  that I used.

19  Q.   Is that more favorable or less favorable to Imperium?

20  A.   It's more favorable to Imperium.

21        MR. JENNER:   Would you also look at Exhibit

22  Demonstrative 408.

23  Q.   (By Mr. Jenner) Now, this is a chart calculating

24  average -- weighted average operating profit for OmniVision.

25  Do you see that?

42

1    A.  Yes, sir, I do.

2    Q.  Do you understand that the chart that I used covered a

3    period of 10 years?

4    A.  Yes, sir.

5    Q.  What's the significance of the one that I used covering

6    10 years?

7    A.  Well, basically what you did was you used the same

8    period of time for OmniVision that Ms. Riley had used for --

9    for -- for Samsung when she made her calculations.  So the

10   time periods were the same.

11   Q.  Is that what you did?

12   A.  It's not.  When I -- and it's not her fault at all.  But

13   when I first read her report that she submitted, I didn't

14   completely understand how she did her calculations.

15       Later, through some testimony and other things, I

16   figured it out.  And so I had used a different calculation

17   in my report than what you used on the board.

18   Q.  In fact, did you use a calculation for the most recent

19   three years as shown in 408?

20   A.  I did, yes, sir.

21   Q.  What's the consequence of having used the numbers you

22   used in 408 instead of the numbers I used doing my

23   questioning?

24   A.  Well, again, my numbers were a little bit lower, so your

25   numbers, again, were more favorable to Samsung -- more

43

1   favorable to Imperium than mine were.

2   Q.  Okay.  So turning back to the chart, Exhibit 2018A, what

3   is the impact of using the actual operating profits of

4   sensor sales from sensor imaging companies like Sony and

5   OmniVision instead of using Samsung's worldwide corporate

6   profit on all kinds of products?

7   A.  Well, both these companies, their profits are very, very

8   close together as you would expect, because they're selling

9   just this little commodity.  And this goes -- if Sony were

10  actually -- if Samsung were actually selling these as

11  opposed to -- to just using them internally, then that's

12  about the markup they would expect.

13      It certainly wouldn't be the same as you would get when

14  you take what Samsung makes on tablets and phones and

15  refrigerators and televisions and dishwashers and a lot of

16  other stuff.

17  Q.  And by applying the Sony and OmniVision numbers, does

18  that cause you to get higher or lower range of operating

19  profits?

20  A.  Well, it brings the operation -- operating profit down

21  considerably.

22  Q.  And is that similar to or dissimilar to what's shown on

23  2018A?

24  A.  Well, that's exactly what's shown.  If you make that

25  calculation, the 27 cents becomes 12 cents and the 74 cents

44

1    becomes 32-1/2 cents when you just bring those down by

2    that -- by that amount.

3    Q.  Now, what's the second issue that you had with

4    Imperium's methodology?

5    A.  Well, the second issue I had has to do with the arrow

6    over on the left that -- that goes down from -- that has the

7    document in the middle and goes down from the 27 cents down

8    to 2.7 cents.  It's her lower bound number that's supposed

9    to represent the lowest amount that ESS would have accepted.

10   Q.  And what's the problem there?

11   A.  Well, there's a couple of problems.  One of them is, if

12   you look at the agreement she based this on, this agreement

13   was an agreement between Imperium and ESS.  When they --

14   when they -- when ESS assigned the patents to Imperium, they

15   said:  What percentage of the revenue from the patents will

16   ESS get?

17        Now, at that time, same board of directors, same person

18   signing the documents, head guy, Mr. Blair, for both

19   parties.  So it wasn't an arms-length transaction at all.

20   And basically, it was a -- it was people deciding how to

21   carve up money among themselves in large measure.

22        And so the -- the fact that the 10 percent number was

23   selected doesn't mean anything.

24   Q.  Was there a manufacturing company who would be seeking a

25   license here like Samsung or Sony or BlackBerry?

1   A.   No, sir.   That's my second and even bigger problem.   You

2   don't have a licensee here.   What this says is:   If we

3   license these patents, this is how we're going to carve up

4   the money we get.

5        It says nothing about, over here, what you might get

6   from somebody that actually wants to license the patents and

7   make a product with them.   There's no licensee.   There's no

8   manufacturing in this deal at all.   So it's just a -- it's

9   just a number that -- that two interconnected companies

10  decided to divvy up among themselves.

11  Q.   And what is the impact of that on the left-hand arrow

12  and the 2.7 cent number that it results from that's on the

13  bottom left?

14  A.   Well, it just basically says that we don't have any

15  evidence to tell us what that number should be.

16  Q.   Sir, what's the third issue that you had with this

17  methodology that Imperium used?

18  A.   Well, my third issue has to do with the other arrow that

19  goes from the higher number, the 74 cents or 32.5, as

20  modified, down to the 13.5 cents by multiplying by 18.25

21  percent.   That was how she characterized the maximum amount

22  that -- that Samsung might be willing to pay or a licensee

23  might be willing to pay.

24  Q.   And what's the root of the problem with this part of the

25  analysis?

1   A.  Well, again, several things on this one.

2       First of all, she gets this from two surveys she looked

3   at that were done by a company called InfoTrends.  And I

4   think Dr. Benner talked about these some.

5       The point --

6   Q.  Excuse me.  Before you explain it, maybe it would help

7   to bring one up to look at.

8       Could you turn to PX-60?

9   A.  60?  Yes, sir.

10  Q.  And turn over to Page 18 so we have some context.

11  A.  Yes.

12  Q.  Is this where part of that 18.25 percent number comes

13  from?

14  A.  Yes, sir, it is.

15  Q.  And that's the Roe camera resolution toward the bottom

16  of the chart?

17  A.  That's correct, yes, sir.

18  Q.  All right.  So I'm sorry I interrupted, but go ahead

19  with your explanation.

20  A.  That's fine.  I think that's helpful.

21      Well, if you look at the question that was asked here,

22  it asks people to name three features that would be the top

23  things that would influence their purchase of a phone.

24  Q.  And that's at the top of the page?

25  A.  Yes, sir.  Yes, sir.

1    Q.   What's the consequence of that?

2    A.   Well, the consequence is that everybody names three

3    things, at least that's the first consequence.   So you don't

4    have a hundred percent here.   It's not 18 percent of a

5    hundred percent.   It's really 18 percent out of 300 percent.

6         Now, they only reported the top 10 answers or so here,

7    but if you just look at the first few, you've got brand at

8    31 percent; display at 29.7 percent; operating system at

9    28.6 percent; and total package at 24.9 percent.   Just the

10   first four, you're already over a hundred percent.

11        So this is not 18 percent of a hundred percent.   This

12   is -- or 16 percent in this case, 16.8 percent of a hundred

13   percent; it's 16.8 percent of 300 percent.   So that's one

14   issue.

15   Q.   Okay.   Yes.

16   A.   A second issue is, if you think about the question, it

17   says:   Name three things that would -- that would -- your

18   top three responses here, and this one came in eighth on

19   this one.

20        Camera resolution came in eighth place.   I think it

21   came in sixth on the other one.   She averaged two of them to

22   get the 18.25 percent.   But if you think about it, it says

23   camera resolution.   Now, these patents don't have anything

24   to do with camera resolution.

25        And there's been some suggestion that some people may

1   confuse camera resolution with overall image quality.  Well,

2   that may be true.  That may be true.  But it's not just

3   these three patents that make -- certain camera resolution

4   involves pixel counts, pixel size, that type of thing.

5       It also involves a lot of other things.  If people are

6   making a synonym for image quality, it's going to be

7   brightness, sharpness.  It's going to be a whole lot of

8   things that are implicated by a whole lot of technologies.

9       So it's not that 18.5 percent of 300 percent even said

10  we're going to buy -- we picked this as one of our top three

11  because -- because we're -- because of these three patents.

12  It's because of everything that goes into image quality.

13  And there's a lot of things that go into image quality.

14  Q.  Now, is it even image quality?  It says camera

15  resolution.

16  A.  Camera resolution.  And with some -- some customers will

17  understand camera resolution.  I think more and more people

18  are figuring out pixels now, it seems like.  But some --

19  some -- some might make that a proxy for image quality.

20  Q.  All right.  So what --

21      MR. JENNER:  Let's go back to 2018A.

22  Q.  (By Mr. Jenner) What then in total is your view about

23  the appropriateness of using that 18.25 percent average from

24  the two InfoTrends studies?

25  A.  Well, I think immediately we need to divide it by three

1    because it's not 18.25 percent of a hundred percent; it's

2    18.25 percent of 300 percent.

3    Q.  Did you see that Mr. Benner testified about just a

4    couple of other represent -- exemplary studies where the

5    number relating to camera was as low as about 3 percent?

6    A.  I did, yes, sir.

7    Q.  All right.  Does that affect your views in any way?

8    A.  Well, it just reinforces more of what is shown when you

9    analyze these documents properly.

10   Q.  Was there another issue that you had with this method of

11   analysis?

12   A.  Yes, sir, there is.  And as I say, this one kind of has

13   a 4A and 4B to it.

14       And I think just to keep things simple here for a

15   minute, let's pretend I didn't talk about the other three

16   for a minute, and let's just go back to the chart with --

17   with the 2.7 cents to the 13.5 cents because that math has

18   been done more precisely at this point.

19       That was what she described as the reference range in

20   which you would negotiate the royalty.  And then she came up

21   with a -- with a number for each patent, and I'm not sure

22   how she did that, but -- but she came up with the 8 cents,

23   the 7 cents, and the 4 cents.

24       Well, what that range is, that's the range of profit

25   that's available, if you start at the top and then look at

1    the bargaining range that would be defined here.  That's the

2    amount of profit that's available for, according to the

3    survey, camera resolution.  Everything that goes into camera

4    resolution.

5    Q.   Zoom?

6    A.   Zoom, sure.

7    Q.   White balance?

8    A.   White balance, pixels.

9    Q.   Color balance?

10   A.   Color balance.

11   Q.   Spherical aberration?

12   A.   I don't know what that is, but, yes, I've seen that

13   word.

14   Q.   In the patents-in-suit?

15   A.   Absolutely, among other things.

16   Q.   All right.

17   A.   And so she -- and so not only has she said these

18   patents-in-suit are equivalent to image quality, she said

19   each one of them individually is.  If you add up these three

20   numbers, she's come up with 19 cents in royalties just for

21   these three patents when the total amount available for

22   image quality is 13.5 cents even using her numbers.

23       In other words, these numbers don't reflect the fact

24   they haven't apportioned for all the other technology that

25   goes into camera resolution or image quality.

51

1    Q.  Any other problems, or have we covered the gamut?

2    A.  I -- I think that's -- I think that's the gist of it,

3    yes, sir.

4    Q.  All right.

5              MR. JENNER:  Your Honor, I have one more short block

6    that I think we need to seal the courtroom, I think to protect

7    Imperium information.  And so it would only be the Samsung

8    people that I would need to step out.

9              THE COURT:  Okay.  We'll go ahead and seal the

10   courtroom related to the Samsung people.

11                        (Courtroom sealed.)

12                        (Page 51, line 12 through page 58,

13                        (line 14 redacted by Court order.

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

54

```
 1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
```

1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

57

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

58

```
1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
```

15          THE COURT:  Can we unseal the courtroom?

16          MR. JENNER:  Yes.  I'm sorry.  Yes, we can.

17          THE COURT:  I suspect that we probably -- not all of

18   that needed to be sealed, so when you check the transcript --

19          MR. JENNER:  Yes, certainly, Your Honor.  I

20   apologize.  We were just being overcautious with all the --

21          THE COURT:  No.  I understand.

22          MR. JENNER:  -- things that go on in the case.

23          THE COURT:  No problem.  But just go back and remark

24   tomorrow morning or Monday for me.

25          MR. SALTMAN:  May I proceed, Your Honor?

```
 1              THE COURT:  Yes.  Go ahead.
 2                      CROSS-EXAMINATION
 3   BY MR. SALTMAN:
 4   Q.  Good afternoon, Dr. Perryman.
 5   A.  Good afternoon.
 6   Q.  We met at your deposition?
 7   A.  Absolutely.  Nice to see you again.
 8   Q.  It's nice to see you as well, sir.
 9        I'd first like to start talking about the hypothetical
10   negotiation.
11   A.  Yes, sir.
12   Q.  ESS and Samsung would be the parties to that
13   negotiation, right?
14   A.  That's correct, yes, sir.
15   Q.  So OmniVision wouldn't be at that table, right?
16   A.  Of course not, no.
17   Q.  And Sony wouldn't be across from ESS negotiating a
18   license, right?
19   A.  No, certainly not.
20   Q.  And, Dr. Perryman, you issued a supplemental report in
21   this case on November 2nd of last year.  Does that sound
22   right?
23   A.  Yes, sir, I did.
24   Q.  And in that report, you put forth the same rate that you
25   told the jury about today?
```

1   A.   Yes, sir, that's correct.

2   Q.   And so prior to issuing your report, you had come to

3   your damages conclusion in this case?

4   A.   Well, we had come to the conclusions in terms of what

5   the appropriate rates would be.  We got some new information

6   about some quantities and that sort of thing, so we updated

7   information about the number of quantities, and so we had to

8   recalculate some numbers.

9   Q.   But in terms of your conclusion, you had come to it; you

10  just had to change the number of units, right?

11  A.   With respect to the rates, that's correct, yes, sir.

12  Q.   And for your report in this case, you didn't draft the

13  majority of that report, right, sir?

14  A.   Well, we talked about this at my deposition.  It depends

15  on how you define "draft."  A lot of my staff worked on it

16  with me, and they -- they -- they wrote some sections of it.

17       A lot of -- there's a lot of pages in there that are

18  just an introduction to Samsung, an introduction to the

19  products, an introduction to the patents that I didn't

20  personally write.

21       There's other sections that describe some things about

22  the patent system in general that I wrote a while back, and

23  we edit them every time, and I didn't write them for this

24  report.  So on the whole, I would say there's probably more

25  words written this time around by my staff than by me.

1   Q.  And I think at your deposition, you said if you defined

2   it in terms of pages and paragraphs, Mr. Cox wrote the

3   majority of the report.

4   A.  Well, I don't know if I would say the majority.  I would

5   say he wrote more than I did.

6   Q.  Okay.  And I took your deposition on November 3rd of

7   last year?

8   A.  That sounds right, yes, sir.

9   Q.  So you actually issued your supplemental report the

10  night before I took your deposition?

11  A.  Yes, sir.  As soon as we got the quantities and could

12  crunch the numbers.

13  Q.  And so prior to that deposition, again, you had come to

14  your conclusion aside from adjusting the number of units,

15  right?

16  A.  We had come to a conclusion with regard to the royalty

17  rates, that's correct, yes, sir.

18  Q.  And as you said during your direct testimony, you're

19  being -- your company is being compensated at 775 hours --

20  $775 per hour for your time in this case, right?

21  A.  Yes, sir, that's correct.

22  Q.  And I believe you told the jury the proper damages here

23  was approximately $2.5 million?

24  A.  That's correct, yes, sir.

25  Q.  And at the time of your deposition about three months

1    ago, you estimated that your firm had already billed Samsung

2    about a million dollars in fees on this case, right?

3    A.   That was an estimate, yes, sir.

4    Q.   And that number has only gone up since then?

5    A.   It's gone up some, yes, sir.

6    Q.   Now, you talked about the Georgia-Pacific Factors, the

7    15 factors, right, sir?

8    A.   Yes, sir.

9    Q.   And you put up a demonstrative showing which factors you

10   thought were most important for your analysis, right?

11   A.   Yes, sir.

12            MR. SALTMAN:  Mr. Rennick, could you please bring up

13   DDX-402, please?

14   Q.   (By Mr. Saltman) And this was the demonstrative where

15   you highlighted -- the slide where you highlighted which

16   factors you thought were most important for your analysis,

17   right?

18   A.   Yes, sir, that is correct.

19   Q.   And you analyzed all of the factors; is that right?

20   A.   Yes, sir.

21   Q.   And I noticed that Factor 11 was not one of the factors

22   that you thought most important for your analysis, right?

23   A.   (No response.)

24   Q.   It's shaded out, sir?

25   A.   Yes, sir.  We did not find much evidence with regard to

1    that at all that significant use could be made of the

2    technology.

3    Q.  And you didn't find any evidence probative of the value

4    of that use that was relevant for your analysis, right?

5    A.  Well, that kind of got -- and a lot of these factors

6    overlap.  That kind of gets subsumed into some others.

7    Basically we found, and I think I talked about it in Factor

8    12, that the value of the use was -- was minimal, if any.

9    Q.  And so you didn't discuss Factor 11 with the jury today,

10   correct?

11   A.  Not separately.  All the relevant information was

12   discussed, but I didn't pull it out separately and repeat

13   it, no, sir.

14            MR. SALTMAN:  Thank you, Mr. Rennick.

15   Q.  (By Mr. Saltman) Now, I understand, sir, you had a prior

16   commitment earlier this week.  But you weren't in the

17   courtroom for Mr. Capone's testimony, right?

18   A.  That's correct.  I had to read the transcript.

19   Q.  And you weren't here for Dr. Benner's testimony either?

20   A.  No.  I had to read Dr. Benner's as well, that's correct.

21   Q.  And you weren't here when Mr. Jeon's testimony was

22   played for the jury, right?

23   A.  I don't recall if I was or not.  I -- if it was one of

24   those days I was out, then if it was played one of those

25   days, then I was not here for that.  I read it, regardless.

1    Q.  And you weren't -- as you stated, you weren't in the

2    courtroom during Ms. Riley's testimony, right?

3    A.  That's correct, yes, sir.

4    Q.  So you didn't see the slides that went along with her

5    presentation.  You didn't see -- as she testified, you

6    didn't see those slides, right?

7    A.  I did not see the slides, that is correct.

8    Q.  Now, Dr. Perryman, I'd like to talk about some of the

9    things you looked at in preparing your report.

10   A.  Yes, sir.

11   Q.  Before coming to your damages conclusion, you did not

12   speak with anyone at Samsung regarding the marketing of the

13   products, the accused products, right?

14   A.  I'm sorry?  Regarding what?

15   Q.  The marketing of accused products.

16   A.  I did not talk with anyone at Samsung, that is correct.

17   I read some depositions and had some information, but I did

18   not have to talk to anyone.

19   Q.  So you didn't speak to anyone at Samsung about

20   licensing, for example, right?

21   A.  Oh, I didn't need to, no, sir.

22   Q.  Now, I'd like to talk to you about some of those Samsung

23   employees.  At your deposition, you didn't know who Hae Sun

24   Lee was, right?

25   A.  That's right.  I didn't recall at the time, that is

1    correct.

2    Q.  You also didn't know who Jaehun Lim was, right?

3    A.  That's right.  And some of those I had not -- I had not

4    read their deposition because, if they were in the technical

5    side of the case, because I start with the assumption that

6    they're valid and infringed, there's some of these folks

7    that the information they bring to bear is important in this

8    case potentially, but because I'm starting out with assuming

9    that they're valid and infringed, it's not as important to

10   me.

11   Q.  Are you aware some of those deponents said that image

12   quality was very important?

13   A.  Oh, it wouldn't surprise me.  I think -- I think image

14   quality is a significant factor.

15   Q.  And that Samsung has approximately 60 employees working

16   on image quality on the accused products?

17   A.  I didn't know that number, but it certainly wouldn't

18   surprise me.

19   Q.  And at your deposition, you didn't know who Jun Bang

20   was -- Jun Bang was, right?

21   A.  That's correct.  I had cited his -- some of his

22   deposition, but I did not recall the name at the time.

23        Normally you hear that kind of stuff with the report in

24   front of you.  You just kept asking me if I remembered

25   things, and I -- and that's now how I normally do it in a

1    deposition.  But I did not recall, that is correct.

2    Q.  And you didn't recall who Jongsoo Lee was at your

3    deposition?

4    A.  That's correct.

5    Q.  And you didn't recall who Daniel Shim was at your

6    deposition?

7    A.  That is correct.

8    Q.  And you didn't recall who Sean Diaz was at your

9    deposition?

10   A.  The financial guy, yeah, I could not -- I did not recall

11   his name, that's correct.

12   Q.  And you thought Stephanie Ebbeler may have been involved

13   in the grading of ESS's patents, right?

14   A.  Right.  And, in fact, she's a marketing person, yes,

15   sir.

16   Q.  She's a marketing person at Samsung, right?

17   A.  Correct.  Yes, sir.

18   Q.  And you thought Daejin Jeon was the chief engineer

19   involved with the accused technologies, right?

20   A.  Right.  I knew he was on the engineering side of things

21   because his deposition was one I had spent a fair amount of

22   time with.  I didn't know his title.

