```
 1                    UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF TEXAS
 2                         SHERMAN DIVISION

 3
      IMPERIUM IP HOLDINGS (CAYMAN) :      DOCKET NO. 4:14CV371
 4                                  :
      VS.                           :      SHERMAN, TEXAS
 5                                  :      FEBRUARY 8, 2016
      SAMSUNG ELECTRONICS CO.       :      9:30 A.M.
 6
                         TRANSCRIPT OF TRIAL
 7           BEFORE THE HONORABLE AMOS L. MAZZANT,
          UNITED STATES DISTRICT JUDGE, AND A JURY
 8
      APPEARANCES:
 9
      FOR THE PLAINTIFF:            MR. ALAN MICHAEL FISCH
10                                  MR. ROY WILLIAM SIGLER
                                    MR. JEFFREY SALTMAN
11                                  MR. JOHN T. BATTAGLIA
                                    FISCH SIGLER
12                                  5301 WISCONSIN AVENUE NW
                                    FOURTH FLOOR
13                                  WASHINGTON, DC  20015

14                                  MR. DAVID MICHAEL SAUNDERS
                                    MR. S. DESMOND JUI
15                                  MR. SRULI YELLIN
                                    FISCH SIGLER
16                                  96 N. THIRD STREET, SUITE 260
                                    SAN JOSE, CA  95112
17
                                    MS. SILVIA JORDAN
18                                  FISCH SIGLER
                                    505 EIGHTH AVE, 12TH FLOOR
19                                  NEW YORK, NY  10018

20

21    FOR THE DEFENDANT:           MR. JESSE J. JENNER
                                    MR. CHRISTOPHER JOHN HARNETT
22                                  MR. STEVEN PEPE
                                    MR. KEVIN JOHN POST
23                                  MR. ALEXANDER ERNEST MIDDLETON
                                    ROPES & GRAY
24                                  1211 AVENUE OF THE AMERICAS
                                    NEW YORK, NY  10036
25
```

```
1                              MR. SAMUEL LAWRENCE BRENNER
                               MR. SCOTT STEPHEN TAYLOR
2                              ROPES & GRAY
                               PRUDENTIAL TOWER
3                              800 BOYLSTON STREET
                               BOSTON, MA  02199
4
                               MS. REBECCA R. CARRIZOSA
5                              ROPES & GRAY
                               1900 UNIVERSITY AVE 6TH FLOOR
6                              EAST PALO ALTO, CA  94303

7                              MR. CLYDE MOODY SIEBMAN
                               MR. LARRY PHILLIPS
8                              SIEBMAN BURG PHILLIPS & SMITH
                               300 N. TRAVIS
9                              SHERMAN, TX  75090

10

11   COURT REPORTER:           MS. JAN MASON
                               OFFICIAL REPORTER
12                             101 E. PECAN #110
                               SHERMAN, TEXAS  75090
13

14

15

16

17

18

19

20

21

22

23

24   PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY, TRANSCRIPT

25   PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
```

3

1                    (Jury out.)

2          THE COURT:  Good morning, everyone.

3          MR. FISCH:  Good morning, Your Honor.

4          THE COURT:  I will apologize for the delay in getting

5    you the final instructions.  Partly it's y'all's fault because

6    you were supposed to e-mail the claim construction chart you

7    wanted in the charge and no one ever did, so we had to type

8    that out this morning.  But otherwise, I think I made all the

9    other changes.

10      I guess at this point, if you have any other objections

11   to the charge.  We're going to go ahead and print this

12   for the jury.  You can make whatever record on objections,

13   but is there anything else that -- did you look through to

14   see if we made all the changes that I indicated at the

15   charge conference?

16          MR. SIGLER:  Yes, Your Honor.  We just have a few

17   objections that we would like to briefly put on the record.

18          THE COURT:  Okay.  Go ahead.

19          MR. SIGLER:  Your Honor, these -- these are items we

20   covered in the charge conference on Saturday as well.

21      The first objection we would like to put on the record

22   is on page 13 of the final instructions under the

23   instructions for infringement.  Imperium had proposed that

24   the language be added after the first sentence that

25   infringement may be proved with direct or circumstantial

4

1   evidence.  In making this determination, you may consider

2   direct and circumstantial evidence, including the totality

3   of the evidence bearing on the issue, whether or not there

4   is infringement by Samsung.

5       As with every issue, you can draw on your common sense

6   and the inferences you can reasonably draw from the

7   evidence.

8       Imperium had proposed that based on the Federal Circuit

9   precedent in Nordock versus Systems and Broadcom versus

10  Qualcomm.

11      And the next one, Your Honor, is with regard to page 15

12  of the final instructions under induced infringement.

13  Imperium objects to the inclusion of the language "Samsung

14  took action during the time the patents-in-suit were

15  enforced, intending to cause the infringing acts by users of

16  the accused Samsung products", as well as the language under

17  number three there, "or that Samsung believed there was a

18  high probability that the acts by users of the accused

19  Samsung products and services would infringe a patent of

20  Imperium and took deliberate steps to avoid learning of that

21  infringement", as well as the language under that stating

22  "in order to establish active inducement of infringement, it

23  is not sufficient that the end-user itself directly

24  infringes the claim, nor is it sufficient that Samsung was

25  aware of the acts by the end-user that allegedly constitute

1  the direct infringement.  Rather, you must find that Samsung

2  specifically intended the end-user to infringe the

3  patents-in-suit or that Samsung believed there was a high

4  probability that users of accused Samsung products and

5  services would infringe the patents-in-suit but deliberately

6  avoided learning the infringing nature of the acts of the

7  users of Samsung products and services".

8       Imperium objects to that language being included as

9  it's not required under the precedence of Global Tech and

10  Acmine.

11       And finally, Your Honor --

12            THE COURT:  Did you raise that Saturday?

13            MR. SIGLER:  Pardon, Your Honor?

14            THE COURT:  Was that raised Saturday?

15            MR. SIGLER:  Yes, I believe it was, Your Honor.

16            THE COURT:  Okay.  Go ahead.

17            MR. SIGLER:  And finally, Your Honor, on page 16 in

18  the section on willfulness, Imperium -- there was language that

19  was stricken from the initial instructions to the final

20  instructions.  Specifically, the language was:  In addition,

21  you may consider whether Samsung sought out and reasonably

22  relied on the opinion of an attorney regarding infringement.  A

23  competent opinion of counsel stating that a defendant does not

24  infringe a patent may show that the Defendant had a good faith

25  belief that it did not infringe the patent, and thus, did not

1   willfully infringe.

2         On the other hand, the failure of the Defendant to seek

3   out and obtain any opinion at all may show that the

4   Defendant acted recklessly, and thus, willfully infringed

5   the patent.

6         Imperium objects to the striking of that language as --

7   it's our position that that language is consistent with the

8   Federal Circuit precedent in Suprema that we discussed at

9   the Pretrial Conference.

10        That's all I have, Your Honor.  Thank you.

11             THE COURT:  Okay.  I overrule those.  For Samsung,

12  any objections for the record?

13             MS. COX:  Yes, Your Honor.  Courtney Cox on behalf of

14  Samsung.

15        We have two objections to the instructions.  The first

16  is to the insertion of the enablement instruction in the

17  anticipation section, that to prove anticipation, Samsung

18  must prove by clear and convincing evidence that a single

19  item of prior art enabled one of the ordinary skill to make

20  it.  This is contrary to law.

21        Second, we object to the removal of the marking

22  instruction that appears at page 22.

23             THE COURT:  Okay.  I'll overrule those objections.

24             MS. COX:  Thank you, Your Honor.

25             THE COURT:  Any issues with the verdict?  I think all

1    the changes were the changes y'all had wanted.

2         I would ask you to -- as we do the final arguments,

3    look through to make sure that we've -- there were no issues

4    there, but I want to make sure that all the changes were

5    properly made before I send the verdict back and I'll look

6    at it as well.

7         Okay.  Anything else before we begin closing arguments?

8              MR. POST:  Your Honor, just one brief housekeeping.

9    We had indicated we would read the Michaelson exhibit to trial

10   exhibit mapping into the record for the court reporter, so

11   we can do that now very briefly if you would like.

12              THE COURT:  Okay.

13              MR. POST:  So the 13 exhibits that were referenced

14   during the Michaelson deposition that was played back on

15   Friday:  Michaelson Exhibit 17 is DX-27.

16        Michaelson Exhibit 18 is DX-28.

17        Michaelson Exhibit 23 is DX-1102.

18        Michaelson Exhibit 37 is DX-1116.

19        Michaelson Exhibit 39 is DX-1118.

20        Michaelson Exhibit 42 is DX-1121.

21        Michaelson Exhibit 54 is DX-103.

22        Michaelson Exhibit 4 is DX-103.

23        Michaelson Exhibit 9 is DX-16.

24        Michaelson Exhibit 11 is DX-105.

25        Michaelson Exhibit 12 is DX-106.

1    Michaelson Exhibit 13 is DX-107.

2    And Michaelson Exhibit 14 is DX-108.

3    And as far as the verdict form goes, Your Honor, we did

4    take a brief look and didn't have any issues with the copy

5    you provided.

6         THE COURT:  Very good.  Is that the same for

7    Imperium?

8         MR. SALTMAN:  One more minor issue, Your Honor,

9    housekeeping issue.

10    On Friday afternoon during the cross examination of Dr.

11    Perryman he stated the settlement number for Techwin on the

12    record, and we just ask that that portion be sealed or

13    redacted.  It's Page 79, Lines 3 through 8 of the Friday

14    afternoon, February 5th transcript.

15         THE COURT:  Okay.

16         MR. SALTMAN:  I talked to counsel for Samsung and

17    they have no objection.

18         THE COURT:  Okay.  I'll grant that request and ask

19    the court reporter to make that delineation.

20         MR. SALTMAN:  Thank you, Your Honor.

21         THE COURT:  Okay.  So now we're ready for closing

22    arguments.  Of course, again, like opening statements, you can

23    roam around the courtroom without asking permission.

24    And then have you given time that you want warnings

25    from Ms. McCord?

1    I guess, Mr. Fisch, are you going to be doing the

2  closing?

3         MR. FISCH:  I will be, Your Honor.

4         THE COURT:  So have you told her how much time -- I

5  don't know how much time you want to reserve.

6         MR. FISCH:  45/15, Your Honor.

7         THE COURT:  Then she'll give you a warning at one

8  minute, or do you want her to just tell you when you're at 44?

9         MR. FISCH:  44, 43 is fine.  Thank you.

10         THE COURT:  Okay.  And then Mr. Harnett.

11         MR. HARNETT:  I would like 60 with a five minute

12  warning.

13         THE COURT:  Okay.  Very good.  Anything else before

14  we bring the jury in?

15         MR. FISCH:  Not from Imperium, Your Honor.

16         THE COURT:  Okay.  Let's go ahead and bring the jury

17  in then.  It will take a minute to bring them down, so --

18         COURT SECURITY OFFICER:  All rise for the jury.

19         THE COURT:  Oh, they're already there.

20              (Jury in.)

21         THE COURT:  Please be seated.

22    Ladies and gentlemen, thank you for being so attentive

23  and patient throughout the trial.

24    It is now time for the closing arguments of the

25  attorneys for the parties.  They each have an hour, and the

10

1   way the process works is the Plaintiff gets to go first and

2   then they get the final rebuttal as well.  So please listen

3   to both sides' arguments.

4        I'll now call upon Imperium.  Mr. Fisch, if you would

5   like to open the closing arguments.

6            MR. FISCH:  Thank you very much, Your Honor.  May it

7   please the Court.

8        Good morning, ladies and gentlemen.  It's great to be

9   back with you again like this.  Thank you.

10       Before I walk through the week we just had last week

11  together and all the evidence and how it supports the issues

12  of infringement and the damages model, I thought I would

13  talk about something that occurred Friday afternoon right

14  after Samsung closed its case.

15       As you may recall, when that ended, Judge Mazzant

16  turned to each of you and issued an instruction, and the

17  instruction he issued I have a copy of right here as well.

18  It may have gone by quickly so I thought it would make some

19  sense for us to walk through it together again for a few

20  moments.

21       Mr. Rennick, could you please put the first portion of

22  what Judge Mazzant said on the screen, please?

23       Here it is, ladies and gentlemen, and I'll read and

24  we'll follow along together.

25       At 2:19 a.m. yesterday morning Samsung produced for the

1   first time previously undisclosed documents regarding

2   specific facts within the personal knowledge of Mr. Bang and

3   Mr. Lee, in violation of this Court's rules regarding the

4   disclosure of evidence.

5       Now, ladies and gentlemen, Mr. Bang and Mr. Lee, we

6   remember who they are.  Mr. Bang was the attorney for

7   Samsung who was involved in the process of working with the

8   attorney from San Francisco to try to see if they could

9   acquire Imperium's patents anonymously.  That was Mr. Bang.

10      Mr. Lee, you may recall, was the engineer who now is in

11  law school being paid for by Samsung in Baltimore.  He is

12  the gentleman that spoke as well.  That is Mr. Lee and Mr.

13  Bang.

14      Judge Mazzant continued Friday afternoon.  If we could

15  put what he said on the screen, Mr. Rennick, I'll read

16  along.

17      This evidence, meaning the evidence that Samsung

18  disclosed at 2:19 in the morning, this evidence contradicts

19  the sworn testimony of Mr. Bang and Mr. Lee and indicates

20  that the testimony that Mr. Bang and Mr. Lee gave about

21  Samsung discussions with Imperium and its analysis of

22  Imperium's patents was false, and therefore, not worthy of

23  belief.

24      Judge Mazzant had caught two Samsung witnesses

25  providing false testimony.  Now, they appeared by videotape,

12

1    ladies and gentlemen.  But let there be no confusion about

2    that.  As you heard many times at the start of this trial,

3    someone that appears by videotape is the same as somebody

4    sitting in this chair right here who has sworn the oath to

5    tell the truth to God.

6        Now, I'll come back to how all of this fits into the

7    bigger case facts in a moment.  What I would like to do now

8    is start our process of going back through the evidence.  I

9    would like to start with the first ever witness in this

10   case, Mr. Melfi.

11       Mr. Melfi's testimony was interesting for two reasons.

12   The first was what he talked about.  It was interesting

13   because what he did is he shared his experiences.  I don't

14   think any of us will forget what he had to say.  He talked

15   about what it was like with Samsung hounding him constantly

16   for information in three different areas of camera

17   technology.  He told us they wanted to know about the

18   interface.  They wanted to know about preflash.  They wanted

19   to know about anti-flicker technology, and they pushed and

20   they pushed and they pushed, and they used their

21   relationship as a customer of ESS to try to gain as much

22   knowledge about these cameras as possible.

23       It went so far that they even asked for the source

24   code, and in one of the questions posed by the jury, it was

25   asked of Mr. Melfi, is that something that's common, and the

1   answer was, no, that isn't common.  It was the secret sauce,

2   as he called it.

3       We know ultimately what happened next, which is Samsung

4   then began to release its own infringing chips, and in 2007

5   Mr. Melfi told you what happened inside the company.

6   Profits were dropping.  Sales were dropping.  Margins were

7   being squeezed.  Tax liabilities were increasing.  They were

8   under financial strain, and the company ultimately had to

9   close the camera division and lay off all of the good men

10  and women who worked there.

11      What we also know, ladies and gentlemen, is that at

12  that point in time, at that point in time, ESS was not just

13  hurting from the camera division but it began to hurt in

14  other ways.

15      So I said there were two reasons why Mr. Melfi's

16  testimony was absolutely remarkable in this trial.  One is

17  for what he said, and we just walked through that.  The

18  second reason it was remarkable is for what Samsung didn't

19  say.  You didn't hear a single witness in this entire trial

20  say that Mr. Melfi was wrong.  Not a one.

21      You didn't hear a single witness in this trial from

22  Samsung come in and say we didn't put Mr. Melfi's laboratory

23  in our offices.  You didn't hear a single witness from

24  Samsung come in here and explain how it is they developed

25  the interface technology, how did they develop the preflash

1    technology, and how they developed the anti-flicker

2    technology.

3         In fact, ladies and gentlemen, Samsung did not even

4    bring you a single witness, live or by videotape, that was

5    at the Samsung engineering area when all of this activity

6    took place.  Not a one.

7         What they also didn't show you was the things one would

8    normally expect to see with large engineering projects, the

9    types of documentation, the materials that go along with

10   these big efforts.  As you have seen by now, these are

11   complicated patents.  Make no mistake about it.  These

12   inventions are complex.  We have heard over and over again

13   about the PhDs involved in developing technology like this.

14        Samsung didn't show you any notebooks, any e-mails, any

15   project charts.  They didn't show you engineering notes.

16   They didn't show you reports from the engineers to the

17   management on progress.  No status.  Nothing that one would

18   associate with such a large and complex undertaking.

19        We know now in 2007, as I said, ESS began to experience

20   economic strife, and we've heard already that 2007, 2008 --

21   we all remember those years.  Those were very difficult

22   economic years in this country.  We couldn't open the

23   newspaper or click on a story on the Internet or watch T.V.

24   without hearing about lay-offs, foreclosures, bankruptcies,

25   more lay-offs, more foreclosures, more bankruptcies.  People

1    thought we were moving into a great depression possibly.

2        This great company, ESS, was struggling and it was

3    struggling to find someone who in that environment would

4    invest in it.  Not an easy feat.  But as I said at the

5    opening, at the very start of our time together, they found

6    that company.  They found that entity, that white knight, in

7    Imperium.  The hedge fund in New York City.

8        We heard from Mr. Michaelson, the co-CEO of Imperium.

9    Imperium is made up of investors from families, from

10   individuals, from companies, and from organizations, and

11   they saw ESS, its declining margins, its increasing tax

12   liability.  But through that, what they saw is what Mr.

13   Michaelson told us.  ESS wasn't a failed company.  ESS was a

14   company with great technology who was having its technology

15   trespassed upon.  And he believed in the technology and in

16   that market he did something others didn't have the courage

17   to do, which was invest in ESS.

18       As we know today, ESS has made a come-back.  ESS is not

19   where it once was but today it has 130 employees in Silicon

20   Valley.

21       But what we also know is when Imperium came in, they

22   began the process of understanding where the other

23   trespasses may have taken place, and they found them.  They

24   found other trespassers.  It wasn't just Samsung, ladies and

25   gentlemen, and we know that.  But as we also heard Mr.

1   Michaelson testify, he had never sued anybody in his entire

2   business career, never, and he had never been sued by anyone

3   either.

4       He also testified, as you remember, that litigation was

5   his last resort, not his first resort.  So they began to

6   work with an attorney to help with a licensing program.  Her

7   name was Alecia Moore.  You may remember that name.  Alecia

8   Moore.

9       Ms. Moore came in and she put together a plan, and as

10  you heard Mr. Michaelson say, ultimately, after a few years

11  of trying, the plan didn't succeed.  The big guys weren't

12  interested in hearing from the little guys.  There were

13  nibbles here and there, but the big guys wouldn't pay

14  attention.