23   Q.  So you said you spent a fair amount of time reviewing

24   Mr. Jeon's deposition?

25   A.  The parts that were relevant to my analysis, yes, sir.

1   Q.   And he was Samsung's licensing witness, right?

2   A.   I believe so, yes, sir.

3   Q.   And at the time you came to your damage conclusion, you

4   knew that flicker affected image quality, right, sir?

5   A.   I knew that -- I -- I understood that -- that flicker

6   was an issue, yes, sir.

7   Q.   But aside from that, you did not have a precise

8   understanding of what flicker was, right?

9   A.   That's correct.  Yes, sir.

10  Q.   And so you didn't know what a picture or video would

11  look like if it did not have the ability to reduce flicker,

12  right?

13  A.   That's correct.

14  Q.   And, similarly, when you came to your damage conclusion,

15  you didn't know what a picture would look like if it did not

16  use preflash, right?

17  A.   That's correct.  I had been told the relative importance

18  by the -- by the experts, and that's what I needed to know

19  for my analysis, that's correct.

20  Q.   But you didn't know what a picture would look like if it

21  didn't use the accused technology, right?

22  A.   That -- yes, sir.  As I said, I just -- I just had been

23  told the relative importance of that relative to all these

24  other things that Mr. Jenner mentioned a moment ago.

25  Q.   And you didn't look at any of the accused products as

1    part of your work on this case, right?

2    A.  Well, I mean, I've seen the products.  I did not examine

3    them in some way.  I -- that's not what I do.  I'm not an

4    engineer.

5    Q.  And you know from examining the patents that they each

6    cover a different aspect of image sensors and processors,

7    right?

8    A.  I do that -- know that, yes, sir.

9    Q.  And I believe during your direct testimony, you talked

10   about a number of components of an image sensor that you

11   referenced back to the inventors of the patents, right?

12   A.  Correct.  Yes, sir.

13   Q.  And you also discussed those components in your expert

14   report, right?

15   A.  I did, yes, sir.

16   Q.  Do you know which of those components relate to the

17   patents in this case?

18   A.  I'm sorry.  Say that again.

19   Q.  You do know which of those components relate to the

20   patents in this case, right?

21   A.  Which components?  I'm sorry.

22   Q.  The ones you referenced in your direct testimony when

23   you were talking about the inventors.

24   A.  Well, my understanding from what the inventors said was

25   that -- that the technology that they were inventing was

1    only a small part of -- of the -- of the many things that

2    went into sensors and image quality.

3    Q.   And do you recall at your deposition, I asked about the

4    components of those CMOS image sensors that were discussed

5    in your report?  Do you recall our discussion on that?

6    A.   I think so, yes, sir.

7    Q.   And I asked, which of those components relate to the

8    patents-in-suit in this case, and you said you didn't know?

9    A.   Well, again, I'm not an engineering person.  That's the

10   kind of information you would get from the gentlemen we've

11   already heard from.

12   Q.   Now, let's talk about the non-infringing alternatives

13   that you've discussed in your direct testimony.

14   A.   Yes, sir.

15   Q.   Now, for something to be a non-infringing alternative,

16   it has to be available at or near the time of the

17   hypothetical negotiation?

18   A.   Yeah.  I didn't discuss them much at all in my direct

19   testimony, but it has -- my understanding, it has to be

20   available or very obvious technology at the time.

21   Q.   And it has to be non-infringing, right?

22   A.   And it has to be non-infringing, yes.

23   Q.   Has to be acceptable to Samsung and its customers?

24   A.   You would certainly think so, yes, sir.

25   Q.   It has to be a reasonable cost?

1    A.  Again, you would certainly think so.

2    Q.  And for the non-infringing alternatives for the preflash

3    patent that you considered, you don't know if they would

4    apply to all the asserted claims, right?

5    A.  I mean, again, those are the kind of questions that the

6    technical experts would address and have addressed.  I mean,

7    I -- that's not the sort of thing I would know about.

8    Q.  Mr. Parulski didn't tell us the answer to that question

9    during his testimony, did he?

10   A.  I don't recall everything in -- in his testimony.  And,

11   again, I -- I really put very little focus on the

12   non-infringing alternatives, but I don't recall how much he

13   talked about it.

14   Q.  And you're aware that Mr. Parulski never talked to a

15   single Samsung employee about the non-infringing

16   alternatives to that patent, right?

17   A.  I can't think why he would, but, no, I'm not aware that

18   he did, no, sir.

19   Q.  And, similarly, for the anti-flicker patent, you don't

20   know if they would apply to all the asserted claims of that

21   patent, right?

22   A.  Well, again, that would be the type of issue that Dr.

23   Neikirk would address.

24   Q.  And Dr. Neikirk didn't discuss any non-infringing

25   alternatives during his testimony, did he?

1    A.  I thought I remembered him talking about some, but if

2    you -- but I'll accept your representation on that.

3    Q.  Thank you, sir.

4        And, similarly, for the non-infringing alternatives for

5    the interface patent, you don't know whether they apply to

6    all the asserted claims of that patent, right?

7    A.  Oh, again, no, I wouldn't begin to know that, no, sir.

8    Q.  And Dr. Baker didn't discuss that during his testimony,

9    did he?

10   A.  I don't believe he did, no, sir.

11   Q.  And for each of the patents, you're not certain if the

12   non-infringing alternatives would apply to each of the

13   accused products, right?

14   A.  Well, again, no, those are all technical issues that

15   someone like Dr. Baker or Mr. Parulski or Dr. Neikirk would

16   discuss.

17   Q.  And those individuals didn't discuss that in their

18   testimony in this --

19   A.  I don't believe they did, no, sir.

20   Q.  And as we talked about, a non-infringing alternative has

21   to be acceptable to Samsung -- Samsung's customers, right,

22   sir?

23   A.  Obviously, Samsung wants to please its customers.

24   Q.  But you haven't seen any evidence that Samsung's

25   customers would find these non-infringing alternatives

1    acceptable, right?

2    A.  Well, I don't know what evidence you would see of that,

3    in that I know there's a dispute over whether the patents

4    are even infringed or not.  So I don't -- I don't know what

5    evidence you could see about that, but I'm not aware of

6    anything, no, sir.

7    Q.  And a non-infringing alternative has to have minimal

8    cost, right, sir, or reasonable cost?

9    A.  Yeah.  Again, it has to be feasible within the

10   marketplace.  It's a very competitive marketplace.

11   Q.  And for the non-infringing alternatives you discussed

12   for each of the patents, you don't know the cost of any of

13   them, right?

14   A.  Oh, no, no.  I would not know that at all, no, sir.

15   Q.  And the technical experts didn't discuss that during

16   their testimony, did they?

17   A.  I don't believe so, and I don't think that they

18   discussed it when I spoke with them about these issues.

19   Q.  And when a customer buys a smartphone, they expect to

20   see a camera, right, sir?

21   A.  I think by and large today, when people buy a

22   smartphone, that there's a camera in it, yes, sir.

23   Q.  And I think when I talked to you at your deposition, I

24   asked about when a customer thinks about the camera feature.

25   It's your opinion that customers care most about image

1    quality, battery life, and ease of use.  That's what you

2    told me, right, sir?

3    A.  That was -- could well have been.  Again, I'm -- I'm not

4    reading from it, but if you are, that's great.  That's

5    something --

6    Q.  You have no reason to disagree with what I just said,

7    right, sir?

8    A.  That -- that -- if that's what I said, that sounds

9    great.  I like that answer.

10   Q.  Samsung features the camera in the marketing of the

11   accused products, right, sir?

12   A.  Yes, sir.

13   Q.  And that's because the camera feature in the phone is of

14   interest to its customers, right?

15   A.  Among many other things, certainly, it is, yes, sir.

16   Q.  And Samsung also markets the image quality of its

17   cameras in its smartphones, right?

18   A.  Certainly.  All the competitors do.

19   Q.  And that's because, as you, I think, said during your

20   direct testimony, for some customers, image quality plays a

21   role in their -- in their decision?

22   A.  Right.  The -- the -- the evidence indicates that for

23   some percentage, it does, yes, sir.

24   Q.  And when a customer takes a picture with their

25   smartphone, they expect a certain minimum level of image

1  quality, right?

2  A.  I would think most customers do.  As we talked about in

3  my deposition, I'm kind of one of those guys that just kind

4  of wants to remember the moment.  I just point and click,

5  and mine are out of focus and everything else, but I would

6  think a lot of people do, yes, sir.

7  Q.  And I think you said during your direct testimony that

8  certain customers equate resolution with image quality,

9  right?

10  A.  I think that's a reasonable thing to assume.  There has

11  been some literature to suggest that.

12  Q.  And you said, I think, as time has gone on, customers

13  have gotten more sophisticated about that issue, right?

14  A.  Again, there seems to be some evidence to support that,

15  yes, sir.

16  Q.  Back in, say, 2007, more customers would have equated

17  camera resolution with image quality, right?

18  A.  You know, I haven't seen a trend or anything, but that's

19  certainly possible and certainly makes sense.

20  Q.  Now, you talked about a number of Imperium settlement

21  agreements in this case, right, sir?

22  A.  Yes, sir.

23  Q.  And, Dr. Perryman, you talked about specifically the

24  Apple and the Sony agreements, correct?

25  A.  Those are ones I focused in on, among the others, yes,

1    sir.

2    Q.  You looked at all of them, but those are the two you

3    really focused on?

4    A.  In terms of a check on things, once I had finished my

5    analysis, yes, sir.

6    Q.  And I think you stated that you couldn't use those

7    settlements to affirmatively determine what a reasonable

8    royalty would be in this case?

9    A.  That's correct, yes, sir.

10   Q.  And that's because there's risk associated in litigation

11   to both parties?

12   A.  That was one of the reasons.  There are also the lump

13   sums, you know, one payment for all the usage for the entire

14   life of the patents worldwide, multiple patents, a lot of

15   other reasons, but that was certainly one of them, yes, sir.

16   Q.  And another one is there's no agreement about validity

17   and infringement, right?

18   A.  Absolutely.  In many cases, when they settle a case, and

19   I think these in particular, that was the case, yes, sir.

20   Q.  And for a license -- the hypothetical license here

21   between ESS and Samsung, validity and infringement would not

22   be in dispute, right?

23   A.  That's right.  When you sit down -- as we said at the

24   very beginning, when you sit down at the hypothetical

25   negotiation table, you assume that the patents are valid and

1    infringed, and the parties are going to act reasonably to

2    reach an agreement, that's correct.

3    Q.  And during a settlement negotiation or any real-world

4    negotiation, the parties don't have perfect information,

5    right?

6    A.  That's right.  In a hypothetical negotiation, we

7    basically assume -- an analogy I've heard very often and Ms.

8    Riley used, the cards are face up.  Everybody has the same

9    information to work from, and that's not always the case in

10   real life.

11   Q.  And you're in agreement with Ms. Riley that the

12   settlement agreements in the hypothetical are fundamentally

13   different, right?

14   A.  Yes, sir, they are.  I think we're pretty much in

15   agreement on that.

16   Q.  And the settlement agreements here took place about six

17   years after the hypothetical negotiation, right?

18   A.  That's correct, yes, sir.

19   Q.  And as things happened further away from the

20   hypothetical negotiation, they become less relevant, right?

21   A.  They can become less relevant.  It's certainly something

22   you want to take a look at and analyze.  They can become

23   less relevant, but I didn't think the settlement agreements

24   were particularly relevant to what a reasonable royalty

25   would be in any case.

1   Q.  And for each of those settlements, you don't know how --

2   any knowledge -- you don't -- strike that.  Excuse me.

3       For each of the settlements, you don't have any

4   knowledge of XXXX(Redacted)XXXXXX under that -- those

5   agreements, right?

6   A.  No -- no idea whatsoever.  It's just a -- it's a lump

7   sum for all the units.

8   Q.  And that includes XXXXXXXXXXXXXXXXXXXXXXXXXXX for Apple,

9   right?

10  A.  That's correct.

11  Q.  You don't have XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12  A.  That is correct.

13  Q.  And Samsung actually sells far more smartphones

14  worldwide than anyone else, right?

15  A.  Worldwide, that's correct, yes, sir.  This is a license

16  for U.S. usage, but worldwide, that's correct.

17  Q.  And, for example, on the Apple license, there's no

18  information about XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19  XXXXXXXXX, right?

20  A.  That's exactly right, yes, sir.

21  Q.  And for the Apple agreement, you kind of took each

22  patent as a typical patent, and then you adjusted based on

23  the grading summary you talked about, right?

24  A.  Well, that was one of the things I looked at.  And as I

25  said, there were a lot of reasons why that agreement

1   didn't -- didn't work, and you pointed out several of them

2   again.  But that was certainly one of them, yes, sir.

3   Q.  And aside from the three patents in this case, you never

4   looked at any of the other Imperium patents, right?

5   A.  As far as just reading the patent documents themselves,

6   no, sir.  I would have no reason to do that.

7   Q.  So you don't know how each of them are different from

8   one another, do you?

9   A.  Other than seeing just the very brief descriptions of

10  them in the table where they were all ranked A plus, A, B,

11  and C, I don't, no, sir.

12  Q.  And you don't know which of Imperium's patents --

13  Imperium's patents Apple is using and which ones it isn't,

14  right?

15  A.  I -- I don't know if it's using any of them or not.  I

16  really don't.

17  Q.  I think on your deposition, you said you did not take a

18  great deal of time looking at the Apple agreement, right,

19  sir?

20  A.  Well, I didn't have to take a great deal of time.  It's

21  a fairly short, straightforward agreement, yes, sir.

22  Q.  Another agreement we've heard about is the Samsung

23  Techwin agreement, right?

24  A.  Correct, yes, sir.

25  Q.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1  right?

2  A.   That's correct, yes, sir.

3                      (Page 79, lines 3 through 8 redacted

4                      (by order of the Court.

5  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9  Q.   So that was the only asserted patent in that case,

10  right?

11  A.   I believe so, yes, sir.

12  Q.   And then Imperium offered to license the remaining

13  portion of the portfolio for an additional 50 percent,

14  right?

15  A.   Correct, yes, sir.

16  Q.   And I think during your direct testimony you said Ms.

17  Riley attributed two-thirds of the value of the portfolio to

18  just the anti-flicker patent, right?

19  A.   That's correct, yes, sir.

20  Q.   But during her testimony, she talked about the asserted

21  patents versus non-asserted patents, right?

22  A.   She did, yes, sir.

23  Q.   So she's talking about, for example, the three patents

24  in this case versus the rest of the portfolio, right?

25  A.   Well, not really, with all due respect, because she was

1  doing that when she had a comparison of -- of the Chronicle

2  license with -- with her conclusion.

3      And the Chronicle license, the way she did her

4  calculation was she said there's the '884 patent and there

5  was 80 other patents in that -- in that agreement and eight

6  other applications.  She said and all the others would be

7  one-third.

8      So -- so, with all due respect, the way she treated it,

9  she treated it as if it were the entire portfolio.

10 Q.  But she was focused on the asserted patents because

11 that is -- those are the patents that Imperium, at least,

12 has done research and thinks that the licensee is

13 infringing, right?

14 A.  Well, I think it's very fair to say that her analysis,

15 by and large, was focused on the asserted patents, but that

16 particular reasonableness check where she used that

17 two-thirds number, the only place that intersects with any

18 patents -- because it didn't in the LG thing at all -- the

19 only place it intersected with any patents at all was -- was

20 in that analysis of the Chronicle license, which was a total

21 portfolio of all the patents.

22 Q.  Dr. Perryman, you were a professor at Baylor for

23 17 years, right?

24 A.  That's correct, yes, sir.

25 Q.  And during -- I think you testified, during nine of

1    those years, you also worked at the Perryman Group?

2    A.  Yes, that would be correct, yes, sir.  I had to do some

3    quick math there.

4    Q.  And we talked about at your deposition, when you used to

5    give out grades, you used to give As and Bs and Cs, right?

6    A.  We did, yes, sir.

7    Q.  And you said for a student to get an A, they'd have to

8    get a 90, right?

9    A.  I usually curve mine pretty good.  I was nice.  But --

10   but that was the grading system at Baylor.  90 was an A, 80

11   was a B, 70 was a C.  You know, an A was four grade points,

12   a B was three grade points, and so forth, yes, sir.

13   Q.  So when someone was getting a grade, a C was worth a 70,

14   but as you discussed on your analysis, a C was less than 30

15   percent, right?

16   A.  Well, again, those are totally unrelated.  First of all,

17   the only grades in this system were A plus, A, B, and C.

18   There were no Ds and Fs.  In the university, we have Ds and

19   Fs.  And so -- and so basically you've got the bottom grade

20   versus the top grade.

21       And grades in the university versus how these patents

22   were graded, and in particular, what Mr. Blair said about

23   these patents are just about -- I can't think of two things

24   any more unrelated than that.

25   Q.  But for your analysis, you gave any patent that was a C

82

1    a 30 percent, right?

2    A.  Based on the analysis that I did and described here,

3    that's correct, yes, sir.

4    Q.  And you used that ESS report card to adjust your rates,

5    right?

6    A.  Yes, sir.

7            MR. SALTMAN:  Mr. Rennick, could you please put up

8    PX-45?  Thank you, sir.

9    Q.  (By Mr. Saltman) And this is the grading summary, the

10   report card you talked about during your direct testimony?

11   A.  Yes, sir, it is.

12   Q.  You don't know who at ESS created this document, right?

13   A.  This e-mail or the -- or the --

14   Q.  The actual grading summary.

15   A.  The actual grading summary?  No.  Some of the testimony

16   indicated that a Ms. Moore might have been involved in it,

17   but I don't know exactly who did the grading.

18   Q.  Do you know when Ms. Moore got involved with ESS

19   Imperium?

20   A.  No, I don't.  I honestly don't.

21   Q.  You don't know that it was after April of 2007?

22   A.  That could well be.  I just remember some reference in

23   testimony to her evaluating patents.  I don't know if it was

24   the same evaluation or a different one.  But I don't have

25   internal knowledge of who internally at ESS would have done

1    this.

2    Q.  And so you discussed Mr. Blair's deposition testimony

3    about this document, right?

4    A.  I did, yes, sir.

5    Q.  Are you aware that Samsung has not shown the jury any of

6    Mr. Blair's deposition testimony?

7    A.  I believe that's correct, yes, sir.

8    Q.  And when asked about this document at his first

9    deposition, Mr. Blair said that he had never seen it before,

10   right?

11   A.  I believe he did say that, yes, sir.

12   Q.  And you don't know that any detail of what bases was

13   used to grade these patents, right, sir?

14   A.  That's right.  No.

15       As I mentioned, Mr. Blair did say at one point that he

16   wasn't even sure it was worth keeping the B and C patents

17   active, that he thought they had very little value.

18   Q.  But Mr. Blair didn't know any of the details of how this

19   grading was done, right?

20   A.  Not -- no, sir, I don't think he did.

21       MR. SALTMAN:  Thank you, Mr. Rennick.

22   Q.  (By Mr. Saltman) And, Dr. Perryman, you're aware Ms.

23   Riley looked at the cost of the image sensors in the accused

24   products, right?

25   A.  Yes, sir.

1    Q.  And she looked at the cost of the image processors in

2    the accused products, right?

3    A.  Yes, sir.

4    Q.  And the parties would have considered those prices

5    during the hypothetical negotiation, right?

6    A.  I would think so, yes, sir.

7    Q.  And you've not seen any data about what profits Samsung

8    actually attributes to the image sensors and processors in

9    this case, right?

10   A.  I haven't.  I've seen very good market data to suggest

11   what it would be, but I haven't -- I haven't seen --

12   actually seen it because they don't sell them in the United

13   States, so there is no sales data we can calculate that

14   from.

15   Q.  They do sell them outside the United States, right?

16   A.  Yes, sir, I believe they do.

17   Q.  And those figures Ms. Riley used were worldwide sales,

18   right?

19   A.  Well, the figure Ms. Riley used were worldwide sales of

20   everything Samsung does.  I didn't see any figures that I

21   would -- I don't think Samsung does their accounting in such

22   a way we could sort out the -- just the processors they sell

23   worldwide.

24   Q.  But image sensors and processors would be included in

25   that 11.8 percent, right, sir?

1   A.   Yeah.   They would be -- those little processors would be

2   included, along with refrigerators and televisions and

3   phones and tablets and a lot of other stuff, yes, sir.

4   Q.   And you understand it's Samsung's contention that they

5   don't infringe the patents-in-suit in this case?

6   A.   Oh, absolutely, yes, sir.   I do understand that.   And

7   that's just an assumption that I'm required to make, that

8   they do, to do my analysis.   I am in no way saying that

9   Samsung infringes these patents.

10  Q.   And you haven't seen any evidence of how much it cost

11  Samsung to develop the accused technology in the image

12  sensors and processors, right?

13  A.   I have not.   I know they have a lot of image technology

14  and a lot of patents in that field, but as far as the actual

15  cost of developing that, I don't know.