15      So with a lot of hand-wringing and a lot of internal

16  discussion, the decision was made to sue.  As we talked

17  about the very first time together, if there is a trespasser

18  on the land, we can call the sheriff.  But there is no

19  sheriff for patents.  You can't even go to the Patent

20  Office.  They don't help you there.  What they do is they

21  issue valid patents.  So you have to take matters into your

22  own hands, and they did, ladies and gentlemen.

23      We've seen this before.  This is the list of the people

24  sued in this courthouse in 2011.  We know that all of these

25  companies did the right thing and ultimately paid

17

1   collectively 22.6 million, XXXXX(Redacted)XXXXXXXXX to

2   Imperium.

3        Absent from this list you all know, of course, is

4   Samsung.  Why?  Again, we all know that too.  We know that

5   Samsung was a large customer of ESS and the revenue stream

6   was too important.  There was hope that a business

7   resolution could be achieved.

8        The goal was to capture Samsung's attention by suing

9   these other folks, taking care of those issues, that Samsung

10  eventually would be motivated to try to do the right thing.

11       But now we have seen the evidence.  We know what

12  happened in 2011.  After this litigation was initiated,

13  ladies and gentlemen, Samsung took notice.  They did.  We

14  heard the sworn testimony of one of the Samsung attorneys

15  who said they began to explore the case.  He was asked why.

16  His answer, ladies and gentlemen, was that they wanted to

17  know why they hadn't been sued.  Why weren't they sued?

18       Now, ladies and gentlemen, lawsuits are filed in this

19  country every single day.  I don't think any of us run to

20  the courthouse to try to figure out why we weren't sued by

21  somebody.

22       They wanted to know why they weren't sued?  That was

23  their reason for beginning the analysis?  It is the guilty

24  mind, ladies and gentlemen, because they knew they should

25  have been and they weren't.

18

1      But instead of doing the right thing and coming to

2    Imperium, they did something else.  That something else, we

3    all know now, was to put together a group internal of

4    Samsung comprised of lawyers and engineers over multiple

5    continents with the goal of trying to anonymously buy the

6    ESS Imperium patents.

7      And what do we know about that?  We know that they

8    hired an attorney in San Francisco to be their front man.

9    They signed a contract with him to serve as the front man in

10   this process.

11     He reached out, reached out to Imperium's lawyers, and

12   sure enough, what happened next?  We've seen the e-mails.

13   The reach-out began.  Immediately Imperium knew it was

14   Samsung and Samsung knew immediately that Imperium knew it

15   was Samsung.

16     Now, the parties began a multi-year process of talking

17   with each other.  The testimony you saw from Mr. Bang and

18   Mr. Lee suggested that their interest and analysis ended in

19   2011.  But, ladies and gentlemen, that -- the evidence today

20   contradicts the sworn testimony of Mr. Bang and Mr. Lee.

21     And what is that evidence?  It was some of the e-mails

22   you saw late Friday, some of the new e-mails late Friday.

23   Ladies and gentlemen, you haven't seen all of them so I'm

24   going to give you the exhibit number, and while you're

25   deliberating, if you want to see them, you can ask for it by

1  number.

2      PX-768, PX-768, 2:19 in the morning during trial,

3  months after their obligation to produce these, Samsung

4  delivered these.  In contravention of Judge Mazzant's order,

5  they produced these late.

6      There are a number of them.  We have limited time

7  together.  I want to call your attention to just one of the

8  statements right now.

9      Mr. Rennick, so that others could read along, could you

10 please put on the screen the October 31, Halloween, 2013

11 e-mail from Mr. Kaler to Mr. Bang?

12      Ladies and gentlemen, I'm going to call your attention

13 to the second to last paragraph.  Instead of initiating

14 suit, Alan thought that this would be a good time to

15 reconnect with me to see if my client would like to either

16 license or purchase any or all of the patents-in-suit prior

17 to such a lawsuit.

18      This late evidence, ladies and gentlemen, not only

19 contradicts the testimony of Mr. Bang and Mr. Lee, and

20 there's plenty more in these e-mails, it also contradicts

21 the statement that Samsung's lawyer made to you at the very

22 first moment of this trial when he said to each and every

23 one of you that Imperium never even offered a license to

24 Samsung.

25      And there it is, ladies and gentlemen, in the e-mail

1    itself.  And you'll see in other e-mails, Samsung was

2    offered a license.

3          Ultimately, as we know, June 9, 2014, this case was

4    filed and here we sit today, February 8, 2016, and Samsung

5    still won't do the right thing.

6          So what is it they won't do the right thing about?

7    Well, we know it all well.  Three patents, they have

8    trespassed on three patents, interface patent, preflash

9    patent, anti-flicker patent.

10         When we were together for the first time I promised

11   each of you that you would see through the evidence how it

12   is that Samsung in fact infringes, and to do that we had Dr.

13   Wright come in, sit in this chair right here and swear his

14   oath.

15         Dr. Wright, could you please stand?  Thank you, sir.

16         Dr. Wright came in and he did exactly what I promised

17   to you.  He showed how each and every small piece of those

18   claims can be found in Samsung's own documents.  That's how

19   he proved infringement.  Every one of those checks, check

20   after check after check, that's what he did.

21         Samsung responded.  Samsung responded by not bringing

22   in one expert to cover all the patents, they actually

23   brought in three experts, one for each patent.  And I don't

24   think that was lost on anybody here why they did that.  They

25   searched high and low for someone who could advance what

1  they wanted to say.  Three experts from three different time

2  zones.  Any one of those experts, ladies and gentlemen,

3  could have covered all three patents just like Dr. Wright

4  did, but they didn't.

5      In fact, the experts weren't even given the information

6  necessary to make the proper determination.  They didn't

7  have all the evidence.  They weren't given the evidence.

8      Let's walk through some specifics of that, ladies and

9  gentlemen.  The first -- first witness we saw on the issue

10  of the interface patent was Dr. Baker.  Dr. Baker was the

11  professor from the University of Nevada-Las Vegas.  You may

12  recall at the end of his testimony, with his many patents,

13  he indicated that he wasn't even sure whether Samsung did or

14  did not infringe any of them.

15      Dr. Baker testified at length trying to explain why it

16  is that Dr. Wright was wrong.  But, ladies and gentlemen,

17  Dr. Baker wasn't given all the evidence.  Dr. Baker wasn't

18  given this, ladies and gentlemen, PX-66.  This is the user

19  guide to the interface, PX-66.  Nowhere does he look at or

20  mention PX-66.

21      And why is that important?  Because PX-66, this user

22  guide, you've seen it before.  You've seen this before,

23  ladies and gentlemen.  And the reason you've seen this is

24  because this is the key to Dr. Wright's proof of

25  infringement.  This is the key to where all of the

1   information that's going to be necessary to help prove

2   infringement can be found.  And Samsung withheld this

3   document from Dr. Baker.  He doesn't have it and he didn't

4   have it, and that's how he reached the wrong conclusion.  He

5   didn't have all the evidence.

6        Dr. Baker also made another fundamental mistake.  I

7   know we remember this.  We saw it on the first day, saw it a

8   few days ago during the week, the bike and the race car.

9   Under Dr. Baker's view of how he thinks the patent works, he

10  believes that the race car and the bicycle have to operate

11  constantly at the same time, which of course makes no sense

12  for this patent because that doesn't save battery life.

13       The decision needs to be made, race car or bike.  But

14  Dr. Baker slides the word "both" in there.  You don't see

15  it, but he slides the word "both" in there as he was asked

16  about it during his cross examination.  What does that

17  "both" mean?  It means that both have to happen at the same

18  time.

19       But that's not how it works.  We all understand that.

20  This is to save battery life.  Having both of them work all

21  the time actually diminishes the battery life of the phone.

22  So that was the first expert.  That was the first patent.

23       What about the second patent, the preflash patent?

24  That was Mr. Parulski.  He was the gentleman from Kodak.  He

25  was the gentleman who Samsung was infringing his patents as

1    well.  Kodak paid -- received from Samsung $550 million.

2        He had another fundamental flaw, one that was even

3    pointed out with a jury question as well, and it related to

4    the issue of whether an LED could be a strobe.  His belief

5    is they can't, can't be a strobe.

6        But Dr. Wright came in and explained that on Friday.

7    Any fast moving light, any fast moving light is a strobe,

8    and that includes an LED, and that's a fundamental flaw in

9    Mr. Parulski's analysis.  That's how he reaches a conclusion

10   different and apart from that of Dr. Wright.

11       The third patent, the third patent is the anti-flicker

12   patent, and here again, ladies and gentlemen, their expert,

13   Dr. Neikirk, didn't show you this.  He didn't mention this

14   at all, but you've seen it before.  This is PX-22.  Dr.

15   Wright talked extensively about PX-22.

16       PX-22 has technical details all through it.  You may

17   recognize a little bit of how the cover looks, this first

18   page here.  Dr. Neikirk didn't discuss this at all.  He

19   didn't show this document to you at all, ladies and

20   gentlemen, and he reached an improper conclusion as well.

21       All three of these gentlemen also talked about the

22   issue of invalidity, the invalidity of the patents.  Now, we

23   all know this, that the patents are presumed valid until

24   proven otherwise by clear and convincing evidence.  That

25   means the Patent Examiner is presumed to have done his job.

24

1    Two of these patents have spent over 2000 days inside the

2    Patent Office.  You can see that when you go deliberate.

3    Look at the date it was filed and the date it issued.  One

4    of the patents was in the Patent Office for over 600 days,

5    ladies and gentlemen.  These Examiners are professionals.

6    They do this every day in the same technologies every day.

7         The first thing they tried at Samsung was to tell you

8    that it was a word search game, that it was just a game.

9    You look for the key words of the claims and then you try to

10   find other pieces of prior art that use those words.

11        Dr. Wright put a stop to that.  On Friday he shared

12   with you a fantastic analogy.  There could be a patent on a

13   wing, he said, and a patent on an engine, but that doesn't

14   invalidate the airplane.  You can't squish these things

15   together just because.

16        And he pointed out that although some of the technology

17   has the right words, when you put these things together,

18   they don't work.  They don't mesh.

19        He also pointed out how some of the prior art they were

20   showing was actually found on the U.S. side and already used

21   by the Patent Office.

22        Then finally Dr. Neikirk, as we recall, didn't tell

23   anyone here that the prior art he was advancing for you had

24   already been advanced in this courtroom.  It was advanced by

25   all of those prior Defendants, Apple and the others.  Every

1  single one of them had it.  It wasn't until cross

2  examination that that information surfaced, ladies and

3  gentlemen.  And then you learned that all those people that

4  had paid had the same prior art.

5      All three Patent Examiners didn't make mistakes, ladies

6  and gentlemen.  These patents are valid.  The technology is

7  significant.

8      If it were so obvious, ladies and gentlemen, why didn't

9  the others come up with it first?  They didn't.  Even

10  Toshiba -- remember, there was the Toshiba One reference and

11  the Toshiba Two reference.  Now, Samsung didn't refer to the

12  second Toshiba reference as Toshiba Two.  They called one by

13  the company name and the other by the inventor's name, but

14  they were both Toshiba.  Toshiba had two parts and it wasn't

15  even obvious to them to put the two together.

16      These patents are as valid as they were the day they

17  came out of the Patent Office, ladies and gentlemen.

18      So that leads us to the question of damages, of

19  damages, what is the amount that is owed for this trespass.

20  You've heard a lot of testimony on that as well.

21      One thing you heard from Samsung's lawyer at the very

22  start of the trial was the idea that he took all the patents

23  together, added them up and then tried to divide and said,

24  well, that means this patent is worth $37,500.

25      But he also said something else to you that afternoon.

1    He said -- and I know you remember it -- that if he says

2    anything about the law and it's different than what the

3    Judge says about the law, then the Judge is right and he is

4    wrong.  Now, that's a very interesting thing for a lawyer to

5    say at the start of a trial.

6        It turns out, ladies and gentlemen, his view of the law

7    on that issue was incorrect.  I'm holding here, ladies and

8    gentlemen, what are known as the jury instructions.  These

9    are the jury instructions.  These are the instructions

10   you'll be given to begin the deliberation process.  In it,

11   it includes the law from Judge Mazzant.

12       I know you will recall one of the first things we

13   talked about in terms of damages is that it's done by an

14   evaluation of 15 different factors, right?  Fifteen

15   different factors.  You've heard them all plenty of times

16   now.

17       But so there can be no confusion about what you heard

18   at the start of trial to the end of trial, Judge Mazzant

19   makes it clear right here, ladies and gentlemen, and I'll

20   call -- and I'll note to you that when you get -- when you

21   get the jury instructions, look to page 23, page 23, and

22   there you're going to see, ladies and gentlemen, reasonable

23   royalty, relevant factors.  And you know what you're going

24   to find?  Not dividing up the patents and slicing them like

25   a pizza.  You'll find Judge Mazzant has listed the 15

1    factors.

2         And what about those 15 factors, ladies and gentlemen?

3    Those 15 factors are significant.  Those 15 factors are

4    important.  Both of the damages experts agree on the

5    application of the 15 factors.  They agree with the law as

6    put out by Judge Mazzant.

7         They both agree that the date of the hypothetical

8    negotiation would be 2007.  They both agree that sitting at

9    the table would be ESS and Samsung, and that's significant,

10   because it's not going to be ESS and Sony or ESS and

11   Omnivision.  It's ESS and Samsung.

12        Where these two experts disagree, how their numbers are

13   different from each other is borne out of three different

14   factors, three different criteria.  Let's talk about the

15   first one, which is the profitability numbers.

16        Now, these experts work with the information that

17   Samsung provides.  That's how they do it.  Samsung provided

18   profitability information, not for the products in the case.

19   They could have but they didn't.  What they did was provide

20   profitability information about the company as a whole.

21        And as you heard Ms. Riley state --

22        Ms. Riley, could you please stand?  Here's Ms. Riley

23   who testified on these issues.  Thank you.  Thank you very

24   much, Ms. Riley.

25        They said -- she said with all of her professional

1 experience, she believes that they provided the corporate

2 numbers but the product numbers would have produced higher

3 margins.  These are higher margin, higher profit products,

4 so it actually depresses the number to use the corporate

5 numbers, but that's what she has to work with so that's what

6 she puts into the system.

7     The difference between her on that and Samsung's expert

8 is Samsung's expert won't even use Samsung's numbers.  He

9 uses numbers from Sony and Omnivision.  Those two companies

10 aren't in this case.  They're not sitting there at the

11 hypothetical negotiation.  That's not how it works.

12     So Samsung's own expert runs from Samsung's numbers.

13 That's one source of the disagreement.

14     The second source of the disagreement is the marketing

15 information.  Samsung wants us to believe that picture

16 quality is not a significant issue for them.  They are

17 not -- this is not something that customers care deeply

18 about.

19     Now, our own common sense and instinct tells us that's

20 not entirely true.  But we don't have to rely on our

21 instinct on this one, ladies and gentlemen.  We can look to

22 Samsung's own documentation, PX-96 -- we saw this at

23 trial -- page 11.

24     Now, this is very grainy, so I'm going to ask,

25 Mr. Rennick, could you put a copy of this on the screen?

1  This is hard to read like this, but this is how it was

2  produced from Samsung to Imperium.

3      Ladies and gentlemen, I call your attention to this

4  point here that says image quality and we'll read the first

5  sentence together.  Consumers rely on camera usage for

6  occasions which represent significant life memories, and

7  therefore, image quality is an essential consideration.  An

8  essential consideration.  Not a minor consideration, an

9  essential one.  This is where the two experts disagree.

10     Again, Ms. Riley works with the survey evidence that

11  Samsung provided.  They provided 2010, 2012.  That's what

12  she had to work with.  Had they provided 2007, 2008, she

13  would have worked with that.  She can only work with what

14  Samsung provides.

15     And that evidence teaches that this is an important

16  consideration for them.  Samsung wants you to believe and

17  their expert says it's not.

18     The third source of disagreement is what is known as

19  Factor 11, ladies and gentlemen.  We've seen this slide.

20  This is one of the slides that was used, Factor 11.  The

21  extent to which the infringer has made use of the invention,

22  Factor 11, and any evidence probative to the value of that

23  use.

24     But what do we know, ladies and gentlemen?  We know

25  that Samsung was interested in the patents.  In fact, they

1    pursued them.

2         This factor right here their expert drives to zero.  He

3    says this factor has no bearing on his calculation, none.

4         Ms. Riley, using the evidence that was available right

5    before trial when she finished the report, concluded that

6    the discussions in at least 2011 between the parties

7    evidenced not only their activity but their interest in the

8    patents.

9         What do we know now, ladies and gentlemen?  We know now

10   that those discussions didn't end in 2011.  Last week at

11   2:19 in the morning Ms. Riley didn't have that information

12   to know that the discussions continued way past 2011, 2012,

13   2013, 2014, including Samsung's continued analysis.

14        In fact, we know that again, because the testimony of

15   Mr. Bang and Mr. Lee from Samsung saying that it ended in

16   2011 is not worthy of belief.

17        Now, had Ms. Riley had this information when she was

18   formulating her opinion, there is a chance that her Factor

19   11 numbers could actually increase to where they are above

20   today.

21        Those are the three key disagreements between the

22   experts on damages.  When they're resolved, when we look at

23   them appropriately, when we don't use Sony and Omnivision's

24   numbers but we use the numbers from Samsung, when we don't

25   use only three percent of customers care about image quality

1    and look at what Samsung is actually saying and its primary

2    research on these issues, when we understand that Samsung

3    did have a real interest and a substantial use, Factor 11

4    moves up, as it should.  It reconciles to what we saw at the

5    very start of trial as well, this.

6         Now, you won't have this piece of paper when you go

7    back to deliberate.  Some of you have taken notes on this,

8    for others that haven't, it's here right now.  The numbers

9    haven't changed.  Seven cents, four cents, eight cents.

10   When you multiply it by the number of unit sales, 7.7

11   million, 4.2 million, really 4.3, and 6.7 million.

12        Soon, very soon, it will be time for your voices to be

13   heard.  It will be time for you to speak on these issues,

14   for you to share your views and beliefs about what you've

15   heard last week.  You'll be able to make a statement.  If

16   you believe this isn't how business should be done, it's

17   time to be counted.  And this is how you'll do it, ladies

18   and gentlemen.  This is the jury verdict form.

19        Now, the jury instructions each of you will get, but it

20   will be one jury verdict form.  Everybody will have to agree

21   on the answers to the questions.  All of the questions are

22   yes and no questions, so I'll walk through briefly what it

23   is you're going to see when you get back in the room and see

24   the jury verdict form.