16  Q.   And you don't know if they have any patents related to

17  flicker, right, sir?

18  A.   I don't know off the top of my head, no, sir, I don't.

19  Q.   And you don't know if they have any patents related to

20  preflash?

21  A.   I don't know, no, sir.

22  Q.   And you don't know if they have any patents related to

23  interfaces either, right, sir?

24  A.   I wouldn't need to know any of that for my analysis, no,

25  sir.

86

1  Q.  And if Samsung offered a phone that did not include a

2  feature a customer is expecting to see, Samsung would have

3  to lower the price of that phone, right, sir?

4  A.  More than likely.  I mean, it's a very competitive

5  market out there, and the companies are constantly trying to

6  bring out the latest and greatest things to be more

7  competitive.

8          MR. SALTMAN:  Your Honor, at this point, I would

9  request to seal the courtroom.  I'm just going to be getting

10  into Samsung confidential information.

11          THE COURT:  Okay.  At this point, I'll go ahead and

12  seal the courtroom.

13          MR. SALTMAN:  Thank you, Your Honor.

14                  (Courtroom sealed.)

15                  (Page 86, line 15 through page 102,

16                  (line 8 redacted by Court order.

17  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

```
 1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
```

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

```
 1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
```

1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

```
 1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
10    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
11    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
12    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
13    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
14    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
15    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
16    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
17    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
18    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
19    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
20    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
21    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
22    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
23    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
24    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
25    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
```

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
2  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
3  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
4  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
5  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
6  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
7  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
8  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
9  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
10 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
11 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
12 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
13 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
14 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
15 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
16 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
17 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
18 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
19 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
20 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
21 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
22 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
23 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
24 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
25 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

```
1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
```

9            THE COURT:  All right.  Can we go ahead and unseal

10  the courtroom?

11            MR. JENNER:  As far as I'm concerned, we can.

12            MR. SALTMAN:  Yes.

13                   (Courtroom unsealed.)

14            THE COURT:  Additional questions?

15            MR. JENNER:  Just a few, Your Honor, yes.

16       May I proceed, Your Honor?

17            THE COURT:  Yes.  Go ahead.

18                 REDIRECT EXAMINATION

19  BY MR. JENNER:

20  Q.  A few things I'd like to clarify.

21  A.  Certainly.

22  Q.  First of all, counsel asked you a number of questions at

23  the outset about the Georgia-Pacific Factors.

24  A.  Yes, sir.

25  Q.  I'd just like to be clear.  Even though you talked today

1  about the yellow highlighted factors that you considered to

2  be most important in your final analysis, did you or did you

3  not consider all of the Georgia-Pacific Factors?

4  A.  Oh, absolutely.  I considered all of them.  And in the

5  report I provided to the -- to the Plaintiffs, I discussed

6  each one of them individually.

7  Q.  All 15; is that correct?

8  A.  Oh, absolutely, yes, sir.

9  Q.  Counsel asked you a lot of questions about

10  non-infringing alternatives.

11  A.  Yes, sir.

12  Q.  Did you, in fact, rely today much on non-infringing

13  alternatives in your testimony?

14  A.  Oh, not at all.  No.  I was very surprised by that.

15  Q.  All right.  Counsel asked you some questions about

16  worldwide sales as between Apple and Samsung, and I'd just

17  like to make sure it's clear.

18      What are the relative sales qualitatively between

19  Samsung and Apple in the United States?

20  A.  In the United States, Apple sells roughly 50 percent

21  more -- has roughly 50 percent more market share than

22  Samsung.  One of them is about 43, 44 percent, is Apple, and

23  Samsung is around 27 right now.  So half again as much.

24  Q.  And is it the U.S. sales that you considered in your

25  analysis or the worldwide sales?

1   A.  Oh, it's the U.S. sales.  Again, we're talking about

2   U.S. patents here, which apply to products in the United

3   States.

4   XXXXXXXXXXX(Redacted pursuant to Court order)XXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6         MR. JENNER:  So I would ask that we put up DX-167.

7   Q.  (By Mr. Jenner) I think counsel used Exhibit 162.

8   That's just another version of the same agreement?

9   A.  Yes, sir, it is.

10         MR. JENNER:  We need to seal here?

11      I'm sorry, Your Honor.  Apparently, because of this

12   XXXXXXXXXXX(Redacted pursuant to Court Order)XXXXXXXXXXXXXX

13   courtroom.

14         THE COURT:  Okay.  We'll go ahead and seal the

15   courtroom again.  I don't know if there's anybody else that

16   needs to be -- I'll let the parties monitor those people that

17   need to leave, but -- okay.  Go ahead.

18                     (Courtroom sealed.)

19                     (Page 104, line 19 through page 109,

20                     (line 12 redacted by Court order.

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

107

1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

```
1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
10  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
12  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
```

13              THE COURT:  So unseal the courtroom.

14                     (Courtroom unsealed.)

15              THE COURT:  And, ladies and gentlemen, if you have a

16   question, go ahead and send that.  And as soon as we finish

17   this portion, we'll take a break.  I know you're probably

18   wanting a break.

19       (Pause in proceedings.)

20              THE COURT:  Can I have counsel approach?

21       (Off the record bench conference.)

22              THE COURT:  Okay.  Dr. Perryman, I allow the jury to

23   ask questions of live witnesses.

24              THE WITNESS:  Yes, sir.

25              THE COURT:  And so -- and the question is, if you can

110

1   answer this question, what was the selling price for a

2   smartphone camera phone in early 2007 comparable to a Samsung

3   camera phone, if you know?

4   A.  You know, I honestly don't know what the relative

5   selling prices were at that time.  They are a lot less than

6   they are now, I think, but I don't know what the -- what

7   the -- what the prices of phones were at that point in time.

8           THE COURT:  Okay.  Thank you.

9       I don't know if there's any follow-up to that question?

10          MR. JENNER:  Nothing here, Your Honor.

11          MR. SALTMAN:  Nothing, Your Honor.

12          THE COURT:  You may step down.

13          THE WITNESS:  Thank you, Your Honor.

14          THE COURT:  Ladies and gentlemen, we're going to go

15  ahead and take a break.  We're going to take about 20 minutes

16  this time, because I'm going to stay on the bench.  I have to

17  do a criminal matter before I get to take -- my staff and I get

18  to take a break, but...

19      So we'll take 20 minutes and come back.  Again, don't

20  talk about the case with yourselves or with anybody else,

21  and we'll continue this afternoon.

22      Thank you.

23          COURT SECURITY OFFICER:  All rise.

24              (Jury out.)

25              (Recess.)

1          COURT SECURITY OFFICER:  All rise.

2          THE COURT:  Okay.  Go ahead and bring the jury in.

3          MR. HARNETT:  Your Honor, one moment.  I understand

4    that an instruction is going to be given at this time.  Just to

5    make sure there's no confusion on the record, we -- we need to

6    formally object to what you're doing.

7          THE COURT:  I understand.  It's overruled.  After you

8    rest -- I'll let you rest in front of the jury first.

9          COURT SECURITY OFFICER:  All rise for the jury.

10               (Jury in.)

11          THE COURT:  Go ahead and be seated, please.

12     Okay.  What says Samsung?

13          MR. HARNETT:  Samsung rests.

14          THE COURT:  Thank you.  And before I call upon

15   Imperium to do the rebuttal, I want to give you an instruction.

16      On Tuesday, Imperium offered Mr. Bang's and Mr. Lee's

17   testimony by way of their videotaped depositions.  Mr. Bang

18   testified under oath that Samsung discontinued discussions

19   with Imperium regarding Imperium's patent portfolio, did not

20   perform an analysis of Imperium's patents after 2011.

21      Mr. Bang further testified that he did not review any

22   pleadings in the first Imperium case against the seven

23   smartphone Defendants, and he did not monitor that

24   particular Imperium litigation.

25      Mr. Lee testified under oath that in 2011, Samsung

1    decided to drop its pursuit of Imperium's patents.

2         Mr. Lee further testified Samsung's business units had

3    determined that Imperium's patents were not worth acquiring.

4         At 2:19 a.m. yesterday morning, Samsung produced for

5    the first time previously undisclosed documents regarding

6    specific facts within the personal knowledge of Mr. Bang and

7    Mr. Lee, in violation of this Court's rules regarding the

8    disclosure of evidence.

9         This evidence contradicts the sworn testimony of Mr.

10   Bang and Mr. Lee and indicates that the testimony that Mr.

11   Bang and Mr. Lee gave about Samsung's discussion with

12   Imperium and its analysis of Imperium's patents was false

13   and therefore not worthy of belief.

14        Accordingly, I will strike these portions of Mr. Bang's

15   and Mr. Lee's testimony from the record and instruct you to

16   disregard the testimony in its entirety.

17        What says Imperium regarding rebuttal?

18        MR. FISCH:  Your Honor, we'd like to recall two

19   witnesses, please.

20        Your Honor, as our first witness, we would like to

21   recall Dr. Cameron Wright, please.

22        THE COURT:  And, Dr. Wright, you understand you're

23   still under the oath that was given earlier?

24        THE WITNESS:  Yes, sir.

25        THE COURT:  Thank you.

1    Go ahead and proceed.

2        MR. FISCH:  Thank you, Your Honor.

3    Ladies and gentlemen of the jury, this is the phase of

4    the case where Dr. Wright has the opportunity to speak to

5    the issue of validity.  He also has now the opportunity to

6    address the points made by Samsung's technical experts.

7    DR. CAMERON WRIGHT, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

8                    DIRECT EXAMINATION

9    BY MR. FISCH:

10   Q.  Good afternoon, Dr. Wright.

11   A.  Good afternoon, sir.

12   Q.  I understand that you are here to talk about all three

13   patents; is that correct?

14   A.  Yes, sir, that is correct.

15   Q.  Let's begin with the first, Doctor, the interface

16   patent, please.

17   A.  Yes, sir.  This is the interface patent, and I would

18   like to talk first about validity.

19   Q.  What should the jury know, sir?

20   A.  Well, sir, Samsung admits that the interface patent came

21   first.  There's no other piece of information out there that

22   has all the elements of the claims that -- that we're

23   asserting here.  There is no piece.  They did not point to

24   any other piece that -- that covers it all.

25       So from that, you can turn to what they did talk about.

1    In particular, Dr. Baker tried to combine two dissimilar

2    patents to try to come up with something close to the

3    interface patent.

4         In particular, he tried to combine Toshiba and Umeda,

5    which I will call Toshiba 2 since it was really owned by

6    Toshiba, and Roe and Umeda.

7         Now, these are very dissimilar patents.  It would be --

8    it would be like 115 years ago if -- if there's a patent on

9    a wing and there's a patent on an engine and you can somehow

10   imagine you can mush them together and come up with an

11   airplane.  It's not going to work.  It took the Wright

12   brothers to invent the airplane.  You can't just take two

13   dissimilar things and put them together like that.

14        And particularly Toshiba describes an I/O cell.  I

15   mean, that's what they talk about throughout the whole

16   patent is an I/O cell.  What they don't talk about

17   throughout the patent, there's no mention of a camera.

18   There's no mention of an image processor.  There's nothing

19   about that anywhere in the patent.

20        Umeda, on the other hand, is simply a -- a video system

21   to format the video signal.  That's all it is.  Nobody would

22   think to take those two things and mush them together.  It's

23   just not going to happen.  If you tried, it wouldn't work.

24        So -- so looking at Toshiba and Umeda, which is really

25   Toshiba 2, it just doesn't make sense.  And really Toshiba

1  owned both patents, and they never combined them.  So it

2  just makes sense that that is not a reasonable combination.

3  Q.  Doctor, what about the applicability to digital cameras,

4  the very issue in these patents in this case?

5  A.  Well, sir, the Toshiba patent as an I/O cell has no

6  applicability in its own rights to digital cameras.

7  Q.  What about the next one, Doctor?

8  A.  Well, the next combination that Dr. Baker discussed was

9  -- was Roe with Umeda.  And once again, Roe is an I/O

10  circuit.  It's -- it's just trying to convert some signals,

11  and the way that it makes them available to its output pins.

12  So that's all it is.  It's just a tiny little cell, and it

13  even says in the patent that this is meant to be used in

14  part of a larger integrated circuit.  That's all it's

15  supposed to do.

16      On the other hand, I already talked about Umeda just

17  being a video formatter.  To put the two together, again,

18  makes no sense.  If you -- if you were to try to put them

19  together for some reason, it most likely would not work.

20  And nobody would be motivated to put them together.  They

21  come from two different areas.  They're solving two very

22  different problems.

23  So to say that they somehow combine, they're going to come

24  up with all of the embodiments of the interface patent, I am

25  not convinced.  That is -- that is just wrong.

1    Q.   Then, Doctor, what is your conclusion with respect to

2    the validity of the interface patent?

3    A.   Sir, my opinion, the interface patent remains valid.

4    Q.   Every bit as much as the day it came out of the Patent

5    Office?

6    A.   Yes, sir.

7    Q.   Now, you heard some discussions about infringement from

8    the experts.  Why don't we talk about infringement as it

9    relates to the interface patent.  Where would you like us to

10   begin?

11   A.   Yes, sir.  Well, if you recall, I stepped you through

12   all of the elements of Claim 10 for the interface patent.

13   And if you think back to Dr. Baker's testimony, he really

14   had no argument on any of those except for the final

15   element, the element talking about the image processor

16   connected to the CMOS image sensor.  That was really his

17   main argument.

18   Q.   And what should we know about that, Doctor?

19   A.   Well, sir, the main basis of his argument all comes down

20   to an incorrect interpretation of the claim construction.

21   Really, if you look at what he said, if you -- if you take

22   it all down to its basics, what he was trying to say is that

23   the claim construction was supposed to have an additional

24   word in there, that word being "both."

25        So if we look at the claim construction, on the right

1   is what the Court constructed here, "a processor connected

2   to the CMOS image sensor for processing image data received

3   from the single-ended and the differential interface."

4   It does not say received from both the single-ended and

5   differential interface.  It just does not.

6   Q.  And, Dr. Wright, just to clarify, what's on the left and

7   what's on the right?

8   A.  On the left is the wording from the patent.  On the

9   right is the Court's claim construction.  The word "both"

10  does not show up in the claim construction.

11  Q.  So if you were to take the approach that was taken by

12  Samsung's witness, what would that result in?

13  A.  Well, sir, that would -- that would be a really bad

14  idea.

15      If you recall a slide I used to show the advantages and

16  disadvantages of single-ended and differential, here -- we

17  have it here.  So you've got the bicycle and you've got the

18  race car, right?  The kind of slow bicycle for -- for the

19  single-ended control signal, the -- the race car to -- to

20  move your image data fast.

21      If we accepted Dr. Baker's idea of the word "both,"

22  you'd be trying to ride the bicycle and ride the race car at

23  the same time.  The overall result would be the overall data

24  rate would be slower and the drain on your battery would be

25  higher.  It makes no sense to try to do that.

1  Q.  So then, Doctor, what is your ultimate conclusion

2  regarding infringement?

3  A.  Sir, I conclude that the -- that Samsung infringes the

4  interface patent.

5  Q.  Thank you, Doctor.  Why don't we look at the preflash

6  patent?

7  A.  Yes, sir.

8  Q.  Where would you like to begin there?

9  A.  Sir, again, I think it's best to start with validity.

10  Q.  What should the jury know about that, sir?

11  A.  Once again, Samsung did not find any one piece.  They

12  did not -- they admit that the preflash came first.  There

13  is no one piece of -- of art out there, no other patent that

14  has all the elements of the preflash patent.  So there's no

15  argument there.

16      Then they tried to make these combinations again.  So

17  the combination that they tried to make in this case was

18  Sugimoto and Shimada.  If you remember -- you remember Mr.

19  Parulski talked about this and he kept talking about Shimada

20  and Shimada.  But really, Shimada is the Japanese version of

21  a U.S. patent called Sugahara.  And the Patent Office looked

22  at both of those and the combination of those and still

23  decided to award the patent for the preflash patent.

24  Q.  How do you know about that?

25  A.  Well, I looked at the file history, the official file

1    history of that patent which shows just what the Examiner

2    looked at.  It shows the letters going back and forth

3    between the inventors and the Examiner and what they

4    considered and all that.

5        And you can see right here -- I have an excerpt from

6    that file history.  They definitely looked at Sugimoto and

7    Sugahara.  So they looked at that combination, and they

8    still decided to award the patent.

9    Q.  What else should we know, Doctor?

10   A.  Well, you may recall that Mr. Parulski tried to justify

11   that he wanted to look at Shimada instead of Sugahara

12   because he said sort of in passing that, well, Sugahara

13   doesn't really have look-up tables.

14       That's not quite correct.  Sugahara doesn't have the

15   big huge picture of a look-up table, but Sugahara definitely

16   talks about and discusses look-up tables.

17       And you see here an excerpt from the patent where it

18   talks specifically about look-up tables.  This isn't the

19   only place in the patent where it talks about it.  And the

20   way it's discussed, anybody working in the field would

21   understand that it's really the same idea that was shown in

22   the picture of the Japanese patent.

23       So the two are the same.  I have -- I have both of them

24   right here.  I have -- I have put them together

25   side-by-side, page-by-page.  I've gone through both of them.

1    They disclose exactly the same invention.  The Patent Office

2    looked at both of these and decided to award the patent for

3    the preflash patent.

4    Q.  So, then, Doctor, what is your conclusion with respect

5    to validity of the preflash patent?

6    A.  Sir, it's clear to me that the preflash patent remains

7    valid.

8    Q.  Every bit as much as it was the day it was issued?

9    A.  Yes, sir.

10   Q.  What about infringement, Doctor?

11   A.  Well, infringement, if you recall, we went through three

12   different claims.  And Claim 1 had all these -- these

13   elements.  And if you think back to Mr. Parulski's

14   presentation, one of the fundamental points on which he

15   rested to try to talk about no infringement, he kept saying

16   that LEDs are not strobes.  Well, that's wrong.  That is

17   just incorrect.

18       A strobe is simply a light source that can be turned on

19   and off very quickly.  Doesn't matter what light source it

20   is.  LEDs are turned off -- on and off very quickly all over

21   the place.  In the real world, LEDs are used as strobes all

22   the time.  That's a fundamental part of his argument, and it

23   just falls apart when you really look at how LEDs are really

24   used.

25       Another part of his argument, based on this claim, was

1    how he treated the predetermined preparatory duration of the

2    preparatory light.  You remember it has to turn on for a

3    time that's known ahead.  And, again, that -- that is

4    consistent with the Court's claim construction, but the

5    Court's claim construction doesn't say that you can only

6    turn it on for a certain amount of time.  It says you have a

7    preparatory time that you have to emit it, and you have to

8    know before you turn it on.

9         It does not say that you can't keep it on.  It doesn't

10   say when you have to turn it off.  It doesn't say that if

11   the camera decides it needs more than one preparatory image,

12   that it can't do that.

13        That's completely consistent with the patent, and

14   that's completely consistent with all of the evidence that I

15   saw.  And so there's nothing wrong with that.  That's --

16   that's how it works.

17   Q.  So your conclusion, Doctor, is Claim 1 infringed every

18   bit as much as it was when you walked through it?

19   A.  Yes, sir.  One other part of the claim, however, is he

20   did talk to the point of look-up tables.  And he said sort

21   of in passing -- right at the end of his presentation, he

22   said in passing, look-up tables, oh, they don't -- they

23   don't include duration times.  That's wrong.  The look-up

24   tables definitely include duration time.  I showed you

25   tables from Samsung documents that included duration time.

1    Not only that, if the table didn't include duration

2  times, it wouldn't work.  In order to know how much light

3  you've put out there on the scene, you've got to know the

4  length of time and you've got to know the power.  Just like

5  when you cook in your microwave, you set the power value,

6  you set the time.  If you don't know those things, your --

7  the information you would gather from a preflash would be

8  meaningless.

9    So his arguments fall apart.

10 Q.  So, Doctor, that's Claim 1, but, of course, this patent

11 has three claims that you have concluded infringe.  What's

12 your view on Claim 6 and Claim 7?

13 A.  Well, sir, Samsung still infringes Claim 1, and we go to

14 Claim 6.  Mr. Parulski really didn't argue at all about

15 Claim 6.  And Samsung still infringes Claim 6.

16    And if we go to Claim 7, if you recall, Claim 7 is

17 really just Claim 1 but with the slightly added words

18 "machine-readable instructions."  So this is really just

19 taking Claim 1 and saying you're going to have a computer

20 program that does this.  That's all it says.

21    So the same argument that I just made for Claim 1

22 applies to Claim 7.  And, again, Samsung infringes Claim 7.

23 Q.  Doctor, what's your overall conclusion with respect to

24 the preflash patent infringement?