25        It's broken into three parts, one part for each patent.

1    The first patent to be discussed is the '884 patent.  The
2    first patent to be discussed is the '884 patent.  The first
3    five questions on this form will ask you, do you believe
4    there's infringement.  It will go claim by claim, Claim 1
5    and so on until we get to Claim 17.  And you'll have to
6    answer yes or no as a group to that question.
7         What is the test for infringement?  Well, each piece
8    has a different standard.  The weight of evidence -- Judge
9    Mazzant talked about this at the very beginning of trial,
10   that to prove infringement we need to think of a scale
11   perfectly weighted, perfectly balanced, and for there to be
12   a jury conclusion of infringement, the evidence only needs
13   to be the amount of the feather on top of that 50-50
14   balance.
15        If you believe there is infringement on those first
16   five claims, you check yes.
17        The sixth question, Question Six, ladies and gentlemen,
18   is willful infringement, and we don't have to guess at what
19   the definition of willful infringement is.  Judge Mazzant
20   has also provided that to us.  You will find it, ladies and
21   gentlemen, on page 15 of your jury instructions, page 15.
22   I've circled the heading.  It's down here, and here's what
23   he says.  I won't read it all.  Willful infringement --
24   willfulness requires you to determine by clear and
25   convincing evidence that Samsung acted -- here's the key

1   word -- recklessly, that Samsung acted recklessly.

2        Maybe you're thinking to yourself, but that doesn't

3   help me.  What is reckless?  The good news is Judge Mazzant

4   has given us a definition for that as well.  So we turn the

5   page to page 16 and he gives examples.  These are not

6   exclusive examples.  There can be other things, but he gives

7   examples.  He gives five of them and I'm going to talk about

8   two.  In fact, the two I'm going to talk about are number

9   two and number five.

10       Example number two, Samsung intentionally copied.  If

11  you believe they intentionally copied, then their behavior

12  was reckless.  If their behavior was reckless, it is willful

13  infringement.

14       Factor number five, whether or not Samsung tried to

15  cover up its infringement.  If you believe that Samsung

16  tried to cover this up and they acted recklessly, then

17  they're willful infringers.

18       And you'll be asked that question about willful

19  infringement for each of the three patents-in-suit.

20       After that is done, ladies and gentlemen, you'll be

21  asked about validity.  You'll be asked whether Samsung

22  proved to you by clear and convincing evidence that these

23  patents are invalid.

24       Now, we talked about the proof that's necessary for

25  infringement, the feather, but that's not what is necessary

1   here.  Clear and convincing evidence is something very, very

2   different, ladies and gentlemen.  Clear and convincing

3   evidence is a much higher burden.  Here in the State of

4   Texas we use clear and convincing evidence as the standard

5   to take a baby away from its mother.  That's how high this

6   standard is, ladies and gentlemen.  This is not done

7   lightly.

8       If you believe there is no infringement, then the

9   answer to the next five questions whether Samsung proved it

10  will be no.  You'll want to put the word no in there.

11      Then, ladies and gentlemen, the final question for the

12  '884 patent will be if you believe there is infringement and

13  you haven't been convinced the patents are invalid, they're

14  as valid as the day they came out of the Patent Office, then

15  the question is how much is owed to Imperium.

16      Here too the Judge has helped us.  He has helped us,

17  ladies and gentlemen.  Here I want to call your attention to

18  page 21.  At the top of mine I just wrote the words "not

19  less".  Page 21, what is Imperium entitled to?  By law, not

20  less than a reasonable royalty, not less than a reasonable

21  royalty.

22      What is that reasonable royalty?  Again, that comes

23  from the 15 factors.  We talked about that.  These numbers

24  have been calculated as the reasonable royalty for each of

25  the patents.  So if they're in your notes, you have them.

35

1   That is the "not less" number, not less than these three

2   numbers, ladies and gentlemen.

3           THE CLERK:  Mr. Fisch, it's 42 minutes.

4           MR. FISCH:  I'm sorry, ma'am?

5           THE CLERK:  Forty-two.

6           MR. FISCH:  Thank you, ma'am.

7       So with that, ladies and gentlemen, the process will

8   continue on the jury verdict form in the identical manner

9   for the other two patents.  You'll be asked the same set of

10  questions, filling in the same answers as you go along.

11      The jury verdict form is your voice.  The jury verdict

12  form is how you will express your views about this case.

13  This is the only place Imperium can come, right here.  There

14  are seven billion people on planet earth, but only the eight

15  of you will get to decide what happens in this 12 year saga.

16      With that, ladies and gentlemen, I want to say thank

17  you.  I will have a few minutes to revisit with you after

18  Samsung has had its turn and I look forward to that.  But

19  until that time, again, I want to say thank you.  Thank you

20  for your time, thank you for your attention, and most

21  importantly, thank you for your service as jurors in this

22  most important case.

23      I will reserve the remainder of my time.

24          THE COURT:  Thank you, Mr. Fisch.

25          MR. FISCH:  Thank you.

36

1          THE COURT:  For Samsung, Mr. Harnett.

2          MR. HARNETT:  Good morning, Your Honor.  May it

3     please the Court.

4          Good morning, ladies and gentlemen.  I would like to

5     start by thanking you.  I would like to thank you for your

6     diligence throughout the case.  I would like to thank you

7     for your attention, and most of all, I would like to

8     thank you for keeping an open mind.

9          Over the next hour I'm going to give you a summary of

10    the evidence.  I'm actually going to talk to you about the

11    evidence.  It's very important that you base your decision

12    on the evidence.

13         But I want to address something that Mr. Fisch said

14    during his opening statements.  I agree with exactly three

15    of them.  One:  There was some late documents produced.

16    They were produced at 2:19 in the morning.  That's right.

17    We produced them as soon as we found them.  We didn't wait

18    until 8:00 o'clock the next morning.  We produced them as

19    soon as they came to light.

20         The second thing I agree with:  We very much want you

21    to read Plaintiff's Exhibit 768.  It's an e-mail chain.  It

22    goes from back to front in terms of time.  The front of it

23    was already produced.  The back part was what we should have

24    found earlier.  We should have found it earlier.  Samsung

25    should have found it earlier.  Samsung regrets that it

1    didn't find it earlier.  Samsung made a mistake.  Samsung

2    violated a procedural rule of the Court.  Samsung apologized

3    to the Court, and Samsung apologizes to the Court again.

4    Wish we had found it earlier, but we didn't.

5         But I want you to read it.  What really matters is

6    what's in the document, not that it was produced late.  And

7    I'm going to start my presentation not where I really wanted

8    to start it.  I really wanted to talk to you right from the

9    start about infringement and invalidity, because that's what

10   this case is about, but I know this is going to be a

11   distraction and it's a problem of our making, for producing

12   the document late, and I want to explain to you the

13   significance of that document.  I'm going to spend five

14   minutes.  You can put it to the side and then you can do

15   what you're supposed to do here.  You can focus on the

16   questions of infringement and validity.

17        And I made a couple of promises to you when I started

18   this.  I told you that Samsung was going to provide you the

19   evidence that was required for you to discharge your duty.

20   The Judge is going to ask you questions.  He's not going to

21   ask you whether we produced a document late.  We did.  The

22   Judge is going to ask you whether or not Imperium has proved

23   infringement and the Judge is going to ask you whether we

24   proved invalidity.

25        We provided you with the evidence that you need to

1  answer those questions, and that's what I want to talk

2  about, so I want to get this out of the way.  And I'm going

3  to address you for the most part from the podium, because

4  I'm actually going to show you evidence and it's much easier

5  to coordinate showing you that evidence from up there.  So

6  give me one second and we'll get started.

7      Oh, the third thing I agree with.  Just like I said at

8  the start, pay very close attention to Judge Mazzant's

9  instructions.  We don't run away from a word of them, but

10 the Judge will tell you, you read those instructions

11 together as a whole, and some of those instructions deal

12 with claim construction.  Pay very close attention to the

13 issues of claim construction.  Follow the words of Judge

14 Mazzant's claim constructions when you are considering the

15 questions of infringement and validity.

16     On Friday you'll remember the last thing of the day Ms.

17 Riley was on the witness stand.  The issue of the late

18 produced document came up.  Imperium showed Ms. Riley that

19 document.  You might remember Mr. Jenner's cross examination

20 of her.

21     Let's talk about that document and what it shows.  It

22 seems that Imperium was more interested in showing you that

23 Samsung produced that document late than showing you its

24 contents.  I want you to read it.  I really do.  Read the

25 document for yourself, and when you read it, you'll see it's

1    an e-mail chain that reads from back to front.  The new

2    material is at the front.  The back was already produced.

3         When you read that document, you'll see it has nothing

4    to do with infringement.  It has nothing to do with

5    validity.  When Mr. Jenner cross-examined Ms. Riley on it,

6    it was clear as day that that document says nothing at all

7    about Samsung's interest in Imperium's patent portfolio.

8    What it shows is Samsung was utterly disinterested.  Nothing

9    about the new material changed that.

10        What that document shows is that -- not that Samsung

11   wanted to buy the patents.  It doesn't show that at all.

12   What it shows is that Imperium wanted to sell the patents.

13   What it shows is that Mr. Kaler, who is a patent broker,

14   wanted to facilitate a sale of those patents between

15   Imperium and Samsung.

16        What that document shows is that Imperium's lawyer

17   repeatedly called Mr. Kaler out of the blue to try to

18   interest Samsung in buying those patents.  Mr. Kaler, as he

19   always did, reported when Imperium's lawyer called out of

20   the blue.  And one time, one time, Imperium's lawyer called

21   Mr. Kaler and said there was a proceeding in the previous

22   litigation, the litigation against those seven defendants,

23   and he said something happened in there.  There was a

24   hearing.

25        Mr. Jun Bang got that message.  He went, checked on the

40

1    computer to see anything about that hearing, didn't find

2    what he expected to see and asked Mr. Kaler for some

3    clarification.  That's it.  That's it.

4        Samsung never expressed interest in acquiring

5    Imperium's patents.  Read it for yourself.  But don't just

6    read Exhibit 768.  Read it in conjunction with Defendant's

7    Exhibit 165 and Defendant's Exhibit 526.  Those are the

8    earlier e-mail chains, and let's look at what they say,

9    because they were shown to you during Ms. Riley's cross

10   examination.

11       Let's start with Exhibit 526.  This is the first

12   communication from Imperium to Mr. Kaler communicated back

13   to Samsung.  Imperium's lawyer told Mr. Kaler we want

14   $400 million.  $400 million.

15       Let's look at Exhibit 526, a little later in time.  Of

16   course, Samsung would never have responded to a request for

17   $400 million.  Preposterous.  The price drops to

18   $133 million.  Nothing happened.  Just silence.

19   $400 million.  $133 million.

20       Now, look at Exhibit 165, another e-mail that was here.

21   Everyone knew about it.  The number drops after $133

22   million, let's look at what it says.  Another out of the

23   blue call from Imperium's lawyer.  This time not after 400,

24   not after 130, this time Imperium would be happy to

25   entertain any offer for any of its patents.  Invites to

1    cherry-pick.  400 million, 133 million, pick them.

2         Samsung's response comes out on page 165 -- Exhibit 165

3    as well.  Unfortunately, our position has not changed.

4    Thanks but no thanks.

5         Imperium did not -- there is nothing in here that shows

6    Samsung had an interest in Imperium's patents.  This notion

7    that any of these documents show that Ms. Riley's damages

8    number would have been higher makes no sense at all.

9    Samsung's answer was thanks but no thanks.  It always was

10   that way.

11        Read Exhibit 768 that they told you to read.  Please

12   read it.  All it is is a series of unsolicited calls.  Mr.

13   Kaler, maybe Samsung wants to buy our patents.  Mr. Kaler,

14   maybe Samsung wants to buy our patents.  Mr. Kaler, maybe

15   Samsung wants to buy our patents.

16        Samsung didn't want to buy the patents.  Samsung had no

17   interest in them.  Samsung has thousands of patents of its

18   own.

19        Now, how is someone supposed to respond to a company

20   like Imperium?  They approach you and they say we want

21   $400 million.  How do you respond to that?  Well, let's look

22   at how the real world responded.  Let's look at the real

23   world facts.

24        Imperium's own internal documents that you heard during

25   the damages case show that Imperium itself valued its patent

42

1    portfolio at zero.  Imperium's own document said they

2    wondered whether any of their patents would stand up to

3    scrutiny.

4         Think of the Needham evaluation, think of the Sutter

5    evaluation.  These were documents that were talked about

6    during Mr. Michaelson's videotape deposition.  And think of

7    what happened in the real world.

8         Can you queue up the Q & A that was read during Mr.

9    Michaelson's testimony?

10        Here's the real world.  I asked him during his

11   deposition:  Did anyone ever make a firm offer for the

12   portfolio in 2009?  No.  2010?  No.  2011?  No.  All the way

13   through 2015.

14        And it wasn't from lack of trying.  They were nothing

15   if not dogged in trying to sell that portfolio.  As it turns

16   out, the real world tells us what the value of this patent

17   portfolio is.  It's -- the value of the portfolio is the

18   threat of a lawsuit.  That's what it is.

19        This is -- these are lawsuits designed to make money

20   for Mr. Michaelson's hedge fund.  Nothing about these

21   documents -- please read them.  Please read all three.  Read

22   every word of them.  Nothing about those documents suggest

23   in any way that Samsung was interested in these patents.

24   They weren't.  They weren't for the reasons I explained

25   during opening statement.  They're old, out-of-date

1   technology, passed down from company to company.  Passed

2   down from Conexant to Pictos to ESS to Imperium.

3        A company like Samsung, with its tens of thousands of

4   patents of its own, does not need this kind of technology,

5   and that's what this case should focus on.

6        You didn't hear a word in Imperium's opening statement

7   about comparing the limitations of the claims as construed

8   by the Court.  That's the legal instruction that matters.

9   You didn't hear a word about how to do that.  You hardly

10  heard a word about it during trial, but we're going to talk

11  about it now because that's the information that you need to

12  answer the questions that the Judge will ask you.

13       So I'm going to start going through the technical

14  information now, and it is more than I can humanly cover in

15  the amount of time that I have, so what I'm going to do is

16  I'm going to just try to remind you of some of the key

17  points that you heard from these distinguished experts, the

18  real leaders in the field that we brought to teach you.

19       And when we march through this evidence, you're going

20  to see that this really is a case of contrasts.  Samsung

21  presented you with science, not spin.  Samsung -- Samsung's

22  experts presented you with detailed technical analysis, not

23  an unsupported slide show.  Samsung gave you the detail that

24  you need to know to answer the questions of infringement and

25  invalidity that the Judge will ask you.  Samsung didn't put

1   an expert on the witness stand to tell you what Imperium

2   wants you to say.

3        We gave you the information, the evidence, so that you

4   can make the decision.  That's what the Judge is going to

5   ask you to do, and we have faith in you that you'll be able

6   to do it.

7        Let's start with infringement, the legal requirements.

8   If even one requirement set forth in the claims is missing,

9   there's no infringement.  Even one, no matter how small.

10  Lots are missing here.

11       Second one, there was some confusion about this when

12  there were arguments made.  If an independent claim is not

13  infringed, the subsequent dependent claims cannot be

14  infringed.  That's why we focused a lot on the independent

15  claim.  That doesn't give the dependent claim a free pass.

16  So by reference to the '884 patent, as Professor Neikirk

17  explained, if Claim 1 is not infringed, then Claims 5 and 6

18  are not infringed.  If Claim 14 is not infringed, neither is

19  Claim 17.

20       These are two bedrock principles that you have to

21  consider when you're doing the infringement analysis.

22       The third is when you compare the words of the claims,

23  they're the words of the claims set forth in the Judge's

24  claim construction.  That's an instruction of law.  Pay very

25  close attention to it.

1          All right.  Let's get started.  We'll start with the

2    '884 patent.  Here are the key limitations that are not

3    infringed.  If you remember, Professor Neikirk explained to

4    you, he carefully read the prosecution history of the '884

5    patent.  That's the back and forth between the Patent

6    Examiner and the applicant.  These claims stood rejected.

7    The only way that these claims got allowed is by adding this

8    "adjusting while maintaining" limitation.

9          So despite Imperium's efforts throughout the trial to

10   give you question and question and question of does this --

11   does this product have flicker cancellation, does this

12   product have flicker reduction, does this product have

13   flicker correction.  That's just confusing.  Flicker

14   correction, flicker reduction, flicker cancellation does not

15   equal the '884 patent.  Nobody says it does.

16         In order to infringe the '884 patent, you need to

17   infringe the "adjusting while maintaining" limitation.

18   That's the way it got out of the Patent Office.  Key

19   limitation here.

20         What did Professor Neikirk say?  You heard -- oh,

21   Professor Neikirk didn't show you any technical documents?

22   They found one document on the list that wasn't on the list

23   that Dr. Neikirk looked at.  Remember his testimony.  He

24   didn't look at technical documents?  How many technical

25   documents did he show you?  He saw everything that mattered.

46

1    He saw all the -- all the key engineering documents, the

2    product specs, everything about the image sensors and image

3    processors.

4         And here are some graphs.  Twenty-eight products are

5    accused of infringing the '884 patent.  One of them, exactly

6    one, has the "adjusting while maintaining" limitation.  That

7    is the Epic 4G Touch.  How do we know?  Two ways.  When the

8    graph shows a step function -- remember Dr. Neikirk's

9    testimony, remember he went up to the board and remember he

10   talked to you about the step function on here.  Step

11   function equals adjusting while maintaining.  The period of

12   the periodic intensity.  It stays that way flat, immediately

13   goes to the next and goes.  Adjusting while maintaining is a

14   step function.

15        When you see this function, it's adjusting but it's not

16   maintaining.  He -- he told you, there was one product that

17   does it, the Epic 4G Touch.  The other 28 do not.  Adjusting

18   while maintaining is not met.

19        There's a couple of other things.  Imperium utterly

20   failed to prove infringement of the method claims.  Listen

21   to the Judge's instruction about this.  This is not a

22   technicality.  There are specific legal requirements that

23   are required to infringe a method claim.  You have to prove

24   it.  You can't just say it happens.

25        A method claim, in order to infringe it, the method has

1    to be practiced in the United States.  Dr. Wright came to

2    the stand and didn't give you any evidence of that.

3        But there's more.  Listen very closely when Judge

4    Mazzant gives you the instructions about inducement.

5    There's a notion called inducement.  There's a lengthy

6    instruction on it.  In order to prove infringement of the

7    method claim here, Imperium would have to prove inducement.

8    You didn't hear that word.  They didn't prove it.  Listen

9    closely to that instruction.

10        The next one, the coupled limitation.  Dr. Wright got

11   to the stand, like he did on many things, and said it's just

12   there.  The graphic he showed you, we brought it up to Dr.