25 A.  Sir, I conclude that Samsung infringes the preflash

1   patent, and I -- I -- also it's -- they only have to

2   infringe one claim of these three to be infringing the

3   patent.

4   Q.  Doctor, that leaves us with the final patent.

5   A.  Yes, sir.

6   Q.  The flicker patent?

7   A.  The anti-flicker patent.  So, again, sir, I would like

8   to start with validity.

9       So this is where Dr. Neikirk talked about Hashimoto and

10  Johnson.  Now, these are not as similar to the anti-flicker

11  patent as he may have tried to make it sound.  Hashimoto,

12  for example, never discloses setting the integration time to

13  an integer multiple of the variation of the -- of the

14  lighting, the flicker frequency.  Never -- never says that.

15  Never.

16      It discloses the step of adjusting while maintaining.

17  Remember that one, that you can adjust the integration time

18  as you need to but you have to maintain it to an integer

19  multiple so that you -- you're eliminating the flicker?

20  Never discloses that one.

21      In fact, the Hashimoto patent really only talks about

22  two specific shutter speeds, 1/100th and 1/50th, neither of

23  which would reduce flicker in the United States.  And the

24  patent is completely silent on whether you can use any other

25  shutter speeds in between there.  So to say that that patent

1    is close to the anti-flicker patent is just not true.

2        Now, likewise with Johnson, Johnson has very, very

3    little to do with the anti-flicker patent.  If you read the

4    Johnson patent, what it has to do with is it's trying to

5    convert signals from a very atypical CCD sensor that has

6    four colors and they're trying to reformat that information

7    into a standard video signal that would have three colors.

8    It's just a reformatter.  That's all it's meant for.

9        Out of over 40 columns of text in that patent, there's

10   one paragraph that even mentions flicker.  And in that

11   paragraph -- and there's a little figure that goes along

12   with it.  Dr. Neikirk showed you that little figure.  But

13   that one paragraph of seven sentences, it just talks about,

14   well, you can average the light over one cycle or two cycles

15   of the light variation, and that's really all it says.

16       And it talks of this flickerless mode in this

17   paragraph.  Never says how you're supposed to achieve this

18   flicker mode, how you're supposed to -- what kind of

19   equipment it takes to do this.  It's very -- just kind of in

20   passing.  Obviously, wasn't very important to the inventors

21   if they only spent this tiny little paragraph on this big,

22   long patent.

23       So I don't find that these two prior patents are really

24   close to the anti-flicker patent at all.

25   Q.  Are you the first, you think, Doctor, to reach that

1   conclusion?

2   A.  No, sir.  Both of these patents were available to Apple

3   and the other six companies in the previous litigation when

4   they looked at this.  Those companies chose not to come

5   forward and try to use these two patents to try to show

6   invalidity.  They -- they just did not do it.

7   Q.  What about the combinations, Doctor, do they add up?

8   A.  No, sir.  Again, you try to make these little

9   combinations of things like slapping a wing and an engine

10  together and you don't get an airplane.  But, again, they're

11  trying to make these combinations.

12       So the three that were discussed with Dr. Neikirk's

13  testimony were Hashimoto and Kinugawa, Hashimoto and Hata,

14  and Johnson and Oster.  So I'll take -- I'll take those one

15  at a time.  This is -- I won't take much longer.

16       And so Hashimoto and Kinugawa.  Again, this assumes

17  that Hashimoto is really close to the anti-flicker patent,

18  and you just have to reach out and get one little piece from

19  Kinugawa and stick it in and it's somehow going to work and

20  make it equal to the anti-flicker patent.  Not true.

21       Well, for -- for one thing, if you read the patents,

22  Hashimoto talks about a digital camera.  Kinugawa talks

23  about an analog camera.  Very different things.  You can't

24  just take a piece out of one and slap it into the other one.

25  It would be like opening a case on an Apple computer and

1    opening a case on a PC, pulling out some chips on the Apple

2    and trying to shove them into the PC and thinking it's going

3    to work.  Not gonna work.

4        Similarly, Hashimoto and Hata.  Again, the assumption

5    is that Hashimoto somehow is so close to the anti-flicker

6    patent that you just need one little piece from Hata to --

7    to make it equal.  Doesn't work like that.  That -- that

8    piece that -- that Dr. Neikirk wanted to take from Hata was

9    the gamma correction.

10       If you read the Hashimoto patent carefully, look at the

11   diagrams, you'll see that that digital gamma correction, as

12   it's described, would not work in Hashimoto.

13       So I don't care where you take it from, Hata or

14   anywhere else, if you stick it into Hashimoto, you've just

15   rendered it non-functional.  It won't work.

16       And so the words may line up nicely.  You know, oh, now

17   I have gamma correction, but it doesn't work.  So you don't

18   get a functional combination when you try to make that --

19   that combination.

20       Now, Johnson and Oster.  Similar sort of thing.  Again,

21   the assumption is Johnson is close enough to the

22   anti-flicker patent that you just have to reach out and grab

23   this one little thing from Oster.  In this case, the one

24   little thing they're looking for was the flicker detection.

25   But, again, this -- this is really just not true.

1    Johnson is a video reformatter.  It's just reformatting
2    from that strange four-color CCD to a standard three-color
3    video signal.  That's what it's for.  To go out and grab
4    some flicker detection piece out of Oster and somehow mash
5    it into Johnson, it's not going to work.  Nobody would be
6    motivated to do that.
7    And that's -- the part of the test on these
8    combinations is that somebody would just be motivated to,
9    oh, those are so similar I can fit them together like hand
10   in glove.  Not true in this case at all.  So Johnson and
11   Oster, they're -- it's not a reasonable combination either,
12   sir.
13   Q.  So, Doctor, what is your conclusion with respect to
14   validity?
15   A.  Well, sir, I conclude that the anti-flicker patent
16   remains valid.
17   Q.  Every bit as valid as the day it was issued by the
18   United States Patent and Trademark Office?
19   A.  Yes, sir.
20   Q.  Doctor, what are your thoughts on what you heard about
21   infringement?
22   A.  Well, once again, for infringement, Dr. Neikirk talked
23   about lots of things in his presentation, but as I go
24   through these, then I remember what his presentation was.
25   One thing that sticks out in my mind is that he wanted you

1    to think that none of these methods are performed in the

2    United States.  Well --

3                    MR. HARNETT:  May we approach, Your Honor?

4                    THE COURT:  Yes.

5                              (Off the record bench conference.)

6                              (Pause in proceedings.)

7                              (On the record bench conference.)

8                    MR. HARNETT:  We are preserving -- Samsung is

9    preserving their objection to Dr. Wright being permitted to

10   offer testimony on the question of infringement of the method

11   claims of the '884 patent for the first time in Imperium's

12   rebuttal case.

13       It is Samsung's position that Imperium could have and

14   should have offered proof on the infringement of the method

15   claims in its direct and its failure to do so requires a

16   directed verdict that those claims are not infringed.

17       The record will show and Samsung will move in

18   post-trial papers that Dr. Wright said not one word about

19   the requirements in proving a method claim in his

20   non-infringement testimony during Imperium's case-in-chief.

21       And we strenuously object.

22                    MR. FISCH:  We're going to oppose any such motion.

23                    THE COURT:  Okay.  Overruled.

24                              (Bench conference concluded.)

25                    THE COURT:  Go ahead and proceed.  If you'll turn the

1  mic back on.  Oh, that's fine.

2          MR. FISCH:  Thank you, Your Honor.

3          THE COURT:  Wait, wait.  Would you turn your mic back

4  on?  And wait one second for the court reporter.

5          MR. FISCH:  Much appreciated, Your Honor.  Thank you,

6  sir.

7  Q.  (By Mr. Fisch)  Dr. Wright, when we left off, you

8  were --

9          THE COURT:  Mr. Fisch, wait one second.  The court

10  reporter is not ready yet.

11         MR. FISCH:  No worries.

12         THE COURT:  Okay.  Go ahead.

13         MR. FISCH:  Thank you all.

14  Q.  (By Mr. Fisch)  Dr. Wright, when we left off, you were

15  sharing some thoughts about Claim 1?

16  A.  Yes, sir.  I was starting to discuss the fact that Dr.

17  Neikirk talked about the fact that the methods described in

18  -- in this patent are not performed in the United States.

19      On the other hand, we have heard testimony in the last

20  few days that over a hundred million units have been sold in

21  the United States.  So these -- these operations that are

22  part of the anti-flicker algorithm that Samsung uses, these

23  are automatic.  They're part of the automatic-exposure mode.

24  You turn -- you turn the camera on, you turn the phone on,

25  these modes are -- are operating in the background.  The

1    flicker algorithm is running in the background.

2        So there are a hundred million some-odd units operating

3    with these algorithms running.  So I -- I -- the statement

4    that this is not performed in the United States is wrong.

5    Q.   Where next, Doctor?

6    A.   Well, sir, another -- another aspect that Dr. Neikirk

7    discussed is my interpretation of some of the line diagrams

8    that were used in some of the datasheets, and he pointed, in

9    particular, to one unit and he said, oh, well, this one does

10   do flicker correction, like you said.  This one out of all

11   our products that Samsung makes, this one does it, but none

12   of the others do.

13       And diagrams like this -- this is a slide that I showed

14   you in my testimony, and there are diagrams like this in the

15   datasheets for all the sensors pretty -- you know, you can

16   find this information in one way or the other in all of

17   those sensors and how they're doing, the flicker algorithm.

18   And he was saying that, well, this -- this one product I can

19   show you these tiny little bumps and I can go along with the

20   idea that maybe that's an integer multiple, but I'm not

21   going to go along with this one.

22       In fact, if you look at the way that -- that is

23   labeled, if you look at the top -- so you look at the top

24   of -- of those diagrams, if you see on the left-hand side of

25   the vertical axis, you see where it says Exposure 1 and

1    Exposure 2?  So -- so those are the only two allowable

2    exposure values that Samsung is willing to use in this mode

3    of operation.

4        And that angled line where it's -- where it's going

5    from Exposure 1 to Exposure 2, that's just it's

6    transitioning from one to the other.  That's all.

7        Samsung does not use those intermediate values of -- of

8    shutter -- I'm sorry, of integration times.  And how do I

9    know that?  Again, I turn into the Samsung documentation

10   across-the-board, and in Samsung's own document where they

11   discuss their flicker algorithm, you can see down here at

12   the bottom where they're very adamant about the fact they

13   can only use integer multiples of one over two times the

14   frequency of the AC.  So we're talking about in here one/120

15   in integer multiples of that.  And they say N, the integer,

16   can be 1, 2, 3, dot, dot, dot.

17       So they've clearly said and they've clearly

18   communicated this to the other people in their company that

19   this is how you do flicker correction, and this is what we

20   use in our flicker algorithm.

21       So Dr. Neikirk's statement that it's not used in all

22   these other products is just incorrect.

23   Q.  Doctor, let me ask you.  If a Samsung product is used

24   under the right lighting conditions and there is no flicker,

25   then is the product infringing the anti-flicker patent?

1   A.  Yes, sir, it is.  It's using Samsung's flicker

2   algorithm, and Samsung's flicker algorithm, as I've stepped

3   you through during my -- my testimony earlier, goes through

4   all the steps of the anti-flicker patent.

5       And so if this automatic mode is engaged, you're in the

6   right environment, it -- it will use those steps that are

7   described in the anti-flicker patent.  And so it would be

8   infringing.

9   Q.  There are a few more claims to discuss, right, Doctor?

10  A.  Yes, sir.  So Claim 5 was not really contested, and I

11  still believe that Samsung infringes Claim 5.

12      Again, Claim 6 wasn't really contested.  I still

13  believe Samsung infringes Claim 6.

14      When we get to Claim 14, this is a -- this is another

15  place where Dr. Neikirk said that I didn't show evidence, in

16  particular, about the overall integration time adjustment

17  block coupled --

18          MR. HARNETT:  Objection, Your Honor.  Same objection

19  that I put on the record before on this ground.

20          THE COURT:  Overruled.  Go ahead.

21  A.  So the integration time adjustment block coupled to the

22  programmable integration time circuitry.  Coupled, of

23  course, in this context just means they're connected

24  together.  So it says that the adjustment block is coupled

25  to the circuitry that can do the adjustment.  That's all it

1    says.

2         And I did show you evidence -- I showed you evidence

3    from Samsung's own datasheets where they talk about

4    adjusting the integration time, setting the integration time

5    to the integer multiple that they needed.

6         And if you take a step back from this also, does it

7    make any sense that Samsung would talk all about being able

8    to adjust the integration time on all these sensors and not

9    connect the adjustment block to the adjustment circuitry?

10   Of course, it's connected.  That's the only way it would

11   work.  If it -- if you didn't connect them, or couple them,

12   in the wording of the claim, you would have a non-functional

13   camera.  So it does.  I did show you that evidence.

14   Q.  Claim 17, Doctor, what are your thoughts?

15   A.  Claim 17, again, not contested.  The value -- each one

16   of these elements were all shown, and, again, I believe that

17   Samsung is infringing Claim 17 of the anti-flicker patent.

18   Q.  So what's your conclusion, Doctor, with respect to

19   infringement of the anti-flicker patent?

20   A.  I conclude that, as I stated before, Samsung infringes

21   the anti-flicker patent.

22   Q.  And are there any non-infringing alternatives to the

23   anti-flicker patent?

24   A.  No, sir.  This is the best way to do it.  Some of the --

25   some of the ways that were suggested by Dr. Neikirk where

1   you could just set the integration time to -- to one of the

2   multiples, that's not the whole -- that's not the whole

3   invention.

4        Really, one of the key parts of the invention is this

5   adjusting-while-maintaining, so that you can go to other

6   integer multiples of the -- for the shutter time while

7   maintaining it at an integer multiple that you don't get

8   flicker.

9        Now, why do you have to do that?  Well, if I'm taking a

10  video -- you know, maybe my son's birthday party or

11  something and somebody -- somebody kind of walks by or they

12  open a shade or they do something, the lighting changes,

13  right?  The lighting changes when you're taking videos.

14  If you don't have this ability to adjust while maintaining,

15  the camera cannot adapt to this changing light.  You can't

16  just lock in one shutter speed -- or, I'm sorry, integration

17  time.  You can't just lock that in and expect to take a good

18  video.  I don't see that as a -- as an appropriate

19  non-infringing alternative, sir.

20  Q.  Doctor, once again, thank you very much for the

21  education.

22            MR. FISCH:  Your Honor, I'll pass the witness at this

23  time.

24            THE COURT:  Cross-examination.

25                 CROSS-EXAMINATION

1    BY MR. PEPE:

2    Q.  Good afternoon, Dr. Wright.

3    A.  Good afternoon, sir.

4    Q.  It's good to see you again.  We saw each other up in

5    Wyoming back in October?

6    A.  Yes, sir, we did.

7    Q.  I just wanted to clean up a few points about your

8    background.

9        How many issued patents do you have?

10   A.  Sir, I have one.

11   Q.  And are you being paid for your time that you've worked

12   on this case?

13   A.  Yes, sir, I am.

14   Q.  Now, Doctor, Samsung's experts, you saw them testify,

15   correct?

16   A.  Yes, sir, I was here for all of their testimony.

17   Q.  Over seven hours of testimony?

18   A.  It was a long time, sir.

19   Q.  They put up figures from the prior art patents, texts

20   from the prior art patents; is that right?

21   A.  That's correct, sir.

22   Q.  We had color-coded demonstratives; is that right?

23   A.  Very attractive, sir.

24   Q.  You didn't show the jury one piece of prior art during

25   your rebuttal; is that right?

1    A.  Say that again, sir.

2    Q.  You didn't show for the jury a demonstrative that

3    included anything from the prior art.  You didn't show a

4    figure from the prior art; isn't that right?

5    A.  I disagree, sir.

6    Q.  Did you show a figure from the prior art to the jury?

7    A.  Yes, sir.

8    Q.  Which one?

9    A.  I showed -- I showed the excerpt from Sugahara.

10   Q.  I stand corrected.  Did you show anything from Roe?

11   A.  Didn't need to, sir.  It wasn't necessary.

12   Q.  I'm not asking you if you needed to.  I'm asking you if

13   you did.

14   A.  No, sir.  It wasn't necessary.

15   Q.  Did you show anything from Toshiba?

16   A.  No, sir.  It wasn't necessary.

17   Q.  Did you show anything from Umeda?

18   A.  No, sir.  It wasn't necessary.

19   Q.  You showed two technical figures in response to the

20   testimony on non-infringement from Samsung's experts,

21   correct.  Just the two?

22   A.  Yes, sir.

23   Q.  Samsung's experts testified for over seven hours, and

24   you were done in about 25 minutes --

25   A.  Yes, sir.

Q.   -- in rebuttal.   That's right?

A.   That's correct, sir.

Q.   Now, you understand that the Court will be instructing
the jury on the law, right?

A.   Yes, sir.

Q.   You understand that they will -- the Court will be
instructing the jury on the law of obviousness; is that
right?

A.   Yes, sir.   I assume they will.

Q.   Under the law of obviousness, it's appropriate to
combine references if there was a motivation to a person of
skill in the art to combine them, right?

A.   Yes, sir.   I -- I addressed that in my testimony.

Q.   And if there are two pieces of prior art that can be
combined and they disclose every element, that claim is
invalid, right?

A.   The pieces of art that -- to be combined, must combine
into a functional unit.

Q.   You believe the Judge is going to instruct the jury that
when the two pieces of prior art are combined, it -- you
need to be able to build a functional unit?

A.   I wouldn't presume to predict what the Judge is going to
tell the jury.

Q.   A claim that is obvious is just as invalid as a claim
where every limitation is shown in a piece of prior art; is

1    that right?  That's the difference between anticipation and

2    obviousness, correct?

3    A.  Anticipation means every claim is there.  Obvious means

4    some combination can -- can equal what you had in another

5    patent.

6    Q.  It's just as invalid under obviousness as it is as

7    anticipation, correct?

8    A.  No argument there, sir.

9    Q.  You talked a little bit about the predetermined duration

10   limitation.

11   A.  Yes, sir.

12   Q.  Before the camera turns the preflash on, it does not

13   know how long it will stay on; isn't that correct?

14   A.  Say that again, sir.

15   Q.  Before the camera turns the preflash on, the camera does

16   not know how long it will stay on; isn't that correct?

17   A.  Well, sir, it's for a predetermined time, but there can

18   be multiple predetermined times.

19   Q.  Sir, that's not what I'm asking you.  I would appreciate

20   it if you could try to answer my question.

21       Before the camera turns the preflash on, the camera

22   does not know how long it will stay on; isn't that correct?

23   A.  It depends on the implementation, sir.

24   Q.  You admitted on the cross-examination from my partner,

25   Chris Harnett, that before the camera turns the preflash on,

1    it does not know how long it will stay on?

2    A.   In general.  In general terms, if you need more than one

3    preparatory image, it might take another one.  In that case,

4    it would leave the preflash on longer.

5    Q.   Though it may need others?

6    A.   Yes, sir.

7    Q.   So before the flash turned on, you didn't know how long

8    it was going to stay on?

9    A.   That's consistent with the description of the algorithm,

10   sir.

11          MR. PEPE:  Can we put up PDX-46?  We're going to

12   switch gears and talk about the '290 patent for a second.

13   Q.   (By Mr. Pepe)  You talked on your direct about the claim

14   limitation shown there in red?

15   A.   I'm sorry, sir.  I thought you said the '029.

16   Q.   Oh, '290 patent.  I said we're going to switch gears to

17   '290 patent.

18   A.   So the interface patent?

19   Q.   Yeah, interface patent.

20   A.   Yes, sir.

21   Q.   You agree that the jury will not be receiving

22   instruction that it is image data received from the

23   single-ended or the differential interfaces; isn't that

24   right?

25   A.   Yes, sir.

1   Q.  They're going to be receiving an instruction from the

2   Judge that the image data must be received from the

3   single-ended and the differential interface; isn't that

4   right?

5   A.  Yes, sir, because the interface is a single-ended and

6   differential interface.

7   Q.  And the image data must be received from the

8   single-ended and the differential interface?

9   A.  No, sir, I disagree.

10  Q.  Sir, these are the words that the Judge will be

11  instructing the jury on.

12  A.  Yes, sir.

13  Q.  Doesn't it say image data received from a single-ended

14  and the differential interfaces?

15  A.  The interface is a single-ended and differential

16  interface.  It does say nothing about which way the image

17  data goes.  If you look just above that, it talks about with

18  the understanding that the data interface circuit need not

19  be restricted to communicating only image data.  That says

20  that there's other data and that that can go on the

21  single-ended side, which it does, and it can be image data

22  which goes on the differential side, which it does.  And to

23  implement it any other way would be technically infeasible.