13   Neikirk, we showed it to him.  All Dr. Wright did was

14   restate the claim language and say yep, no analysis.  That's

15   not how you prove infringement.  The '884 patent is not

16   infringed.

17        And there is a good reason why, just like I said.

18   Flicker cancellation, flicker correction, flicker reduction,

19   that's not the '884 patent.  It has to have the "adjusting

20   while maintaining" limitation.  That explains why flicker --

21   this -- this supposed invention never applies.  It would

22   only apply in a situation if you're taking video in a room

23   under old-fashioned fluorescent lights with the window

24   shades closed or at night where there is dramatic changes in

25   light from the old-fashioned fluorescent lights.  It's

1    hardly ever used.  It's not practical.  That's the only

2    time.

3         The "adjusting while maintaining" limitation, the

4    limitation that was required to add to the claims to get the

5    patent out of the Patent Office, doesn't apply.  Samsung

6    doesn't need it.  Samsung did it in the Epic 4G Touch.

7    Nowhere else.

8         Next, the '029 patent.  Legal instructions, please pay

9    attention to the Court's legal instructions.  Claim

10   construction, the claim limitation is preparatory light for

11   a predetermined preparatory duration.  The Court construed

12   that.  This is law now.  Preparatory light emitted for an

13   amount of time that is determined before emitting the

14   preparatory light.

15        Mr. Parulski, Kodak, hundreds of patents, knows things,

16   worked in the industry for a long time, told you, and here's

17   a very colloquial, common sense way of saying it.  So the

18   camera literally does not know how long the preflash is

19   going to be on when it turns on.

20        This is an instance, one of the few, where Dr. Wright

21   actually agreed.  He actually came to the same reasonable

22   conclusion that Samsung's expert came to.  He was asked --

23   and this was -- this was a question -- you should know, this

24   was a question that was asked during a deposition before

25   trial started and it was read to him.

1      In the Galaxy Note2 before preparatory light begins

2  emitting light, the device does not know the exact amount of

3  time that the preflash will be emitting light, correct?

4  Yes, sir, that's correct.

5      He has admitted that Samsung's products do not meet the

6  Court's claim construction.  "Before" means "before.

7  "Before" does not mean "after.  "Before" does not mean

8  "during.  "Before" does not mean "during, then after".

9      So look at what Dr. Wright says now.  The Court's

10  construction does not say that you can keep it on.  It

11  doesn't say that you have to turn it off.  It doesn't say

12  that the camera decides it needs more than one preparatory

13  image, that it can't do that.  The Court's claim

14  construction says it has to know before.  Before means

15  before.

16      There is no infringement.  It is impossible under the

17  claim construction.  Claim construction is law.  Judge has

18  given you the law on that.

19      '029 -- '290.  I'm sorry.  Here's another issue of law,

20  claim construction.  Here the word is "and".  Everybody

21  knows what "and" means.  Everybody knows what "before"

22  means.  "And" doesn't mean "or".  "And" means "and".

23  "Before" means "before".  "And" means "and".

24      Dr. Wright does not dispute that in Samsung's product

25  the image data is sent using the differential interface.

1    There is no dispute about it.  Everyone agrees here.  In

2    Samsung image data travels over the data -- over the

3    differential interface.  In Samsung's products the image

4    data is not sent over single ended interface.

5         There is no dispute about what happens in Samsung's

6    products, but what Dr. Wright is saying is "and" doesn't

7    mean "and".  "And" means "or".  That's not right.  He's

8    rewriting the Court's claim construction to say -- he's

9    putting the words "at least" and he's changing the word to

10   "or".  That's the only way he can try to make out a case for

11   infringement.

12        He argues the Court's construction of data interface

13   circuits provides that other signals can be sent over the

14   single ended differential interface.  We don't disagree.

15   But it doesn't change the fact that image data must be sent

16   over the single ended and differential interfaces.  Here in

17   Samsung image data is only over differential.

18        Law again.  "And" means "and".  Don't infringe.

19        So I can't believe you heard it again.  I can't believe

20   they ran the story of Mr. Melfi.  That's -- it's mind

21   boggling.  Throughout trial Imperium has told you things

22   that don't have any bearing on the question of infringement,

23   things about the other lawsuits.  They mention other

24   lawsuits.  Oh, Samsung has been in lawsuits with Apple.

25   Samsung has been in lawsuits with Kodak.  That really

1   shouldn't surprise you.

2       Imperium, though -- let's pull back the curtain.  Why

3   does Imperium say that?  Imperium wants you to think, well,

4   if Samsung gets sued by Kodak, if Samsung gets sued by

5   Apple, well, jeez, they must realy be infringing Imperium's

6   patents.  You know better than that.  You heard the

7   evidence.  Your job is to consider the evidence in this

8   case.

9       Companies sue each other all the time over patents.

10  Sometimes Samsung sues its competitors.  Sometimes Samsung

11  gets sued.  In any event, it's about -- patents are about

12  technological progress and patents are about competition.

13  It's no secret that Samsung and Apple compete.  Samsung and

14  Kodak compete.  Samsung, Kodak and Apple make useful

15  products.  You benefit from that competition.  You get

16  useful products.  The communities you live in get jobs.

17      This is not a case about competition.  Imperium doesn't

18  make anything.  Imperium doesn't design anything.  Imperium

19  doesn't sell anything.  Imperium is simply looking to make

20  money from Samsung that it doesn't deserve.  Mr.

21  Michaelson's hedge fund stands to profit.  Investors like

22  Mr. Bob Blair stand to profit.  They don't make anything.

23      Now, back to the Melfi story.  He was the first witness

24  that they called to the witness stand.  And, again, let me

25  pull back the curtain.  What do they want you to think?

52

1   They tell you -- Imperium wants you to think that Samsung

2   took ESS's source code.  Imperium wants you to think that

3   Samsung did something wrong by building a test lab.

4   Imperium wants you to think that Samsung is responsible for

5   ESS's difficulties in the marketplace.  Samsungs want you to

6   think -- Imperium wants you to think that Samsung put

7   Mr. Melfi out of a job.

8        Through these innuendos, you're supposed to conclude

9   that Samsung infringes these three Imperium patents.  Come

10  on.  None of it is true.  Let's look at the evidence.  The

11  evidence dismantles that innuendo.

12       Mr. Melfi seemed like a fine man, a very nice guy, but

13  what did Imperium do to him?  They put him up on the witness

14  stand to tell half a story, half a story.

15       Here are the facts.  Let's show testimony.  Samsung and

16  ESS were working together to solve problems.  That's what he

17  said in his testimony.

18       All right.  Mr. Melfi admitted what we all know

19  already, there were sometimes defects in ESS's products.

20       Something else I mentioned to you in opening statement,

21  Samsung helped ESS with a $2 million loan.

22       To this day, look at DX-308, Samsung remains a valued

23  customer of ESS.  Mr. Blair said so himself in the apology

24  letter that I showed you in opening statements.

25       Here's the other facts.  Samsung never took anything

1  from ESS.  Imperium tries to make a big deal of the fact

2  that Samsung asked to see some source code.  Samsung asked

3  when it was helping ESS solve its technical problems.  But

4  Mr. Melfi testified that ESS never gave Samsung the source

5  code.  He said it right there:  You're not testifying that

6  Samsung put any of ESS's source code in its own devices,

7  correct, sir?  Oh, correct.  They asked.  We didn't give it

8  to them.

9      Innuendo.  Surely if Samsung had taken ESS's source

10  code, ESS wouldn't be working with Samsung today.  ESS would

11  have sued them for trade secret misappropriation.  That

12  didn't happen.

13      Then there's this business of the test lab.  Imperium

14  wants that to seem sinister too.  Look at Mr. Melfi's

15  testimony on page 79.  Samsung didn't hide it.  Samsung

16  wanted ESS's approval.  Samsung showed that test lab to

17  Mr. Melfi when he visited Korea.  They were proud of it.

18  They asked him if he approved.

19      That's the evidence.  That's -- that was the other half

20  of the story that came out on cross examination.  Having the

21  same test lab in the U.S. and Korea helped ESS and Samsung

22  speak the same language.  It helped them do business

23  together.  It helped them coordinate things.

24      And that makes good sense, as Mr. Parulski, a lifer in

25  the camera industry, said, this kind of thing happens all

54

1    the time.  Standardizing test procedures is routine

2    technical practice.  It's just good science.

3         Now, this is the real kicker.  ESS's story of --

4    Imperium's story about ESS shutting down Mr. Melfi's

5    division.  That wasn't Samsung's fault.  It's not Samsung's

6    fault that Mr. Melfi was put out of a job.  Here's ESS's own

7    documents in the time frame.  Because our products are a

8    generation behind the competition, we, ESS, have been

9    uncompetitive and unprofitable.  The caption of the

10   document, what we, ESS, have been doing wrong.

11        So why is Imperium telling the story about Mr. Melfi?

12   I think you all know the answer.  This is the kind of story

13   a Plaintiff like Imperium tells when it can't prove its

14   case, when it can't prove that the claims as construed, as a

15   matter of law by the Court, read on Samsung's products.

16        You didn't hear a word during opening statements about

17   the claims as construed by the Court reading on Samsung's

18   products.  You heard a story about Mr. Melfi, who was put

19   out of a job by Samsung because Samsung stole source code

20   and a lawsuit that never happened.  It's a story.  It has

21   nothing to do with infringement or validity.

22        Here are the points I started the case with.  They're

23   as valid today.  Samsung doesn't infringe.  Imperium knew

24   they should not sue Samsung.  Imperium's patents are

25   invalid.  Samsung owes no damages.

1          The second point, I'll be brief on this.  The evidence

2    is undisputed in 2009, 2010 Imperium developed a list of

3    eight patent defendants.  Samsung was on the list.  In 2011

4    when Imperium brought suit, it included seven.  Samsung

5    wasn't among them.

6          When Samsung was sued in 2014, Mr. Blair resigned in

7    protest.  He sent an apology letter to Samsung.  That letter

8    had some misleading statements in it, the statements about

9    the independent board of directors.  We showed that was not

10   true.  Imperium and ESS have a complete overlap effectively

11   in the boards of directors.  The apology letter had some

12   serious omissions about Mr. Blair's involvement with both

13   ESS and Imperium and his financial interest.

14         At the time of opening statements Mr. Blair was at the

15   top of Imperium's witness list.  As Mr. Capone acknowledged,

16   Mr. Blair was the main man at ESS.  Mr. Blair was the main

17   man at Imperium.  That's what Mr. Capone, sitting right here

18   today, testified when he was on the witness stand.

19         And we were expecting Mr. Blair to come and explain

20   things, to explain if he really did believe that Samsung

21   infringed, if he really did believe that the patents were

22   valid, and to explain how he negotiated with himself in the

23   Blair/Blair agreement that's at the center of Imperium's

24   damages model here.  We were expecting the main man to come

25   tell you that.  He didn't show up.

1        Let's get to validity, or better spoken, invalidity.

2    It's the third point on the board.  Think of the evidence

3    you heard from Samsung's experts, the most recent

4    experience.  Think of the detailed analysis Professor

5    Neikirk gave you when we were talking about the '884 patent.

6    Think of how he went through every technical detail

7    necessary to show that the Johnson and Hashimoto references

8    anticipated the independent claims and most of the dependent

9    claims.  Think of how much work he did.

10        On the other hand, Imperium's entire invalidity case

11    with three patents was a very brief slide show from Dr.

12    Wright.  It took less than 20 minutes.  You might not even

13    remember it.  Mr. Melfi spent more time on the stand.

14        Imperium had no substantive technical response for

15    Professor Neikirk, Dr. Baker and Mr. Parulski.  So with

16    nothing left to say on the merits, nothing substantial to

17    say on the merits, Imperium presented you with another set

18    of distracting arguments.  Let's run through them because

19    you might hear them on rebuttal here.

20        Imperium says some of the prior art was from foreign

21    countries.  That doesn't matter at all.  Judge Mazzant will

22    tell you that foreign patents qualify as prior art.

23        Imperium spent a lot of time asking Samsung's experts

24    where they found the prior art.  You actually heard that,

25    that we hired experts, handed them the prior art.  That

1    doesn't matter either.

2         What matters is that prior art exists.  It matters what

3    the prior art teaches.  It doesn't matter where it came

4    from.  Judge Mazzant will tell you that as well.

5         Imperium spent a lot of time asking whether the

6    Defendants in the earlier case might have known about that

7    same prior art.  I'm sure they did.  But that doesn't matter

8    either.

9         It's undisputed that parties frequently settle lawsuits

10   just to avoid the nuisance of litigation, just to avoid the

11   cost of litigation.

12        Whether any of those companies knew about the prior art

13   doesn't make a bit of difference.  You don't know their

14   motivation for settling.  You can guess.

15        But a better question than whether they did know about

16   the art is who didn't know about the art?  Who didn't know

17   about it?

18        Let's look at the front of the '290 patent, for

19   example.  See what I have highlighted there?  It's the list

20   of prior art that the Examiner considered.  U.S. patents,

21   foreign patents, other publications.  That's prior art.

22   U.S., foreign, publications.  Right on the cover is the list

23   of the prior art that the Examiner knew about.

24        For the '290 patent we're relying on Toshiba, Umeda and

25   Roe.  Where are they?  They're not there.  The Examiner

1    didn't know about them.

2         That gets back to what I said in opening statement

3    about the replay official in football.  We all watched the

4    Super Bowl last night.  It's a fresh analogy.  You now get

5    to review the play on the field.  You get the benefit of

6    seeing things from all angles.  You get to see things -- you

7    got to hear expert testimony that the Patent Examiner

8    doesn't get to hear.

9         As Mr. Parulski said, he testified about it at page 139

10   of his transcript, Patent Examiners are humans.  They can't

11   find anything -- they can't find everything.

12        And this notion that a patent is in the Patent Office

13   for 600 days or 200 days, does anyone there really think --

14   does anyone in the jury box really think a Patent Examiner

15   is working 600 days in a row on a single patent?  Come on.

16        And all that makes sense.  A Patent Examiner isn't

17   going to find everything because they're not motivated to.

18   They've got lots to do.  You heard that in the videotape

19   that the Judge played for you.

20        Nobody is suing a Patent Examiner.  Nobody drops a $400

21   million demand on a Patent Examiner.  If someone did, the

22   Patent Examiner would be motivated just like Samsung to go

23   find the best prior art, to go talk to the best experts, to

24   talk to the real leaders in their respective technological

25   fields and get their view on what the state of the art is,

1    and that's precisely what Samsung did here.  Samsung found

2    the best prior art.  Samsung told you about it.

3         You heard from the best, highest minds in the

4    technology to explain to you the state of the art and

5    explain to you how every claim in Imperium's patents are

6    invalid.  Now you can overturn the ruling on the field.

7         Now, I can't possibly do justice to the invalidity case

8    that our experts put on.  You heard it.  You remember it.

9    You took notes.  You asked some really astute questions.

10   You were paying attention.

11        Remember the testimony.  Go back, think about the

12   documents they showed you.

13        Here's a summary.  We're going to start with the '884.

14   Professor Neikirk, I wish I had a professor like Professor

15   Neikirk.  He understood the technology and he could teach

16   it.

17        '884, the Hashimoto patent anticipates Claims 1, 5 and

18   14.  Renders Claim 6 obvious in view of Kinugawa. Renders

19   Claim 17 obvious in view of Hata.

20        Johnson anticipates Claims 1, 5, 14 and 17.  Renders

21   Claim 6 obvious.

22        I can't possibly go through all the detailed analysis

23   that Professor Neikirk gave you, but I can remind you of

24   this.  Remember when Professor Neikirk got on the witness

25   stand?  This is Figure 7 in the Hashimoto reference, an

1  anticipatory reference.  He read you the text.  He explained

2  the text.  He told you why Hashimoto anticipates.

3      But here it is, the step, the hallmark of adjusting

4  while maintaining, the step.  Not the ramp.  The step.  Like

5  the Epic 4G Touch, not like the other accused products that

6  don't infringe.  The Epic 4G Touch meets the "adjusting

7  while maintaining" limitation.  We don't run away from that.

8  The others don't.

9      Johnson, another anticipatory piece of prior art.  I

10 can't possibly recreate for you all of the technical detail

11 that Professor Neikirk went through.  He read the

12 specification to you, showed you -- again, here's the

13 drawing.  Figure 13 of Johnson.  Step, adjusting while

14 maintaining, not the ramp function.  Just like the Epic 4G

15 Touch, not like the other products with the ramp.

16     The combination, Figure 6, the only limitation that

17 Figure 6 adds is a figure about detecting -- where is the

18 exact language here?  Adding the simple method of detecting

19 the period.  The "adjusting while maintaining" limitation

20 talks about adjusting the period of periodic intensity.  How

21 do you adjust it without detecting it?  It's such a simple

22 thing that everyone knew about it.

23     There were lots of old prior art references like Oster

24 that showed that you detect it, so that minor addition was

25 in Oster.  He said Johnson gives extensive details on how to

1    build the system.  This just adds another feature that lets

2    you know it ahead of time.  That's what the flicker is.  It

3    would be a simple method to put it together.  You could

4    build it easily.  You could enable it.

5        Both Johnson and Hashimoto are issued patents.  The

6    Patent Examiner considered them enabled.  There's no

7    question about that.  They're anticipatory references.

8        The '029 patent, let's look at this.  This is Mr.

9    Parulski that told you about this.  Here again, the Patent

10   Office looked very carefully at this.  Every limitation

11   that's in yellow was found in the prior art.  The Examiner

12   said so.  These are communications from the Patent Office.

13   Everything was there.

14       What wasn't there?  A look-up table.  Well, Shimada

15   discloses a look-up table with preflash values.  There it

16   is.  There's a look-up table.  There's the flash diagram,

17   comes out of Shimada.  They're both in the exact same field

18   of art.  Everything but one thing was there.  Shimada fixed

19   it.

20       What does Dr. Wright say about it?  Dr. Wright says oh,

21   this was taught in Sugahara too.  No, it wasn't.

22       Ask to look at the Shimada reference.  Pick it up, flip

23   through it.  The charts jump out at you.  They jump out at a

24   Examiner.  The graph jumps out at you.  They would jump out

25   at an Examiner.  That's just not present in Sugahara, no

1    matter what Dr. Wright says.

2        And Dr. Wright said something interesting about Figure

3    13 of Johnson as well.  Let's go back to that slide.

4    Doctor -- Dr. Wright didn't say one word about figure --

5    about Figure 7 of Hashimoto.  He didn't say one word about

6    it.  But he did say a couple things about Figure 13 in

7    Johnson.  Let's look at what he said.  Oh, and there's this

8    little figure there that goes along with it.  This little

9    figure shows adjusting while maintaining.  This little

10   figure shows the feature that needed to be added to the

11   claims to get it issued for the Patent Office.  This little

12   feature shows why it anticipates.