24  Q.  Dr. Wright, is the Court going to instruct the jury that

25  that last limitation means a processor connected to the CMOS

1   image sensor for processing image data received from the

2   single-ended and the differential interfaces?  Yes or no?

3   A.   This is the Court's construction, and the jury, I'm

4   sure, will be instructed to use the Court's construction.

5   And I interpreted the Court's constructions, as well, and in

6   the way that Samsung uses this interface.

7   Q.   You're interpreting the Court's construction?

8   A.   I have not changed it, sir.

9   Q.   You're interpreting it, right?

10  A.   No, sir.  Dr. Baker added the word "both."

11  Q.   And you're changing it to "or"?

12  A.   No, I'm not.  Logically, it -- the way I have

13  interpreted it is perfectly correct.

14          MR. PEPE:  Why don't we move on and look at DX-143?

15  Q.   (By Mr. Pepe)  Now, Dr. Wright, you testified the '290

16  patent was the first to come up with the invention in Claim

17  10, right?

18  A.   I'll have to put my glasses on, sir.

19  Q.   I'm sorry.  Take your time.

20       Do you recognize this is the '290 patent?

21  A.   Yes, sir, I do.

22  Q.   You agree that CMOS images, image processors, data

23  interface circuits, single-ended interfaces, and

24  differential interfaces were all known in the prior art

25  prior to April '99; isn't that right?

1   A.  Well, of course, sir.  All the pieces were out there.

2   Q.  And it was also known to use single-ended interfaces

3   with CMOS images; isn't that right?

4   A.  Some CMOS images use single-ended interfaces, sure.

5   Q.  In fact, the '290 patent says that, doesn't it?

6   A.  Yes, sir, it does.

7   Q.  You also agree that it was known art to use differential

8   interfaces with CMOS images, right?

9   A.  Yes, sir, of course.

10  Q.  And, in fact, the Patent Office took official notice of

11  that?

12  A.  Yes, sir.

13  Q.  Now, Dr. Baker combined Umeda with Roe and Toshiba.

14  Now, you testified that these are in different fields; is

15  that right?

16  A.  Yes, sir, I did.

17  Q.  Now, Umeda --

18          MR. PEPE:  Can we pull up Umeda 420?

19  Q.  (By Mr. Pepe)  Do you recognize the Umeda patent?

20  A.  Yes, sir, I do.

21  Q.  And you see that Umeda has an interface section?

22  A.  I do, sir, and I see that the -- the -- the way that

23  it's drawn would -- would show to anyone who works in this

24  field that they're trying to show a parallel interface

25  coming out of that interface section -- neither single-ended

1  nor differential.

2  Q.  Sir, it requires an interface section, right?

3  A.  Yes, sir, it's a box that says "interface section."

4  Q.  And the patent says -- Umeda says you should select the

5  appropriate interface?

6  A.  Yes, sir, they say whatever works.

7  Q.  Now, during your testimony, you referred to Toshiba as

8  disclosing an I/O cell, not an interface; is that right?

9  A.  It is not an interface, sir.  As I described in my

10 earlier testimony, to be an interface, you need both an

11 agreement or protocol and you also need that connection.

12 Q.  Toshiba doesn't disclose an interface.  That's your

13 testimony?

14 A.  That is correct, sir.

15        MR. PEPE:  Why don't we pull up the Toshiba

16 reference?  That's DX-198.  And can we go to Page 12 of this

17 document?  Actually, Mr. Miller, the page number is on the

18 bottom right, 12.  Nope.  Bottom right where it says Page 25, I

19 would like Page 12 instead.  Thank you.

20 Q.  (By Mr. Pepe)  You see this is a translation

21 declaration?

22 A.  Yes, sir, I see that.

23 Q.  And you see No. 2, it says:  I am competent to translate

24 between Japanese and English with 16 years of translation?

25 A.  That is what it says.

144

1    Q.   In 4, it says:  To the best of my knowledge and belief,

2    the attached English language document is true, complete,

3    and correct translation?

4    A.   Yes, sir, that is what it says.

5    Q.   And you see in No. 6 that the declarant says that he's

6    been warned that willful false statements and the like are

7    punishable by fine or imprisonment?

8    A.   Yes, sir, I see that.

9    Q.   He was declaring this under penalty of perjury?

10   A.   Yes, sir.

11            MR. PEPE:  Can we go to the next page?

12   Q.   (By Mr. Pepe)  This is a second translation declaration,

13   and you see in 2, again, the person here says:  I am

14   competent to translate between Japanese and English with 25

15   years of translation experience?

16   A.   Yes, sir, I see that.

17   Q.   And in 3:  To the best of my knowledge and belief, this

18   translation is true, complete, and correct.  You see that?

19   A.   Yes, sir, I see that, too.

20   Q.   And this person has also been warned that willful false

21   statements and the like are punishable by fine or

22   imprisonment?

23   A.   I see that, too, sir.

24   Q.   If we go to the next page, just to confirm that this was

25   actually signed by the declarant --

1      MR. PEPE:  Can we go to Page 16, and look at the

2   purpose paragraph?

3   Q.  (By Mr. Pepe)  Now, Dr. Wright, you're not contesting

4   the accuracy of this translation, correct?  We talked about

5   that at your deposition, right?

6   A.  Yes, sir.

7   Q.  So you're not contesting the accuracy?

8   A.  No, sir.

9   Q.  In the purpose paragraph, it says:  To make it possible

10  to selectively use a differential interface and a

11  single-ended interface, correct?

12  A.  That is what it says, sir.

13  Q.  That's what the words say?

14  A.  That's what the words say.

15  Q.  That's the words the two Toshiba engineers chose to

16  describe their invention?

17  A.  That's the word that the translator used to put in there

18  for what the Toshiba engineers actually said.

19  Q.  You're not contesting the accuracy of that?

20  A.  No, sir, I'm just trying to be precise.

21  Q.  But you didn't ask for your own translation, right?

22  A.  No, sir, I did not.

23  Q.  No, you didn't.  If you had any issue with this

24  translation, you could have asked for your own, right?

25  A.  Sir, I don't have an issue with the translation.  It's

1    how you interpret the words.

2    Q.  Well, what I'm saying to you is that we have two

3    certified translators that say that Toshiba discloses a

4    differential interface and a single-ended interface, right?

5    A.  Yes, sir, but the word "interface" has multiple

6    meanings.

7    Q.  What I'm asking you, sir, is whether or not it discloses

8    -- it states differential interface and single-ended

9    interface?

10   A.  Yes, sir, and it uses interface in the most general

11   possible terms which is simply a boundary.  Just like when

12   you look in the side of an aquarium and you look -- air goes

13   to water, that's a boundary.  When you look at an optical

14   lens, that's a boundary.  It's also sometimes often called

15   an interface.

16   Q.  Are you testifying that the Toshiba engineers did not

17   intend to use single-ended interface and differential

18   interface?

19   A.  I believe that they intended to be talking about

20   single-ended and differential methods of making information

21   available.  But in their patent they spoke nothing about

22   what happens at the other end or how there's any kind of

23   understanding about how it goes and that --

24   Q.  It says --

25             THE COURT:  Dr. Wright?

1         THE WITNESS:  I'm sorry, I apologize.  I apologize.

2         THE COURT:  Don't talk over me.  So don't -- okay,

3   one at a time.

4         MR. PEPE:  I'm sorry.

5   A.  That is -- that is just a critical part of a interface

6   to have that understanding, along with the connection.

7   Otherwise, you cannot transmit data.

8   Q.  (By Mr. Pepe)  The Toshiba engineers used the term

9   "interface."  That's all I'm asking.

10  A.  Whatever word they used, that then got translated to

11  interface.

12  Q.  Dr. Baker believes this discloses an interface, right?

13  A.  Evidently he does, sir.

14        MR. PEPE:  Could we go to Page 19, and can we look at

15  Claim 1?

16  Q.  (By Mr. Pepe)  So when defining their invention, if you

17  look at that second line there, they used the term

18  "interface circuit," right?

19  A.  Yes, sir.  I see that.

20  Q.  But you don't believe Toshiba discloses an interface

21  circuit?

22  A.  No, sir, I do not.

23        MR. PEPE:  Go to Page 21, Claim 2.

24  Q.  (By Mr. Pepe)  That also says interface circuit,

25  correct?

1   A.  Yes, sir, same reasons as before.

2           MR. PEPE:  Let's try 25.

3   Q.  (By Mr. Pepe)  And in the field of the industrial

4   application --

5           MR. PEPE:  Can we zoom in on that, Mr. Miller?

6   Q.  (By Mr. Pepe)  Talks about an I/O circuit for

7   interfacing with the outside.  So they use interface there,

8   too, don't they?

9   A.  Yes, sir, and that's one of the other uses of the word

10  "interface."  That's one of the key things that keys you in

11  when you're reading this patent, that they're not talking

12  about a data interface where you're sending information from

13  Point A to Point B.

14     What this is doing is making inter -- is making voltage

15  levels available at these output pins of a larger integrated

16  circuit where this particular circuit was meant to be used.

17  Q.  But they're available at the output pins for use by

18  other components and devices, right?

19  A.  Yes, sir.

20  Q.  So it's something that's sending information from one

21  side to another side, right?

22  A.  Well, all they talk about is making it available to

23  their pins.  There's no discussion about how it gets there

24  or what the agreement or protocol is.  So in the -- in the

25  sense of a data interface circuit, which is another use of

1    the word "interface," this does not meet that test.

2    Q.   So you have the eye and the brain?

3    A.   Yes, sir.

4    Q.   And the information that's available at the eye is then

5    sent over to the brain with an interface, right?

6    A.   That would be an interface, sir, yes.

7    Q.   But this isn't an interface?

8    A.   This is not.  This would be like the little -- the

9    little signal is dangling from the end of the rods and cones

10   in our retina and just hanging there.

11            MR. PEPE:  Let's go to Page 27 and focus in on the

12   problem to be solved by the invention.

13   Q.   (By Mr. Pepe)  Do you see in about the fourth line down

14   it, again, uses a single-ended interface?

15   A.   Yes, sir, I see that.

16   Q.   And you see a couple of lines down it talks about a

17   differential interface?

18   A.   I see that, too, sir.

19   Q.   And a couple of lines up, it talks about I/O circuits,

20   right?

21   A.   Yes, sir, because it is.  It's an I/O circuit.

22   Q.   But you don't believe Toshiba discloses a single-ended

23   interface or a differential interface or a data interface

24   circuit?

25   A.   It is single-ended and differential options.  It's

1    selected.  It can use one or the other.  It does not

2    describe a data interface circuit, as Dr. Baker tried to use

3    it for.  He tried to use it for something for which it was

4    not intended.

5              MR. PEPE:  Let's go back to Umeda 420.  And can we go

6    to Column 1 and look at Lines 49 through 66?

7    Q.  (By Mr. Pepe)  You see that sentence on the bottom, it

8    says:  If, for example, an appropriate interface is not

9    used, a large number of pins are required to result in an

10   increase in the chip area of the sensor or the size of the

11   package.

12       Do you see that?  I'm sorry, I didn't know you didn't

13   have your glasses on.

14   A.  Yes, sir, I see it.

15   Q.  So an appropriate interface here is not going to have a

16   large number of pins; isn't that what Umeda is saying about

17   interface section 108?

18   A.  Well, they say the opposite.  They say if it's not

19   appropriate, that you'd have a large number of pins.

20   Q.  I agree with that.  And when you have a large number of

21   pins, it increases the size, and it increases the cost?

22   A.  Yes.  And that's one of the purposes of this patent is

23   to try to get it to the smaller size and cost.

24   Q.  Well, ideally, you want an interface that has a minimum

25   number of pins, right?

1   A.  Yes, sir.  But Umeda said nothing about using a

2   single-ended or differential interface.  And the diagrams in

3   Umeda seem to indicate to use a parallel interface.

4              MR. PEPE:  Let's go to Column 2, Line 55 through 58.

5   Q.  (By Mr. Pepe)  This is a summary of the invention.  You

6   see that it talks about a high performance, solid-state

7   image sensor?

8   A.  Yes, sir, I see that.

9   Q.  And talks about having high general versatility?

10  A.  Yes, sir.

11  Q.  You agree with me that those characteristics would also

12  apply to the type of interface that you would use in Umeda?

13  A.  I'm not -- I'm not sure if I follow the question, sir.

14  Q.  Well, if you're trying to get a high-performance, highly

15  versatile CMOS imager, you would want an interface that

16  would help provide those features or characteristics, right?

17  A.  Well, I think that's an over generalization, I'm afraid,

18  sir.

19  Q.  But you agree that Umeda says that it wants to have a

20  high performance, solid-state image sensor having high

21  general versatility?

22  A.  Sir, but what's the resolution of the sensor?  If it's

23  only, say, 640 by 480, you could easily get away with a

24  parallel interface, which is what the diagrams show.  And

25  when this was written, 640 by 480 was extremely common

1   resolution for these types of imagers.  Actually 512 by 512

2   was even more common back then.

3   Q.  Dr. Wright, I was just asking you what the words said.

4   A.  Just trying to be complete, sir.

5   Q.  I understand.  You can have a chance to be complete when

6   Mr. Fisch gets back up.  I would like you to focus on my

7   questions, though.

8   A.  Yes, sir.

9   Q.  Let's go back to -- well, let me ask you this.  You had

10  that figure up before with the bicycle and then the -- what

11  was on the other side, the car?

12  A.  That was a race car, sir.

13  Q.  Race car.  You said the differential interface uses more

14  power; is that right?

15  A.  Yes, sir.  The way it's implemented, it uses more power.

16  Q.  Isn't it true that a differential interface could use

17  less power?

18  A.  There are certain situations in the way you implement it

19  that that could be true, but that's not the case here.

20  Q.  When you say "here," what do you mean?

21  A.  Well, I'm talking about the interface patent and how --

22  how it relates to the way the MIPI standard is implemented

23  in all of Samsung's products.  The way that's done, the way

24  the termination resistor is removed for single-ended mode,

25  it goes to a very low power situation.  And so that when

1   you're in differential, the power is high, but you can send

2   data very quickly.  But when you go to single-ended, it

3   basically turns off that -- that little termination resistor

4   and the power dissipation goes to almost nothing, and so it

5   can save your battery.

6   Q.  So you're saying the differential in the MIPI uses less

7   power, if I understand you correctly?

8   A.  No, sir, that's not what I said.  That's the opposite of

9   what I said.

10  Q.  So what are you saying?

11  A.  In the MIPI standard using CSI-2 and D-PHY, the

12  differential mode uses more power, but has faster data rates

13  than in single-ended mode.  In single-ended mode, you can

14  only send data more slowly, but it hardly uses any battery

15  power.  It uses less battery power than the differential

16  mode.

17          MR. PEPE:  Can we go to DX-143, the '290 patent?  Can

18  we go to Column 3 and look at the summary of the invention?

19  And can we blow up the summary, Mr. Miller?

20  Q.  (By Mr. Pepe)  You see Line 25, starting with the word

21  "further"?  '290 patent says:  Further providing a

22  differential interface allows a lower noise and a lower

23  power interface for external devices that can support a

24  differential signal.  Did I read that correctly?

25  A.  You read it correctly, sir, but again --

1    Q.   Thank you, sir.

2    A.   -- that's on only a particular type of --

3    Q.   Dr. Wright, I was just asking if I read it correctly.

4    Thank you.

5         We had some discussions -- you had some discussions

6    with Mr. Fisch about Claim 17, and you said it wasn't

7    being -- infringement wasn't being contested, or at least I

8    think you said something along those lines?

9    A.   Which patent are we discussing now, sir?

10   Q.   Claim 17 of the '884.

11   A.   So we're at the anti-flicker patent now?

12   Q.   Yes.  That depends from Claim 4; is that right, if you

13   remember?

14   A.   It's a dependent claim, yes, sir.

15   Q.   And Samsung's contesting infringement of Claim 14; isn't

16   that right?

17   A.   Yes, sir.

18   Q.   So by default, it's also contesting infringement of 17

19   because it's a dependent; isn't that right?

20   A.   It would follow through, sure.

21   Q.   Okay.  Just wanted the record to be clear.

22   Sorry.  I'm jumping around from patent to patent.

23   A.   That's why we use names, sir, not numbers.

24   Q.   True.  Let's talk about the '029 patent, the preflash.

25   A.   Pre-flash patent, yes, sir.

155

1    Q.   Now, Mr. Parulski is relying upon a combination of

2    Sugimoto and Shimada, right?

3    A.   That is correct, sir.

4    Q.   And you testified that -- there's a lot of S's here,

5    right -- Sugimoto, Sugahara, and Shimada?

6    A.   Yes, sir, and that's correct.

7    Q.   You said the Patent Office already considered that

8    combination because the Patent Office had considered the

9    combination of Sugimoto and Sugahara, right?

10   A.   That's correct, sir.

11   Q.   And I wrote it down.  You said the two are the same.

12   That's what you said, right?

13   A.   They disclose the same invention, yes, sir.

14           MR. PEPE:  Can we pull up Shimada, which is 202, and

15   can we go to Page 19 of the translation?

16   Q.   (By Mr. Pepe)  This is the look-up table that Mr.

17   Parulski is relying on, right?  Or one of the look-up tables

18   that he's -- sorry.

19   A.   Yes, sir, it is.  And this look-up table only

20   encompasses main flash.  It has nothing to do with duration.

21   Q.   Dr. Wright, I just asked you if he was relying on it.

22   A.   That's what -- that's what Mr. Parulski pointed to, yes,

23   when he said that Sugahara had no look-up tables.

24   Q.   And this has a column that says relative amount of

25   emitted light, correct?

1   A.   Sure.

2   Q.   Has another column that says, flash time?

3   A.   Yes, sir.

4   Q.   Has lots of numbers?

5   A.   Lots of numbers, sir.

6   Q.   And you said that Sugahara and Shimada are exactly the

7   same, right?

8   A.   No, sir, I did not say they're exactly the same.  I said

9   they disclose the same invention.  They're -- I -- I said

10  that I put them side-by-side and I looked through them,

11  paged through them, and they basically describe the same

12  invention.

13          MR. PEPE:  Your Honor, can I approach the witness

14  with a copy of Sugahara?

15          THE WITNESS:  I have one here, sir.

16  Q.   (By Mr. Pepe)  You have one?  Great.

17       So here's the look-up table that Mr. Parulski is

18  relying on.  Can you please tell us where in Sugahara we

19  could find that specific look-up table?

20  A.   Oh, sir, as I mentioned in my testimony, they -- they

21  did not use a figure in the U.S. patent.  They described it.

22  That's where I showed the pullout from that -- from Sugahara

23  where they described the look-up table in such a way that

24  anybody who was going to implement this would certainly

25  understand and come up with the equivalent of what you see

1    here in the figure.

2    Q.  So where is that in Sugahara?

3    A.  I showed a blowup of it.  It's -- it's in several

4    places.  It --

5    Q.  As you're looking, you agree with me that this exact

6    look-up table that Mr. Parulski relied upon with these

7    figures, with these two columns described as relative amount

8    of emitted light and flash times, that table that he relied

9    on is not in Sugahara?

10   A.  The figure showing that table is not there.  The

11   description of it, however, is.

12       On Column 4, around -- starts around Line 25, and you

13   get over to Column 6 and it shows up again there around Line

14   55.  And it's clear, it discusses a look-up table to which

15   the relation between K, which is the brightness, and the

16   light generating time is stored.

17       So that is basically the same thing that the figure

18   shows.  It's just a matter of whether you want to talk about

19   it or whether you want to draw it.

20   Q.  I'm looking at Column 4.  It says a look-up table in

21   which the relation between K and the light generating time T

22   is stored.

23   A.  Yes, sir.

24   Q.  And you're saying that that's the same as this?  If

25   that's your testimony, that's fine, we can move on.

1    A.   Yes, sir.

2    Q.   Thank you.  Dr. Wright, you were here for Mr. Melfi's

3    testimony?

4    A.   Yes, sir, I was.

5    Q.   And you understand that to show that ESS was practicing

6    Imperium's patents, Mr. Melfi needed to show that each and

7    every element of the claim was being practiced by ESS; is

8    that right?

9    A.   Mr. Melfi was a fact witness.

10   Q.   Right.  He didn't do an analysis to show that the '884

11   patent was being used by ESS; isn't that right?

12   A.   No, sir.  He was a fact witness relating his experiences

13   and -- and what happened to him.

14   Q.   He didn't do an analysis to show that the '290 patent

15   was being used by ESS?

16   A.   No, sir.  That's not what he was here for.

17   Q.   And he didn't do an analysis for the '029 patent,

18   either, right?

19   A.   No, sir, he did not.

20   Q.   And you haven't done an analysis to determine or to

21   establish whether ESS was using these patents in the

22   mid-2000s, right?