13       Now, let's talk last in terms of prior art about the

14   '290 patent.  Professor Baker talked about that, and here a

15   picture is worth a thousand words.  The interface circuit is

16   at the heart of this invention.  Here we have the '290

17   patent interface circuit.  Here you have the Toshiba

18   interface circuit.

19       What does the '290 patent require?  Single ended

20   interface, single ended interface, differential interface.

21   Green is single ended, single ended.  Red is differential.

22       What does Toshiba have?  Single ended, single ended,

23   differential.  Same circuit.

24       So let's combine Toshiba with Umeda, and this is the

25   Toshiba interface circuit shown with the corresponding

1     language of the '290 patent claim.

2          So let's go to the next slide.  So where is this all

3     found in the combination?  In blue is the circuitry, single

4     ended, single ended, differential.  That's inside a brown

5     box.  That's the CMOS image sensor.  That's inside the

6     purple box, which is the CMOS imaging apparatus, and another

7     component inside there is the image processor.

8          Every element is met by the combination and Professor

9     Baker said you can design it easily.  He said you could

10    build it.  That does not take a rocket scientist.  That

11    patent is obvious, as obvious today as it was when it was

12    issued from the Patent Office.

13         And, remember, look at the front of the patent.

14    Examiner didn't know about the art.  Reverse the play on the

15    field.  You can do it with all three.

16         Now, let's go to Dr. Wright's testimony.  We heard some

17    attacks on Professor Neikirk, Professor Baker and Mr.

18    Parulski.

19         On the questions of non-infringement and invalidity,

20    Imperium's entire case rises and falls on Dr. Wright.  Dr.

21    Wright, someone who is doing his first patent analysis ever,

22    their whole case rests on him.  And in many ways the case

23    comes down to this:  Who do you believe?  Do you believe

24    Professor Neikirk or do you believe Dr. Wright?  Do you

25    believe Dr. Baker or do you believe Dr. Wright?  Do you

1    believe Mr. Parulski or do you believe Dr. Wright?

2         You get to make that call.  You get to consider what

3    they looked like on the witness stand.  You get to look at

4    the technical detail of their analysis.  You look at their

5    demeanor.  You get to decide who you believe, and I ask you

6    to think real hard about what you heard from the witness

7    stand from all of those people.

8         I ask you to compare and contrast the analyses.

9    Compare and contrast the presentations.  Samsung's expert

10   presented you with detailed, rigorous analyses.  They

11   actually testified.  Dr. Wright read slides.

12        Samsung's experts armed you with the evidence and the

13   technical information that you need to do your job.  I

14   submit to you that Dr. Wright's presentation was not

15   scientific testimony at all.  It was superficial.  Dr.

16   Wright simply told you what Imperium wants you to think.  He

17   did not give you -- unlike Samsung's experts, he did not

18   give you what you need to reach your own decision.  Ran you

19   through a slide show, trust me.

20        Judge Mazzant is going to give you some instructions on

21   how to evaluate witness testimony, and when he does, I ask

22   you to keep a couple things in mind.  Think about how Dr.

23   Wright responded when his opinions were challenged.  Think

24   about how Dr. Wright's testimony changed from before trial

25   to during trial, and let's take his testimony about the

65

1    image sensor as an example.

2         Remember counsel's eyes and brain drawing of the phone,

3    and when Dr. Wright was on the witness stand we asked him

4    about the concept of the eyes and brain.  You probably

5    remember that.  Let's see how he responded, because he said

6    this:  Just want to know your opinion, sir.  Is it your

7    opinion that you really don't need the eye or the image

8    sensor, so to speak, to practice the claims of the '029

9    patent?  For the preflash patents, that's a true statement,

10   sir.

11        And is it also your opinion that you don't need the eye

12   or the image sensor to practice the claims of the '884

13   patent?  Yes, sir, I agree with that too.

14        All right.  He said you don't need an image sensor to

15   practice these patents.  Does that sound right to you?

16        Let's look at what he said at a sworn deposition before

17   trial.  I read him his deposition testimony back to him.

18   Dr. Wright -- this is reading his deposition testimony back

19   to him under oath:  In your opinion is it necessary for a

20   product to have a digital imaging sensor in order for the

21   product to practice Claim 1 of the '029 patent?  Yes or no?

22   As I interpret Claim 1, you would need some sort of digital

23   imaging sensor.

24        Different testimony before trial and different

25   testimony after trial.

1       Then most importantly, someone there in the jury asked

2  him the reasonable question when you gave the written

3  questions.  Let's look at the jury question.  This is the

4  Judge reading the question of the jury.  This is the

5  information the jury wanted to know:  In your view, how can

6  a device without an image sensor infringe on Claim 1 of the

7  '029 patent?

8       That's the question I asked before trial.  Got one

9  answer.  That's the question I asked during trial.  Got a

10  different answer.  And now you asked the question.

11       Let's read the answer to ourselves.  I'll read it out

12  loud as you read it:  The procedure is what's defined in the

13  patent, and so it's the procedure that is dictated by the

14  claims.  The procedure itself doesn't say anything about an

15  image sensor.  That's sort of -- that's sort of off to the

16  side and that is providing information to these methods that

17  are described in the claim.  So it's -- I'm saying it's

18  highly likely but it's possible that you could have

19  something that doesn't have an image sensor that somehow or

20  other provides image data that you could still go through

21  the same methods.  It doesn't mean that this kind of product

22  that is likely, but I'm just saying what is defined

23  specifically by the claims isn't necessarily including an

24  image sensor.

25       I asked him before trial.  He said yes.  I asked him

1   during trial.  He said no.  You asked him.  He said maybe.

2   That's the best I can read out of it.

3        Think of that when you consider his other -- his other

4   testimony.  There's lots of examples.  I only have time for

5   a few.  Let's look at one more.

6        But before we get to the next example, think to

7   yourself, why is Dr. Wright trying so hard to run away from

8   image sensors?  You hear all about image sensors.  The image

9   sensors, the eyes and the brain, image sensors, image

10  processors.  Why are they trying so hard to run away from

11  image sensors?  Could it be that the prior art is loaded

12  with image sensors?  Maybe.

13       One more example.  Think about Dr. Wright's testimony

14  about the Toshiba reference.  Think of how he fought with

15  Mr. Pepe on cross examination.  He did not want to accept

16  the words that appear in the Toshiba patent.  He didn't want

17  to admit that Toshiba's interface circuit used single ended

18  or differential interfaces.  Remember that?  He started

19  saying, well, these are what the Japanese words were

20  translated into.  I'm not challenging the translation.  It's

21  just that when these words got translated, these are the

22  words that showed up.

23       Well, here are the words that showed up.  Let's flip

24  through them.  Interface circuit, interface circuit,

25  differential interface, single ended interface, interface

1   circuit, interface circuit, single ended interface,

2   differential interface, differential interface, single ended

3   interface, interface circuit.

4        Why did he fight so hard?  He's trying to defend

5   Imperium's position.  That's not science.  That's lawyering.

6        Think of how Imperium's witnesses -- think of how

7   Samsung's witnesses looked on the witness stand when they

8   were being cross-examined.  They didn't do stuff like that.

9   Can you imagine Professor Neikirk acting like that?  Can you

10  imagine Professor Baker acting like that?  Can you imagine

11  Mr. Parulski acting like that?  I can't.

12       Think about Dr. Wright's invalidity slide show on

13  Friday, 20 minutes, on and off.  Think about his

14  presentation.  There was no detail.  Ran through the slide

15  show, said what Imperium wanted to say and basically said

16  just trust me.  Well, that really is the question.  Do you

17  believe Professor Neikirk's analysis or Dr. Baker's

18  analysis, Mr. Parulski's analysis or do you believe the

19  slide show?

20       Let's move on to damages.  You don't reach damages if

21  you find no infringement.  You don't reach damages if you

22  find invalidity.  You don't reach willfulness if you find

23  infringement -- non-infringement or invalidity.  So I'm not

24  going to tell you how to fill out the jury form.  It's

25  pretty self-explanatory.  You'll figure it out yourself.

1    You don't reach these questions.

2        But it's interesting to see what kind of analysis

3    Imperium presented you with.  Remember this, Ms. Riley's

4    damages theory, her reference range.

5        I don't know if anyone is as old as me.  Remember the

6    board game Monopoly you played?  There was that card you

7    pulled, bank error in your favor.  At every instance Ms.

8    Riley encounters a bank error in her favor.  Every

9    assumption she makes tends to inflate the damages number,

10   tends to give a bigger number.  That's what Imperium wanted

11   her to do.

12       Start from the top, the profit.  Where did she start?

13   She started with division company-wide Samsung products

14   profit margin.  Not just component image sensors, not just

15   component image processors that are sold on a commodity

16   basis.  Finished products were included in there,

17   refrigerators sold abroad, washing machines sold abroad,

18   televisions sold abroad.  Much higher profit margins on the

19   finished products, so that elevated the profit margin.

20       Then this notion -- Mr. Jenner said, well, why wouldn't

21   you look at Sony or Omnivision profitability numbers on

22   these specific products, image sensors and image processors?

23   You heard this very diversionary argument.  Oh, it's ESS and

24   Samsung at the hypothetical negotiation.  Sony's not there.

25   Omnivision's not there.  That's a diversion.

1    This information, the profitability numbers for those

2 components, you can get them on the computer.  They're

3 publicly available.  They come right out of the securities

4 documents.  Those people sitting at the hypothetical

5 negotiation would know very well what a Sony image sensor

6 profit margin was, what Omnivision profit margin was.  You

7 can get it.  You can go to the library and get it.  You can

8 get it on the internet.  It's publicly available.  Any smart

9 people at a hypothetical negotiation would know that number.

10    No one would ever agree to that enormously high

11 starting point of profit margin.  It's just there to elevate

12 the number.

13    Left-hand side, the Blair/Blair agreement.  He drove a

14 real hard bargain with himself.  Ten percent, to me.  All

15 right.  That's not an arms length negotiation.  That's an

16 utterly invalid data point.  It disqualifies the whole

17 model.

18    Then on the other side there's another way to inflate

19 the number.  The 18.25 percent of camera quality or camera

20 resolution.  Well, these patents aren't directed at camera

21 resolution.  So Ms. Riley says we'll have a synonym, we'll

22 have image quality.  Well, that doesn't do it either.

23    Flicker reduction, using adjusting while maintaining,

24 particular interface circuit and preflash are a minute part

25 of image quality.  There's other things, white balance,

1    color saturation, pixels.  They're a minor part.  That --

2    that is another way to inflate it.

3        And the percentage numbers are not out of 100.  They're

4    out of 300, so it has to be divided by three to start.

5        This entire model is designed simply to get you a big

6    number.  Every assumption is wrong.  You can just disregard

7    it.  It's wrong.

8        Just to drive the point home, let's look at a couple of

9    other things.  There's a signature on the Blair/Blair

10   document that forms the left-hand side.  That's not an arms

11   length negotiation.

12       Next, here's the publicly available profit margin for

13   image sensors.  Anyone at the hypothetical negotiation could

14   have seen that.

15       Next.  Oh, now, here we get to this supposed legal

16   error that I made during opening statements.  I didn't.

17   Let's look.  Here are the 15 Georgia Pacific Factors that

18   Professor Perryman, Dr. Perryman talked about.  Look at

19   number two.  I'm not going to waste a lot of time, but the

20   rates, the comparable licenses, royalties received by the

21   patentee for licensing the patents-in-suit.

22       Nobody said that the exact royalty rates from the

23   previous lawsuit are the be-all and end-all, but they're

24   something that you consider.  They're something that

25   everyone uses as a check.

1      Dr. Perryman told you about something from a Supreme

2  Court case called the Book of Wisdom.  At the hypothetical

3  negotiation, you're allowed to look at things that happen

4  afterwards.  These settlement licenses happened afterwards.

5  They're absolutely something that you can consider.  And you

6  absolutely can consider the nature and scope of that

7  license, that there were 95 patent applications taken.

8  That -- that does give you some indication about the value

9  of the individual patents.  It's something you consider.

10 Right there in the Georgia Pacific Factors.

11     Read the Judge's instructions.  I welcome them.  Read

12 every word of them, please.  Read the claim construction.

13     Next slide.  This is -- Dr. Perryman's analysis is

14 based on real world data.  It's not a game of constructing a

15 model to get the highest number possible.  This is a real

16 XXXXXXXXXXX(Redacted pursuant to Court order)XXXXXXXXXXXXXXXX

17 Similar technology, similar field of technology.

18     You heard a lot of questions on cross examination on

19 XXXXXXXXXXXXX(Redacted pursuant to Court order)XXXXXXXXXXXX

20 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3       All those questions -- think of how many examples of

4   that you had throughout the trial.  Poor Mr. Melfi getting

5   thrown out of a job.  These are -- Apple and Samsung sue

6   each other.  These are not things that help you discharge

7   your oath to answer the Judge's questions.  You've got to --

8   you've got to figure out how to do an infringement analysis,

9   how to do a validity analysis and how to figure out damages.

10      Get rid of that stuff.  Focus on what matters, and

11  we're trying to help you do that.

12      Next.

13          THE CLERK:  Mr. Harnett, four minutes.

14          MR. HARNETT:  Four minutes, and I can finish in four

15  minutes.

16      I'll go through this quickly because you remember Dr.

17  Perryman's -- you remember Dr. Perryman's analysis.  He

18  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21  be a non-exclusive license.  Those other seven people had

22  licenses.

23      Next.  Using those adjustments, he comes up with

24  reasonable royalty rates.

25      Next.  Here's the number he comes up with,

1    $2.5 million, if and only if you find infringement and

2    validity.

3         And one other thing you've got to remember.  You have

4    to decide that on a patent by patent and product by product

5    basis.  Just because -- if you find that one product, like

6    the Epic 4G Touch infringes, that doesn't mean they all do.

7    If you find that the Epic 4G Touch infringes the '884

8    patent, that doesn't mean anything about the '029 or the

9    '290.

10        You have to do the hard work.  We gave you the tools to

11   help you do it.  We're not just saying listen to our slide

12   show and trust us.

13        Now, you know that Imperium is going to get up here for

14   another 15 minutes and talk to you.  I don't -- because of

15   the procedural rules, I don't get to talk to you again.

16        When you're listening to Imperium's last remarks, I'm

17   going to ask you to keep a couple things in mind.  Keep the

18   evidence in mind.  Think about what I would say if I got an

19   opportunity to get up here and talk to you again after

20   Imperium did.  And think about how many of the points that I

21   raised, the technical points, are going completely

22   unaddressed.

23        Again, thanks very much.  We're giving you a lot of

24   hard work to do.  The Judge is giving you a lot of hard work

25   to do.  It's not a matter of listen to a slide show and

1    trust me.  You really have to do this.

2         It's a very important case for Samsung.  Samsung is

3    putting its trust in you to do it.

4         Thank you for your attention.  You really were a

5    diligent jury, we saw from the note-taking, the astute

6    questions.  I know you're going to discharge your duty and

7    do your job the right way.

8         Samsung thanks you.  I thank you.  My legal team thanks

9    you.  Thank you very much.

10              THE COURT:  Thank you, Mr. Harnett.

11        For Imperium, Mr. Fisch, you want to close the

12   argument.

13              MR. FISCH:  Thank you, Your Honor.

14        Ladies and gentlemen, we just heard a lot of personal

15   attacks, attacks on people who have come in here, sworn an

16   oath.

17        I think the core difference, as I've said all along,

18   between Dr. Wright and the other experts you've heard from

19   is that Dr. Wright had all of the evidence.

20        We didn't hear Samsung say that their experts were

21   given PX-66.  PX-66 was not provided to them.  He just

22   brushed it off.  Well, maybe they didn't have it.  But it

23   does matter.  The evidence does matter.  And without this

24   document, you can't reach the right conclusion.

25        Anger isn't evidence, ladies and gentlemen.  This stuff

1    is.  This is the evidence, and without it, you can't get to

2    the right decision.

3        The same is true with PX-22.  Again, we've heard a lot

4    of attacks on Dr. Wright and we heard just a quick gloss

5    over the fact that the expert didn't have this.  He didn't

6    show this to you, ladies and gentlemen.

7        This is the evidence.  Anger isn't evidence.

8        Dr. Wright is sitting right here, ladies and gentlemen,

9    here to look you all in the eye, to face you at the end of

10   this trial.  I don't see any of their other experts here,

11   ladies and gentlemen, not a one.

12       Dr. Wright put forth the only assessment in this entire

13   case that included all of the evidence, all of it, and

14   that's how he reached his conclusions.

15       So the choice between experts is a simple one:  People

16   who looked at all of the evidence, or people who looked at

17   the evidence that was provided to them, spoon fed by their

18   lawyers.

19       Dr. Wright looked at all of that evidence.  He reached

20   these conclusions.  He shared that evidence with each of

21   you.  He provided the information and addressed each of

22   these invalidity positions that were just put forth.

23       The technical arguments we heard raced through on the

24   boards, Dr. Wright responded to every one of those on

25   Friday.  He addressed every issue.  The look-up table, that

1   one, for example, he identified that they didn't use a

2   picture in the other patent but they had used words to

3   describe it.  As soon as he mentioned that to the other

4   lawyer -- I know you noticed -- they moved on to another

5   patent right away.

6        Dr. Wright has all of the evidence and now you do too.

7   Dr. Wright and each of you are the only people with all of

8   the evidence.

9        There has been some evidence misrepresentation.  For

10  example, the contract between Imperium and -- between ESS

11  and Samsung for $2 million, that isn't a loan, ladies and

12  gentlemen.  That's a prepaid sales order.  That's what that

13  is.  Prepayment of $2 million against product to be

14  delivered later.  We know that's not a loan.  That's a sale,

15  and there's a far, far big difference between the two.

16       To come up here and represent that as a loan when it's

17  not gives you an indication of exactly what Judge Mazzant

18  sensed when he said, ladies and gentlemen, that Samsung in

19  fact had testimony not worthy of belief.  Not worthy of

20  belief, ladies and gentlemen.

21       I understand that this is an important case for

22  Samsung, and maybe that's what motivated something like

23  this.  But the facts are the facts.

24       And it's an important case for Imperium too, ladies and

25  gentlemen.  As I said, this has gone on for 12 years.

1    Imperium has tried everything it could short of being here

2    today, but it finds itself here today because even now

3    Samsung still won't do the right thing.  They still haven't

4    brought you the evidence.

5        Again, I didn't hear about a single person at Samsung

6    who has come in here and said they didn't have that

7    information.  Their lawyer misrepresented that Mr. Melfi was

8    saying that Samsung was given the source code.  In fact, it

9    was the opposite.  He testified about that.  That's where

10   they drew the line.  That's where they drew the line.  They

11   stopped when there was the request for the secret sauce.