23   A.   That is not what I was asked to do, sir.

24   Q.   You are offering no opinions on that?

25   A.   Right.  I was asked to look at these three patents to

1  see if Samsung infringed them, and my conclusion is that

2  Samsung does infringe these three patents.

3  Q.  I'm talking about ESS.  There's no evidence that you saw

4  from the trial that establishes that ESS actually used these

5  patents, right?

6  A.  Sir, that's -- that's beyond the scope of what I was

7  asked to look at.

8  Q.  I was just asking yes or no.  You were here for the

9  whole trial.  You didn't hear one scintilla of evidence that

10 ESS was practicing each and every claim -- or each and every

11 element of the claims of the '884, '029, and '290 patent?

12 A.  That's not what I've been asked to look at, sir.

13             MR. PEPE:  Your Honor, I pass the witness.

14             THE COURT:  Mr. Fisch, anything additional?

15             MR. FISCH:  No further questions, Your Honor.

16             THE COURT:  You may step down.  Thank you.

17             THE WITNESS:  Thank you, sir.

18             THE COURT:  And do you have another witness?

19             MR. SALTMAN:  Your Honor, Imperium calls Ms. Michele

20 Riley back to the stand.

21             THE COURT:  Ma'am, you understand you're still under

22 oath?

23             THE WITNESS:  Yes, sir.

24             THE COURT:  Okay.  Go ahead.

25             MR. SALTMAN:  Ladies and gentlemen of the jury,

1  Ms. Riley has the opportunity to rebut the testimony of

2  Samsung's damages expert.

3                      CROSS-EXAMINATION

4  BY MR. SALTMAN:

5  Q.  Good afternoon, Ms. Riley.

6  A.  Good afternoon.

7  Q.  Let's start where you and Dr. Perryman agree.  Could you

8  list some of those areas of agreement for us, please?

9  A.  Well, fortunately, as you heard, we have significant

10 areas of agreement, Dr. Perryman and myself.  So we both

11 agree that ESS and Samsung are the parties to the

12 hypothetical negotiation.  We both agree it would take place

13 in early 2007.  We both agree the parties would have perfect

14 information.  We both agree that they assume or agree that

15 the patents are valid and infringed.  We both agree that the

16 parties would be looking at the Georgia-Pacific Factors --

17 the 15 factors he and I both discussed.  And we also agree

18 almost exactly on the number of units that Samsung sold of

19 the accused products.  We're off by 1 percent, which I think

20 can be explained by the different methods we used to

21 forecast sales through the date of trial.

22 Q.  And you both agree about the nature of settlement

23 agreements?

24 A.  Yes, we also both agree that the settlement agreements

25 you've seen that are the license agreements entered into in

1  settlement of litigation are fundamentally different from

2  the hypothetically negotiated license.

3  Q.  Do you have any areas of disagreement?

4  A.  We do.  I think there are three main areas of

5  disagreement, which could explain the differences between

6  our conclusions regarding damages.

7         MR. SALTMAN:  Mr. Rennick, could you please put up --

8  yeah.

9  Q.  (By Mr. Saltman)  All right.  Ms. Riley, what's the

10 first fundamental disagreement you have with Dr. Perryman?

11 A.  The first main disagreement Dr. Perryman and I have

12 relates to Factor 11, which is the extent to which Samsung

13 has made use of the invention and any evidence relating to

14 the value of that use.

15    So when I was here with you the other day, I discussed

16 my consideration of Samsung's volume of accused product

17 sales and also their approach to Mr. Melfi to determine how

18 to solve the problems that were solved by the patents.  And

19 I also discussed Samsung's interest in the Imperium patents

20 that it demonstrated through its broker, Mr. Kaler, so their

21 interactions with Imperium through their broker to

22 demonstrate their interest in the portfolio.

23 Q.  And why do you and Dr. Perryman disagree on this?

24 A.  Well, we disagree because we both did not have all the

25 information that was available regarding Samsung's interest

1    in these patents.

2         So you heard Mr. Bang testify via video that Samsung's

3    interest in the Imperium portfolio terminated in 2011.  We

4    now have learned during trial this week that Samsung,

5    through its broker, was engaged -- was interested in the

6    patents during 2012 and 2013, as well.

7         So I think if Dr. Perryman had had that information, he

8    and I wouldn't have this fundamental disagreement because he

9    would have -- he would see Samsung's continued interest in

10   the patents.

11        MR. SALTMAN:  Mr. Rennick, if you could please pull

12   up PX-768?  Thank you, Mr. Rennick.

13   Q.   (By Mr. Saltman)  Is this some of the new information

14   you were discussing, Ms. Riley?

15   A.   Yes.  The new information is e-mails between Mr. Bang

16   and Mr. Kaler.

17        MR. SALTMAN:  And, Mr. Rennick, if we could please

18   turn to Page 4 and 5 of PX-768.  And you read my mind.  Thank

19   you very much, Mr. Rennick.

20   Q.   (By Mr. Saltman)  What do we see here, Ms. Riley?

21   A.   Here, we see in July 2012, Mr. Bang, Jun, at the bottom

22   signature there, is asking Mr. Kaler to clarify something

23   for Samsung when Samsung was looking at the Imperium

24   litigation in Texas where Imperium sued Apple, LG, Sony, the

25   prior litigation that we have been talking about.

1    So Samsung was interested in determining essentially what

2    was happening in that case and asked Mr. Kaler to check

3    in -- check into it.

4              MR. SALTMAN:  Mr. Rennick, if we could go to Page 3

5    and blow up the bottom email, please.

6    Q.   (By Mr. Saltman)  What do we see here, Ms. Riley?

7    A.   So next in -- on Halloween, October 31 of 2013, Mr.

8    Kaler e-mails Mr. Bang at Samsung and says that counsel for

9    Imperium -- this is in the highlighted portion of the

10   e-mail -- counsel for Imperium has told him that the next

11   phase for Imperium is to sue Samsung in Federal District

12   Court.

13        And then down at the bottom, yellow highlighted

14   portion, Mr. Kaler says:  Instead of initiating suit,

15   counsel for Imperium thought this would be a good time to

16   reconnect to see if my client, which we know is Samsung,

17   would like to either license or purchase any or all of the

18   patents at issue prior to such a lawsuit.  So this is in,

19   again, 2013.

20   Q.   And did Mr. Bang respond to this e-mail?

21   A.   Yes.  Mr. Bang responded a few days later.

22   As you can see, this email is dated November 5th, 2013.  He

23   responded to Mr. Kaler that he would need time to revisit

24   this -- this, of course, being the Imperium patents, and he

25   will get back to you -- to Mr. Kaler soon.

1          MR. SALTMAN:  Mr. Rennick, if we could go to Page 1

2     and zoom in on the bottom email, please?

3     Q.  (By Mr. Saltman)  What happened next, Ms. Riley?

4     A.  Next, we have -- this is towards the end of December

5     2013 -- December 4th, the highlighted portion of the e-mail

6     from Mr. Kaler, again, to Mr. Bang at Samsung.  Mr. Kaler

7     says that according to Imperium's counsel, Vince -- that's

8     Mr. Capone -- would like to present a set of pricing options

9     to Mr. Kaler for Samsung to consider, a licensing offer and

10    an offer to purchase the entire portfolio.  So Mr. Kaler is

11    communicating this to Mr. Bang.

12         MR. SALTMAN:  And can we bring up the last e-mail in

13    the chain or the next e-mail?

14    Q.  (By Mr. Saltman)  What do we see here, Ms. Riley?

15    A.  This is the last e-mail from December 17th, 2013.  In

16    the highlighted portion of the e-mail, which is from Mr.

17    Kaler to Mr. Bang, Mr. Kaler reports that he has had a phone

18    call with Mr. Capone and Imperium's counsel where Mr. Capone

19    laid out several options with some numbers attached.  So

20    Samsung did receive the information from Imperium relating

21    to purchase or license of the patents.

22         MR. SALTMAN:  Mr. Rennick, could you please put back

23    up the other slide, please?

24    Q.  (By Mr. Saltman)  Ms. Riley, what affect does this have

25    on your royalty analysis?

1   A.   This certainly confirms my conclusion that Samsung was

2   interested in the Imperium patents, and I think as an area

3   of disagreement, you had heard Dr. Perryman, and I had

4   concluded this, you know, had an upward influence on the

5   royalty rate due to Samsung's extensive use and interest in

6   these patents.

7        You heard Dr. Perryman testify earlier that in his

8   consideration of Factor 11, he didn't see much evidence in

9   the record that would be applicable to that factor.  And I

10  think if he had had this information, he might have come to

11  the same conclusion that I did regarding Samsung's interest.

12  So he would have also determined that this has an upward

13  influence on the royalty rate.

14  Q.   And does this new information affect your analysis of

15  any of the other factors?

16  A.   Well, when we -- when we think about licensing interest

17  in patents on Samsung's part, we need to think about Factor

18  2, which is where we look at rates that Samsung had paid for

19  comparable patents.  This is a slide from my presentation I

20  did -- gave to you the other day.

21  XXXXXXXXXXXX(Redacted pursuant to Court order)XXXXXXXXXXXXXX

22  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  further cements my consideration of Factor 2, as well.

1  Q.  Ms. Riley, what is your second fundamental disagreement

2  with Dr. Perryman?

3  A.  The second fundamental disagreement relates to my use of

4  the ESS/Imperium patent transfer agreement to determine an

5  amount that ESS was willing to accept as a royalty payment

6  for the patents.  And this was the 10 percent number that

7  you've heard a lot about.

8  Q.  And what's the substance of that disagreement?

9  A.  The substance of that disagreement has been

10  characterized by Samsung, and a little bit by Dr. Perryman,

11  as Mr. Blair negotiating with himself.  And so -- but we

12  have a situation here where Mr. Blair is involved with ESS

13  and Imperium.  They're separate companies.  ESS is an

14  operating company.  It has over a hundred employees.

15  Samsung is still a customer of ESS to this day, has a

16  factory in California.

17      Imperium is a patent holding company.  The companies do

18  have common members of their boards of directors, but they

19  have distinct constituencies.  And by constituencies, I mean

20  they have different shareholders.

21  So Mr. Blair is responsible to both groups of shareholders

22  for both parties.

23  Q.  And I know it's not uncommon for someone to be a CEO of

24  two different companies.  For example, I think Steve Jobs

25  was the CEO of Apple and Pixar, the movie studio at one

1   point.  What does someone in that responsibility -- in that

2   position have -- what kind of responsibilities does he or

3   she have?

4   A.   Someone in that position has a fiduciary duty to both

5   companies, and this duty means that they have to be fair to

6   both companies.  They couldn't enter into a deal that would

7   harm either company.

8        So when Mr. Blair is determining whether to sign this

9   agreement between ESS and Imperium, he looks to his left to

10  the operating company, ESS, he looks to his right to

11  Imperium, the patent holding company, and determines that it

12  would be fair for both parties, which is why I think it's

13  appropriate to use that agreement to set ESS's expectations

14  for a royalty.

15          MR. SALTMAN:  And, Mr. Rennick, could we put Ms.

16  Riley's slides back up on the screen, please?

17  Q.   (By Mr. Saltman)  All right.  Ms. Riley, what is the

18  third disagreement between you and Dr. Perryman?

19  A.   The third area of disagreement relates to my use of the

20  InfoTrends market research in order to determine

21  Samsung's -- the maximum Samsung would be willing to pay.

22  And these documents -- Dr. Perryman doesn't appreciate the

23  importance of primary research that these InfoTrends surveys

24  represent.

25  Q.   What do you mean by primary research?

 1   A.   Primary research is research -- is new research, and it

 2   is where you formulate questions to answer specific

 3   questions.

 4        These surveys are primary research that are used to

 5   discern customer preferences.  It uses a methodology called

 6   choice modeling.  And this type of research is what

 7   companies would make decisions on about operations.  This is

 8   certainly the type of research that companies would use to

 9   set themselves apart from the competition or gain an edge

10   over their competitors.

11   Q.   How do you know this is primary research?

12   A.   It says so right on the front page of the cover page of

13   the survey.

14   Q.   We've heard some testimony about 300 percent.  What is

15   your opinion of that?

16   A.   When we're looking at these purchase drivers, I think a

17   good analogy would be when you go to a restaurant -- I guess

18   Samsung's counsel is trying to say that we have to

19   distribute these purchase drivers among a hundred percent

20   and customers have to pick 10 purchase drivers and

21   distribute the percentages among a hundred percent.  But

22   it's like when you go to a restaurant, you can choose

23   between soup, salad, entree, dessert, appetizer.  You don't

24   have to choose one of each every time or some portion of

25   each every time.

1          The beauty of this kind of choice modeling is that it

2     lets Samsung know what the implicit -- what the implicit

3     willingness to buy is of the customers, and it lets them set

4     optimal pricing.

5          So that's what choice modeling is used for, and that's

6     why we can look at the number of respondents who said image

7     quality, camera quality, resolution as a purchase driver.

8     That was one of their top three responses, and that's why

9     that's -- that percentage is appropriate to utilize to set

10    what Samsung is willing to pay in this negotiation.

11    Q.  Ms. Riley, why did you rely on data from 2012 and 2014?

12    A.  Well, certainly, if there were information available

13    from 2007, around the time of the hypothetical negotiation,

14    I would have used it, but there wasn't information from that

15    time period in the record.

16    Q.  Now, Ms. Riley, how does this type of primary research

17    contrast with the share of the conversation, perhaps, we saw

18    Dr. Benner use during his testimony and use during your

19    cross-examination?

20    A.  Well, the share of the conversation information, if you

21    recall, involves looking at the Internet to see what people

22    are talking about.  What are they saying about Samsung

23    products, whether it's good, bad, indifferent?

24         So that type of information is certainly interesting.

25    It certainly is a data point, but it doesn't -- it doesn't

1    carry the same relevance the primary research regarding

2    choice modeling for consumer preferences would -- would

3    yield to Samsung.  And it wouldn't be the type of

4    information that you would make business decisions around.

5    Q.  So, Ms. Riley, what happens when you correct for these

6    fundamental disagreements with Dr. Perryman?

7    A.  Well, my opinion doesn't change for the reasons I have

8    given to you in explaining these fundamental disagreements,

9    differences.  I still have the same opinion as to a royalty

10   rate of 7 cents for the interface patent, 4 cents for the

11   preflash patent, and 8 cents for the anti-flicker patent.

12   And those royalty rates would be applied to the number of

13   accused products shown beneath each patent, which I read to

14   you the other day so I won't read again.

15   Q.  And, again, why is the preflash -- preflash patent a

16   little lower?

17   A.  The preflash patent rate is a little bit lower because

18   only the processor is implicated in infringement, and the

19   profitability on the processor is less than if you had two

20   sensors plus a processor of profit share.

21   Q.  Ms. Riley, once again, when you do the math, what do the

22   damages work out to be?

23   A.  The damages work out to be $7,766,317 for the interface

24   patent; $4,259,217 for the preflash patent; and

25   $9,000,681 -- excuse me -681,544 dollars for the

1    anti-flicker patent.

2    Q.   What do these numbers represent, Ms. Riley?

3    A.   These numbers would represent the minimum damages

4    adequate to compensate Imperium for Samsung's infringement

5    of the patents.

6    Q.   Thank you very much for the education, Ms. Riley.

7              MR. SALTMAN:  Pass the witness, Your Honor.

8              THE COURT:  Cross-examination.

9              MR. JENNER:  Yes, sir.

10                        CROSS-EXAMINATION

11   BY MR. JENNER:

12   Q.   Ms. Riley?

13   A.   Yes.

14   Q.   So we have three principle areas of disagreement that

15   exist between you and Dr. Perryman.  So I would like to ask

16   you briefly about each of those three areas.

17        The first two, seems to me, have been covered quite a

18   bit in the prior examination of you and of Dr. Perryman,

19   Those two being the ESS/Imperium agreement as providing the

20   10 percent number for the left side of that chart that I've

21   been using, and the InfoTrends information with the 18.25

22   percent taken for camera resolution.  We've had a lot of

23   discussion about those two, correct?

24   A.   We have.

25   Q.   And then there's this additional matter that you've

1    raised about the e-mails that have come into play.  So let's

2    start first -- you have explained your view of the

3    Blair/Blair agreement as one that would be carried out as A

4    practical matter for the best interest of the companies; is

5    that right?

6    A.  Yes, I think so.

7    Q.  So that when Mr. Blair and himself met for the purpose

8    of putting this agreement together, this was as good as an

9    arm's length transaction because they would have been

10   looking out for both of the Blair/Blair companies pretty

11   much?

12   A.  I think it is different than an arm's length

13   transaction.

14   Q.  But the fact does remain you don't dispute that, as I

15   characterized it the other day, it's Mr. Blair and Mr. Blair

16   getting together in a room agreeing on how to divide the

17   profits they hope to get from other people, right?

18   A.   Right.  Looking to his left to ESS to discern what ESS

19   would need to receive through the agreement and looking to

20   his right to Imperium.

21   Q.  And I didn't hear you disagree with Dr. Perryman when he

22   testified that the other factor that's not -- that's not

23   present here is Mr. Blair and Mr. Blair actually negotiating

24   at arm's length with a manufacturing company that's going to

25   have to agree to pay the royalty.  There's no BlackBerry,

1  LG, Apple, or anybody else in the room with Mr. Blair and

2  Mr. Blair when they're making their little agreement, is

3  there?

4  A.   No.   Those companies have separate agreements.

5  Q.   All right.   So that hasn't changed and that, I think,

6  focuses it pretty -- pretty well for the jury whether your

7  explanation of why continued reliance on the ESS/Imperium

8  agreement, which I have characterized as a non-arm's length

9  transaction between Mr. Blair and Mr. Blair, is not reliable

10  as a way of determining what the lower-bound royalty would

11  be when there's no potential licensee in the room

12  essentially negotiating back.   Are you with me?   That's the

13  dispute for the jury.

14  A.   I -- I suppose so.

15  Q.   Okay.

16  A.   Whether the jury would think it's appropriate to set

17  ESS's expectations as to a reasonable royalty.

18  Q.   Right.

19  A.   That's the question.

20  Q.   Right.   So that's where that one sits.   We -- we submit

21  that it is unreasonable to rely on the Blair/Blair

22  agreement, and you submit that it is reasonable to agree on

23  it, and that's where that is?

24  A.   Okay.   I agree.

25  Q.   Okay.   The second one we've talked about at some length,

1   and perhaps we can help here to address this --

2          MR. JENNER:  If you could bring up Exhibit --

3   Plaintiff's Exhibit 50 at Page 21?

4   Q.  (By Mr. Jenner) This is the InfoTrends report from

5   January 2014 that we've talked about, and it's got on 21,

6   one of the camera resolution lines that you rely on, the

7   one -- sixth down.  It's 19.7 percent here.  It was 16 point

8   something percent in the other InfoTrends agreement,

9   arriving at an 18.25 percent average?

10  A.  Yes, sir.

11  Q.  And that's what you used?

12  A.  Yes, sir.

13  Q.  And so what I heard you testify about and to explain to

14  the jury is why they should disregard the fact that the

15  numbers don't add up to 300 percent.  Because when you go

16  into McDonald's, you can choose a hamburger, a diet Coke,

17  fries, and maybe even something for dessert.  You can make

18  multiple choices.  But the fact of the matter is these

19  numbers just don't add up to a hundred percent.

20  A.  No.  And they won't as -- as a function of choice

21  modeling.

22  Q.  Right.  So this -- this is not a situation where we have

23  a hundred percent responses, and you can look to see what

24  percent of a hundred percent were interested in the feature

25  and know who the ones were that were interested if this had

1    been one choice being made, and then 19.7 percent of a

2    hundred choices, you'd know how many were made that were

3    just out of a hundred percent.  We can't get that, can we?

4    A.  No, this is actually more powerful than the information

5    you describe.

6    Q.  All right.  I understand you -- you think that.  You did

7    not, to my hearing, address some of the other issues, the

8    issue, for one, that camera resolution, as defined on a

9    later page of this document that we've looked at, is all

10   about pixel resolution.  We did see a reference in the other

11   document that some people use camera resolution and think of

12   camera quality.  But, of course, camera quality isn't the

13   same thing as image quality, is it?

14   A.  Well, I think Dr. Perryman agreed during his testimony

15   that resolution could be used as a yardstick for image

16   quality.

17   Q.  Some people think it --

18   A.  That is how -- I'm sorry.  Go ahead.

19   Q.  No, go ahead.

20   A.  But that is how customers might think about.  So I think

21   that might be another area of agreement between us.

22   Q.  Actually, I think he said some customers, but I also

23   think he said that there is no way to derive from camera

24   resolution anything about image quality, much less about the

25   features of the three patents-in-suit.  And we're still left

176

1   with the problem that this entry for camera resolution

2   doesn't tell you anything about how many people might be

3   interested in any of the three features of the patents,

4   right?