12   But by then Samsung had almost everything they needed from

13   ESS anyway.  So that's another misrepresentation.

14       And, ladies and gentlemen, we heard something that I

15   would like to leave you with as a final thought.  We heard

16   over and over again of Samsung boasting of its patents.  We

17   heard in the opening thousands of patents.  We heard by

18   Samsung's witness that they have thousands of patents.  We

19   just heard again that they have thousands of patents.

20       How many patents from Samsung did you see in this

21   entire case, ladies and gentlemen?  None.  No patents.  Now,

22   I didn't need to see the 5,000 patents.  I didn't need to

23   see the 1,000 patents.  What I would have enjoyed seeing

24   were just three patents, ladies and gentlemen.  I would have

25   enjoyed seeing their interface patent.  I would have enjoyed

1    seeing their preflash patent.  I would have enjoyed seeing

2    their anti-flicker patent.  But the only three of those

3    types of patents we saw in this entire case, those belong to

4    Imperium and those are being infringed by Samsung.

5        In just moments, ladies and gentlemen, you'll hear some

6    more instructions from Judge Mazzant.  After that, you'll

7    begin the process of deliberation.  You'll begin the process

8    of allowing your voice in this case, as I said, to be heard.

9        The world is watching.  You get to make the

10   determination as to whether business should be conducted the

11   way Samsung has done it.  You get to make the determination

12   as to whether this type of trespass should be allowed or

13   not.  You get to make the determination as to whether might

14   makes right.  Ultimately, ladies and gentlemen, you are the

15   final decision makers.

16       It is up to you to decide, and as you contemplate that

17   decision, one thing you must know is that this is the only

18   place that Imperium can recover.  There is nowhere else.

19   This is it.  And if it doesn't happen here, ladies and

20   gentlemen, then everything that Samsung just did, it's like

21   it never happened.  There's nowhere else to go.

22       So with that, ladies and gentlemen, I want to say a

23   final thank you.  Thank you for your time.  Thank you for

24   your attention.  And on behalf of everybody at Imperium, I

25   want to thank you all for your service as jurors in this

1    most important trial.  Thank you.

2         Your Honor, I have concluded.

3              THE COURT:  Thank you, Mr. Fisch.

4         Ladies and gentlemen, at this time if you want to stand

5    and stretch, I'm going to go ahead and have a copy of my

6    instructions given to you.  So I'll have my lawyer hand

7    those out to you, but if you want to stand and stretch -- I

8    have to read these to you, but if you want to stand and

9    stretch right now, you're welcome to do so before I start.

10   That goes to anybody in the courtroom.  If you want to stand

11   and stretch, go ahead.

12                   (Pause in proceedings.)

13              THE COURT:  Everyone please be seated.

14        Ladies and gentlemen, the law requires me to actually

15   read these to you so you can follow along or just listen to

16   me.  You have to listen to me either way, but I give them to

17   you so you can follow along if you like, but I am required

18   to read these.

19        Members of the jury, it is my duty and responsibility

20   to instruct you on the law that you are to apply in this

21   case.  The law contained in these instructions is the only

22   law you must follow.  It is your duty to follow what I

23   instruct you the law is, regardless of any opinion you might

24   have as to what the law ought to be.

25        If I have given you the impression during the trial

1    that I favor either party, you must disregard that

2    impression.  If I have given you the impression during the

3    trial that I have an opinion about the facts of the case,

4    you must disregard that impression.

5         You are the sole judges of the facts of this case.

6    Other than my instructions as to the law, you should

7    disregard anything that I have said or done during the trial

8    in arriving at your verdict.

9         You should consider all the instructions about the law

10   as a whole and regard each instruction in light of the

11   others, without isolating a particular statement or

12   paragraph.

13        The testimony of a witness -- of the witnesses and

14   other exhibits introduced by the parties constitute the

15   evidence.  The statements of counsel are not evidence.  They

16   are only arguments.  It is important for you to distinguish

17   between the arguments of counsel and the evidence from which

18   those arguments rest.  What the lawyers say or do is not

19   evidence.  You may, however, consider their arguments in

20   light of the evidence that has been admitted and

21   determined -- and determine whether the evidence admitted in

22   this trial supports the arguments.

23        You must determine the facts from all the testimony

24   that you have heard and other evidence submitted.  You are

25   the judges of the facts, but in finding those facts, you

1    must apply the law as I instruct you.

2         You are required by law to decide the case in a fair,

3    impartial and unbiased manner, based entirely on the law and

4    on the evidence presented to you in the courtroom.  You may

5    not be influenced by the passion, prejudice or sympathy you

6    may have for Plaintiff or the Defendant in arriving at your

7    verdict.

8         Now, the Plaintiff, Imperium IP Holdings (Cayman),

9    Limited, or as we've been referring to them, Imperium, has

10   the burden of proving infringement and damages by a

11   preponderance of the evidence.  To establish by a

12   preponderance of the evidence means to prove something is

13   more likely so than not.

14        If you find that Imperium has failed to prove any

15   element of its claim by a preponderance of the evidence,

16   then it may not recover in that claim.

17        To prove invalidity of any claim, Defendant Samsung

18   Electronics Company, Limited, Samsung Electronics America,

19   Inc. and Samsung Semiconductor, Inc., or as we've been

20   referring to them, Samsung, must persuade you by clear and

21   convincing evidence that the claim is invalid.  Proving a

22   claim or defense by clear and convincing evidence means it

23   is highly probable that the facts are as the party contends.

24        If you find the patents are valid and infringed, you

25   will need to consider Imperium's contention that Samsung's

1   infringement was willful.  Imperium bears the burden of

2   proving willfulness by clear and convincing evidence.

3       These standards are different than what you have heard

4   in criminal proceedings where a fact must be proven beyond a

5   reasonable doubt.  On a scale, these various statements of

6   proof as you move from preponderance of the evidence where

7   the proof need only be sufficient to tip the scale in favor

8   of a party proving the fact to beyond a reasonable doubt

9   where the fact must be proven to a very high degree of

10  certainty, you may think of clear and convincing evidence as

11  being between the two standards.

12      Now, the evidence you are to consider consists of the

13  testimony of the witnesses, the documents and other exhibits

14  admitted into evidence and any fair inferences and

15  reasonable conclusions you can draw from the facts and

16  circumstances that have been proven.

17      Generally speaking, there are two types of evidence.

18  One is direct evidence, such as the testimony of an eye

19  witness.  The other is indirect or circumstantial evidence.

20  Circumstantial evidence is evidence that proves the facts --

21  proves a fact from which you can logically conclude another

22  fact exists.

23      As a general rule, the law makes no distinction between

24  direct and circumstantial evidence but simply requires you

25  find the facts from a preponderance of all the evidence or

84

1    by clear and convincing evidence, both direct and

2    circumstantial.

3         Now, certain charts and summaries have been shown to

4    you solely to help explain or summarize the facts disclosed

5    by the books, records and other documents that are in

6    evidence.  These charts and summaries are not evidence or

7    proof of any facts.  You should determine the facts from the

8    evidence.

9         Now, some exhibits have been presented to you as

10   illustrations.  Demonstrative evidence can be used to

11   describe something involved in this trial, but it is not

12   itself evidence.  If your recollection of the evidence

13   differs from the exhibit, rely on your recollection.

14        Now, you alone are to decide or determine the questions

15   of credibility or truthfulness of the witnesses.  In

16   weighing the testimony of the witnesses, you may consider

17   the witness's manner and demeanor on the witness stand, any

18   feelings or interest in the case, or any prejudice or bias

19   about the case that he or she may have, and the consistency

20   or inconsistency of his or her testimony, considered in

21   light of the circumstances.

22        Has the witness been contradicted by other credible

23   evidence?  Has he or she made statements at other times and

24   places contrary to those made here on the witness stand?

25        You must give the testimony of each witness the

1    credibility you think it deserves.  Even though a witness

2    may be a party to an action and, therefore, interested in

3    its outcome, the testimony may be accepted if it is not

4    contradicted by direct evidence or by any inference that may

5    be drawn from the evidence, if you believe the testimony.

6        You are not to decide to case by counting the number of

7    witnesses who have testified on the opposing sides.

8    Witnesses' testimony is weighed.  Witnesses are not counted.

9    The test is not the relative number of witnesses, but the

10   relative convincing force of the evidence.

11       The testimony of a single witness is sufficient to

12   prove any fact, even if a greater number of witnesses

13   testified to the contrary, if, after considering all the

14   other evidence, you believe that witness.

15       Now, when knowledge of a technical subject matter

16   may be helpful to the jury, a person who has special

17   training or experience in a technical field is permitted to

18   state his or her opinion on those technical matters.

19   However, you are not required to accept that opinion.  As

20   with other witnesses, it is up to you to decide whether to

21   rely upon it.

22       Now, as I told you in my preliminary instructions, I

23   have given you the opportunity to give me written questions

24   anonymously after a witness testified when you had an

25   important question of the witness that was strictly limited

1    to the substance of the witness's testimony.

2         Remember that I asked that you not be offended if I did

3    not present your question to be answered by the witness.

4    You should not speculate on the answer to any unasked

5    question and you should not speculate or consider any facts

6    or events outside the testimony and exhibits that you have

7    heard and seen here in the courtroom.

8         Now, when testimony or an exhibit is admitted for a

9    limited purpose, you may consider that testimony or exhibit

10   only for the specific limited purpose for which it was

11   admitted.

12        Now, in determining the weight to give to the testimony

13   of a witness, consider whether there was evidence that at

14   some other time the witness said or did something or failed

15   to say or do something that was different from the testimony

16   given at trial.

17        A simple mistake by a witness does not necessarily mean

18   that the witness did not tell the truth as he or she

19   remembers it.  People may forget some things or remember

20   other things inaccurately.  If a witness made a

21   misstatement, consider whether that misstatement was an

22   intentional falsehood or simply an innocent mistake.

23        The significance of that may depend on whether or not

24   it has to do with an important fact or an unimportant

25   detail.

1          A corporation may act through natural persons or its

2    agents or employees.   Generally, any agent or employee of a

3    corporation may bind the corporation by their acts and

4    declarations made while acting within the scope of their

5    authority delegated to them by the corporation or

6    partnership, or within the scope of their duties as

7    employees of the corporation or partnership.

8          Stipulations of fact.   A stipulation is an agreement.

9    When there is no dispute about certain facts, the attorneys

10   may agree or stipulate to those facts.   You must accept a

11   stipulated fact as evidence and treat that fact as having

12   been proven here in court.

13         Here the parties have stipulated to the following:

14         1.   The Plaintiff Imperium IP Holdings (Cayman),

15   Limited is the owner of the patents-in-suit.

16         2.   The Plaintiff Imperium IP Holdings (Cayman),

17   Limited is incorporated in the Cayman Islands with its

18   principal place of business in New York.

19         3.   Defendant Samsung Electronics Company, Limited is a

20   South Korean company with its principal place of business at

21   the address there in Korea.

22         I'm not pronouncing that because I would mess up the

23   pronunciation, so I want to do no disservice to anyone in

24   the case.

25         4.   The Defendant Samsung Electronics Company is a

1  subsidiary of Samsung Electronics Company, Limited and is a

2  corporation organized and existing under the laws of the

3  State of New York with its principal place of business in

4  New Jersey.

5       5.   Defendant Samsung Semiconductor, Inc. is an

6  indirect subsidiary of Samsung Electronics Company, Limited

7  and is a California company with its principal place of

8  business in California.

9       6.   That on August 6, 2001 the United States Patent and

10  Trademark Office issued United States Patent No. 6,271,884

11  entitled "image flicker reduction with fluorescent

12  lighting".

13       7.   That the named inventors of the '884 patent are

14  Randall M. Chung, I guess Magued Bishay and Joshua Ian Pine.

15       8.   On December 28, 2004 the United States Patent and

16  Trademark Office issued U.S. Patent No. 6,836,290, which is

17  entitled the "combined single-ended and differential

18  signaling interface".

19       9.   The named inventors of the '290 patent are Randall

20  Chung, Ferry Gunawan and Dino Trotta.

21       10.  On August 15th, 2006, the United States Patent and

22  Trademark Office issued United States Patent No. 7,092,029

23  entitled the "strobe lighting system for digital images".

24       11.  The named inventors on the '029 are Robert Medwick

25  and Glenn Stark.

1    Now I want to go over the summary of the contentions of

2 the parties.  As I did at the start of the trial, I'll give

3 you a summary of each side's contentions in this case.

4 I will then provide you with detailed instructions on what

5 each side must prove to win on each of its contentions.

6    The Plaintiff in this case is Imperium IP Holdings

7 (Cayman), Limited, often referred to here simply as

8 Plaintiff or Imperium.  The Defendants in this case are

9 Samsung Electronics Company, Limited, Samsung Electronics

10 America, Inc. and Samsung Semiconductor, Inc., often

11 referred to simply as the Defendants or Samsung.

12    The patents involved in this case are U.S. Patent No.

13 6,271,884, referred to in shorthand as the '884 patent;

14 United States Patent No. 6,836,290, referred to in shorthand

15 as the '290 patent; and U.S. Patent No. 7,092,029, referred

16 to in shorthand as the '029 patent.

17    These patents were referred to as the asserted patents,

18 the patents at issue or the patents-in-suit.

19    The patent claims at issue in the '884 patent are the

20 following claims:  Claims 1, 5, 6, 14 and 17.

21    The patent claim at issue in the '290 patent is Claim

22 10.

23    The patent claims at issue in the '029 patent are the

24 following:  Claims 1, 6 and 7.

25    Imperium asserts that Samsung infringes Claims 1, 5, 6,

1   14 and 17 of the '884 patent, Claim 10 of the '290 patent

2   and Claims 1, 6 and 7 of the '029 patent.

3        Imperium seeks damages from Samsung for allegedly

4   infringing the patents at issue.  Imperium asserts Samsung

5   knowingly and willfully infringed one or more of these

6   patents.

7        The products that are alleged to infringe one or more

8   of the patents-in-suit are certain Samsung products that

9   have cameras, namely, tablets, phones, computers and digital

10  cameras.  They may be referred to simply as the accused

11  products.

12       Samsung denies it has infringed or infringes the

13  asserted claims of the patents-in-suit.

14       Now, those are the positions of the parties that are

15  here before you today.  Your job is to decide which, if any,

16  of the asserted claims have been infringed and which, if

17  any, of those claims are invalid.

18       If you decide that any claims are infringed and not

19  invalid and determine any money damages that should be

20  awarded to Imperium to compensate it for any infringement

21  that you find, then you must consider whether Samsung's

22  infringement was willful.

23       It is my job as the judge to determine the meaning of

24  any claim language from these patents that need

25  interpretation.  You must accept the meanings that I give

1    you and you use them when you decide whether any claim is

2    infringed.

3          In your notebook you have been provided with a copy of

4    the meanings that I have adopted for certain claim terms.

5          Now the claims of the patent.  Before you can decide

6    whether any of the issues -- before you can decide any of

7    the issues in this case, you will need to understand the

8    role of the patent claims.  The patent claims are the

9    numbered sentences at the end of each patent.  The claims

10   are important because it is the words of the claims that

11   define what the patent covers.  The figures and text in the

12   rest of the patent provides a description and/or examples of

13   the invention and provides a context for the claims, but it

14   is the claims that define the breadth of the patent's

15   coverage.  Each claim is effectively treated as if it were a

16   separate claim, and each claim may cover more or less --

17   each claim may cover more or less than another claim.

18   Therefore, what a patent covered depends in turn --

19          Let me read that again.

20          Therefore, what a patent claim covered depends in turn

21   on what each of the claims cover.

22          The patents at issue in this case have been provided

23   you in your jury notebooks.  Remember that certain claims of

24   the three patents are at issue.  Do not attempt to determine

25   infringement or invalidity with respect to any other claim

1  included in the patents-in-suit.

2      The claims are usually divided into parts or steps

3  called limitations or elements.  When a thing such as a

4  product or process meets all the requirements of a claim,

5  the claim is said to cover that thing and that thing is said

6  to fall within the scope of that claim.

7      In other words, a claim covers a product or process

8  where each of the claim elements or limitations is present

9  in that product or process.

10     For example, a claim that covers the invention of a

11  table may recite the table top, four legs, the glue that

12  secures the legs to the table top.  In this example, the

13  table top, the legs and the glue are each a separate

14  limitation or element of the claim.

15     Now claim interpretation.  You will first need to

16  understand what each claim covers in order to decide whether

17  or not there is infringement of the claim and decide whether

18  or not the claim is invalid.  Sometimes the words in the

19  patent claim are difficult to understand, and therefore, it

20  is difficult to understand what requirements these words

21  impose.

22     The law says it is my role to define the terms of the

23  claims and it is your role to apply my definitions to the

24  issues you are asked to decide in this case.  Therefore, as

25  I explained to you at the start of the case, I have

1    determined the meaning of the claims and I will provide you

2    my definition of certain claim terms.

3        You must accept my definitions of these words in the

4    claims as being correct.  By understanding the meaning of

5    the words in a claim and by understanding the words in the

6    claim set forth the requirements that a product or process

7    must meet in order to be covered by that claim, you will be

8    able to understand the scope of the coverage for each claim.

9        Once you understand what each claim covers, then

10   you are prepared to decide the issues that you'll be asked

11   to decide, such as infringement and invalidity.

12       For any words in the claim for which I have not

13   provided you with a definition, you should apply its

14   ordinary and customary meaning as understood by one of

15   ordinary skill in the art.

16       You shall not take my definition of the language of the

17   claims as any indication that I have a view regarding how

18   you should decide the issues that you are being asked to

19   decide, such as infringement and invalidity.  These issues

20   are for you to decide.  My interpretation of the various

21   claim terms and phrases appears in your jury notebook and

22   I will also read them to you now.

23       For the '884 patent, Claims 1, 5, 6, 14 and 17, the

24   preamble of Claims 1 and 14 are not limiting.

25       As to Claim 1, "adjusting the overall system gain by

1  adjusting the integration time" means "adjusting the overall

2  system gain by an amount as close to the determined amount

3  as can be accomplished by adjusting the integration time".

4  "Integration time" as set forth in Claims 1 and 14

5  means "the amount of time that a pixel is allowed to gather

6  light before that pixel is read".

7  "Overall system gain" for Claims 1 and 14 mean "the

8  ratio of the output signal of the entire system to the input

9  signal to the entire system".

10  And "gamma correction" as to Claim 17, this term should

11  be given its plain meaning.

12  As for the '290 patent for Claims 1, 6 and 7, claim --

13  "a preparatory light for a predetermined preparatory

14  duration" for Claims 1 and 7 means "preparatory light

15  emitted for an amount of time that is determined before

16  emitting the light".

17  A "preparatory image" for Claims 1 and 7 mean this

18  should be given its plain meaning.

19  "Average image luminance" in Claim 6 means "average

20  preparatory image luminance".