5   A.  Right.  I discussed the other day that a document like

6   this, which is marketing focus, would not be using patent

7   language for customers to --

8   Q.  So --

9   A.  -- you know, to perform the choice modeling when they're

10  picking their top three purchase drivers.

11  Q.  Right.  So this still doesn't get us to the point of

12  being able to derive anything about consumer interest in the

13  three features of the patents-in-suit from that number.  We

14  just don't know?

15  A.  Well, we just have to look at the benefits taught by the

16  patents, which are image quality, as we've heard, and that

17  is the link that allows us to use this information with

18  camera resolution being a yardstick for camera quality, and

19  image quality being the result -- you know, equivalent to

20  camera quality.

21  Q.  And we also have a lot of evidence that there are

22  dozens, if not hundreds or thousands, of other features in

23  the image sensor that contribute to the value of the image

24  sensor, right?

25  A.  We've heard some reference to different functionalities

1    of the image sensor that are not accused.

2    Q.  Right.

3    A.  What I discussed in my consideration of Georgia-Pacific

4    Factor 3.

5    Q.  Right.

6    A.  Non -- go ahead.

7    Q.  No, no, I'm sorry.  I thought you were done.

8    A.  Which requires consideration of non-patented

9    functionalities that are contributed by Samsung.

10   Q.  And there's also the co-related requirement that was

11   referred to of having to allocate for the smallest saleable

12   unit the patented feature from the other features that are

13   in the smallest saleable unit, correct?

14   A.  Yes.  Dr. Perryman and I agree on the smallest saleable

15   unit in this case.

16   Q.  And the requirement to allocate?

17   A.  I'm sorry?

18   Q.  And the requirement to allocate?

19   A.  We agree the smallest saleable unit are the sensors and

20   processors.  I perform my allocation of profitability

21   through utilization of the Georgia-Pacific Factors, one of

22   which requires consideration of the additional non-patented

23   functionalities you discuss.

24   Q.  And you did not have a way to allocate how much of a

25   feature like camera resolution should be attributed to the

1  patents-in-suit, as opposed to all the other features that

2  go into camera resolution, correct?

3  A.  Well, camera resolution is camera resolution.  It's

4  defined by the pixels.

5  Q.  I -- I don't think you've answered my question.  You

6  have -- you have not a way -- you have not been able to

7  allocate out of that percentage how much of it should be

8  attributed to the contribution of the three patents-in-suit

9  versus how much of it should be allocated to all other

10  contributions in the image sensor?

11  A.  Well --

12  Q.  You can't do that, can you?

13  A.  -- for the profitability of up to 74 cents, Samsung

14  keeps all but 7 cents, 4 cents, or 8 cents, depending on the

15  patent, and that is the portion that is attributable to

16  non-patented elements.

17  Q.  Is that what you did?  You took 74 cents' worth of

18  profitability for the sensor, then you took 18.25 percent of

19  that, and attributed it to all of camera resolution.  So you

20  didn't take anything out of that for all the other features,

21  did you?

22  A.  Well, I think that's fair.  I'm sorry, it would be the

23  portion of that profit that is available to share as a

24  royalty, so that 13 -- the range between 4 cents, for

25  example, on the preflash patent and 13 cents that Samsung

1    keeps under the structure of my analysis.  That saved

2    profit, retained profit, the 8 cents -- I'm sorry, am I

3    doing my math right?  8 and a half cents, 9 cents, is what

4    represents the portion Samsung gets to keep for its

5    contributions that are outside of the teachings of these

6    patents.

7    Q.  And I'm glad you said that because then Dr. Perryman

8    showed that when you add up the three royalty rates you get

9    for the three patents-in-suit, you get a number that's

10   bigger than all of the money that was attributed to camera

11   resolution.  There isn't any money left over for the other

12   features, is there?

13   A.  Well, it depends on which components are implicated in

14   the infringement --

15   Q.  What's --

16   A.  -- and also -- I'm sorry, go ahead.

17   Q.  I thought you were done.  Sorry.  Go ahead.

18   A.  We also have three separate patents which are accused of

19   infringement, so it is an analysis of three unique

20   inventions that are taken -- the conversation around which

21   is formulated by using the same profit range.

22   Q.  But the fact of the matter, based on what you just said,

23   is for the huge number of the products here that are accused

24   of infringing all three patents, they will be, under your

25   model, liable for all three royalties which is 4 and 7 is

1    11, and 8 is 19 cents.  That's bigger than the entire amount

2    of money that you attributed to that camera resolution

3    factor, which was 13.5 cents.

4        You are not holding -- not leaving money left over for

5    all of the other features that make up camera resolution.

6    You're actually taking money away from other areas because

7    your royalty for those three patents is bigger than what you

8    attributed to camera resolution, right?

9    A.  I think we'll have to disagree for the reasons I've

10   explained.

11   Q.  Okay.  I think we've covered that one.

12       The last point that you raised was that the e-mails

13   that you referred to show in a different light that Samsung

14   had a substantial interest -- I won't call it substantial.

15   Had an ongoing interest in acquiring the Imperium patents as

16   a measure of the patents being valuable; is that right?

17   A.  Yes.  The measure of the value of Samsung's use of the

18   patents, correct.

19   Q.  All right.  Since you've raised this new issue about

20   Samsung e-mails showing Samsung's interest in Imperium's

21   patents, let's take a look at that.  Let's start -- before

22   we come up to the e-mail that you have -- with Defendant's

23   Exhibit 525.

24            MR. JENNER:  Can we bring that up?

25   Q.  (By Mr. Jenner)  Now, 525 is a little chain of e-mails,

1   the most recent one, of course, being on top.  So the most

2   recent one is from Stuart Kaler to somebody on June 11th,

3   2011.  Do you see that?

4   A.  Yes.

5   Q.  And Stuart Kaler is the so-called patent broker?

6   A.  Yes.

7   Q.  Right?

8   A.  Yes.

9   Q.  And he's communicating with some people at Samsung.  In

10  this particular top e-mail, it's somebody named Jun, and

11  it's somebody named Jongsoo, correct?

12  A.  Yes.

13  Q.  So I would like you to look at one of the earlier

14  e-mails first -- go to the second page, please.  And toward

15  the bottom there's an e-mail that starts on Thursday, May

16  26th, and it runs down for the rest of the page.  Okay.  Do

17  you see that e-mail?

18  A.  Yes.

19  Q.  That's an e-mail from Stuart Kaler to Jun and Jongsoo,

20  correct?

21  A.  Yes.

22  Q.  That's an e-mail to Samsung, not from Samsung?

23  A.  Yes, I had seen this previously.

24  Q.  Good.  That will help.  So this is a meeting where Mr.

25  Kaler is reporting that he was given a number from Imperium

1    about what Imperium would like for its patent portfolio,

2    right?

3    A.  Yes.

4    Q.  And the number that he is given that Imperium wants for

5    the portfolio is 400 million U.S. dollars, correct?

6    A.  Yes.

7    Q.  So step 1, May 2011, Imperium wants $400 million.  Whole

8    lot of money, right?

9    A.  That is a lot of money, yes.

10   Q.  Now, let's go back to Page 1 of this same exhibit and

11   look at the second e-mail on the page where there is a

12   response starting with the words, "on Thursday, June 2nd."

13   Do you see that?

14   A.  Yes.

15   Q.  And this is a response, again, from Stuart Kaler going

16   to Jun and Jongsoo, correct?

17   A.  Yes.

18   Q.  So this -- once again, this is the -- the broker

19   reporting back.  And in the second paragraph, he says: I

20   informed Imperium that my client is not finding agreement

21   with the $400 million number that Imperium proposed.

22   Correct?

23   A.  Yes.

24   Q.  I said that my client's thinking is at least in order of

25   magnitude lower at this point in time.  Imperium interpreted

183

1    this to mean $40 million, but I said I don't think there's

2    any hard number that my client has agreed to as yet.  Do you

3    see that?

4    A.   Yes.

5    Q.   So at this point in time, the broker is reporting back

6    to Samsung that Samsung has told Imperium, no to $400

7    million; isn't that right?

8    A.   Yes.  And this is all information that was available

9    previously.

10   Q.   Right.  We're going to see where this takes us into your

11   e-mail.  Now, would you look next at Exhibit 526, please?

12   These are later e-mails than the ones I just showed you in

13   525, correct?  The top one is -- now it's June 21st, 2011?

14   A.   Yes.

15   Q.   And the one that's interesting here is the first one

16   that starts at the top of the page.  It's from Stuart Kaler,

17   the broker, June 21st, 2011, and it runs halfway down the

18   page, "the very best regards, Stu."  Do you see that?

19   A.   Yes, I do.

20   Q.   So this is another one from the broker, reporting back

21   to Samsung, correct?

22   A.   This is from Mr. Kaler, the broker, that Samsung engaged

23   to have these discussions with Imperium.

24   Q.   Right.

25   A.   And he is writing Samsung, yes.

1    Q.   In the first paragraph, he reports he called Imperium

2    and left a voicemail.

3         In the second paragraph, which is the one of interest

4    here, he says:  At the end of my business day, 5:00 p.m.,

5    Imperium called me to say that he -- he had a quick -- he

6    had a meeting with Imperium's board and CEO.   Imperium

7    wanted to, quote, to price the package deal on the portfolio

8    for a quick exit, close quote.  With that, Imperium said

9    that Imperium was proposing, presumably to my client and all

10   other interested parties, a deal of one-third of the

11   original asking price, which by my calculations makes --

12   makes it one-third of 400 million, or about 133 million,

13   plus some form of participation.  Do you see that?

14   A.   Yes.

15   Q.   So now, as of June 21st, 2011, the report is that

16   Imperium has come off of $400 million and now will take a

17   deal for $133 million.  Do you see that?

18   A.   Yes.  That's what Mr. Kaler is reporting to Samsung.

19   Q.   And this is one of the things that you had known about

20   before?

21   A.   Yeah, I knew that there were discussions in 2011.

22   Q.   But the price didn't stop -- come plunging down from a

23   hundred -- from 400 to 133 million, did it?

24   A.   I don't -- I don't know.  I don't remember exactly.  I

25   assume we're going to see.

1  Q.  You'll find out right now.

2  A.  Yes.

3          MR. JENNER:  Could we have Defendants' Exhibit 165,

4  please?

5  Q.  (By Mr. Jenner) Defendant's 165 is another series of

6  e-mails between Mr. Kaler, the broker, and people at

7  Samsung.  Let's turn to the fourth page of e-mails and look

8  at the one at the bottom, June -- if I'm reading this right,

9  July rather, July 25, 2011.  And it's Stuart Kaler writing

10  back to Jun and Jongsoo, again, at Samsung, right?

11  A.  I lost the signature, but, yes, it's from Stuart Kaler,

12  yes, to Jun and Jongsoo.

13  Q.  And this is about a month after the last one I showed

14  you in Exhibit 526 where there's -- the report that Imperium

15  would take 133 million.  Remember that?

16  A.  Yeah, we're still in 2011.

17  Q.  Right.  So now in July of 2011, Stuart Kaler reports to

18  Jun and Jongsoo:  Thank you for your e-mail and letting me

19  know where Samsung's interest lies with respect to Imperium.

20  I understand Samsung's position, and accordingly, I will not

21  pursue this case further, unless Samsung changes its

22  position.

23      Do you see that?

24  A.  Yes, I do.

25  Q.  That makes it sound like Samsung doesn't have any

1    interest in Imperium's numbers, does it?

2    A.  And that was the testimony that we heard from Mr. Bang,

3    that he said essentially thanks but no thanks in 2011.

4    Q.  Now go up to the top of the page, and there's an August

5    26th, 2011, e-mail, again, from Stuart Kaler to the people

6    at Samsung?

7    A.  Yes, sir.

8    Q.  Do you see that?

9    A.  Yes, I do.

10   Q.  And the first paragraph says:  Oddly enough, I received

11   a call, out of the blue, from Alan Fisch, attorney

12   representing Imperium Holdings.  Imperium mentioned that

13   Imperium would be happy to entertain any offer -- any in

14   exclamations -- for any -- in exclamations -- of its patents

15   and their portfolio.  Do you see that?

16   A.  I do.

17   Q.  Any offer for anything, they would be happy to entertain

18   it, right?

19   A.  Any offer for any of its patents in their portfolio.

20   Q.  And then two paragraphs below that it says:  With that,

21   Imperium is inviting my client to cherry-pick the

22   portfolio -- that is, make an offer on any subset of patents

23   that are there.  And make an offer.  Is that something that

24   the business unit would want to do?

25       You see that?

1    A.   I do.

2    Q.   So that sounds like, doesn't it, that Imperium is now

3    saying make us an offer.  Offer us something, anything for

4    any of the patents, but we'll consider anything you have to

5    say, right?

6    A.   Any offer for any of the patents, yes.

7    Q.   So so far we've gone from a -- a powerful $400 million

8    demand, rejected to $133 million demand for these patents,

9    rejected, to please give us anything, we'll entertain any

10   offer.  Is that about it so far?

11   A.   So far I think your characterization is -- is fair

12   enough.

13   Q.   All right.  Now, let's look at the e-mail that you

14   relied on.  Brings us to your Exhibit 768.

15            MR. JENNER:  Can we have 768 up?  Is this it?

16   Q.   (By Mr. Jenner)  Okay.  So starting from the last page,

17   I'd like to explore whether this really shows any interest

18   on the part of Samsung or not.

19      The e-mail at the bottom of the page is July 25th,

20   2011, from Stuart Kaler to Samsung.  This is the one that

21   says in the second paragraph:  I understand your position.

22   I won't pursue it further.  Right?  We saw that?

23   A.   Yes.

24   Q.   And the one above that is the one that Stuart Kaler sent

25   to Samsung saying:  Imperium will entertain any offer at

1  all.  Make us -- make them an offer.  We just saw that one?

2  A.  Yes, we did.

3  Q.  Now, look at the next e-mail that starts at the bottom

4  of Page 7 of this chain.  This one now is from Samsung to

5  Stuart, right, on August 31st, 2011?  This is from Jun,

6  who's at the top of the next page, to Stuart, right?

7  A.  Yes.  This is one we had seen previously.

8  Q.  And let's see what it says:  Unfortunately, our position

9  has not changed since our last correspondence regarding

10  these patents.  And that's the Imperium patents, right?

11  A.  I think so, yes.

12  Q.  In other words, thanks but no thanks.  When you get a

13  chance, let me know how things are with you.

14     So wouldn't you agree with me that as of this e-mail,

15  Samsung continues to have no interest at all in buying

16  Imperium's patents?

17  A.  And this is what Mr. Bang testified to.

18  Q.  Right.

19  A.  In 2011, thanks but no thanks was said.

20  Q.  Now, the next e-mail up is July 5th, 2012, and now it's

21  from the broker, Stuart Kaler, to Jun at Samsung who says he

22  received a phone call from Imperium, talking about a legal

23  proceeding called a Markman proceeding.  Do you see that?

24  A.  Yes, I do.

25  Q.  Which they thought had gone well in the litigation at

1    that time, and Imperium wants to know if the client, which

2    they suspect is Samsung -- never confirmed that -- would

3    have any interest in a deal for the portfolio.  Kaler asked

4    Imperium if Imperium had a specific proposal to offer, and

5    there was some discussion about whether any might be

6    forthcoming.

7        Then there's an action item to Samsung:  Please let me

8    know if Samsung has interest in engaging in any discussions

9    with Imperium for the portfolio.  You see that?

10   A.  Yes, I do.

11   Q.  So that's a request from the broker to Samsung to find

12   out whether their zero value interest has changed, right?

13   A.  He's asking to please let me know if Samsung has

14   interest in engaging in any discussions.

15   Q.  Right.  So the question is:  Will you go from zero to

16   interest in the portfolio?

17   A.  Oh, what do you mean zero?  You mean the thanks but no

18   thanks to --

19   Q.  Right.

20   A.  Okay.

21   Q.  Isn't thanks but no thanks we're not going to pay

22   anything?

23   A.  Yeah, thanks but no thanks is we're not going to do the

24   deal.

25   Q.  Right.  So no interest in paying anything to Imperium to

1   being asked do you want to reconsider?

2   A.   Yes.

3   Q.   Then the e-mail above that, another one from Stuart

4   Kaler saying:  I'm resending this e-mail in the off chance

5   you didn't see it.  Imperium has asked me to try to get

6   information on interest in the Imperium portfolio.  Is

7   Samsung exploring this, or is there no further interest?

8        So the broker is still trying to find out, and Samsung

9   is still at zero, right?

10  A.   Samsung has not replied.

11  Q.   Right.  So there's no change in Samsung's position, no

12  interest.

13       Then there's another e-mail above that.  It starts at

14  the bottom of the next page, and that one is still from

15  Stuart Kaler, July 12th, 2012, regarding another call.  And

16  he's asking Samsung again -- he's asking Jun, do you have an

17  update for me to pass along to Imperium?

18       Still no indication of interest by Imperium, correct?

19  A.   By Samsung.

20  Q.   By Samsung rather, correct?

21  A.   They have not responded.

22  Q.   So at this point in time, there's nothing that Samsung

23  has said that changes their valuation of these patents above

24  zero, correct?

25  A.   Well, they haven't said anything, so we don't know

1     what's going on.

2     Q.  Still thanks but no thanks, right?

3     A.  They haven't said anything.  I mean --

4     Q.  Okay.  Now, the next e-mail, July 11th, 2012, is from

5     Samsung to Kaler.  I'll ask and get back to you shortly.  We

6     may need a couple of days to reopen and review.  Is there

7     any additional information since the last time, which

8     Imperium can share with us, to assist a re-review of the

9     portfolio?

10         So they're just saying, is there anything you've got to

11    tell me, right?

12    A.  Yes, that's correct.  We need to reopen the file, so to

13    speak.

14    Q.  Then the next e-mail is July 12, 2012, and that is from

15    the broker still to Samsung, saying that Imperium had

16    called, thought the client might have some interest because

17    they think they're going to get some favorable legal ruling.

18    No hard sale.

19         Imperium, in the third paragraph, was trying to give me

20    the impression that Imperium would accept a reasonable

21    amount to sell the portfolio.  I don't know what reasonable

22    is, in the fourth paragraph.

23         And then the fifth paragraph it ends:  Is there

24    anything specific you would like me to ask?  And then the --

25    the e-mail above that one is the one you referred to, I

1  believe.  That's a July 12th, 2012, e-mail from Samsung --

2  I'm sorry, yes, from Samsung to Kaler saying:  Can you

3  clarify something.  And it's a question about the

4  litigation.  It talks about the latest order, fact

5  discovery, no mention of the so-called Markman hearing.  And

6  he just asks him to check.

7      Now, that doesn't say anything about anybody being

8  willing to pay money, does it?  It's just asking for

9  information?

10  A.  Right.  Mr. Kaler was saying, what do you want me to

11  find out.  And he -- Samsung says:  Here's what we'd like

12  you to find out.  And this is in 2012.  So this is the new

13  information.  We had previously thought Samsung said thanks

14  but no thanks in 2011.

15  Q.  Right.  I grant you --

16  A.  There's --

17  Q.  -- new information.  We all know that.  But it doesn't

18  say anything about Samsung changing its mind and -- and

19  saying we might be willing to pay money, does it?

20  A.  No.  It just says Samsung's interested in learning more.

21  Q.  About the lawsuit that's going on?

22  A.  That is the specific question that's being asked, yes.

23  Q.  Now, if we turn to the top of Page 4, there is an e-mail

24  from Mr. Kaler to Samsung saying that he'd read some

25  information about people moving around.  And he asked

1   whether Imperium was -- was going to remain involved.  No

2   answer.  And there's just nothing in there one way or the

3   other about anybody being interested in paying money, is

4   there?

5   A.  This looks like information from Mr. Kaler to Mr. Bang

6   at Samsung.

7   Q.  Certainly nothing about Samsung being interested in

8   changing its mind and paying money?

9   A.  I don't see any discussion of money.

10  Q.  All right.  Now let's go to the bottom of Page 3, and

11  here's the October 31, 2013 e-mail.  This is another one

12  that you referred to in your direct testimony, but this is

13  another one from the broker to Samsung, correct?

14  A.  Yes, it is.

15  Q.  And you referred to the fourth sentence as -- the fourth

16  paragraph, I should say, as Imperium tells me the next phase

17  for Imperium is to sue Samsung.  Okay.  And then the two

18  paragraphs after that, instead of initiating suit, Imperium

19  thought this might be a good time to reconnect.

20      But in the last sentence that you didn't quote, once

21  again, the broker says to Samsung "please let me know if you

22  would like to open up dialogue with Imperium through me."

23  Right?

24  A.  Correct.

25  Q.  So this is yet again a request from the broker to

1   Samsung to see if Samsung wants to change its mind, which

2   for the last two years it hasn't done at all, right?