21  And "generating a supplemental strobe duration" or

22  "supplemental strobe duration stored in the memory as

23  generated" for Claims 1 and 7 should be given its plain

24  meaning.

25  For the '029 patent the claim term "single-ended

1   interface" for Claim 10 means "interface that uses a single

2   line to communicate a signal".

3       "Differential interface" in Claim 10 means "interface

4   that uses two lines to communicate a signal".

5       The claim term "wherein an output of data interface

6   circuit is selectable between a single-ended interface

7   output and a differential interface output" for Claim 10

8   should be given its plain meaning.

9       The "sensor having a data interface circuit" for Claim

10  10 means a CMOS image sensor has a circuit that communicates

11  image data signals with the understanding that the data

12  interface circuit need not be restricted to communicating

13  only data image -- image data.  Excuse me.

14      Finally, "an image processor connected to the CMOS

15  image sensor to receive the signals output by a data

16  interface circuit" for Claim 10 means "a process connected

17  to the CMOS image sensor for processing image and data

18  received from a single-ended and differential interfaces".

19      Now independent and dependent claims.  This case

20  involves two types of patent claims:  Independent claims and

21  dependent claims.  An independent claim sets forth all the

22  requirements that must be met in order to be covered by that

23  claim.  Thus, it is not necessary to look at any other claim

24  to determine what an independent claim covers.

25      In this claim -- in this case, Claims 1 and 14 of the

1  '884 patent, Claim 10 of the '290 patent and Claims 1 and 7

2  of the '029 patent are independent claims.

3      A dependent claim does not itself recite all the

4  requirements of the claim, but refers to another claim for

5  some of its requirements.  In this way the claim depends on

6  another claim.

7      A dependent claim incorporates all the requirements of

8  the claim to which it refers.  The dependent claim then adds

9  its own additional requirements.

10      To determine what a dependent claim covers, it is

11  necessary to look at both the dependent claim and the

12  independent claim to which it refers.  For example, Claims 5

13  and 6 of the '884 patent are dependent claims that depend on

14  independent Claim 1 of the '884 patent.

15      If you find that the independent claim is not

16  infringed, then you must also find that its dependent claims

17  are not infringed.

18      If you find an independent claim is infringed, you must

19  further decide whether its dependent claims are also

20  infringed.

21      Now, a claim may be literally infringed.  I will now

22  instruct you on the specific rules you must follow to

23  determine whether Imperium has proven that Samsung has

24  infringed one or more of the patent claims involved in this

25  case.

1      Literal infringement.  You must decide whether Samsung

2  has made, used or sold or offered for sale within the United

3  States or imported into the United States a product covered

4  by any of the asserted claims of the '884 patent, '290

5  patent and the '029 patent.

6      You must compare each claim to Samsung's product to

7  whether every requirement of the claim is included in the

8  accused product.

9      To prove literal infringement, Imperium must prove that

10  it is more probable than not that Samsung's products

11  includes every requirement in patents -- in Imperium's

12  patent claim.

13      If Samsung's products omit any requirement recited in

14  Imperium's patent claim, Samsung does not infringe that

15  claim.

16      Now, Imperium has asserted method claims.  To prove

17  infringement of method claims, Imperium needs to show that

18  every step of the method is practiced in the United States.

19  A claimed invention is met if it exists in the accused

20  product as it is described in the claim language, either as

21  I have explained that language to you, or if I did not

22  explain it, as it would be understood by one of ordinary

23  skill in the art.

24      You must determine separately for each asserted claim

25  whether or not there is infringement.  There is one

1   exception to the rule.  If you find that a claim on which

2   other claims depend is not infringed, you cannot -- there

3   cannot be infringement for any dependent claim that refers

4   directly or indirectly to that independent claim.

5        On the other hand, if you find an independent claim has

6   been infringed, you must still decide separately whether the

7   process meets additional requirements of any claims that

8   depend from the independent claim, thus, whether those

9   claims have been infringed.

10       A dependent claim includes all the requirements of any

11  of the claims to which it refers, plus additional

12  requirements of its own.

13       For literal infringement, Imperium is not required to

14  prove Samsung intended to infringe or knew of the patent.

15       Indirect infringement or induced infringement.

16  Imperium alleges Samsung induced infringement of certain

17  claims of the '884 and '029 patents.  A party induces patent

18  infringement if it purposely causes, urges or encourages

19  others to infringe the claims of the patent.  Inducing

20  infringement cannot occur unintentionally.  This is

21  different from direct infringement which can occur

22  unintentionally.

23       And with direct infringement, you must determine

24  whether there has been active inducement on a claim by claim

25  basis.  To prove that Samsung induced patent infringement,

1   Imperium must prove that it is more probable than not that:

2       1.   Users of accused Samsung products directly infringe

3   an asserted claim.

4       2.   Samsung took actions during the time the

5   patents-in-suit were in force, intending to cause the

6   infringing acts by users of the accused Samsung products.

7       3.   Samsung was aware of the patents-in-suit and knew

8   that the acts, if taken, would constitute infringement of

9   that patent, or that Samsung believed there was a high

10  probability that the acts by users of the accused Samsung

11  products and services would infringe a patent of Imperium

12  and took deliberate steps to avoid learning of that

13  infringement.

14      In order to establish active inducement of

15  infringement, it is not sufficient that the end-user itself

16  directly infringes the claims, nor is it sufficient that

17  Samsung was aware of the acts by the end-user that allegedly

18  constitutes the direct infringement.  Rather, you must find

19  that Samsung specifically intended the end-user to infringe

20  the patents-in-suit, or that Samsung believed there was a

21  high probability that users of the accused products and

22  services would infringe the patents-in-suit but deliberately

23  avoided learning of the infringing nature of the acts of the

24  users of Samsung products and services.

25      Willful infringement.  In this case Imperium contends

1    that Samsung infringed the asserted claims of the '884, '290

2    and '029 patents, and further, that Samsung infringed

3    willfully.  If you find that Samsung infringed the asserted

4    claims of the patents-in-suit, then you must also go on to

5    address the additional issue of whether or not this

6    infringement was willful.

7         Willfulness requires you to determine by clear and

8    convincing evidence that Samsung acted recklessly.  To prove

9    that Samsung acted recklessly, Imperium must persuade you

10   that Samsung actually knew of the risk of infringement or

11   that the risk of infringement was so clear from the

12   circumstances that Samsung should have known of the risk.

13        To determine whether Samsung had the state of mind,

14   consider all the facts, which may include but are not

15   limited to:

16        1.  Whether or not Samsung acted in accordance with the

17   standards of commerce for its industry.

18        2.  Whether or not Samsung intentionally copied a

19   product that is covered by the patents-in-suit.

20        3.  Whether or not there is a reasonable basis to

21   believe that Samsung did not infringe or had a reasonable

22   defense to infringement.

23        4.  Whether or not Samsung made a good faith effort to

24   avoid infringing the patents-in-suit.  For example, whether

25   Samsung attempted to design around the patents.

1    5.  Whether or not Samsung tried to cover up its

2 infringement.

3    Invalidity.  Patent invalidity is a defense to patent

4 infringement.  Even though the PTO Examiner has allowed the

5 claims of the patent, you have the ultimate responsibility

6 for deciding whether the claims of the patent are valid.

7    I will now instruct you on the invalidity issues you

8 should consider.  As you consider these issues, remember

9 that Samsung bears the burden of proving by clear and

10 convincing evidence that the claims are invalid.

11    A person of ordinary skill in the art.  The question of

12 invalidity of a patent claim is determined from the

13 perspective of a person of ordinary skill in the art in the

14 field of the asserted invention as of 1999 when considering

15 the '884 patent and '290 patent.  As of --

16    Okay.  Let me read that again.  Let me just read that

17 sentence again.  Excuse me.

18    The question of invalidity of a patent is determined

19 from the perspective of a person of ordinary skill in the

20 art in the field of the asserted invention as of 1999 when

21 considering the '884 and the '290 patent and as of 2000 when

22 considering the '029 patent.

23    You must determine the level of ordinary skill in the

24 field of the invention.  The higher the level of ordinary

25 skill, the easier it may be to establish that an invention

1  would have been obvious.  Persons that have a greater level

2  of education, training or experience in the field will more

3  readily appreciate technical details that may be more

4  challenging for persons having a lower level of skill.

5      On the other hand, persons having a lower level of

6  skill may not perceive as obvious technical details that

7  would be apparent to persons having greater skill.

8      In order to determine the obviousness of an invention,

9  you will be asked to determine whether the ordinary level of

10  skill was in the field of the invention.

11      Regardless whether you decide to articulate in your

12  verdict what you believe was the level of ordinary skill in

13  the field of the invention, you must consider and assess

14  this factor before reaching your conclusion in this case.

15      Prior art.  Prior art includes any of the following

16  items received into evidence during the trial.

17      1. Any product that was publicly known or used by

18  others in the United States before the patented invention

19  was made.

20      2.  Patents that issued more than one year before the

21  filing of the date of the patent or before the invention was

22  made.

23      3.  Publications including foreign patent applications

24  having a date more than one year before the filing of the

25  date of the patent or before the invention was made.

1       4.  Any product that was in public use or on sale in

2   the United States more than one year before the patent was

3   filed.

4       5.  Any product that was made by anyone before the

5   named inventors created the patented product or the product

6   was not abandoned, suppressed or concealed.

7       Regardless of whether particular prior art references

8   was or were considered by the United States Patent and

9   Trademark Office Examiner during the prosecution of the

10  application, which matured into the patents-in-suit, Samsung

11  must prove that the challenged claims are invalid.  Samsung

12  must do so by clear and convincing evidence.  The burden of

13  proof on Samsung never changes, regardless of whether or not

14  the Examiner considered the reference.

15      Anticipation.  If a device or process has been

16  previously invented or disclosed to the public, then it is

17  not new and, therefore, the claimed invention is considered

18  anticipated by the prior invention.  Simply put, an

19  invention must be new to be entitled to patent protection

20  under the U.S. patent laws.

21      To prove anticipation, Samsung must prove by clear and

22  convincing evidence, namely, evidence that leaves you with a

23  clear conviction that the claimed invention is not new.

24      To anticipate a claim, each and every element in the

25  claim must be present in a single item of prior art and

1    arranged or combined in the same way as recited in the

2    claims.

3         You may not combine two or more items of prior art to

4    find anticipation.  In addition, Samsung must prove by clear

5    and convincing evidence that a single item of prior art must

6    enable one of ordinary skill in the art to make the

7    invention without undue experimentation.

8         In determining whether every one of the elements of a

9    claimed invention is found in the prior art, you should take

10   into account what a person of ordinary skill in the art

11   would have understood from his or her review of the

12   particular piece of art.

13        Obviousness.  Even though an invention may not have

14   been identically disclosed or described before it was made

15   by the inventor, in order to be patentable, the invention

16   must also not have been obvious to a person of ordinary

17   skill in the field of technology of the patent at the time

18   the invention was made.

19        Samsung must establish that a patent claim -- I'm

20   sorry.  Samsung may establish that a patent claim is invalid

21   by showing clear and convincing evidence that the claimed

22   invention would have been obvious to persons having ordinary

23   skill in the art at the time the invention was made.

24        In determining whether a claimed invention is obvious,

25   you must consider the level of ordinary skill in the field

of the invention that someone would have had at the time the

claimed invention was made, the scope and content of the

prior art, and any differences between the prior art and the

claimed invention.

Keep in mind that the existence of each and every

element of the claimed invention in the prior art does not

necessarily prove obviousness.  Most, if not all, inventions

rely on building blocks of prior art.

In considering whether a claimed invention is obvious,

you should consider whether at the time of the claimed

invention, there was a reason that would have prompted a

person having ordinary skill in the art to combine the known

elements in a way that the claimed invention does, taking

into account such factors as (1) whether the claimed

invention was merely the predictable result of using prior

art elements according to their known functions; (2) whether

the claimed invention provides an obvious solution to a

known problem in the relevant field; (3) whether the prior

art teaches or suggests the desirability of combining

elements combined in the invention; (4) whether the prior

art teaches away from combining elements in the claimed

invention; (5) whether it must have been obvious to try the

combination of elements such as when there is a design need

or market pressure to solve a problem that there's a finite

number of identified predictable solutions; and (6) whether

1    the change resulted more from design incentives or other

2    market sources.

3        To find it is rendered -- to find it rendered the

4    invention obvious, you must find that the prior art provided

5    a reasonable expectation of success.  Obvious is to try --

6    to try is not sufficient in unpredictable technologies.

7        In determining whether the claimed invention was

8    obvious, consider each claim separately.  Do not use

9    hindsight, i.e., consider only what was known at the time of

10   the invention.  In making these assessments, you should take

11   into account any objective evidence, sometimes called

12   secondary considerations, that may have existed at the time

13   of the invention and afterwards that may shed light on the

14   obviousness or not of the claimed invention regarding:

15       Whether the products covered by the claim were

16   commercially successful due to the merits of the claimed

17   invention, rather than due to advertising, promotion,

18   salesmanship or features of the product other than those

19   found in the claim;

20       Whether there was a long-felt need for a solution

21   for the problem facing the inventors which was satisfied by

22   the claimed invention;

23       Whether others tried but failed to solve the problem

24   solved by the claimed invention;

25       Whether others copied the claimed invention;

1    Whether the claimed invention achieved unexpectedly

2  superior results over the closest prior art;

3    Whether others in the field praised the claimed

4  invention or expressed surprise at the making of the claimed

5  invention;

6    And whether others accepted licenses under the asserted

7  patents because of the merits of the claimed invention.

8    Now, for example, if products incorporating the

9  invention were commercially successful as a result of the

10  claimed invention, then that may suggest that the invention

11  was not obvious.  If you find that the claimed invention

12  satisfied a long-felt but previously unsolved need, you may

13  also suggest that the invention was non-obvious.

14    On the other hand, if you find that someone else came

15  up with the claimed invention before or around the same time

16  the inventor thought of it, this may suggest the claimed

17  invention was obvious.

18    Finally, acceptance of the claimed invention by others

19  shown by licensing of the claimed invention may also show

20  that the claimed invention was not obvious.  In this

21  consideration, you should give less weight to -- in this

22  consideration, you should give less weight to a license

23  entered into for the purpose of avoiding the cost of

24  litigation, all other things being equal.

25    Now, these factors are relevant only if there is a

1    connection or nexus between the factor and the invention

2    covered by the patent claims.  If you conclude that some of

3    the indicators have been established, those factors should

4    be considered along with all the other evidence in the case

5    to determine whether Samsung has proven that the claimed

6    invention would have been obvious.

7        Keep in mind that these factors relate to obviousness

8    only, not anticipation.  Samsung must prove obviousness by

9    clear and convincing evidence.

10       Now, if you find that Samsung infringed any valid

11   asserted claim of the asserted patents, you must consider

12   what amount of damages to award Imperium.  Imperium must

13   prove each of the elements of its damages, including the

14   amount of damages, by a preponderance of the evidence, which

15   means likely true than not.

16       If proven by Plaintiff, damages must be in an amount

17   adequate to compensate Imperium for the infringement.

18       The purpose of a damage award is to put Imperium in

19   about the same financial position it would have been if the

20   infringement had not happened, but the damage award cannot

21   be less than a reasonable royalty.

22       You may not add anything to the amount of damages to

23   punish an accused infringer or to set an example.  You may

24   not add anything to the amount of damages for interest.

25       The fact that I'm instructing you on damages does not

1  mean that the Court believes that one party or the other

2  should win its case.  My instructions about damages are for

3  your guidance only in the event you find in favor of

4  Imperium.

5      You will need to decide the issue of damages only if

6  you find that one or more of the asserted claims are both

7  not invalid and infringed.

8      Now, if you find that Samsung has infringed any of the

9  claims, Imperium can recover damages it proved by a

10  preponderance of the evidence for a period of no more than

11  six years before the filing date of the complaint.  The

12  complaint in this case was filed on June 9, 2014.  Thus, the

13  earliest damage period could begin is June 9, 2008.

14  However, damages may be limited to a narrower time frame.

15      Reasonable royalty.  A royalty is a payment made to a

16  patent holder in exchange for the right to make, use or sell

17  the claimed invention.  A reasonable royalty is the amount

18  of royalty payment that a patent holder and the infringer

19  would have agreed to in a hypothetical negotiation, taking

20  place at a time prior to when the infringement first began.

21      In considering this hypothetical negotiation, you

22  should focus on what the expectations of the patent holder

23  and the infringer would have had -- would have been had they

24  entered into the agreement at that time and that they acted

25  reasonably in their negotiations.

1    In determining this, you must assume that both parties

2 believe that the patent was valid and infringed and that the

3 patent holder and the infringer were willing to enter into

4 an agreement.

5    The reasonable royalty you determine must be a royalty

6 that would have resulted from a hypothetical negotiation and

7 not simply a royalty either party would have preferred.

8    Evidence of these things that happened after the

9 infringement first began can be considered in evaluating the

10 reasonable royalty only to the extent that the evidence aids

11 in assessing what royalty would have resulted from a

12 hypothetical negotiation.

13    Although evidence of actual profits an alleged

14 infringer may have made may be used in determining the

15 anticipated profits at a time of the hypothetical

16 negotiation, the royalty may not be limited or increased

17 based on actual profits of the -- actual profits the alleged

18 infringer made.

19    Now, in determining the reasonable royalty, you should

20 consider all the facts known and available to the parties at

21 the time the infringement began.  Some of the kinds of

22 factors you may consider in making your determination are

23 the following:

24    (1)  The royalties received by the patentee for

25 licensing of the patents-in-suit proving or tending to prove

1  an established royalty;

2      (2)   The rates paid by the licensee for use of other

3  patents comparable to the other patents-in-suit;

4      (3)   The nature and scope of the license as exclusive

5  or non-exclusive or as restricted or non-restricted in terms

6  of territory or respect to whom the manufactured product

7  may be sold;

8      (4)   The licensor's established policy and marking

9  program to maintain his or her patent monopoly by not

10  licensing others to use the invention or by granting

11  licenses under special conditions designed to preserve that

12  monopoly;

13      (5)   The commercial relationship between the licensor

14  and the licensee, such as whether they are competitors in

15  the same territory in the same line of business, or whether

16  they are an inventor and promoter;

17      (6)   The effect of selling the patented specialty in

18  promoting sales of other products of the licensee -- the

19  licensee, the existing value of the invention to the

20  licensor as a generator of sales of his non-patented items

21  and the extent of such derivative or conveyed sales;

22      (7)   The duration of the patent and term of the

23  license;

24      (8)   The established profitability of the product made

25  under the patents, its commercial success and its current

1    popularity;

2        (9)   The utility and advantages of the patented

3    property over the old modes or devices, if any, that have

4    been used for working out similar results;

5        (10)   The nature of the patented invention, the

6    character of the commercial embodiment of it as owned and

7    produced by the licensor and the benefits to those who have

8    used the invention;

9        (11)   The extent to which the infringer made use of the

10    invention and any evidence probative of the value of that

11    use;

12        (12)   The portion of the profit or of the selling price

13    that may be customary in a particular business or in

14    comparable business to allow for the use of the invention or

15    the analogous inventions;

16        (13)   The portion of the reasonable profits that should

17    be credited to the invention as distinguished from

18    non-patented elements, the manufacturing process, the

19    business risk or significant features or improvements added

20    by the infringer;

21        (14)   The opinion and testimony of qualified experts;

22        (15)   The amount that a licensor such as the patentee

23    and a licensee such as the infringer would have agreed upon

24    at the time the infringement began if both had been

25    reasonably and voluntarily trying to reach an agreement,

1  that is, the amount what a prudent licensee who desired as a

2  business proposition to obtain a license to manufacture and

3  sell the particular article embodying the patented invention

4  would have been willing to pay as a royalty, and yet be able

5  to make a reasonable profit, and what amount that would have

6  been acceptable by a prudent patentee who was willing to

7  grant a license.