3   A.   They have asked for more information.   We just weren't

4   aware that they had asked for more information previously.

5   Q.   Right.   There -- there's no suggestion here that Samsung

6   has taken a different position about the value of the

7   Imperium patents than it took two years earlier in 2011.

8   A.   There's no suggestion that they're willing to do a deal.

9   Q.   Now go up an e-mail at the top of the page.   Here's an

10  e-mail from Stuart Kaler, the broker, again to Samsung.   And

11  it says "just checking in, and once again are you thinking

12  of a potential response to Imperium."   Do you see that?

13  A.   Yes, I see that.

14  Q.   So once again, it's still the broker doing what he's

15  been doing for years, maybe trying to make some money,

16  asking Samsung, are you -- are you willing to change your

17  mind and consider paying for these patents.   He's still

18  asking, right?

19  A.   He's checking in to see if Samsung received the last

20  e-mail.   Do you have a response.

21  Q.   Now look at the bottom of Page 2.   This is another one

22  you referred to.   This is a response from Samsung to Kaler

23  kind of like the one we saw a year ago saying "I need time

24  to revisit this.   Will get back to you soon."   Right?

25  A.   Yes, that's what Mr. Bang is telling Mr. Kaler.

1    Q.   So he's just saying, as he did in an earlier e-mail we

2    looked at, I'll look into it, I'll get back to you.  Kind of

3    like don't call me, I'll call you.

4    A.   Well, my point is that we did not realize that Samsung

5    was discussing this, anything about Imperium with Mr. Kaler

6    in --

7    Q.   And I don't --

8    A.   I'm sorry.  Go ahead.

9    Q.   No, no.  Go ahead.

10   A.   In the 2013 time frame or in the 2012 time frame.

11   Q.   And I don't dispute with you that that is absolutely

12   true.  This is new information that Samsung and the broker

13   are having these back and forths.  But it continues to be

14   the fact that Samsung's position has not changed one iota

15   from two years earlier.  It has not suggested it's willing

16   to pay anything for these patents, right?

17   A.   I think if we read the e-mails on their face, we

18   don't -- we don't know.  They're going to revisit the issue.

19   Q.   They're going to revisit the issue like --

20   A.   We don't know --

21   Q.   -- like you and I going to revisit the issue.  They say

22   they're going to do it and we'll get back to you.  That's

23   what they say, right?

24   A.   He says we're going to revisit the issue and we'll get

25   back to you.  I think that's what we can determine they're

1    going to do.

2    Q.  Well, let's see how he gets back to them.  The next

3    e-mail up on the page, Wednesday, November 13th, 2013, the

4    broker Kaler, Stu, keeps at it.  He's determined, if nothing

5    else.  And he writes to Samsung again and says "any further

6    thoughts on how to respond to Alan?  Please let me know at

7    your earliest convenience."  Do you see that?

8    A.  Yes, I do.

9    Q.  Once more, an inquiry from the broker to Samsung, no

10   indication that Samsung has changed its position at all,

11   right?

12   A.  We don't know their thoughts.

13   Q.  Right.  And then above that, my god, if it isn't Stuart

14   Kaler again on November 26th, 2013 writing to Samsung:

15   "Imperium pinged me today to inquire whether my client has

16   any thoughts.  Do you have any instructions for me?"  From

17   the broker.  Do you see that?

18   A.  Yes, I do.

19   Q.  Anything there suggesting that Samsung has changed its

20   position about the value of these patents?

21   A.  We can't tell.  There's no response.

22   Q.  There is no response.  Exactly.  To every one of these

23   pings, poor Mr. Kaler, just trying to make a buck, can't get

24   a response because Samsung isn't saying, yeah, we're

25   interested, are they?

1  A.  All we know is that they're revisiting it and they need

2  time.

3  Q.  Right.  And then if we go to the first page -- and we're

4  almost done -- the e-mail at the bottom of the page that you

5  referred to, December 4th, 2013, again it's from the broker.

6  It's from poor Mr. Kaler to Samsung saying "Imperium has

7  asked me to come with him and Imperium's general counsel for

8  dinner.  They would like to present pricing options."

9  Imperium would like to present pricing options.  "It's my

10  impression Imperium would like to strike a deal.  I'll

11  attend the dinner and report back to you.  But do you have

12  any feedback or instructions for me?"

13      Fifth, sixth consecutive e-mail.  Any instructions?

14  And notably, nothing from Samsung, is there?

15  A.  They have not responded.

16  Q.  No response to any of these things?

17  A.  Just the one that we saw where they're revisiting the

18  portfolio.

19  Q.  They're looking at it and we'll get back to you.  I

20  can't think of how many thousand times I've said that.  Have

21  you said that to people a lot?  I'll check into it and I'll

22  get back to you?

23  A.  In what context?

24  Q.  Any context?  Haven't you ever said that?  No?

25  A.  I try not to.

1    Q.  Oh, okay.  And let's look there at the last e-mail on

2    the page, the one at the top.  This is the last of the ones

3    that you referred to.  This is Tuesday, December 17th, 2013,

4    and again, it's from poor Stuart Kaler to Jun at Samsung.

5    "The dinner didn't take place.  The general counsel couldn't

6    leave the East Coast."  Okay.  "I had gotten off a telephone

7    conference with them", and the last sentence:  "If you want

8    to know more, I invite you to call me at your convenience."

9         So once again, we have the broker trying to gin up some

10   interests and not a whit of a response from Samsung,

11   correct?

12   A.  There's -- they have not responded.

13   Q.  There is absolutely nothing here that shows any

14   deviation of Samsung's position from 2011 that they're not

15   willing to make an offer on anything, it's still thanks, but

16   no thanks, right?

17   A.  I think I would dispute that characterization of the

18   e-mails, because, as Mr. Bang testified, we said thanks but

19   no thanks in 2011.  We can see from these e-mails Samsung

20   did communicate with its broker, did respond to him

21   occasionally to say we're revisiting this.  We need more

22   information on the Markman hearing.  That's the new

23   information we have.

24   Q.  Don't you agree with me that Samsung's position from

25   2011 until today in the context of these e-mails, insofar as

199

```
 1    it affects your position that Samsung placed value on these

 2    patents, is wrong, that Samsung placed no value on these

 3    patents?

 4    A.  I disagree.

 5    Q.  You disagree?

 6    A.  Yes.

 7    Q.  Okay.  And then just to close this, I take it then that

 8    you as the damages expert for Imperium want your position to

 9    be known to the jury that you think these e-mails show some

10    interest on the part of Samsung in paying value for these

11    patents?  That's your position?

12    A.  They show that Samsung continued its dialogue with

13    Imperium through its broker in 2012 and 2013.

14    Q.  "We'll get back to you."  That's what they said.

15    A.  They said we're revisiting this, we need time.

16              MR. JENNER:  No further questions.

17              THE COURT:  Anything additional?

18              MR. SALTMAN:  Yes, Your Honor.

19                      REDIRECT EXAMINATION

20    BY MR. SALTMAN:

21    Q.  Ms. Riley, did Samsung hire Mr. Kaler to negotiate on

22    behalf of Samsung?

23    A.  Yes.

24    Q.  Did they sign him to a contract to do that?

25    A.  Yes.
```

1      MR. SALTMAN:  Mr. Rennick, can you please pull up --

2  Mr. Rennick, can you please pull up PX-768, please?

3  Q.  (By Mr. Saltman) Ms. Riley, you understand that this

4  document was first given to Imperium on Wednesday night at 2

5  a.m. approximately?

6  A.  Yes.

7  Q.  And are you aware that Imperium asked for these

8  documents back in July of last year?

9  A.  Yes.

10  Q.  Now, on Page 1 in the top e-mail it says "if you want --

11  if you want to know more, I invite you to call me at your

12  convenience."  Do you see that?

13  A.  Yeah.

14  Q.  And that's asking Mr. Kaler to -- it's Mr. Kaler asking

15  Mr. Bang to give me a call at some point, right?

16  A.  Yes.

17  Q.  And we don't know if Mr. Bang ever called Mr. Kaler,

18  right?

19  A.  We don't -- I don't know.

20  Q.  And that's because at Mr. Bang's deposition, Imperium

21  didn't have the opportunity to ask him questions about these

22  documents, right?

23  A.  I -- I believe so.

24  Q.  And I believe counsel talked to you a bunch about

25  Samsung's thoughts on these patents in 2012 and 2013.

1    A.   Yes.

2    Q.   We don't know Samsung's thoughts on these patents at

3    that time, right?

4    A.   No, we don't.

5    Q.   And why didn't we know that?

6    A.   Well, Mr. Bang wasn't asked about these e-mails at his

7    deposition.

8    Q.   Because they weren't available, right?

9    A.   That's correct.

10   Q.   So Imperium couldn't ask any Samsung witness about these

11   documents until 2:00 a.m. -- after 2:00 a.m. on Wednesday,

12   right?

13   A.   Correct.

14   Q.   We could have asked Mr. Kaler about these documents if

15   he had been here, correct?

16   A.   If he had been here, yes.

17   Q.   And you understand Mr. Kaler was on the witness list for

18   Samsung?  Do you understand that?

19   A.   I do have that understanding.

20   Q.   And Mr. Kaler was taken off Samsung's witness list last

21   night, right?

22   A.   Yes, I understand that.

23   Q.   So Samsung decided not to call Mr. Kaler to explain

24   these e-mails, right?

25   A.   I -- I think so.

1          MR. SALTMAN:  Thank you very much, Ms. Riley.

2          MR. JENNER:  Your Honor, could we approach

3    a moment?

4          THE COURT:  Yes.

5                    (Off the record bench conference.)

6          THE COURT:  Any additional questions?  If

7    you will turn your mic on.

8                    RECROSS EXAMINATION

9    BY MR. JENNER:

10   Q.  Just one more question, and that is, in your capacity as

11   the testifying expert on damages for Imperium, is it your

12   position that this string of e-mails justifies taking the

13   position that Samsung had placed substantial value on these

14   patents?

15   A.  It's further confirmation that my opinion regarding

16   Georgia-Pacific Factor 11 is correct, has a strong upward

17   impact on the royalty.

18   Q.  That really didn't answer my question.

19   A.  Oh, I'm sorry.

20   Q.  My question is:  Is it your position as the testifying

21   expert on damages for Imperium that this string of e-mails

22   justifies taking the position that Samsung had placed

23   substantial value on these patents?

24   A.  It's further justification for that position, as shown

25   in my demonstrative.

1          MR. JENNER:  Okay.  Thank you.

2      No further questions.

3          THE COURT:  Anything further?

4          MR. SALTMAN:  Nothing further, Your Honor.

5          THE COURT:  You may step down, ma'am.

6  Thank you.

7      What says Imperium?

8          MR. FISCH:  Your Honor, Imperium rests.

9          THE COURT:  And then what says Samsung?

10  Of course, for rebuttal on the issue of invalidity.

11          MR. HARNETT:  No rebuttal, and we renew our Rule 50

12  motions.

13          THE COURT:  Okay.  Those will be denied.

14      So both sides close?

15          MR. FISCH:  Correct, Your Honor.

16          MR. HARNETT:  (Nods head affirmatively).

17          THE COURT:  If counsel would just approach

18  a second.

19                    (Off the record bench conference.)

20          THE COURT:  Okay.  Ladies and gentlemen,

21  thank you for being so attentive.

22      I had to discuss the game plan with the attorneys to

23  give you further instructions.  We're going -- I'm going to

24  be sending you home, which is probably what you expected,

25  but I wanted to give you instructions for Monday.

1          Of course, you've now heard all the evidence and the

2    evidence is closed, but it's very important that you don't

3    start thinking about -- of course, not talking about it or

4    even thinking about anything, about decisions that have to

5    be made in this case, until after you hear the argument of

6    counsel on Monday and then not until my final instructions.

7    And so Monday will be the time that you will finally get the

8    case and be able to make the decisions that we've asked you

9    to make.

10         So please don't discuss the case among yourselves or

11   anybody else.  Monday if you want to come in -- I'm going to

12   have you come in for 9:30, and so then just to give you a

13   little more extra time since I've been taking time away from

14   you here working later.  Then we'll come back at 9:30 and

15   have the argument of counsel and then my instructions and

16   then the case will be yours to decide at that point.

17         So have a nice weekend, a safe drive and we'll see you

18   Monday at 9:30.

19              COURT SECURITY OFFICER:  All rise.

20                   (Jury out.)

21              THE COURT:  Please be seated.

22         Y'all said you wanted to -- you said there were some

23   other issues you wanted to raise in terms of any other

24   motions you wanted to make at this time.

25              MR. SIGLER:  We have some Rule 50 motions, Your

1    Honor, we would like to make orally.

2              THE COURT:  That's fine.

3              MR. SIGLER:  Mr. Battaglia will be

4    addressing those.

5              MR. BATTAGLIA:  Good evening, Your Honor.

6         Imperium respectfully moves for judgment as a matter of

7    law on the MIPI license defense, the affirmative defense

8    that -- for which I don't think there was any evidence at

9    all.  It wasn't mentioned in opening and wasn't pursued at

10   all, and for that reason, we respectfully request, since

11   it's their burden and there being no evidence, that judgment

12   as a matter of law should be granted on this MIPI license

13   defense.

14             Mr. POST:  Your Honor, Samsung withdraws

15   the MIPI license defense.

16             THE COURT:  I'm not sure the mic was on.

17             MR. POST:  I think someone stole mine.

18             THE COURT:  You have to turn that mic on

19   as well.  There's a button at the bottom of the

20   base.

21             MR. POST:  Thank you, Your Honor.

22             THE COURT:  Okay.  Very good.  We will take that out

23   of the proposed charge.

24             MR. BATTAGLIA:  Thank you, Your Honor.

25             THE COURT:  And I'll grant that since they

1   have conceded and they've withdrawn that.

2          MR. BATTAGLIA:  Thank you.  And, Your Honor, Imperium

3   also respectfully moves for judgment as a matter of law with

4   respect to their affirmative invalidity defenses, anticipation

5   and obviousness.  No reasonable jury could find by clear and

6   convincing evidence, based on the evidence presented, that they

7   had established and met their clear and convincing evidence

8   burden with respect to those defenses.

9          MR. POST:  Your Honor, Samsung opposes that motion,

10  has its own corresponding motion for judgment as a matter of

11  law, that no reasonable jury could find the patents not

12  invalid.

13         THE COURT:  I deny both of those motions.

14      Anything else?

15         MR. BATTAGLIA:  Nothing from Imperium.

16         THE COURT:  Anything from Samsung?

17         MR. POST:  Yes, Your Honor.  Samsung renews its

18  motions for judgment as a matter of law of non-infringement, no

19  willfulness and no damages that were made at the close of

20  Imperium's case-in-chief, Your Honor.

21         THE COURT:  I understand and I overrule those.

22      I'm sorry.  I didn't give you a chance to respond.  Did

23  you want to respond?

24         MR. BATTAGLIA:  No, Your Honor.

25         MR. POST:  Thank you, Your Honor.  I don't believe we

1    have any more at this point.

2            THE COURT:  Okay.  Any other questions

3    about anything?

4            MR. SALTMAN:  One minor point, Your Honor.  I think

5    Dr. Perryman's CV, which I think was DX-912, I believe there's

6    an agreement between the parties that that would not be entered

7    into evidence.  It can be shown to the jury but not entered in.

8            THE COURT:  Okay.

9            MR. POST:  That's correct.  That was the parties'

10   agreement and understanding.

11           THE COURT:  Okay.  I'll make sure we take

12   that off the list.  What's the number again?

13           COURTROOM DEPUTY:  912.

14           MR. SALTMAN:  It's DX-912, Your Honor.

15           THE COURT:  Because we may have entered it

16   based on our -- my procedure because it was

17   utilized.

18       And then I do have one question.  I think in Mr.

19   Michaelson's deposition it seemed to me that two of the

20   exhibits were numbered the same thing on the screen when you

21   showed the exhibit number.  It seemed like there were two

22   1116, and I presume that the other one was 1117, which is

23   the other minutes, the board minutes.  Can you just check

24   that?

25           MR. POST:  It may be 1118 but we'll confirm that.

1        THE COURT:  I had 1118, but it just seemed

2   like there were two -- you switched exhibits and it

3   seemed like they both were No. 1116.  And so I just

4   wondered if that was the 1117.  I just put a

5   question mark but I meant to ask.

6        MR. POST:  We will go back and confirm and

7   also confer with Imperium's counsel and make sure

8   the record has the correct exhibits.

9        THE COURT:  Okay.  Then we'll just go ahead and have

10  the informal charge conference tomorrow at 10 a.m. here.  And

11  then what I'll do is -- we'll make whatever decisions and then

12  you'll have a chance to make whatever record.  We'll just do it

13  a few minutes before, whatever record anyone needs to make, and

14  we'll figure that out tomorrow, what disagreements we have.

15  But I'll let you make your record for that on Monday before

16  closing arguments.

17       I just want to bring up one other thing to your

18  attention.  During one of the -- I've been notified by

19  somebody that one of the people that were here earlier, when

20  the courtroom was sealed, apparently there was some -- it

21  was a man that was standing in between the two doors.  They

22  were closed.

23       And the person that was reporting it was one of the

24  prosecutors and said you could hear -- standing there you

25  could hear what was going on.

1       The person -- then the person re-entered the courtroom

2   when it was unsealed.  I don't know who it was, but I got a

3   message saying that that had happened.  I don't know which

4   side it was from or even what time period.

5       So I don't -- I raise that to both sides because it's

6   possible maybe it was an attorney that was not coming in

7   because -- waiting until the courtroom was reopened.  I

8   don't know, so --

9           MR. HARNETT:  Obviously we -- we don't have any

10  problem.

11          MR. JENNER:  It was one of those routers from Nokia,

12  Your Honor.

13          THE COURT:  What?

14          MR. JENNER:  It was one of those routers from Nokia.

15          THE COURT:  Okay.  I'm not necessarily concerned

16  about it but I wanted to apprise y'all of it.

17          MR. FISCH:  No issues for Imperium, Your Honor.

18          THE COURT:  Okay.

19          MR. POST:  Your Honor, one more final

20  point.  Samsung would like to file two offers of

21  proof, one on the Sony license issue, the other on

22  the laches issue, to address excluded evidence to

23  preserve our rights for appeal.  And we would

24  propose we submit those as soon as possible, short

25  papers identifying the evidence that would have been

210

1    presented

2          THE COURT:  Okay.  So what do you want to present on

3    the issue of the -- let me make sure I understand what you're

4    giving to me on the issue of the Sony license issue.

5          MR. POST:  Sure.  So the Sony license issue

6    submission will lay out Sony's specific evidence, particularly

7    testimony that would have been elicited from witnesses who did

8    testify related to the Sony issue and identify our position

9    that that information should come out in the same trial with

10   the substantive infringement issues, understanding that Your

11   Honor has proposed dealing with those in a post-trial

12   proceeding.

13        But since we don't know what that's going to look like,

14   in order to properly preserve our rights, we think that this

15   submission is something that is appropriate and should go

16   in.

17         THE COURT:  Well, you can submit it and I'll consider

18   whether to accept that as an offer of proof or not.  I'm hoping

19   to consider that issue over the weekend to see -- try to see if

20   I can come to a decision on that issue of how that will proceed

21   after it's over.

22        What was the other issue?

23         MR. POST:  We're happy to wait until Monday if that's

24   something Your Honor would like to do.  See how things play

25   out.

1      THE COURT:  That's fine.  What was the

2  second offer you wanted to make?

3      MR. POST:  The second offer would relate to any

4  additional evidence related to laches.  Obviously, we did make

5  our objection.  You did overrule it.  But in order to preserve

6  any rights to appeal, we believe we have to submit that offer

7  of proof.

8      THE COURT:  Well, I don't know.  I'll have

9  to study my appellate procedure whether or not it's

10  appropriate at this point to do that.  Because like

11  the issue that was brought up at the bench about Mr.

12  Kaler is that his testimony was never offered, so I

13  never had an opportunity to consider the issue while

14  the evidence was still coming in whether there were

15  any portions of his testimony that would be allowed

16  or not.

17      So, I mean, you can submit whatever you

18  want to in writing.  I don't know if I'll accept it

19  or not as a proper offer of proof at this point.

20      MR. POST:  Thank you, Your Honor.

21      THE COURT:  Okay.  Anything else?

22      MR. FISCH:  Nothing from Imperium, other than thank

23  you, Your Honor.

24      MR. HARNETT:  Thank you, Your Honor.  See you

25  tomorrow.

1          THE COURT:  Okay.  Very good.

2          COURT SECURITY OFFICER:  All rise.

3                    (Court adjourned.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19    I certify that the foregoing is a correct transcript from

20    the record of proceedings in the above-entitled matter.

21

22    _____        _____

23    Judith Werlinger                    Date

24

25