8      Now, no one factor is dispositive and you should and

9  can consider the evidence that has been presented to you in

10 this case on each of these factors.

11     You may also consider any other factors which in your

12 mind would have increased or decreased the royalty the

13 infringer would have been willing to pay and the patent

14 holder would have been willing to accept acting as normal,

15 prudent business people.

16     The final factor establishes the framework which you

17 should use in determining a reasonable royalty, that is, the

18 payment that would have been resulted from a negotiation

19 between the patent holder and the infringer taking place at

20 the time to when the infringement began.

21     Now, it is your duty to deliberate and to consult with

22 one another in an effort to reach a verdict.  Each of you

23 must decide the case for yourself, but only after an

24 impartial consideration of the evidence with your fellow

25 jurors.

1    During your deliberations, do not hesitate to

2    re-examine your own opinions and change your mind if you're

3    convinced that you were wrong, but do not give up your own

4    honest beliefs because of what the other jurors -- because

5    other jurors think differently or just to finish the case.

6         Remember at all times, you are the judges of the facts.

7         You have been allowed to take notes during the trial.

8    Any notes that you took during the trial are only aids to

9    your memory.  If your memory differs from your notes, you

10   should rely on your memory and not your notes.  The notes

11   are not evidence.  If you did not take notes, rely on your

12   own independent recollection of the evidence and do not be

13   unduly influenced by the notes of other jurors.  Notes are

14   not entitled to any greater weight than the recollection or

15   impression of each juror about the testimony.

16        Now, when you go to the jury room to deliberate, you

17   may take with you a copy of the charge, the exhibits that I

18   have admitted into evidence and your notes.

19        The first thing you should do is select your jury

20   foreperson to guide you in your deliberations and to speak

21   for you here in the courtroom.

22        Again, your verdict must be unanimous.  After you have

23   reached a unanimous verdict, your jury foreperson must fill

24   out the answers to the written questions on the verdict form

25   and sign and date it.

115

1    After you have concluded your service and I have

2    discharged you as a jury, you are not required to talk to

3    anyone about this case.

4    If you need to communicate with me during your

5    deliberations, the jury foreperson should write the inquiry

6    and give it to the court security officer.  After consulting

7    with the attorneys, I will respond either in writing or by

8    meeting with you in the courtroom.

9    Keep in mind, however, that you must never disclose to

10   anyone, not even me, your numerical division on any

11   question.

12   Of course, I'll be sending you a copy -- you can take

13   your charge with you.  I'll be sending you a copy of the

14   verdict which goes through a series of questions and it

15   gives you instructions, and you should utilize the verdict

16   with the charge to figure out and answer those questions.

17   Now, also the last two pages are -- I'm not going to

18   read those for you, or the last I guess number of pages are

19   a glossary of the terms you've seen throughout the trial,

20   and those are basic definitions of those terms for the

21   assistance of you.

22   So when you go back to the jury room, the first thing

23   you're to do is deliberate and decide who your foreperson

24   is, and that would be your Juror Note No. 1 back to the

25   Court is who you selected as your foreperson.

1      After that you can begin your deliberations, and one

2   thing I'll tell you is that if at some point, just like all

3   my instructions during the trial, if one of you go to the

4   restroom, your deliberations should stop.  Deliberation

5   should only happen when all eight of you are present.  And

6   the same will be true if you decide -- and, of course, you

7   control your own time now.  So if you would like to go to

8   lunch when you go back to the jury room after you decide who

9   your foreperson is, you're welcome to go to lunch, if you so

10  desire, or you can stay and work.  Totally up to you.  You

11  control kind of the time here the rest of the day.

12      If you decide to leave for lunch, again, the same

13  instructions always apply.  You cannot discuss the case,

14  even if you all go together as a group.  All deliberations

15  will happen in the jury room on the third floor.

16      So at this time I thank you for being so attentive to

17  all the parties' arguments and to my instructions, which I

18  know took me awhile to read, and I will now send you back to

19  the jury room to begin your deliberations.  Thank you.

20             COURT SECURITY OFFICER:  All rise.

21                     (Jury out.)

22             THE COURT:  Please be seated.

23      Anything further from Imperium?

24             MR. FISCH:  Nothing from Plaintiff, Your Honor.

25             THE COURT:  Anything from defense?

1          MR. HARNETT:  Nothing from Samsung, Your Honor.

2          THE COURT:  I did want to go over one other item.

3    I'm handing you another copy.  I noticed during closing

4    arguments that the verdict -- some changes were made that

5    probably shouldn't have been made, so I want to go through on

6    the issue of the invalidity to make sure we've got these

7    correct now, because at the charge conference we made some

8    changes to certain claims which only went to obviousness and

9    didn't go to the issue of being anticipated, and I think the

10   change was made to every question, so I made -- I instructed

11   those changes to be made.  I'm looking at it for the first

12   time, so before I send the verdict form back, I want you to

13   look at this to make sure we're all on the same page.  It only

14   pertains really to those questions on invalidity.

15       Let me ask you this.  Claim 5 of the '884 patent,

16   should that just be as to obviousness, or is that to both?

17          MR. PEPE:  Claim 7, Your Honor?

18          THE COURT:  No, Claim 5 of the '884 patent, Question

19   Eight, is that both or just obviousness?

20          MR. HARNETT:  Where is the demonstrative I showed

21   that has that breakdown?

22          THE COURT:  I just want to check, because that's one

23   I think y'all mentioned Saturday but I wanted to -- if you want

24   to just get together and go through it together.

25          MR. SIGLER:  I want to see the same chart.

1          THE COURT:  Please, go ahead.

2                    (Pause in proceedings.)

3          MR. HARNETT:  Here we go.  Hashimoto anticipates

4    Claims 1, 5 and 14.  Renders Claim 6 --

5          THE COURT:  Wait one second.  Let's go through this.

6    So Claim 1, 5 and 14, and then Claim 6 should just be

7    obviousness?

8          MR. PEPE:  Claim 6 is obvious.

9          THE COURT:  Okay.  And Claim 17 is both?

10          MR. POST:  Yes.

11          MR. PEPE:  Claim 17 is both.

12          MR. SIGLER:  Your Honor, the form appears correct to

13    us.

14          THE COURT:  Okay.  On the new one we just handed out,

15    just check that.  I believe they're correct now.

16          MR. PEPE:  So Question Seven should just be

17    anticipation.

18          THE COURT:  Question Seven should just be --

19          MR. PEPE:  Anticipation.

20          THE COURT:  Okay.  So Question Seven will read:  Has

21    Samsung proven by clear and convincing evidence that Claim 1 of

22    the '884 patent is valid as anticipated?  Is that --

23          MR. PEPE:  We're just confirming the others, Your

24    Honor.

25          THE COURT:  I'm making sure.  I just changed that so

1    you understand.

2              MR. PEPE:  Yes.

3              MR. SIGLER:  Yes, Your Honor.

4              MR. PEPE:  That's the only change, Your Honor.

5              THE COURT:  Very good.  I'll have it reprinted out

6    and then you can see that we made the change before I send it

7    up to the jury.

8              MR. PEPE:  Thank you.

9              MR. SIGLER:  Thank you, Your Honor.

10             THE COURT:  Nothing else, then we'll wait on the

11   jury's verdict.

12        Let me just ask where people -- I'll let you know if

13   the jury takes a lunch break.  Again, I let them control

14   that.  If they do, I'll let you know.

15        Then where will people be at?  Are people staying close

16   to the courthouse or --

17             MR. SIEBMAN:  Your Honor, we will stay in the

18   courthouse until we get question one that identifies the

19   foreperson.

20             THE COURT:  Yes, I'll come let you know as soon as I

21   get that note.

22             MR. SIEBMAN:  And then after that, we'll be across

23   the street in my office.

24             THE COURT:  And, Mr. Fisch, where is your team

25   located?

1      MR. FISCH:  We're in the Chase Bank Building, Your

2  Honor.

3      THE COURT:  Okay.  So do we have a number so our

4  staff can get you once -- so they can call you?

5      MR. FISCH:  Yes, Your Honor.

6      THE COURT:  Very good.  We'll be in recess.

7           (Recess.)

8      COURT SECURITY OFFICER:  All rise.

9      THE COURT:  Of course, I already told you about Juror

10  Note No. 1.  That was that the foreperson was Juror No. 3.

11  Then Juror Note No. 1 -- really it's Juror Note No. 2.  It says

12  on page 11 of the jury instructions, the second table is

13  labeled the '290 patent, Claims 1, 6 and 7.  We believe this

14  should be the '029 patent as shown in the juror notebook.

15  Please clarify.

16     I'm just going to say yes, you're correct.

17     MR. HARNETT:  They're smarter than we are.

18     THE COURT:  There's a lot that --

19     MR. FISCH:  I mentioned this in opening, Your Honor,

20  that everyone makes this mistake once.

21     THE COURT:  So we'll just say yes, you're correct,

22  and I'll print it out and send it to them.

23     MR. JENNER:  Okay.

24     MR. HARNETT:  Thank you.

25     MR. FISCH:  Thank you, sir.

1               (Recess.)

2          THE COURT:  Please be seated.

3      I have Juror Note No. -- they still call it No. 1 but

4  it's really note three, that they have reached a verdict,

5  and so I will bring the jury in.

6      When I publish the verdict, after I do that, I will

7  poll each juror to see if that's their verdict and make sure

8  it's unanimous.

9      Then afterwards, when we're finished, I'll go up and

10  talk to the jury afterwards and I encourage the lawyers to

11  stay, because if you would like to speak to the jury, I

12  encourage them to come speak to y'all.

13      Okay.  Anything else before I bring the jury in?

14          MR. FISCH:  Nothing from Imperium, Your Honor.

15          MR. HARNETT:  Nothing from Samsung.

16          THE COURT:  The only other issue, depending on the

17  verdict, assuming the Plaintiffs -- if Plaintiffs win, then

18  I will enter a briefing schedule on the issue of resolving the

19  license issue so we can get that resolved.  I believe that was

20  the only other outstanding issue.  Well, I guess there may be

21  an issue for willfulness if they make that finding on the part

22  I have to decide.

23      Anything else you can think of, loose ends?

24          MR. HARNETT:  No, Your Honor.

25          MR. FISCH:  That's fine, Your Honor.  Thank you.

1          THE COURT:  Okay.  Go ahead and bring the jury in

2   then.

3          COURT SECURITY OFFICER:  All rise for the jury.

4                    (Jury in.)

5          THE COURT:  Everyone can be seated except Juror No.

6   3.

7       Juror No. 3, it's my understanding you have reached a

8   verdict.

9          JUROR NO. 3:  Yes, Your Honor, we have.

10          THE COURT:  And -- keep it folded.  And then is it a

11   unanimous verdict?

12          JUROR NO. 3:  Yes, sir.

13          THE COURT:  If you'll fold it and hand it to the

14   court security officer.

15       You may be seated, sir.  Thank you.

16       Okay.  Ladies and gentlemen, I'm going to go ahead and

17   publish your verdict.  When I'm finished publishing your

18   verdict, I'll ask each of you to stand and tell me if this

19   is your verdict.

20       In the Case No. 4:14CV371, Imperium Holdings versus

21   Samsung Electronics Company, Limited, et al, verdict of the

22   jury:

23       Question One:  Has Imperium proven by a preponderance

24   of the evidence that Samsung infringes Claim 1 of the '884

25   patent?  Yes.

1    Question Two:  Has Imperium proven by a preponderance

2 of the evidence that Samsung infringes Claim 5 of the '884

3 patent?  Answer:  Yes.

4    Question Three:  Has Imperium proven by a preponderance

5 of the evidence that Samsung infringes Claim six of the '884

6 patent?  Answer:  No.

7    Question Four:  Has Imperium proven by a preponderance

8 of the evidence that Samsung infringes Claim 14 of the '884

9 patent?  Answer:  Yes.

10    Claim Five:  Has Imperium proven by a preponderance of

11 the evidence that Samsung infringes Claim 17 of the '884

12 patent?  Answer:  Yes.

13    Question Six:  Has Imperium proven by clear and

14 convincing evidence that Samsung willfully infringed a claim

15 of the '884 patent?  Answer:  Yes.

16    Question Seven:  Has Samsung proven by clear and

17 convincing evidence that Claim 1 of the '884 is invalid as

18 anticipated?  Answer:  No.

19    Question Eight:  Has Samsung proven by clear and

20 convincing evidence that Claim 5 of the '884 patent is

21 invalid, either anticipated or obvious?  Answer:  No.

22    Question Nine:  Has Samsung proven by clear and

23 convincing evidence that Claim 6 of the '884 patent is

24 invalid as obvious?  Answer:  No.

25    Question Ten:  Has Samsung proven by clear and

1  convincing evidence that Claim 14 of the '884 patent is
2  invalid, either anticipated or obvious?  Answer:  No.
3      Question Eleven:  Has Samsung proven by clear and
4  convincing evidence that Claim 17 of the '884 patent is
5  invalid, either anticipated or obvious?  Answer:  No.
6      Question Twelve:  If, and only if, you determined that
7  at least one of the asserted claims of the '884 patent was
8  proven -- both proven to be infringed and was not proven to
9  be invalid, what sum of money do you find from a
10  preponderance of the evidence would fairly and reasonably
11  compensate Imperium for Samsung's infringement of the '884
12  patent?  Answer:  $4,840,772.  So that would be 4840772.
13      Question Thirteen:  Has Imperium proven by a
14  preponderance of the evidence Samsung infringes Claim 10 of
15  the '290 patent?  Answer:  Yes.
16      Question Fourteen:  Has Imperium proven by clear and
17  convincing evidence that Samsung willfully infringed a claim
18  of the '290 patent?  Answer:  Yes.
19      Claim Fifteen:  Has Samsung proven by clear and
20  convincing evidence that Claim 10 of the '290 patent is
21  invalid as obvious?  Answer:  Yes.
22      Question Sixteen, they answered zero.
23      Question Seventen:  Has Imperium proven by a
24  preponderance of the evidence that Samsung infringes Claim 1
25  of the '029 patent?  Answer:  Yes.

1    Question Eighteen:  Has Imperium proven by a

2    preponderance of the evidence that Samsung infringes Claim 6

3    of the '029 patent?  Answer:  Yes.

4    Question Nineteen:  Has Imperium proven by a

5    preponderance of the evidence that Samsung infringes Claim 7

6    of the '029 patent?  Answer:  Yes.

7    Question Twenty:  Has Imperium proven by clear and

8    convincing evidence that Samsung willfully infringed a claim

9    of the '029 patent?  Answer:  Yes.

10    Question Twenty-One:  Has Samsung proven by clear and

11    convincing evidence that Claim 1 of the '029 patent is

12    invalid as obvious?  Answer:  No.

13    Question Twenty-Two:  Has Samsung proven by clear and

14    convincing evidence that Claim 6 of the '029 patent is

15    invalid as obvious?  Answer:  No.

16    Question Twenty-Three:  Has Samsung proven by clear and

17    convincing evidence that Claim 7 of the '029 patent is

18    invalid as obvious?  Answer:  No.

19    Question Twenty-Four:  If, and only if, you determined

20    that at least one of the asserted claims in the '029 patent

21    was both proven to be infringed and was not proven to be

22    invalid, what sum of money do you find from a preponderance

23    of the evidence would fairly and reasonably compensate

24    Imperium for Samsung's infringement of the '029 patent?

25    Answer:  $2,129,608.50.

126

1          So Juror No. 1, is that your verdict?

2                  JUROR NO. 1:  Yes, it is.

3                  THE COURT:  Thank you.  Juror No. 2, is that your

4     verdict?

5                  JUROR NO. 2:  Yes, it is.

6                  THE COURT:  Juror No. 3, is that your verdict?

7                  JUROR NO. 3:  Yes, it is.

8                  THE COURT:  Juror No. 4, is that your verdict?

9                  JUROR NO. 4:  Yes, it is.

10                 THE COURT:  Juror No. 5, is that your verdict?

11                 JUROR NO. 5:  Yes, it is.

12                 THE COURT:  Juror No. 6?

13                 JUROR NO. 6:  Yes, it is.

14                 THE COURT:  Juror No. 7, is that your verdict?

15                 JUROR NO. 7:  Yes, it is.

16                 THE COURT:  Juror No. 8, is that your verdict?

17                 JUROR NO. 8:  Yes, it is.

18                 THE COURT:  Thank you.

19         Well, ladies and gentlemen, thank you so much for your

20    service, service to the United States as a juror in this

21    case.  Again, our system of justice as we know it and

22    operate it couldn't function without men and women willing

23    to serve as arbiters in these kind of cases and serve as

24    jurors in our cases, so I want to thank you very much for

25    your service.  I know the parties appreciate it, the Court

1    appreciates it and I want to thank you on behalf of the

2    United States for your service.

3        At this time I'm going to send you back to the jury

4    room.  I'm going to come up and just talk to you for a few

5    minutes and see if you have any questions before I discharge

6    you for the day.  Again, I'll be up there in a few minutes,

7    but I want to again thank you and now you are discharged

8    back to the jury room.  Thank you.

9              COURT SECURITY OFFICER:  All rise.

10                  (Jury out.)

11             THE COURT:  I'll go ahead and file the verdict and

12   make it part of the record.

13       Anything further from the Plaintiff?

14             MR. FISCH:  Nothing from Imperium, Your Honor.

15             THE COURT:  Anything further from the defense?

16             MR. HARNETT:  I don't think so, Your Honor.

17             THE COURT:  Okay.  Very good.  If you'll hang around,

18   I'll certainly go and see if -- after I speak to them for a few

19   minutes, if they want to talk to you.

20       We'll be in recess.  Thank you.

21

22

23   I certify that the foregoing is a correct transcript from

24   the record of proceedings in the above-entitled matter.

25

128

1  _____          _____
   Jan Mason                          Date
2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25